UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOSEPH E. ZAVATSKY,         ) | |
|                       ) | |
|      Plaintiff            ) | |
|                       ) | |
| vs.                      ) | CIVIL ACTION NO. |
|                       ) | |
| JOHN O'BRIEN, ELIZABETH TAVARES, ) | |
| EDWARD DALTON, PAUL LUCCI,     ) | |
| and ROBERT MULLIGAN,         ) | |
| in his Individual Capacity         ) | |
|                       ) | |
|      Defendants.         ) | |

**PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL**

**JURISDICTION AND VENUE**

Jurisdiction is proper under 28 U.S.C. §1331, §1343 and §1367 and venue is proper under

28 U.S. C. 1391(b) because the defendants were employed in Massachusetts and transacted

business in Massachusetts.

**PARTIES AND FACTS**

1.     Plaintiff, Joseph E. Zavatsky ("Zavatsky"), is a resident of Barnstable County,

Massachusetts.  Zavatsky is employed as a Probation Officer for the Probation Department of the

Commonwealth of Massachusetts.

2.      Defendant, John O'Brien ("O'Brien"), is a Massachusetts resident who, upon

information and belief, resides in Quincy, Norfolk County, Massachusetts.  O'Brien is the former

Commissioner of Probation for the Commonwealth of Massachusetts.  Upon information and

belief, O'Brien was the Commissioner of Probation for the period including 1998 to in or around

December 2010.  At all material times, hereto, O'Brien was acting under color of law.  O'Brien is

being named in this Complaint in his individual capacity.

3.      Defendant, Elizabeth Tavares ("Tavares"), is a resident of the Commonwealth of Massachusetts and is a former employee of the Office of the Commissioner of Probation for the Commonwealth of Massachusetts.  During all material times hereto, Tavares was employed as either the Second Deputy Commissioner or the First Deputy Commissioner of Probation and was acting under color of state law.  Tavares is being named in this Complaint in her individual capacity.

4.      Defendant, Edward Dalton ("Dalton"), is a resident of the Commonwealth of Massachusetts and is a former employee of the Office of the Commissioner of Probation for the Commonwealth of Massachusetts.  During all material times hereto, Dalton was employed as a Supervisor of Probation Services for the Office of the Commissioner of Probation and was acting under color of state law.  Dalton retired on or around August 13, 2010.  Dalton is being named in this Complaint in his individual capacity.

5.      Defendant, Paul Lucci ("Lucci"), is a resident of the Commonwealth of Massachusetts and is a current employee of the Office of the Commissioner of Probation for the Commonwealth of Massachusetts.  During all material times hereto, Lucci was employed as a Deputy Commissioner of Probation and acting under color of state law.  Lucci is being named in this Complaint in his individual capacity.

6.      Defendant, Robert Mulligan ("Justice Mulligan"), is a resident of the Commonwealth of Massachusetts and since 2003 Justice Mulligan has been the Chief Justice for Administration and Management of the Trial Court for the Commonwealth of Massachusetts.  At all material times hereto, Judge Mulligan was acting under color of state law.  Justice Mulligan is being named in his individual capacity.

7.      The Office of the Commissioner of Probation is a department or division of the Massachusetts Trial Court, which administers and oversees probations services delivered across the Commonwealth of Massachusetts.

8.      The Chief Justice for Administration and Management of the Trial Court ("CJAM") oversees the Trial Court, which includes the Office of the Commissioner of Probation.

9.      Justice Mulligan was appointed to the position of CJAM in or around 2003.  In 2001, Justice Mulligan's predecessor published the *Personnel Policies and Procedures Manual* pursuant to G.L.c. 231 §8, which established standards for the hiring and promotion of trial court employees, including probation officers.  Since its publication in 2001, the *Personnel Policies and Procedures* have governed the hiring and promotion process for trial court employees, including probation officers.

10.      Since his appointment to CJAM in 2003, Justice Mulligan has been responsible for ensuring that the hiring and promotions of trial court employees, including probations officers is in accordance with the *Personnel Policies and Procedures Manual*.

11.      According to Section 1 of the *Personnel Policies and Procedures Manual* "the purpose of the Manual is to provide fair and equitable treatment for all employees and applicants for employment in the Trial Court."

12.      According to Section 4 of the *Personnel Policies and Procedures Manual*, "the objective of the hiring [and promotional] process is to select the most qualified individuals who can carry out their responsibilities in a competent and professional manner."

13.      According to Section 4.302(C) of the *Personnel Policies and Procedures Manual*, interviews of applicants for positions and promotions "must be objectively tailored to measure the applicant's knowledge, skill and abilities for the position under consideration."

14.     According to Section 4.302(D) of the *Personnel Policies and Procedures Manual*, individuals assigned to interview probation officers for promotions to Assistant Chief Probation Officer and other positions were to be "well-informed of the major responsibilities and requirements of the position to be filled and should not compromise the fairness of the selection process."

15.     According to Section 4.302(E) of the *Personnel Policies and Procedures Manual*, an interview committee consisting of the Commissioner of Probation (or his designee), the Chief Probation Officer of the Division and a representative of the Chief Justice of the Department was required to interview applicants for positions and promotions "consistent with the guidelines set forth in [Section 4]."

16.     According to Section 4.304 of the *Personnel Policies and Procedures Manual*, it was "the policy of the Trial Court that all appointments [including promotions] be made solely on the basis of merit."

17.     According to Section 4.400 of the *Personnel Policies and Procedures Manual*, "the [CJAM] must certify compliance with the personnel standards of [Section 4]".

18.     According to Section 6.303 of the *Personnel Policies and Procedures Manual*, Sections 4.100(C) and (D), and Sections 4.301, 4.302, 4.303, 4.304, 4.400 and 4.500 "must be adhered to in the appointment process" related to promotions.

19.     By the time the *Personnel Policies and Procedures Manual* was promulgated and published in 2001, O'Brien had been Commissioner of Probation for approximately three years. By 2001, O'Brien had begun to exert control over the appointment and promotion of probation officers to the courts of the Commonwealth, but O'Brien (and others in the Probation Department) were acting contrary to the *Personnel Policies and Procedures Manual* by, <u>inter</u>

alia, not basing promotions solely on merit and by considering an applicant's political associations and/or affiliations as a substantial factor in the promotional process.

20.     By 2005, Justice Mulligan had all but ceded control for the appointment and promotion of probation officers to O'Brien, which was contrary to Justice Mulligan's obligations set forth in G.L.c. 211B §§8-9 and even though Justice Mulligan knew or believed that O'Brien was not basing promotions on the basis of merit, but rather was considering unlawful factors such as an applicant's political association or affiliation.  In January and February 2005, Justice Mulligan was the CJAM, O'Brien was the Commissioner of Probation, Tavares was the Second Deputy Commissioner, Lucci was a Deputy Commissioner, and Dalton was the Supervisor of Probation Services for the region covering Barnstable County .

21.     By 2005, Justice Mulligan knew, or at the very least believed, that the hiring and promotion process for Probation Department employees was dishonest and that O'Brien, Tavares, Lucci, Dalton and other Probation Department employees were rigging this process for their own benefit, and for the benefit of those applicants who were politically affiliated with them or who were affiliated with politicians who supported the Probation Department and Trial Court and their corrupt and dishonest hiring and promotion practice, all to the detriment of qualified applicants, including Zavatsky.

22.     In spite of his knowledge and/or belief that the hiring and promotion process was fraudulent and politically influenced, Justice Mulligan failed to take any serious action to stop the rigged hiring and promotion process being implemented by O'Brien, Tavares, Lucci, Dalton and other Probation Department employees.  By his failure to act, Justice Mulligan approved, condoned or tacitly authorized this conduct, even though he knew that the conduct was unlawful and contrary to the policies and practices he was charged with enforcing.

23.     In January and February 2005, Zavatsky was a Probation Officer assigned to the Barnstable Division of the District Court Department of the Trial Court.  Zavatsky was first appointed to the position of Probation Officer in 1985 and by February 2005, Zavatsky had established a stellar record as a Probation Officer in the Barnstable District Court.  However, by 2005, Zavatsky had not developed a record of donating to political campaigns of state legislators, or being politically active or affiliated to curry favor of O'Brien and others in the Probation Department and the Trial Court.

24.     As of February 2005, Zavatsky was the Senior Probation Officer in charge of the entire Operating Under Influence case load at the Barnstable District Court.

25.     Zavatsky was awarded a Bachelor of Science degree in Education and a Minor Degree in English in 1972 and a Masters Degree in Education from Boston University in 1982.

26.     In or around 2000, Zavatsky applied for the position of Probation Officer-in-Charge of a Community Corrections Center, but was not selected for this position.

27.     Pursuant to the Collective Bargaining Agreement in effect at the time, Zavatsky grieved this decision of the Trial Court.

28.     Zavatsky's grievance was denied.

29.     Thereafter, in or around January 2005, Zavatsky observed a posting for the position of Assistant Chief Probation Officer for the Barnstable District Court.

30.     Zavatsky had a property interest in a fair, equitable and merit-based promotion process for the position of Assistant Chief Probation Officer for the Barnstable District Court. Zavatsky's property interest was defined in G.L.c 211B §§8-9 and in the *Personnel Policies and Procedures Manual* promulgated by the CJAM.

31.     Zavatsky completed an Application for Employment for the position of Assistant

Chief Probation Officer and submitted his application to the Trial Court on or around January 19,

2005.

32.     Pursuant to Sections 6.103 and 4.302(E) of the *Personnel Policies and*

*Procedures Manual*, an interview committee consisting of a designee of the Commissioner of

Probation, the Chief Probation Officer of the Barnstable District Court and a representative of

the Chief Justice of the Barnstable District Court was established to interview Zavatsky in

February 2005.  The Commissioner of Probation's designee to this interview committee was the

defendant, Dalton.  Joining Dalton on this interview committee was the Chief Probation Officer

for the Barnstable District Court, David A. Parke and the First Justice of the Barnstable District

Court, Joseph Reardon.

33.     Approximately 12 applicants, including Zavatsky and an individual named Elzy

Tubbs, a Probation Officer -in -Charge assigned to the Trial Court's Community Corrections

Center in Hyannis, Massachusetts, were scheduled to be interviewed on February 2, 2005 during

the first phase of the promotion process for the position of Assistant Chief Probation Officer for

the Barnstable District Court.  Upon information and belief, Elzy Tubbs was affiliated with

political leaders and legislators in southeastern Massachusetts who were close to O'Brien and

others in the Probation Department and Trial Court and who supported the manner in which

promotions were being conducted in the Probation Department.

34.     According to Section 4.302 of the *Personnel Policies and Procedures Manual*, a

list not to exceed 8 names of applicants/candidates from the initial interview pool was to be

advanced to a second round of interviews.  According to Section 4.304, all appointments

(including promotions) to the position of Assistant Chief Probation Officer were "to be made solely on the basis of merit."

35.     Zavatsky and ten other applicants were interviewed by the Reardon-Dalton-Parke interview committee on February 2, 2005 at their scheduled interview times.

36.     However, Tubbs failed to attend his interview with the Reardon-Dalton-Parke interview committee at his scheduled time.

37.     Tubbs was the only applicant to fail to appear for his scheduled interview.

38.     Dalton called Tubbs on at least three (3) occasions on February 2 in an attempt to locate Tubbs so that Tubbs could be interviewed for the position before the interviews were closed.  Tubbs failed to respond to these telephone calls.

39.     The last interview occurred at approximately 1pm on February 2, 2005.  Members of the Reardon-Dalton-Parke interview committee again tried to contact Tubbs after this last interview concluded so that Tubbs could be interviewed before the interviews were closed, but were unsuccessful.

40.     It was not until the conclusion of all of the interviews on February 2 and after numerous unsuccessful attempts to contact Tubbs that the Reardon-Dalton-Parke interview committee commenced deliberations to select 8 applicants to advance to the second round of the interview process.

41.     At approximately 1:30 p.m. on February 2, 2005 the Reardon-Dalton-Parke interview committee voted to advance Zavatsky to the second round along with seven other applicants.  However, not all three members of this interview committee recommended advancing Zavatsky to the second round.  While Judge Reardon and Chief Probation Officer

Parke recommended that Zavatsky be advanced to the second round, O'Brien's designee, Dalton, did not recommend Zavatsky for inclusion in the top 8 of the interviewed candidates.

42.     Dalton's role as a member of the interview committee had been compromised by O'Brien and Tavares and, as a result, Dalton impermissibly ignored Zavatsky's qualifications and the merits of Zavatsky's application in an effort to subvert the promotional process against Zavatsky.

43.     Dalton had been intimidated, threatened and/or coerced by O'Brien, Tavares, and other Probation Department employees to deny Zavatsky a fair and merit-based promotional process.

44.     Dalton had been intimidated, threatened and/or coerced by O'Brien, Tavares, and other Probation Department employees to poorly grade and evaluate Zavatsky's performance during his interview regardless of Zavatsky's qualifications.

45.     O'Brien, Tavares, and other Probation Department employees threatened, intimidated and/or coerced Dalton to poorly grade and evaluate Zavatsky's performance so that Zavatsky would not be advanced to the second round of interviews.

46.     In response to the threats, intimidation and/or coercion conveyed by O'Brien, Tavares, and others, Dalton gave Zavatsky poor grades and criticized Zavatsky's performance during the interview despite Zavatsky's stellar record, credentials and positive performance.

47.     In spite of Dalton's efforts to subvert the interview process against Zavatsky, the Reardon-Dalton-Parke interview committee voted to advance 8 applicants, including Zavatsky, to the second round.

48.     After the interview committee vote had been certified to advance 8 applicants to the second round, Tubbs appeared at the courthouse claiming that his interview was scheduled for sometime at or around 2:00 p.m.

49.     Initially, Dalton and Parke agreed to interview Tubbs, but Judge Reardon refused.

50.     However, Judge Reardon was pressured, coerced and/or intimidated by O'Brien, Tavares, Dalton, Justice Mulligan and others to interview Tubbs, in spite of the fact that the interview committee had concluded its interviews and had voted to select 8 applicants to be advanced to the second round.

51.     Upon information and belief, Tubbs was associated and/or affiliated with politicians, including state legislators, in southeastern Massachusetts at all material times hereto including 2005.   Upon information and belief, these political figures were close to O'Brien and others within the Probation Department and Trial Court and supported the manner in which promotions were being conducted in the Probation Department.   As a result, Tubbs was the preferred candidate of O'Brien, Tavares, Dalton, Justice Mulligan and other Trial Court Department employees for the position of Assistant Chief Probation Officer of the Barnstable District Court.

52.     Zavatsky had no such political associations and/or affiliations before, in, or subsequent to 2005.

53.     Judge Reardon relented to the imposed pressure, coercion and/or intimidation and agreed to interview Tubbs so long as he received a formal request and/or directive from Justice Mulligan, O'Brien or the Chief Justice of the District Court to conduct this interview.

54.     Judge Reardon notified Tavares (and through Tavares, O'Brien), and Justice Mulligan (through an individual named Philip McCue) that he was prepared to interview Tubbs

on February 3, 2005 at 9a.m. (which was the very next morning), with Dalton and Parke and, upon information and belief, had coordinated with Dalton and Parke to conduct this interview.

55.     In spite of Judge Reardon's willingness to interview Tubbs on February 3, O'Brien, with the assistance of Tavares, Dalton, Justice Mulligan and others in the Probation Department and Trial Court Department, dissolved the Reardon-Dalton-Parke interview committee and declared its vote null and void.

56.     The Reardon-Dalton-Parke interview committee was dissolved because O'Brien, Tavares, Dalton, and others were concerned that Judge Reardon would not favorably view Tubbs' candidacy.

57.     O'Brien, Tavares and Dalton were also motivated to dissolve the Reardon-Dalton-Parke interview committee to void the vote that had been taken to advance Zavatsky to the second round of the interview process.

58.     O'Brien, Tavares, and Dalton had no authority to dissolve the Reardon-Dalton-Parke interview committee.

59.     Justice Mulligan knew or should have known that O'Brien, Tavares, and Dalton had no authority to dissolve the Reardon-Dalton-Parke committee, but failed to take any action to stop O'Brien, Tavares, and Dalton from dissolving the committee and subverting the promotional process, to the detriment of Zavatsky.

60.     Justice Mulligan knew or should have known that the dissolution of the Reardon-Dalton-Parke committee was being done for purely political reasons and to ensure that Tubbs, who was politically affiliated with legislators friendly to O'Brien, the Probation Department and the Trial Court, was appointed to the position of Assistant Chief and that other applicants who

did not possess the same political affiliations or associations, such as Zavatsky, were not appointed.

61.     Upon information and belief, not only did Justice Mulligan fail to take any action to stop the dissolution of the Reardon-Dalton-Parke committee, he actively encouraged the dissolution of this committee for political reasons to benefit Tubbs and to interfere with the candidacy of Zavatsky and other applicants who had no political affiliations or associations.

62.     Upon information and belief, Justice Mulligan encouraged O'Brien, Tavares and Dalton to dissolve the Reardon-Dalton-Parke interview committee.

63.     The Reardon-Dalton-Parke interview committee was dissolved to harm Zavatsky and to deny Zavatsky a fair and merit-based interview process, as set forth in the *Personnel Policies and Procedures Manual*.

64.     The Reardon-Dalton-Parke interview committee was dissolved to benefit a politically connected and/or politically affiliated candidate (Tubbs) and to harm non-politically connected and non-politically affiliated candidates, such as Zavatsky.

65.     The dissolution of the Reardon-Dalton-Parke interview committee and the voiding of its vote did not serve any legitimate or rational state interest.

66.     The dissolution of the Reardon-Dalton-Parke interview committee and the voiding of its vote were done in bad faith with the intention of injuring Zavatsky.

67.     The actions taken by O'Brien, Tavares, Dalton and others against Zavatsky were taken in bad faith and caused injury to Zavatsky.

68.     However, even in spite of Dalton's negative evaluation, Zavatsky should have been advanced to the second round of interviews in accordance with the *Personnel Policies and*

*Procedures Manual* because he was included on Judge Reardon's and Chief Probation Officer Parke's list of top 8 interviewees.

69.     Upon information and belief, Tubbs was the preferred candidate for the position of Assistant Chief because of his political connections and/or political affiliations.

70.     Zavatsky was not the preferred candidate because he was not politically connected or politically affiliated and because he had filed prior grievances against the Trial Court.

71.     At or around time that the Reardon-Dalton-Parke interview committee was dissolved, a decision was made by O'Brien with the assistance of Tavares, Lucci, Dalton, Justice Mulligan and others within the Trial Court Department to create a new interview committee to re-interview eleven applicants, and to interview Elzy Tubbs for the first time.  This second interview committee consisted of Regional Administrative Justice Rosemary Minehan, defendant and Deputy Commissioner of Probation, Paul Lucci, and defendant and Chief Probation Officer from Orleans District Court, John Chapman.

72.     The second interview committee was created to advance Tubbs because of his political connections and/or political affiliations and to deny Zavatsky access to the fair and merit-based promotional process set forth in the *Personnel Policies and Procedures Manual*.

73.     On or around February 9, 2005, the Minehan-Lucci-Chapman interview panel interviewed 11 candidates again (including Zavatsky), and Elzy Tubbs, for the first time.

74.     On or around February 9, 2005, the Minehan-Lucci-Chapman interview panel voted to send 8 names to the second round of interviews.

75.     Elzy Tubbs was advanced to the second round of interviews along with seven additional applicants.

76.     Zavatsky was not recommended by the Minehan-Lucci-Chapman interview panel to be advanced to the second round of interviews.

77.     Upon information and belief, Tubbs was advanced to the second round due to his political connections and /or political affiliations.

78.     Zavatsky did not advance to the second round due to his lack of political connections and/or political affiliations and because he had filed previous grievances against the Trial Court.

79.     Upon learning that his name was not selected by Minehan-Lucci-Chapman interview panel to advance to the second round, Zavatsky filed a grievance with the Trial Court alleging that the dissolution of the Reardon-Dalton-Parke interview committee was unfair and was violative of the Collective Bargaining Agreement entered into between his union and the Trial Court.

80.     Tavares and Lucci appeared at hearings related to Zavatsky's grievance proceedings and testified untruthfully regarding the promotion process for the position of Assistant Chief Probation Officer for the Barnstable District Court.

81.     During their testimony, Tavares, Lucci and others failed to acknowledge that the Reardon-Dalton-Parke interview Committee had been dissolved because of the political affiliations of Tubbs and with the intent to deny Zavatsky his property interest in a merit based promotion process.

82.     During their testimony, Tavares, Lucci and others failed to acknowledge that the Reardon-Dalton-Parke Committee was dissolved because Zavatsky had advanced to the second round and Tubbs had not.

83.     During their testimony, Tavares, Lucci and others failed to acknowledge that the Personnel Policies and Procedures Manual were not followed with respect to the selection of the Assistant Chie Probation Officer in Barnstable County District Court.

84.     Tavares, Lucci and others did not testify truthfully during the grievance proceedings and the arbitration.

85.     Zavatsky's grievance was denied initially by the Trial Court and ultimately by an arbitrator.

86.     In or around 2007, Zavatsky applied for another Assistant Chief Probation Officer position that had opened in Barnstable District Court.

87.     Zavatsky was again denied a fair and merit-based promotional process after he filed his application for this position.

88.     Upon information and belief, another candidate with no District Court or Superior Court experience was selected for the position of Assistant Chief Probation Officer.

89.     Upon information and belief, this candidate was associated or affiliated with political figures who were close to O'Brien and others in the Probation Department and Trial Court and who supported the Probation Department and Trial Court and their corrupt and dishonest hiring and promotion practices.

90.     Upon information and belief, the promotional process in or around 2007 for the Assistant Chief Probation Officer position was similarly rigged to advance a politically connected and/or politically affiliated candidate and to deny Zavatsky a fair and merit-based opportunity to apply for the posted position.

91.     Zavatsky was intimidated and/or coerced into foregoing his right to grieve result of the 2007 posting for the position of Assistant Chief Probation Officer as a result of his experience in 2005.

92.     In 2010, *The Boston Globe* published a series of articles questioning the hiring and promotion practices within the Probation Department.

93.     In May 2010, the Massachusetts Supreme Judicial Court appointed Attorney Paul F. Ware, Jr. as Independent Counsel "to conduct a prompt and thorough administrative inquiry into alleged improprieties with respect to the hiring and promotion of employees within the Probation Department..."

94.     On November 9, 2010, Attorney Ware delivered submitted a report entitled - "Report of the Independent Counsel" (hereinafter, "the Ware Report") to the Supreme Judicial Court.  As noted in the November 18, 2010 Statement of the Justices of the Supreme Judicial Court Relative to the Report of the Independent Counsel, the Ware Report "describes in careful detail a systematic abuse and corruption of the hiring and promotion processes of the Probation Department."

95.     During this period of systematic abuse and corruption, Justice Mulligan was the CJAM and had the authority to stop these abusive and corrupt practices.  Indeed, Justice Mulligan was required to stop these abusive and corrupt practices, which he knew, or at least believed, were occurring under his watch.

96.     On November 18, 2010, the Ware Report was released to the general public and was read by Zavatsky shortly thereafter.

97.     At pages 125-126 of the Ware Report, Zavatsky read that Dalton admitted to Attorney Ware - under oath- that Tavares (on behalf of O'Brien) had directed Dalton to include

Elzy Tubbs on the list of 8 to be advanced to the second round with respect to the February 2005 application for the Assistant Chief Position at Barnstable County District Court.

98.    Zavatsky also learned for the first time in November 2010 while reading the Ware Report that Tavares (at the direction of O'Brien) had directed Dalton to make sure that Zavatsky did not make it through to the second round of interviews.

**COUNT I**
**Due Process Violation**
**42 U.S.C. §§1983**
**vs. O'Brien, Tavares, Lucci and Dalton**

99.    Plaintiff, Joseph E. Zavatsky, restates and incorporates herein the allegations contained in paragraphs 1 through 98  as if fully set forth herein.

100.    Under <u>Perry v. Sindermann</u>, 408 U.S. 593 (1972), a "person's interest in a benefit is a 'property' interest for due process purposes if there are ... rules or mutually explicit understandings that support his claim of entitlement to the benefit ...."

101.    G.L.c. 211B  §8 and the *Personnel Policies and Procedures Manual* promulgated by the CJAM pursuant to G. L. c. 211 § 8 defined the policy and the procedure that was to be followed with respect to promotions within the Trial Court, including the Probation Department.

102.    According to Section 4.304 of the *Personnel Policies and Procedures Manual*, the promotion process for the January 2005 posting for the position of Assistant Chief Probation Officer in Barnstable County was "to be made solely on the basis of merit."

103.    As a result of G.L.c. 211B §8 and the *Personnel Policies and Procedures Manual* promulgated by the CJAM pursuant to G. L. c. 211 § 8, Zavatsky had a property interest in a fair and merit-based promotional process for the position of Assistant Chief Probation Officer when that position was posted.

104.    The promotion process for the position of Assistant Chief Probation Officer in Barnstable County in January and February 2005 was not performed in a fair and merit-based manner.

105.    The promotion process for the position of Assistant Chief Probation Officer in Barnstable County in January and February 2005 was rigged by O'Brien, Tavares, Lucci and Dalton  so that Zavatsky would be denied a fair and merit based process and accordingly Zavatsky was denied due process.

106.    The promotion process for the position of Assistant Chief Probation Officer in Barnstable County in January and February 2005 was not done in accordance with the *Personnel Policies and Procedures Manual* promulgated by the CJAM.

107.    Zavatsky was denied due process on account of the actions taken by O'Brien, Tavares, Lucci and Dalton.

108.    The unfair selective treatment by O'Brien, Tavares, Dalton, Lucci and other employees of the Trial Court Department and the Probation Department towards Zavatsky directly and proximately caused Zavatsky to suffer loss of income and benefits including loss of pension benefit, and to suffer great physical and mental pain and suffering, emotional distress and humiliation.

WHEREFORE, plaintiff, Joseph Zavatsky, demands judgment against defendants, John O'Brien, Elizabeth Tavares, Paul Lucci and Edward Dalton jointly and severally, for compensatory and punitive damages, plus his costs of this action, including reasonable attorneys fees pursuant to 42 U.S.C. §1988 and prejudgment interest.

**COUNT II**
**Equal Protection - Political Affiliation/ Political Non-Affiliation**
**42 U.S.C. §§1983**
**vs. O'Brien, Tavares, Lucci and Dalton**

109.     Plaintiff, Joseph E. Zavatsky, restates and incorporates herein the allegations contained in paragraphs 1 through 108  as if fully set forth herein.

110.     The Fourteenth Amendment to the United States Constitution provides that "no state ... shall deny any person within its jurisdiction the equal protection of the laws."

111.     Under Elrod v. Burns, 427 U.S. 347 (1976), political non-affiliation is a right protected under the First Amendment.

112.     As set forth in this Complaint, at all material times hereto, Zavatsky was not affiliated with any political leader or legislator, or political party.

113.     As set forth in this Complaint, contrary to the promulgated *Personnel Policies and Procedures Manual*, the promotional process implemented by O'Brien and others in the Probation Department and Trial Court (and at the very least tacitly approved by Justice Mulligan), considered an applicant's political associations and political affiliations in determining who the successful candidate would be to the detriment of Zavatsky.

114.     Upon information and belief, Tubbs was politically connected and/or politically affiliated with politicians and legislators who were close to O'Brien and the Probation Department and the Trial Court.

115.     Zavatsky suffered adverse employment actions because he was not politically connected and/or affiliated with politicians who were connected to O'Brien and others in the Probation Department and Trial Court.

116.     The unlawful promotional process practiced by the defendants violated Zavatsky's constitutional rights to be non-political and his right not to affiliate with any political party, individual or organization.

19

117.    The unlawful and discriminatory promotional process practiced by the defendants did not further any legitimate or compelling government interest and was not rationally related to any government interest.

118.    The unlawful and discriminatory promotional process implemented and carried out by O'Brien, Tavares, Dalton and Lucci and other employees of the Trial Court Department and the Probation Department directly and proximately caused Zavatsky to suffer loss of income and benefits including loss of pension benefit, and to suffer suffered great physical and mental pain and suffering, emotional distress and humiliation.

WHEREFORE, plaintiff, Joseph Zavatsky, demands judgment against defendants, John O'Brien, Elizabeth Tavares, Paul Lucci and Edward Dalton jointly and severally, for compensatory and punitive damages, plus his costs of this action, including reasonable attorneys fees pursuant to 42 U.S.C. §§1988 and prejudgment interest.

### COUNT III
### G.L. c. 12 § 11I
### vs. O'Brien, Tavares, Lucci and Dalton

119.    Plaintiff, Joseph E. Zavatsky, restates and incorporates herein the allegations contained in paragraphs 1 through 118, as if fully set forth herein.

120.    Rights of Zavatsky, which were secured by the Constitution or laws of the United States or the Commonwealth of Massachusetts, were interfered with by O'Brien, Tavares, Lucci and Dalton by threats, intimidation and/or coercion.

121.    Zavatsky's property interest in a fair and merit-based promotional process was interfered with by O'Brien, Tavares, Lucci and Dalton by threats, intimidation and/or coercion, which are set forth in this Complaint.

122.    Zavatsky's exercise and/or enjoyment of rights provided to him through G.L.c. 211B §§8 and 9 and the *Personnel Policies and Procedures Manual* promulgated pursuant to G.L.c. 211B §8 were interfered with by O'Brien, Tavares, Lucci and Dalton by threats, intimidation and/or coercion.

123.    The acts and omissions of O'Brien, Tavares, Lucci and Dalton directly and proximately caused Zavatsky's civil rights, as provided for in the Massachusetts Declaration of Rights and the Constitution and laws of the Commonwealth of Massachusetts, to be violated by threats, intimidation and /or coercion in violation of G.L.c 12 §11I.

124.    The aforesaid conduct of O'Brien, Tavares, Lucci and Dalton directly and proximately caused Zavatsky to suffer loss of income and benefits including loss of pension benefit, and to suffer great physical and mental pain and suffering, emotional distress and humiliation.

WHEREFORE, plaintiff, Joseph Zavatsky, demands judgment against defendants, John O'Brien, Elizabeth Tavares, Paul Lucci and Edward Dalton jointly and severally, for compensatory and punitive damages, plus his costs of this action, including reasonable attorneys fees and prejudgment interest.

## COUNT IV
### Due Process
### 42 U.S.C. §1983
### Justice Mulligan - Individual Capacity

125.    Plaintiff, Joseph E. Zavatsky, restates and incorporates herein the allegations contained in paragraphs 1 through 124, as if fully set forth herein.

126.    Justice Mulligan had a statutory duty to enforce the standards of appointment and promotion within the Trial Court, including the Probation Department.

127.    While under the supervision of Justice Mulligan, defendants, O'Brien, Tavares, Lucci and Dalton acted contrary to the standards of appointment and promotion promulgated by the CJAM, and accordingly violated Zavatsky's constitutional rights as set forth in this complaint.

128.    Justice Mulligan knew that O'Brien, Tavares, Lucci and Dalton were deliberately failing to follow the *Personnel Policies and Procedures Manual* regarding the hiring and promotion of probation officers, including Zavatsky, and that the failure to follow the promulgated policies was likely to lead to violations of civil and constitutional rights of unsuccessful candidates such as Zavatsky.

129.    In fact, Justice Mulligan admitted in the Ware Report that he believed that the promotion process was being rigged by O'Brien and Tavares and others, but he took no serious action to stop this rigged and fraudulent process.

130.    Based on his actual and/or constructive knowledge of the fraudulent hiring and promotion scheme orchestrated and carried out by O'Brien, Tavares, Lucci and Dalton and his failure to take any action to stop this scheme, Justice Mulligan encouraged, condoned, acquiesced and /or participated in the deprivations of Zavatsky's constitutional rights and his civil rights.   Upon information and belief, Justice Mulligan was an active participant in the dissolution of the Reardon-Dalton-Parke interview committee, which caused Zavatsky harm.

131.    Justice Mulligan acted with deliberate indifference to the rigged hiring and promotion scheme perpetuated by O'Brien, Tavares, Lucci and Dalton in contravention of his obligations as CJAM.

132.    The action and/or inaction of Justice Mulligan in response to his knowledge of the rigged hiring and promotion scheme orchestrated and perpetuated by O'Brien, Tavares, Lucci

and Dalton directly and proximately caused Zavatsky to suffer loss of income and benefits including loss of pension benefit, and to suffer great physical and mental pain and suffering, emotional distress and humiliation.

WHEREFORE, plaintiff, Joseph Zavatsky, demands judgment against Justice Mulligan for compensatory and punitive damages, plus his costs of this action, including reasonable attorneys fees pursuant to 42 U.S.C. §1988 and prejudgment interest.

### COUNT V
### Equal Protection
### 42 U.S.C. §1983
### Justice Mulligan - Individual Capacity

133.    Plaintiff, Joseph E. Zavatsky, restates and incorporates herein the allegations contained in paragraphs 1 through 132, as if fully set forth herein.

134.    Justice Mulligan's deliberate indifference and failure to take any action to stop the fraudulent and corrupt hiring and promotional practices occurring in the Probation Department was done knowingly, intentionally, willfully, and purposely.

135.    Further, upon information and belief, Justice Mulligan actively sought to dissolve the Reardon-Dalton-Park committee (or permitted this committee to be dissolved) because Tubbs was affiliated with, or was close to politicians who were allies of the Trial Court and/or Probation Department.

136.    The actions and inactions of Justice Mulligan and other employees of the Trial Court Department and the Probation Department towards Zavatsky directly and proximately caused Zavatsky to suffer loss of income and benefits including loss of pension benefit, and to suffer great physical and mental pain and suffering, emotional distress and humiliation.

WHEREFORE, plaintiff, Joseph Zavatsky, demands judgment against defendant, Robert

Mulligan, for compensatory and punitive damages, plus his costs of this action including reasonable attorneys fees pursuant to 42 U.S.C. §1988 and prejudgment interest.

**COUNT VI**
**G.L.c. 12 §11I**
**vs. Justice Mulligan - Individual Capacity**

137.    Plaintiff, Joseph E. Zavatsky, restates and incorporates herein the allegations contained in paragraphs 1 through 136, as if fully set forth herein.

138.    By permitting, condoning and acquiescing to the fraudulent and rigged promotional process being carried out by O'Brien and others in the Probation Department under his watch, Justice Mulligan interfered with Zavatsky's property interest in a fair and merit-based promotional process.

139.    Zavatsky's exercise and/or enjoyment of rights provided to him through G.L.c. 211B §§8 and 9 and the P*ersonnel Policies and Procedures Manual* promulgated pursuant to G.L.c. 211B §8 were interfered with by Justice Mulligan by threats, intimidation and/or coercion.

140.    The actions and/or inaction of Justice Mulligan directly and proximately caused Zavatsky's civil rights, as provided for in the Massachusetts Declaration of Rights and the Constitution and laws of the Commonwealth of Massachusetts, to be violated by threats, intimidation and /or coercion in violation of G.L.c 12 §11I.

141.    The aforesaid conduct of Justice Mulligan directly and proximately caused Zavatsky to suffer loss of income and benefits including loss of pension benefit, and to suffer great physical and mental pain and suffering, emotional distress and humiliation.

WHEREFORE, plaintiff, Joseph Zavatsky, demands judgment against defendant, Robert Mulligan, for compensatory and punitive damages, plus his costs of this action, including reasonable attorney's fees and prejudgment interest.

JOSEPH E. ZAVATSKY


By  /s/ Donald C. Keavany, Jr.
  Donald C. Keavany, Jr., BBO#631216
  David A. Wojcik, BBO#532040
  Christopher, Hays, Wojcik & Mavricos, LLP
  446 Main Street, 8th Floor
  Worcester, MA 01608
  508-792-2800
  dkeavany@chwmlaw.com
  dwojcik@chwmlaw.com