EXHIBIT A

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

**COMMONWEALTH OF MASSACHUSETTS**

**SUFFOLK, ss:** **SUPREME JUDICIAL COURT**

**IN THE MATTER OF THE PROBATION DEPARTMENT OF THE TRIAL COURT**

**SJC No. 0E-123**

# REPORT OF THE INDEPENDENT COUNSEL

## November 9, 2010

PAUL F. WARE, ESQ.
INDEPENDENT COUNSEL

GOODWIN PROCTER LLP
EXCHANGE PLACE
BOSTON, MA 02109
(617) 570-1000

CORRECTED COPY

## EXECUTIVE SUMMARY

**I. Introduction** ........ 1

**II. Conclusions** ........ 2

A. Discipline of Employees ........ 41
B. Corrective Action ........ 44
C. Policy Changes ........ 45
D. Referrals to Prosecutorial Authorities ........ 47

## BACKGROUND OF THE INVESTIGATION

**I. The *Boston Globe* Spotlight Story** ........ 49

**II. The Order Establishing this Investigation** ........ 50

**III. The Course of the Investigation** ........ 52

A. Overview ........ 52
B. Informal Interviews ........ 53
C. Sworn Testimony ........ 53
D. Documents Collected ........ 55

## BACKGROUND OF THE MASSACHUSETTS PROBATION DEPARTMENT

**I. History of the Department** ........ 57

**II. Composition and Responsibilities of the Department** ........ 57

**III. Leadership of the Department** ........ 59

A. Commissioner John O'Brien ........ 59
B. The Probation Department Hierarchy ........ 61

**IV. The Probation Department Budget** ........ 63

**V. Relationship between the Department and the Courts** ........ 64

## FINDINGS – HIRING AND PROMOTIONS

**I. Hiring and Promotion Authority in the Probation Department** ........ 65

A. Pre-2001 ........ 65
B. Post-2001 ........ 66

**II. Overview of the Hiring and Promotion Process Since 2001** ........ 67

A. Hiring Procedures Prior to 2001 ........ 68
B. The Hiring and Promotion Process Required by the Administrative Office of the Trial Court After 2001 ........ 70
C. Probation Officers ........ 72
D. Associate Probation Officers ........ 76
E. Assistant Chief Probation Officers ........ 78
F. Chief Probation Officers ........ 80
G. Community Corrections Centers ........ 82
1. Probation Officers in Charge ........ 82
2. Community Corrections Positions ........ 84

H. Hiring within Electronic Monitoring .......... 86
I. Other Hiring .......... 87
J. Hiring Freezes and Acting Positions .......... 88

**III. Manipulation of the Interview Process .......... 89**

A. Introduction .......... 89
B. O'Brien's Identification of Preferred Candidates .......... 91
C. O'Brien Was Communicating Instructions, Not "Recommendations" .......... 97
D. The Screening Panels .......... 100
E. The Local Interview Panels .......... 108
 1. Introduction .......... 108
 2. Interference Prior to 2001 .......... 109
 3. Testimony of Ellen Slaney .......... 111
 4. Testimony of Edward Dalton .......... 120
 5. Testimony of Francis Campbell .......... 126
 6. Testimony of Richard O'Neil .......... 129
 7. Testimony of Mark McHale .......... 131
 8. Testimony of Jeffrey Akers .......... 133
 9. Testimony of Brian Murphy .......... 135
 10. Testimony of Dianne Fasano .......... 138
 11. Testimony of Edward Rideout .......... 138
 12. Testimony of Francine Ryan .......... 139
 13. Testimony of Nicholas DeAngelis .......... 141
 14. Testimony of William Burke .......... 145
 15. Testimony of Stephen Bocko .......... 146
F. Associate Probation Officer Hiring .......... 147
G. Final Interview Panels (Other Than Chief Probation Officers) .......... 151
H. Final Interview Panels (Chief Probation Officers) .......... 155
I. Community Corrections Centers .......... 156
 1. Probation Officers In Charge .......... 156
 2. Community Corrections Positions .......... 158
J. Hiring Within ELMO .......... 160
K. Other Hiring .......... 162

**IV. Identification of Candidates Sponsored by Politicians .......... 165**

A. The Collection of Names from Politicians, Judges, and Others .......... 166
B. Sponsor Lists .......... 170
C. The Decision of which Candidates to Prefer .......... 173
D. Reasons For Accommodating Legislators .......... 177
E. Success of Sponsored Candidates .......... 181
F. Assurances Given to Politicians Concerning Candidates .......... 183
G. Hiring of Robert Ryan as a Chief Probation Officer .......... 186

**V. Allegations of "Pay for Play" .......... 190**

A. Statistical Evidence of Pay for Play .......... 190
B. Anecdotal Evidence of Pay for Play .......... 194
C. Allegations of Pay for Play in the *Globe* Spotlight Story .......... 199

1. The Promotion of Mark Prisco to Chief Probation Officer ........ 199
2. The Hiring of Arthur Sousa as a Probation Officer .................... 201

**VI. Retaliation Against Regional Supervisors** ..................................................204

A. Ellen Slaney ........................................................................................ 205
B. Edward Dalton ..................................................................................... 209
C. Other Interviewers .............................................................................. 211

**VII. Concealment of fraudulent Hiring During Grievance and arbitration Proceedings** ........................................................................................215

**VIII. Efforts by AOTC to Control the Hiring Process** ...............................................223

A. Chief Justice for Administration and Management Dortch-Okara ......... 223
B. Chief Justice for Administration and Management Mulligan................ 227

**IX. The Failure of Legal Counsel to the Department to Monitor and Ensure the Department's Legal Compliance** ...................................................................238

A. Former Deputy Commissioner Anthony Sicuso .................................. 240
B. Deputy Commissioner Christopher Bulger.......................................... 242

**X. Problems Arising from the Fraudulent Hiring and Promotion Process** ..................249

A. Unfairness to More Qualified Candidates............................................. 249
B. Unfairness to Politically-Connected Candidates .................................. 253
C. Hiring of Problematic Candidates........................................................ 255
1. Douglas MacLean ............................................................................. 255
2. Patrick Lawton .................................................................................. 262
3. James Rush......................................................................................... 265
D. Detrimental Effects on Morale............................................................. 268
E. Politicization of the Department .......................................................... 274
F. Potential Civil Liability......................................................................... 275

**FUNDRAISING WITHIN THE DEPARTMENT**

**I. Massachusetts Law Prohibits Fundraising by State Employees or on State Property** .........................................................................................................277

**II. Commissioner O'Brien and Others Violated Massachusetts Campaign Finance Laws Repeatedly** ..............................................................................279

**OTHER INCIDENTS**

**I. The Hiring of O'Brien's Wife and Daughter by the Department of the Treasury.** .........................................................................................................289

A. Laurie O'Brien ...................................................................................... 290
B. Kelly O'Brien........................................................................................ 296

II. The Disciplining of Ashley Losapio ..........................................................298

**FOLLOW-UP AND OUTSTANDING ITEMS**

**CONCLUSION**

## LIST OF TABLES AND APPENDICES

Table 1: Success Rate for Sponsored Candidates ..... 183

Table 2: Percentage of Sponsored Candidates Contributing ..... 191

Table 3: Percentage of Contributors Sponsored ..... 192

Table 4: Comparative Success Rate: Contributors vs. Non-Contributors ..... 194

Appendix 1: Independent Counsel Attorneys ..... A1

Appendix 2: Witnesses Who Appeared Informally ..... A2

Appendix 3: Witnesses Who Appeared in Response to Subpoenas ..... A4

Appendix 4: Additional Subpoenaed Witnesses ..... A9

Appendix 5: Unavailable Witnesses ..... A10

Appendix 6: Sources of Electronic Documents ..... A11

Appendix 7: Ten Most Frequent Sponsors ..... A14

Appendix 8: Twenty Most Frequent Recipients of Contributions ..... A15

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

## LIST OF EXHIBITS

**Exhibit No.**

### Legal Sources


Appointment of Paul Ware, Jr. as Independent Counsel, dated May 24, 2010 .......... 1

Statement of Chief Justice Margaret H. Marshall and Chief Justice for Administration & Management Robert A. Mulligan announcing Appointment of Paul Ware, Jr. as Independent Counsel and Investigation into Massachusetts Probation Department practices, dated May 24, 2010 .......... 2

Order regarding Document Preservation, dated May 27, 2010 .......... 3

Order regarding Goodwin Procter, dated July 1, 2010 .......... 4

Notice of Docket Entry regarding Presence of Counsel during testimony, dated August 16, 2010 .......... 5

Memorandum and Order denying Thomas M. Petrolati's Motion to Quash Subpoena, dated September 16, 2010 .......... 6

Arbitration Decision and Award regarding Grievance of Karen Jackson, AAA Case No. 11 390 0233 05, dated July 5, 2006 .......... 7

Arbitration Decision and Award regarding Grievance of Theresa Adamson, AAA Case No. 11 390 01344 06, dated July 23, 2007 .......... 8

Arbitration and Award regarding Grievance of Jason Harder, AAA Case No. 11 390 02259 06, dated May 7, 2008 .......... 9

M.G.L.A. Chapter 55, Section 13 .......... 10

M.G.L.A. Chapter 55, Section 14 .......... 11

M.G.L.A. Chapter 211B, Section 8 .......... 12

M.G.L.A. Chapter 276, Section 83 .......... 13

M.G.L.A. Chapter 276, Section 98 .......... 14

M.G.L.A. Chapter 276, Section 99 .......... 15

*United States v. Sorich,* 523 F.3d 702 (7th Cir. 2008) .......... 16




LIBA/21225629

**Exhibit No.**

**Documents Referenced**

Letter from Commissioner O'Brien to Paul F. Ware, Jr., dated May 28, 2010 .......... 17

Probation Department Budget Analysis .......... 18

"An agency where patronage is job one," The Boston Globe, dated May 23, 2010 .......... 19

"A bid to boost patronage in state court," The MetroWest Daily News, dated November 30, 2001 .......... 20

Commissioner Vacancy Announcement, dated 1984 .......... 21

Commissioner Vacancy Announcement, dated 1997 .......... 22

Trial Court Administrative Order No. 4 regarding Uniform Procedure for Assessing Needs of Probation Offices and Assisting Appointing Authorities in the Filling of the Position of Chief Probation Officers, dated March 1, 1989, with Appendix .......... 23

John J. O'Brien resume .......... 24

Personnel Policies and Procedures Manual, dated May 6, 2001 .......... 25

Memo from Elizabeth Tavares, Second Deputy Commissioner to The Interview Committee regarding Interview Process for Assistant Chief Probation Officer position (undated) .......... 26

Memo from Elizabeth Tavares, Second Deputy Commissioner to The Interview Committee regarding Interview Process for Probation Officer position .......... 27

Job Posting of the Massachusetts Trial Court for a Chief Probation Officer position (Salem District Court, dated March 1, 2005) .......... 28

Agreement between CJAM of the Trial Court of the Commonwealth of Massachusetts and the National Association of Government Employees Service Employees International Union Local 5000, effective July 1, 2004 (Union contract) .......... 29

Current Organizational Chart of the Office of the Commissioner of Probation .......... 30

Transcript of Voicemails received by Edward Dalton from Janet Mucci regarding Probation Department hiring practices, dated October 12, 2000-October 18, 2000 .......... 31

**Exhibit No.**

Sponsor Lists maintained by Maria Walsh, Edward Ryan and Michelle Cahill-Martino....32

Sample rejection letter ....33

Christine Hegarty's Notes regarding Karen Jackson hiring, undated....34

Letter from Chief Justice Robert A. Mulligan to Commissioner John J. O'Brien, dated October 25, 2004 (OCP-VO-0655) ....35

Letter from Chief Justice Robert A. Mulligan to Commissioner John J. O'Brien, dated November 22, 2004 (OCP-VO-0656-0657)....36

Letter from Chief Justice Robert A. Mulligan to Commissioner John J. O'Brien, dated November 30, 2004 (OCP-VO-0660-0661)....37

Letter from Chief Justice Robert A. Mulligan to Commissioner John J. O'Brien, dated December 28, 2004 (OCP-VO-0664-0665) ....38

Letter from Chief Justice Robert A. Mulligan to Commissioner John J. O'Brien, dated March 10, 2005 (OCP-VO-0677)....39

Letter from Chief Justice Robert A. Mulligan to Commissioner John J. O'Brien, dated March 22, 2005 (OCP-VO-0681)....40

Letter from Chief Justice Robert A. Mulligan to Commissioner John J. O'Brien, dated March 25, 2005 (OCP-VO-0692)....41

Letter from Chief Justice Robert A. Mulligan to Commissioner John J. O'Brien, dated March 29, 2005 (OCP-VO-0695)....42

Letter from Chief Justice Robert A. Mulligan to Commissioner John J. O'Brien, dated April 7, 2005 (OCP-VO-0701)....43

Letter from Commissioner John J. O'Brien to Chief Justice Mulligan, dated April 8, 2005 (OCP-VO-0702)....44

Letter from Commissioner John J. O'Brien to Chief Justice Mulligan, dated April 3, 2006 (OCP-VO-0732-0735) ....45

Letter from Chief Justice Robert A. Mulligan to Commissioner John J. O'Brien, dated April 6, 2006 (OCP-VO-0736-0737) ....46

Letter from Chief Justice Robert A. Mulligan to Commissioner John J. O'Brien, dated September 26, 2006 (OCP-VO-0760)....47

**Exhibit No.**

Letter from Commissioner John J. O'Brien to Chief Justice Mulligan, dated October 2, 2006 (approval request) (OCP-VO-0767-0768) ....48

Letter from Commissioner John J. O'Brien to Chief Justice Mulligan, dated October 2, 2006 (approval request) (OCP-VO-0763-0764) ....49

Memo from Patricia Walsh, Deputy Commissioner to Commissioner John J. O'Brien, dated October 2, 2006 (OCP-VO-0779-0781) ....50

Letter from Chief Justice Robert A. Mulligan to Commissioner John J. O'Brien, dated October 17, 2006 (OCP-VO-0782-783) ....51

Letter from Chief Justice Robert A. Mulligan to Commissioner John J. O'Brien, dated January 23, 2007 (OCP-VO-0835-0836) ....52

Letter from Commissioner John J. O'Brien to Chief Justice Mulligan, dated January 25, 2007 (OCP-VO-0837) ....53

Letter from Commissioner John J. O'Brien to Chief Justice Mulligan, dated May 23, 2007 (approval request) (OCP-VO-0856-0857) ....54

Letter from Chief Justice Robert A. Mulligan to Commissioner John J. O'Brien, dated January 24, 2008 (OCP-VO-0930) ....55

Letter from Chief Justice Robert A. Mulligan to Commissioner John J. O'Brien, dated March 6, 2008 (OCP-VO-0942-0943) ....56

Letter from Commissioner John J. O'Brien to Chief Justice Robert A. Mulligan, dated March 11, 2008 ....57

Letter from Chief Justice Robert A. Mulligan to Commissioner John J. O'Brien, dated March 14, 2008 ....58

Letters from Chief Justice Barbara A. Dortch-Okara to Commissioner John J. O'Brien and Chief Justice Samuel E. Zoll, dated January 10, 2001 ....59

Email and attachment from Jerry Berg to John Gay, Paul O'Donnell, Jill Ziter, Darryl Smith and Charles Brownlee, dated January 24, 2001 ....60

Facsimile from Jill Ziter to Jerry Berg enclosing memo regarding interview policy, dated January 30, 2001 ....61

Employment Application of Douglas L. MacLean, dated September 24, 2004 ....62

Portion of Douglas MacLean appointment packet ....63

**Exhibit No.**

Massachusetts Trial Court Formal Letter of Reprimand, dated March 7, 2006 .......... 64

Massachusetts Trial Court Formal Letter of Reprimand, dated October 9, 2007 .......... 65

Memo from Carl J. Cruz, Asst. Chief Probation Officer to James A. Casey, Chief Probation Officer regarding Douglas MacLean, Probation Officer, Incidents on December 31, 2007 and January 2, 2008, dated January 9, 2008 .......... 66

Letter from Chief Justice Robert A. Mulligan to Douglas MacLean approving request for Family Medical Leave, dated February 8, 2008, with attachment of Letter from Kim Albers of Hazelden Foundation re admission of Douglas MacLean for inpatient drug addiction treatment, dated February 6, 2008 .......... 67

Resignation Letter of Douglas MacLean, dated February 28, 2008 .......... 68

Memorandum from First Justice Gilbert J. Nadeau, Jr. to Chief Justice Lynda M. Connolly regarding ACPO Interview Process, dated March 10, 2005 .......... 69

Letter from Chief Justice Robert A. Mulligan to Commissioner John J. O'Brien regarding letter of complaint from the Honorable Gilbert J. Nadeau, Jr. concerning procedure for selection of final candidates for the position of Asst. Chief Probation Officer in Fall River District Court, dated March 25, 2005 .......... 70

Letter from Commissioner John J. O'Brien to Chief Justice Robert A. Mulligan regarding Complaint of Honorable Gilbert J. Nadeau, Jr. on the Selection of Finalists for the position of Asst. Chief Probation Officer of the Fall River Division, District Court Department, dated March 28, 2005 .......... 71

Letter from Chief Justice Robert A. Mulligan to Commissioner John J. O'Brien regarding Complaint Regarding Process for Selection of Assistant Chief Probation Officer, Fall River District Court, dated March 29, 2005 (OCP-VO-0695) .......... 72

Recommendation Letter from Representative David L. Flynn to the Office of the Commissioner of Probation for Patrick Lawton, undated .......... 73

Letter from the Office of the Commissioner Of Probation to Patrick O. Lawton regarding arrest and charging with conspiracy to violate drug law and possession of Class B, C. and E controlled substances and placement of Mr. Lawton on paid leave, dated May 14, 2010 .......... 74

Administrative Office of the Trial Court, Office of Affirmative Action, Investigation Report, #2006-AA-001, dated July 13, 2006 .......... 75

Testimony of Honorable Kathleen Elizabeth Coffey in the Matter of: Helen Brown and Crystal Yong vs. John J. O'Brien, et al., dated November 10, 2009 .......................76

Letter from Neil Morrison to Laurie O'Brien, dated September 8, 2005 .....................................77

Note re candidate Laurie O'Brien (undated) ....................................................................78

Kelly O'Brien Application for Employment .....................................................................79

Email from Michael Coughlin of the Massachusetts Lottery to Scott Campbell and Neil Morrison of the Treasurer's Office regarding position offered to Laurie O'Brien, dated July 1, 2005 .....................................................................................80

Email from Michael Coughlin of the Massachusetts Lottery to Scott Campbell and Neil Morrison of the State Treasurer's Office regarding offering position to Laurie O'Brien, dated July 13, 2005.............................................................................81

Email from Scott Campbell to Neil Morrison, et al., dated June 14, 2007.................................82

Email from Eileen Glovsky to Jennifer Kane, dated February 21, 2006.....................................83

Spreadsheet maintained by Eileen Glovsky.......................................................................84

Worcester Police Department Memorandum from Lt. Thomas J. Gaffney to Thomas Turco, dated April 4, 2008 (OCP-VO-0051-52)..........................................................85

Letter from Worcester Police Department Captain Edward McGinn, Jr. to Commissioner O'Brien, dated April 16, 2008 (OCP-VO-0047-50).............................................86

Letter from Christopher Bulger to Ashley Losapio, dated April 9, 2008 (OCP-VO-0040) .........................................................................................................87

Letter from Elizabeth Tavares to Ashley Losapio, dated April 16, 2008 (OCP-VO-0053) .........................................................................................................88

Letter from Nicola J. Pangonis, Deputy Legal Counsel to Ashley Losapio, dated April 25, 2008 (OCP-VO-0054) ....................................................................................89

Letter from Christopher Bulger to Michael Manning, dated May 27, 2008.................................90

**Excerpts from Transcripts of Sworn Testimony**

Template Warning given to Investigation witnesses ...........................................................91

Akers, Jeffrey, dated August 25, 2010.............................................................................92

**Exhibit No.**

Alicandro, John, dated October 1, 2010 .......... 93

Bocko, Stephen, dated September 13, 2010 .......... 94

Bulger, Christopher, dated October 13, 2010 .......... 95

Burke, William, dated July 22, 2010 .......... 96

Cahill Martino, Michelle, dated July 21, 2010 .......... 97

Campbell, Francis, dated August 10, 2010 .......... 98

Campbell, Scott, dated August 31, 2010 .......... 99

Casey, James, dated October 5, 2010 .......... 100

Coughlin, Michael, dated September 2, 2010 .......... 101

Cremens, John, dated August 6, 2010 .......... 102

Dalton, Edward, dated August 17, 2010 .......... 103

DeAngelis, Nicholas, dated August 24, 2010 .......... 104

DeLeo, Robert, dated November 1, 2010 .......... 105

Dooley, Joseph, dated September 17, 2010 .......... 106

Dortch-Okara, Barbara, dated October 13, 2010 .......... 107

Dow, Bernard, dated October 21, 2010 .......... 108

Fasano, Dianne, dated September 3, 2010 .......... 109

Glovsky, Eileen, dated October 18, 2010 .......... 110

Hegarty, Christine, dated October 20, 2010 .......... 111

Horne, Patricia, dated October 4, 2010 .......... 112

LaFrance, Michael, dated September 29, 2010 .......... 113

Lucci, Paul, dated August 23, 2010 .......... 114

McCarthy, Rita, dated September 27, 2010 .......... 115

McDermott, Edward, dated August 25, 2010 .......... 116

McHale, Mark, dated July 30, 2010 .......... 117

Monteiro, Eugene, dated October 6, 2010 .......... 118

Montigny, Mark, dated October 26, 2010 .......... 119

Morrison, Neil, dated September 30, 2010 .......... 120

Mucci, Janet, dated June 24, 2010 and October 5, 2010 .......... 121

Mulligan, Robert, dated October 4, 2010 .......... 122

Murphy, Brian, dated August 13, 2010 .......... 123

O'Neil, Richard, dated August 3, 2010 .......... 124

Pacheco, Mark, dated October 20, 2010 .......... 125

Price, Stephen, dated October 21, 2010 .......... 126

Prisco, Mark, dated September 24, 2010 .......... 127

Quinn, John, dated November 1, 2010 .......... 128

Rideout, Edward, dated August 27, 2010 .......... 129

Rios, Nilda, dated August 4, 2010 .......... 130

Ryan, Edward, dated June 29, 2010 and July 15, 2010 .......... 131

Ryan, Francine, dated August 9, 2010 .......... 132

Ryan, Robert, dated October 22, 2010 .......... 133

Sicuso, Anthony, dated September 30, 2010 .......... 134

Slaney, Ellen, dated August 5, 2010 .......... 135

Sousa, Arthur, dated October 7, 2010 .......... 136

Tavares, Elizabeth, dated July 13, 2010 .......... 137

Vanasse, Lucia, dated July 20, 2010 .......... 138

Walsh, Maria, dated July 19, 2010 .......... 139

Ziter, Jill, dated September 23, 2010 .......... 140

## COMMONLY USED ACRONYMS

| | |
|---|---|
| ACPO | Assistant Chief Probation Officer |
| AOTC | Administrative Office of the Trial Court |
| APO | Associate Probation Officer |
| CPO | Chief Probation Officer |
| CJAM | Chief Justice for Administration and Management |
| FACPO | First Assistant Chief Probation Officer |
| ELMO | Electronic Monitoring |
| OCC | Office of Community Corrections |
| OCP | Office of the Commissioner of Probation |
| PO | Probation Officer |
| POIC | Probation Officer in Charge |
| RA | Regional Administrator/Regional Supervisor |

# EXECUTIVE SUMMARY

## I. INTRODUCTION

By order dated May 24, 2010, the Massachusetts Supreme Judicial Court appointed Independent Counsel for purposes of an investigation of alleged wrongdoing within the Massachusetts Probation Department.[1]

In that order, the Court instructed that:

> (1) Paul F. Ware, Jr. Esquire of Boston be, and hereby is, appointed Independent Counsel with the powers of Special Master and Commissioner to conduct a prompt and thorough administrative inquiry into alleged improprieties with respect to the hiring and promotion of employees within the Probation Department, as well as other practice and management decisions within the Probation Department that have been called into question, and to file with this Court within ninety days of this date, or as soon as possible, a report of his findings, conclusions, and recommendations;
>
> (2) the Independent Counsel shall also make such recommendations as he may deem appropriate to the Justices of the Supreme Judicial Court with respect to indications or findings of misconduct, if any, on the part of any employee of the judicial branch; and
>
> (3) the Independent Counsel shall have, in addition to the usual powers of a Special Master and Commissioner, the power to subpoena witnesses and to administer oaths.

Over the ensuing five months, Independent Counsel and legal professionals at Goodwin Procter LLP (collectively "Independent Counsel") conducted the administrative inquiry called for in the May 24 order. Independent Counsel interviewed more than two dozen witnesses, took testimony from 67 witnesses under oath, and reviewed more than 525,000 documents collected

[1] A copy of the May 24, 2010 Order accompanies this Report as Exhibit 1.

from the Probation Department and disparate witnesses. Independent Counsel considered all of this evidence in preparing the report that is now presented to the Court.

## II. CONCLUSIONS

### 1. The Hiring and Promotion Process in the Probation Department is Corrupt and Has Disproportionately Favored Politically-Connected Candidates

With limited exceptions based on affirmative action and seniority rules negotiated with the probation officers' union, hiring and promotion decisions in the Probation Department are required to be based on merit, with the most qualified candidate being selected. The *Personnel Policies and Procedures Manual* ("*Policies and Procedure Manual*") for the Trial Court, which is applicable to the Probation Department, is unambiguous:

> The successful operation of the Trial Court depends directly on the abilities and contributions of each employee in the organization. Therefore, the objective of the hiring process is to select *the most qualified individuals* who can carry out their responsibilities in a competent and professional manner.

*Policies and Procedures Manual*, § 4.000 (emphasis added).[2] Merit hiring is further underscored as the basis for hiring and promotion within the Department as the *Policies and Procedures Manual* states that:

> It is the policy of the Trial Court that all appointments be made *solely on the basis of merit*. The practice and appearance of nepotism *or favoritism* in the hiring process are to be avoided.

*Policies and Procedures Manual*, § 4.304 (emphases added).

Despite these unambiguous requirements, the hiring and promotion process within the Probation Department during Commissioner O'Brien's tenure, and particularly since the

---

[2] A copy of relevant excerpts from the Policies and Procedures Manual accompanies this Report as Exhibit 25.

Commissioner was granted statutory authority with respect to hiring and promotion in 2001, has not been intended to select "the most qualified individual" for each position "solely on the basis of merit." Instead, hiring and promotion have been thoroughly compromised by a systemic rigging of the interview and selection process in favor of candidates who have political or other personal connections.

To appearances, the Probation Department has an objective hiring process. Candidates for probation officer, for example, are subject to a screening interview conducted by Department representatives by whom the field of candidates is winnowed. A regional round of interviews before two different Department representatives and one judge then selects up to eight candidates for each available position to be given a final interview. The final round interviews are conducted by two Deputy Commissioners or staff designated by Commissioner O'Brien who rank order the finalists. O'Brien appoints the top-ranked candidate(s) to submit to the Administrative Office of the Trial Court ("AOTC") for approval. At each stage of the process, candidates answer and are scored/ranked on the basis of standardized questions prepared by the Commissioner's office. Different interviewers sit on each panel, including, at the local level.[3] The entire process is intended to create the appearance of a rigorous and objective process designed to identify the most qualified candidates based on individual merit.

That appearance could not be more illusory. Hiring and promotion processes have been fraudulently orchestrated from beginning to end in favor of connected candidates. The fraud begins top with Commissioner O'Brien, and it extends through most of the hierarchy of the Department who participate in interviewing candidates for hiring and promotion, and also

[3] The processes described in the Executive Summary have changed over time. The process described in this paragraph has been in place since 2001, when the Commissioner obtained statutory authority over hiring and promotion. The evidence, as discussed in the body of this Report, reflects that the Commissioner was working to rig hiring even before the statutory change in 2001.

involves administrative personnel who help implement a systematic fixing of hiring and promotion decisions.

First Deputy Commissioner Elizabeth Tavares is one of the Deputy Commissioners who is at the heart of perpetrating the sham selection process. Prior to asserting her Fifth Amendment and Article 12 rights not to testify, Tavares testified extensively that, for the preliminary rounds of interviews, Commissioner O'Brien provided her with the names of candidates whom he preselected to advance to subsequent rounds. Tavares communicated the names of favored candidates to Probation Department employees on the local interview panels, who understood that (unless the favored candidates were blatantly unqualified) they were to make sure the favored candidates made the list for the next round, taking the place of more qualified candidates as necessary:

> Q. … So long as somebody was in some sense qualified, even if they really weren't one of the best eight people who interviewed that day, if they got a recommendation, then you should list their name among the top eight?
>
> A. If they were responsive and two committee members agreed, yes.

Testimony of Elizabeth Tavares, July 13, 2010 (Exhibit 137), at 102.[4]

Regional Supervisors who participated in the screening and local rounds of interviews confirmed Tavares' testimony, and stated that they received names of preferred candidates from others in the Office of the Commissioner of Probation ("OCP"), including Deputy Commissioner Francis Wall, Human Resources Director Janet Mucci, and the Department's legislative liaison Edward Ryan. All testified that they understood that preferred names were chosen by the Commissioner, and that they were instructed to put preferred candidates on the list for the next

---

[4] Relevant excerpts of the testimony of First Deputy Commissioner Tavares accompany this Report as Exhibit 137.

round of interviews even if that meant passing over more qualified candidates. In the vast majority of cases, the regional supervisors confirmed that they did as they were told.

Testimony from some of those involved in the preliminary interview rounds concerning the fraudulent interview process illustrates the severity of the problem. Former Deputy Commissioner William Burke, for example, agreed that he advanced any favored candidate who was not "really, really – and I mean really bad":

> Q. But at the Associate Probation Officer level, when you received a name from the Commissioner's office, you approved the name, isn't that correct?
>
> A. Yeah, if – unless you were – and I'm not making this as a joke against these people – unless you were really, really – and I mean really bad – everybody kind of made the list. I mean, you had to be really bad.
>
> Q. If you could walk and talk and you had been recommended by the Commissioner's office for an Associate Probation Officer position, you got approved by Bill Burke?
>
> A. Yeah.

Testimony of William Burke, July 22, 2010 (Exhibit 96), at 33-34.[5]

Likewise, Regional Supervisor Nilda Rios testified, with respect to screening level interviews for probation officers, that there was no question of refusing to advance a favored candidate:

> Q. How successful would you say you were in putting people onto the next round whose names you had been given by the Commissioner's office?
>
> A. I don't understand the question. I mean, you were told to put a name on; you put the name on.

---

5 Relevant excerpts of the testimony of retired Deputy Commissioner Burke accompany this Report as Exhibit 96.

Q. So, in every instance where you were given a name, it then made it onto the list of candidates to be advanced to the next round?

A. I believe so.

Testimony of Nilda Rios, August 4, 2010 (Exhibit 130), at 81.[6]

In fact, Rios testified that if the numerical scores of the preferred candidates were not high enough to make them finalists, she and her interview partner (typically Regional Supervisor Frank Campbell) would simply falsify the scores of the Commissioner's candidates to ensure that preferred candidates made the cut:

Q. If you were given names and either you informed your co-interviewer that these were the names to make it through or they were given names on their own, did you discuss at all how you were going to get this person through to the next round?

A. No, you scored all the people and then, if the person didn't score high enough, you gave them a, you know, one or two points, whatever it is, to get them on the list.

* * *

Q. ... If you had an individual whose name you were provided as someone who had to make the list for the next round, and assume you had ten spaces and they were 15th, based on your initial combined scoring, what would you do in order to get them on to the top ten?

A. Just raise their score.

Testimony of Nilda Rios, August 4, 2010 (Exhibit 130), at 94-95, 95-96.

First Deputy Commissioner Tavares and other witnesses further testified that the fraudulent process was also implemented at the final round interviews used to determine who ultimately would fill the open positions. O'Brien gave Tavares the names of the candidates he

---

6 Relevant excerpts of the testimony of Regional Supervisor Rios accompany this Report as Exhibit 130.

wanted to select for the vacant positions to be certain this final interview panel ranked those candidates at the top of the list:

> Q. And so the Commissioner would say, tell Fran Wall that these are the people I want to see get ranked the highest at his review level?
>
> A. Yeah, take a good look at them, kind of thing.
>
> Q. And when you say, "take a good look at them," presumably they're taking a good look at everybody, right?
>
> A. Presumably, but I think the folks that are recommended, maybe a more keen eye towards them.
>
> Q. And it was you understanding that the Commissioner was really intending you to pass along, these are the people that I want to see at the top of the list?
>
> A. I think so.

Testimony of First Deputy Commissioner Elizabeth Tavares (Exhibit 137), July 13, 2010, at 73-74.

There was, in fact, no doubt concerning the message for the final interview panel. Edward McDermott, a former practicing attorney who is employed in OCP and who sat on final interview panels, testified that the message he was given by Deputy Commissioners Francis Wall and Patricia Walsh when he sat on panels with them was unambiguous – the favored candidates were to be ranked at the top of the list:

> Q. Okay. Tell us what the first instance was.
>
> A. We were engaged in the process of interviewing the final panel of applicants and at some point, once we've started the interviews Deputy Commissioner Wall says to me "And, by the way, the commissioner's top choice is Joe Jones or Mary Jones." And I says, "Well, what does that mean?" And he said to me, "That means that that candidate has to get the highest score in the interview."

* * *

Q. But describe the process that actually occurred.

A. .... Either Fran Wall or Patricia Walsh would tell me before the interview or before the candidate, the selected one as they call, or the commissioner's choice, he or she would tell me that this is the candidate that the commissioner wants to score the highest.

Testimony of Edward McDermott, August 25, 2010 (Exhibit 116), at 32-33, 34-35.[7]

According to McDermott, Deputy Commissioner Wall typically waited until after he saw how McDermott had scored candidates so that he could falsify his own scoring in order to ensure that the preferred candidate came out at the top of the list. In fact, the final interview panels scored candidates in pencil, facilitating fraudulent rescoring if necessary.[8]

The result of this sham process was that, contrary to the procedures mandated by the *Policies and Procedures Manual*, candidates were not selected "solely on the basis of merit" and "the most qualified individuals" were commonly passed over for hiring and promotion. The Commissioner ensured that many candidates were selected instead on the basis of their political or other personal connections. Former Deputy Commissioner Burke, and many others, were blunt in admitting that fixing the interviews meant that less qualified candidates were hired or promoted over more qualified candidates:

Q. Well, you know that some people who are less qualified than other candidates got jobs because the Commissioner wanted them to get jobs, isn't that correct?

A. I'd say yeah, yes.

Testimony of William Burke, July 22, 2010 (Exhibit 96), at 75.

The hiring and promotion process within the Probation Department represents a pervasive fraud against the Commonwealth. Having created the pretext of following the

---

7 Relevant excerpts of the testimony of Edward McDermott accompany this Report as Exhibit 116.

8 Testimony of Edward McDermott, August 25, 2010 (Exhibit 116), at 53-55.

procedures required by the *Policies and Procedures Manual*, the Commissioner instead awarded valuable positions with substantial salaries and benefits to individuals sponsored primarily by his political allies.

### 2. The Fraud Is Systemic and Not Episodic

Corruption in the hiring and promotion process at the Probation Department is systemic. When Departmental hiring is authorized (typically following completion of annual appropriations), hundreds of calls on behalf of candidates are received by the Office of the Commissioner. These calls come from individuals in all walks of life, notably state legislators, but also judges, mayors, city councilors, prosecutors and other members of the executive branch. Many candidates for positions have numerous letters of recommendation submitted on their behalf. Some letters of recommendation are based on personal knowledge of the candidate and his or her work experience, though others (particularly from legislators) are form letters.

From these "recommendations," the Commissioner's office selects certain contacts to log on spreadsheets known as the "Sponsor Lists." The Sponsor Lists contain the name of the "sponsor," the name of the applicant, and the position for which the applicant is applying. The Sponsor Lists are extensive, with some "sponsors" supporting numerous candidates. Two of the legislative liaisons, Maria Walsh and Edward Ryan, produced over 130 pages of Sponsor Lists for the 2004 – 2007 time period.

Although witnesses repeatedly testified that recommendations were received from a broad array of individuals, the great majority of candidates were sponsored by state legislators, with judges and others making up a small minority. For example, on the spreadsheets for fiscal years 1999-2001 all but 13 of the 119 unique sponsors is either a state representative or senator.

The Sponsor Lists, in other words, are not simply lists of recommenders. They are more narrowly a recording of the support being given to candidates by individuals with political sway over the Department.

Tellingly, the individuals tasked with overseeing the creation of the Sponsor Lists have been the Department's "legislative liaisons." These liaisons subsequently obtained the lists of candidates for final interviews to confirm that candidates sponsored principally by members of the legislature – members of the leadership and key committees such as Ways and Means and Judiciary – were advancing as instructed through preliminary rounds of interviews.

This systematic recording and processing of the names of hundreds of candidates sponsored by influential politicians was necessary because fraudulent interviews occurred on a grand scale. Some witnesses advised Independent Counsel that they received the names of preferred candidates for nearly all of the positions for which they interviewed. As a result, most entry level and promotional positions within the Department went to "Commissioner's Choice" candidates:

> Q. All right. I understood you to say that the people that get hired or got hired in Probation during the 2005 to 2007 time period were by and large most of the time people who had political recommendations behind them, correct?
>
> A. Yes, correct.
>
> Q. Candidates who had no political connection were unlikely to be hired if there were candidates with political connections, is that fair to say?
>
> A. Yeah, I would say that that was the way it is.

Testimony of Edward Ryan, June 29, 2010 (Exhibit 131), at 99-100.[9]

---

9 Relevant excerpts of the testimony of Edward Ryan accompany this Report as Exhibit 131.

Candidates sponsored by politicians had a remarkable success rate in being hired or receiving promotions. Senator Travaglini appears as the sponsor for 28 candidates on Sponsor Lists we received. Of those, 16 candidates were hired or received promotions, for a success rate of 57.1%. Former Speaker Salvatore DiMasi sponsored 36 candidates, of whom 24 were hired or promoted, for a success rate of 66.7%. Speaker DeLeo appears as a sponsor for 12 candidates, and was successful in having seven of them, 58.4%, hired or promoted.

### 3. Commissioner O'Brien And Certain Deputy Commissioners Refused to Cooperate in this Investigation

Within days of the appointment of Independent Counsel, Commissioner O'Brien wrote to Independent Counsel and offered his "full cooperation":

> I am available to meet and cooperate with your inquiry with any pertinent information and/or documentation that you may find of assistance. I stand ready to cooperate fully in any way to assist your inquiry so that a prompt and thorough report of your findings can be completed as soon as possible to clear my name of the untrue and libelous allegations published by the *Boston Globe*.[10]

To assure that Commissioner O'Brien was given an opportunity to present evidence including his views and knowledge of Probation hiring and promotion practices, Independent Counsel called O'Brien (and later his counsel) and offered him an opportunity to present informally such information as he might wish to present. This offer was confirmed in writing by letter to O'Brien's counsel. Despite Independent Counsel's offer to meet, both O'Brien and his counsel repeatedly refused every opportunity to provide information which might give context to the hiring and promotion process implemented by O'Brien, or which might be exculpatory to O'Brien.

Except as to subpoenaed documents, Commissioner O'Brien refused to cooperate in any way with the investigation, invoking his privileges under the Fifth Amendment to the United States Constitution and Article 12 of the Massachusetts Declaration of Rights. Even with respect to subpoenaed documents, O'Brien refused to testify as to how he went about locating and collecting documents or the decision which documents to produce, and refused to answer questions concerning his compliance with the Court's document retention order. It is thus possible that documents O'Brien considered damaging were withheld and/or destroyed, no contrary assurance having been given by O'Brien nor his counsel despite specific questions from Independent Counsel.

Most of O'Brien's senior management team followed his lead in refusing to cooperate with the investigation, including by refusing to state whether they were in compliance with the Court's document preservation order. This includes current Deputy Commissioner Francis Wall and retired Deputy Commissioner Patricia Walsh, both of whom were identified by persons with first-hand knowledge as central to the fraudulent rigging of final interviews. First Deputy Commissioner Elizabeth Tavares provided testimony early in the investigation, but later refused to testify, invoking her Fifth Amendment and Article 12 rights. While a credible argument exists that Tavares waived any privilege by testifying initially and only later asserting her 5th Amendment and Article 12 rights, Independent Counsel elected not to move to compel her testimony.

Two key legislators involved in budgeting for Probation and who sponsored candidates for hiring and promotion also refused to cooperate with the investigation, former Speaker of the

[10] A copy of the May 28, 2010 letter from O'Brien to Independent Counsel accompanies this Report as Exhibit 17.

House Thomas Finneran and Representative Thomas Petrolati, both of whom invoked their Fifth Amendment and Article 12 rights and refused to testify.

Notwithstanding Commissioner O'Brien's refusal to cooperate with the investigation, the evidence is overwhelming that he encouraged extensive falsification of interview results at all levels of Probation. O'Brien's refusal supports an inference that the testimony of the many witnesses who did cooperate is accurate. That evidence alone is sufficient for the Court to take such actions against Commissioner O'Brien, including removal from his position and further sanctions, as the Court may determine. AOTC may conclude that Commissioner O'Brien is no longer qualified to lead the Probation Department. The same conclusion applies with equal force to Deputy Commissioners Wall and Tavares.

### 4. Commissioner O'Brien Retaliated Against Employees Who Refused to Execute the Fraud

On some occasions, interviewers who failed to pass preferred candidates through the preliminary rounds of interviews were the subject of retaliation. Regional Supervisor Ellen Slaney, for example, testified that early in Commissioner O'Brien's tenure she refused to advance one candidate (a state senator's son) to the next round of interviews because he was a convicted felon. In response, O'Brien became angry and told her that if she did not go along with the rigged process, she would be removed from interviewing for openings in her own region, which is in fact what happened:

> Q. As best you can recall, what conversation did you have with the Commissioner concerning this round of hiring?
>
> A. He was – seemed physically upset with me. When I went in, I got called into his office, and he wanted to know why I hadn't put Doug Maclean's name on the final list.

Q. And what did you say in response?

A. That I didn't think he was an appropriate candidate because he was a convicted felon and that I thought my position was one to make sure the best candidates got the job, and I didn't think he was the best candidate or an appropriate candidate.

Q. What was said next in this conversation, as best you can recall?

A. ... And I told him that I thought that having the names ahead of time was unethical, and I felt that it was cheating and that I couldn't do that. And he eventually told me that he understood and that he would not insist that I continue to be on the hiring panels if I did not want to do it, and I said I did not.

Testimony of Ellen Slaney, August 5, 2010 (Exhibit 135), at 18-19.[11]

Other witnesses, including former First Deputy Commissioner John Cremens, confirmed these events. Furthermore, in messages left by Human Resources Director Janet Mucci on Regional Supervisor Edward Dalton's answering machine in October 2000, Mucci states Commissioner O'Brien told her "... if people were real uncomfortable with this" rigging of interviews, "he's going to have to remove people from doing interviews."[12]

In 2005, two regional supervisors who failed to advance preferred candidates (Slaney and Dalton) were pulled aside after a staff meeting by Deputy Commissioner Francis Wall and former Deputy Commissioner Patricia Walsh. Wall and Walsh informed Slaney and Dalton that they were being removed from interviewing within their own regions and instead were reassigned to perform case "audits" far from their homes and geographic regions. This was broadly understood as punishment for their failure to advance preferred candidates.

---

[11] Relevant excerpts of the testimony of Regional Supervisor Slaney accompany this Report as Exhibit 135.

[12] A copy of the transcript of these voicemail recordings accompanies this Report as Exhibit 31.

Others within the Department testified that, fearing similar retaliation, they continued to comply with their instructions to fix the hiring and promotion process despite knowing it was wrong. For example, one of the many such individuals stated:

> Q. Can you tell me why you felt you had to comply with selecting, if you will, the commissioner's choice as opposed to your saying this is a rigged process, I'm not going to participate in that?
>
> A. Quite frankly, because I was afraid for my job. And if I can interject, I had also heard that regional supervisor Ellen Slaney had failed to comply with a request and that she was brought into the office, berated and threatened, and that was not lost on me. And I was three or four years into the probation service at 52 years of age or whatever and I felt that if I didn't comply with a directive by my supervisor, that I might be in harm's way.
>
> Q. So in effect you felt compelled to go along with this scheme because you felt there would be sanctions if you didn't score the commissioner's choice more highly than he deserved?
>
> A. I'm not very proud of it, but yes.

Testimony of Edward McDermott, August 25, 2010 (Exhibit 116), at 37-38.

## 5. Deputy Commissioners Were Complicit in O'Brien's Fraud

As described above, senior management for the Probation Department, including all of the Deputy Commissioners, were involved in implementing a system of fraudulent hiring and promotion in favor of politically-connected candidates pre-selected by the Commissioner. Each of these Deputies acted knowingly, in breach of their fiduciary duties to the Probation Department and in breach of the express provisions of the *Personnel Practices and Procedures Manual.*

First Deputy Commissioner Elizabeth Tavares was central to the process, admitting that she received names of favored candidates from the Commissioner and funneled them to other Deputy Commissioners and regional supervisors in order to ensure that the Commissioner's candidates received final round interviews. While Deputy Commissioner Francis Wall and former Deputy Commissioner Patricia Walsh invoked their Fifth Amendment and Article 12 rights not to testify, numerous witnesses testified that Wall and Walsh regularly provided names of preferred candidates and received names of candidates whom they ranked and scored. Current Deputy Commissioners Steven Bocko and Paul Lucci, as well as retired Deputy Commissioners John Cremens and William Burke, also admitted to participating in fraudulent hiring and promotion practices. All bear some responsibility for the wider fraud inspired by O'Brien.

In addition, it is clear that the two Deputy Commissioners who served as Legal Counsel to the Department during this period – former Deputy Commissioner Anthony Sicuso and Deputy Commissioner Christopher Bulger – either were aware of the wrongdoing within the Department and failed to report it, or had substantial reason to believe that the wrongdoing was occurring and chose to ignore it. Bulger, for instance, admitted during his testimony that he "assumed" that the interview process was being rigged in favor of connected candidates:

> Q. You know, do you not, that it was a routine practice in the office to communicate names of preferred candidates ... to interview panelists at the regional level prior to those interviews ...?
>
> A. I understand that to be the case now that it was routine practice. Prior to the [*Boston Globe*] article, I assumed it occurred anyway. I assumed it happened anyway ....

Testimony of Christopher Bulger, October 13, 2010 (Exhibit 95), at 44.[13]

[13] Relevant excerpts of the testimony of Deputy Commissioner Christopher Bulger accompany this Report as Exhibit 95.

In light of the near universal involvement of high-ranking OCP personnel in the fraud – from the Commissioner down to administrative personnel – Independent Counsel concludes that the testimony by Bulger that he only "assumed" a sham process but lacked actual knowledge cannot be credited. Similarly, Sicuso's disclaimer of any knowledge is not credible. It is potentially a breach of ethical obligations under Rule 1.13 of the Massachusetts Rules of Professional Conduct, and certainly poor judgment, for Legal Counsel to the Department not to take steps to investigate and report suspected wrongdoing within the Department of which either was aware. The dishonest or incompetent oversight by Legal Counsel in monitoring and ensuring the Department's compliance with legal obligations facilitated the fraudulent hiring scheme.

It is clear that Bulger's foremost loyalty even today lies with Commissioner O'Brien, not the Probation Department. When O'Brien was initially told of his suspension, Bulger sought to participate in the suspension meeting, apparently as counsel for O'Brien. More tellingly, Bulger conceded during his testimony that he has been informing Commissioner O'Brien "two or three times a week" of developments in this investigation:

> Q. What's the purpose of your discussions with Commissioner O'Brien –
>
> A. Just –
>
> Q. – since his suspension?
>
> A. The purpose now is to just go over the events that are taking place in our office.
>
> Q. What events are you talking about?
>
> A. The investigation.
>
> Q. Are you saying that you keep Commissioner O'Brien posted on what you know about the investigation?

A. If I hear of something, I will tell him, yeah.

Testimony of Christopher Bulger, October 13, 2010 (Exhibit 95), at 38-39. Bulger told Independent Counsel that he wanted to keep O'Brien informed precisely because he viewed O'Brien as "the target of this investigation":

Q. What exactly have you discussed with Commissioner O'Brien in the two or three conversations a week since May, 2010?

A. What have we discussed? Oh, we've discussed the articles and subsequent articles and -- we've discussed individuals that were being called down to testify, who might be called and --

Q. In short, you were informing Commissioner O'Brien of who within probation had been called to testify here?

A. I've told him who -- if I knew of someone, I would mention that to him.

Q. Well, you knew because you were given a handful of subpoenas for probation employees; isn't that correct?

A. Um, yes. I did get a handful of them, yea.

Q. And did you inform Commissioner O'Brien of the witnesses that had been called?

A. Ones that I knew, I would mention who was -- who had gone down.

Q. Why did you do that?

A. I don't know. I thought he should know.

Q. Why did you feel he should know?

A. Because he's -- I imagine he's the target of this investigation.

Testimony of Christopher Bulger, October 13, 2010 (Exhibit 95), at 63-64.

It is incomprehensible that Counsel to the Department, bearing in mind his fiduciary and ethical obligations, was almost daily apprising a suspended Commissioner and the principal

subject of this investigation of the course of the investigation and discussing with him witness testimony of which he had become aware in his capacity as Probation Legal Counsel.

Bulger also revealed during his testimony that he is effectively of one mind with Commissioner O'Brien that manipulating hiring and promotion is acceptable at some level because, to paraphrase, "everyone does it":

> Q. Have you talked with the commissioner at all with respect to hiring practices?
>
> A. Um, I did. I –
>
> Q. What did he say and what did you say?
>
> A. Um, my understanding is that, you know, I think he would say, yeah, there were phone calls made to him from all walks. And our view is that – I mean, I guess I share his view that it happens in a lot of agencies. So I guess it was, you know – that's what we would discuss. That this is something that happens everywhere to some degree.

Testimony of Christopher Bulger, October 13, 2010 (Exhibit 95), at 39-40.

To the extent Bulger's credibility may be relevant to the Court, Independent Counsel observed Bulger to be consistently evasive and untruthful in responding to questions under oath. He made repeated attempts to deflect the questioning. Many of his answers were blatantly false in the view of Independent Counsel (*see, infra.* ¶¶ 550-562).

Bulger's role as counsel to the Department has been irrevocably compromised by his misplaced loyalty, not only to Commissioner O'Brien but to business-as-usual in Probation. Bulger remains an advocate for the "return" of Commissioner O'Brien whom he praised as a "great Commissioner" and "a man of integrity."[14]

---

[14] Testimony of Christopher Bulger, October 13, 2010 (Exhibit 95), at 141-142.

### 6. Legislative Quid Pro Quo for Fraudulent Hiring and Promotion

The evidence demonstrates that an understanding existed among certain legislators and O'Brien that generous appropriations for the Probation Department were linked to O'Brien's willingness to perpetuate and systematize fraudulent hiring and promotion on a pervasive scale. O'Brien was appointed in December 1997. At least by 2000, a rigged process was in place by which O'Brien saw to the hiring of politically anointed candidates and in return legislators saw to it that Probation's budget increased at a steady rate., even beyond that requested by AOTC. The following recorded voicemail from the Probation Department's Human Resources Director, Janet Mucci, to a regional supervisor *at his home* instructing him that his recommendations must include certain favored candidates is illustrative:

> I know you are not doing interviews today but in Dedham there are people that have to be finalists … Jack had given me, one, two, three, four, like 7 names to be interviewed.
>
> * * *
>
> I've got some names for finalists in the Dedham District Court … can you just make sure they're in there somewhere … so now that I just beefed you up a little bit, you gotta do this… there's one, two, three, four, five, there's 6 people to be finalists in Falmouth… he had a meeting at the State House yesterday and he has no choice.
>
> * * *
>
> Falmouth's going to be tough because there is about, I think there's 5 or 6 finalists and that out of eight is crazy. But Jack had had a meeting over at the State House yesterday… and again that triggered a lot of this. You know [*whispering*] when he got everything he wanted this year in the budget moneywise, so they feel like they did that for him …and obviously he needs to do this for them.[15]

[15] Voicemail recordings (Exhibit 31).

Mucci confirmed that her information came directly from O'Brien after having previously denied communicating any names during an informal interview and under oath in her first appearance before Independent Counsel:

> Q. So you're saying to Mr. Dalton here that because Mr. O'Brien got what he wanted in the budget that he therefore has to be sure these candidates make the final list, correct?
>
> A. Yeah. That's definitely what I'm saying.
>
> Q. And you're not saying that because you made it up, are you?
>
> A. No. Because I would have no reason to – I wouldn't know anything about anything going on at the State House if he didn't tell me it. I can't imagine why he would share that with me.
>
> Q. Does it follow that you got this information directly from Mr. O'Brien?
>
> A. It had to be, yeah. Because I don't know who else he would even go with.

Testimony of Janet Mucci, October 5, 2010 (Exhibit 121), at 180.[16]

Regional Supervisor Ellen Slaney similarly testified that during this same period, shortly after O'Brien became Commissioner, he told her that it was necessary for budgetary reasons to fix the hiring process in favor of legislatively supported candidates:

> Q. What was said next in this conversation, as best you can recall?
>
> A. Well, you know, I also indicated to him that I understood that this was just my perception and that he had other things to consider. He said he did, that the budget was important and that these appointments were important to his being able to accomplish the budget that he needed in order to do our business.

Testimony of Ellen Slaney, August 5, 2010 (Exhibit 135), at 19.

Former Deputy Commissioner William Burke, an ally of Speaker pro tem Thomas Petrolati and other politicians from western Massachusetts, also testified to his understanding that the hiring and promotion process was manipulated by the Commissioner in exchange for favorable legislative action on the Department's funding:

Q. You understood, didn't you, that while it wasn't written down, the legislature was funding Probation generously because Probation was responding to legislative requests for hiring, among other things, isn't that correct?

A. I'd say yeah.

* * *

Q. The way in which it worked was one hand, you know, washed the other?

A. Washes the other. Yeah, I know. I know what you're talking about.

Q. And the way it worked particularly with Probation was Mr. O'Brien would get his funding, and the legislature would get some jobs, isn't that right?

A. Yeah, I would say so, yeah.

Testimony of William Burke, July 22, 2010 (Exhibit 96), at 79, 82-83.

Underscoring the quid pro quo nature of the arrangement, one of the legislative liaisons tasked with helping create the Sponsor Lists testified that the legislators with the greatest sway were those in leadership positions or seats on the Ways and Means and Judiciary Committees:

Q. Was there an understanding within the Probation Office that certain politicians were to have more clout in the hiring process than others?

A. Yes.

Q. And what was the hierarchy in terms of preferences given to candidates sponsored by politicians?

---

[16] Relevant excerpts of the testimony of Janet Mucci accompany this Report as Exhibit 121.

A. I think the leadership would have more say, and I also -- I would say, yeah, I would say the leadership would be able to carry more weight with the Commissioner.

Q. During the period in which you were involved in these preferential lists, what was the leadership to which you're referring?

A. The Senate president, Senate Ways and Means.

* * *

Q. On the House side, what was the leadership to which you refer?

A. The House side was, when I came in, Speaker DiMasi. House Ways and Means was the now-Speaker DeLeo. The chair of the judiciary was, is Gene O'Flaherty

Testimony of Edward Ryan, July 15, 2010 (Exhibit 131), at 153-54, 164.

The sponsor lists reflect the greater influence of legislators in leadership or on important committees. The list of the ten most-frequent "sponsors" includes influential legislators: former Speaker of the House Salvatore DiMasi; Senate President Robert Travaglini; Senators Steven Panagiotakis, Stephen Brewer, John Hart, and Marc Pacheco (all on Senate Ways and Means); Senator Mark Montigny, previously chairman of Senate Ways and Means; Senator Thomas McGee and former Senator Robert Creedon, on the Senate Judiciary Committee; and Representative Stephen Tobin of Quincy (where Commissioner O'Brien resides), who previously was on the House Judiciary and Ways and Means Committees.[17]

Six of these ten legislators – DiMasi, Travaglini, Montigny, Hart, Pacheco, and Brewer – along with Speaker Robert DeLeo and Petrolati also appear on a list of the twenty most-frequent

---

[17] Representative Thomas Petrolati is not among the ten legislators most frequently listed on the Sponsor Lists, but former Deputy Commissioner Burke testified that he sometimes received calls with the names of favored candidates for positions in western Massachusetts from Petrolati directly, and acted on them without going through the Commissioner. That, plus additional evidence, suggests that Petrolati's involvement in patronage hiring within Probation is far greater than the Sponsor Lists demonstrate.

recipients of contributions from Probation Department employees since 2000. Independent Counsel did not uncover direct evidence that legislators were explicitly offering to sponsor candidates in exchange for campaign contributions, but there is statistical evidence that "pay for play" was the reality. Of the 54 candidates sponsored by Senator Montigny, for example, at least 23, or 42.6%, were contributors to the Senator. Of the 23 contributors, 11 were successful in being hired or promoted within a year following the sponsorship (47.8%). By contrast, of the 31 non-contributors, only 1 (3%) was hired or promoted. Of the 28 candidates sponsored by Senator Travaglini, 10, or 35.7%, were contributors. Nine of these ten of these (90%) were hired or promoted within Probation within a year following their sponsorship, whereas non-contributors had "only" a 39% success rate (7/18). Altogether, for the group of legislators most frequently appearing on the Sponsor Lists plus DeLeo and Petrolati, their sponsored contributors had a 62.2% success rate (61/98) for being hired or promoted within a year of being sponsored, while their sponsored non-contributors only had a 25% success rate (55/220).

The evidence demonstrates that Commissioner O'Brien went to extraordinary lengths to placate "important" politicians by ensuring the success of their preferred candidates. For example, O'Brien told Senator Marc Pacheco in 2005 that either he would successfully fill a first assistant chief probation officer position with the Senator's preferred candidate, or he would not fill it at all. The preferred candidate in question, who did receive the promotion, testified that Senator Pacheco relayed this incident to him:

> Q. In 2005, when you were applying for the first assistant chief position, did Senator Pacheco relay to you that the commissioner had told him that if you didn't get the position then the commissioner would just freeze the position and wouldn't fill it?
>
> A. I believe he did.

> Q. As best you can recall, what exactly did Senator Pacheco tell you?
>
> A. He supported me for the first assistant chief's job and that if I did not receive the position, the commissioner would freeze the position.

Testimony of Joseph Dooley, September 17, 2010 (Exhibit 106), at 37-38.[18]

## 7. Fraudulent Hiring and Promotion May Constitute Criminal Conduct

There is credible legal support for the conclusion that the fixing by public officials of a putatively objective interview process for hiring and promotions in favor of politically-connected applicants constitutes criminal conduct in violation of federal fraud statutes. *United States v. Sorich*, 523 F.3d 702 (7th Cir. 2008) is an analogous case which involved the federal mail fraud convictions of three former employees of the Chicago Office of Intergovernmental Affairs who had orchestrated a pervasive and long-running political patronage scheme.[19] Like Commissioner O'Brien, defendant Sorich received the names of favored campaign workers and volunteers who were seeking civil service jobs. Like Commissioner O'Brien, Sorich maintained documents tracking job applicants and their sponsors, including a spreadsheet showing thousands of patronage applicants and their sponsors over a seven-year span. Like Commissioner O'Brien, Sorich forwarded the names of favored candidates to the heads of various city departments for jobs. As here, departmental managers who had been provided with favored names conducted sham interviews in which the favored candidates had their scores artificially inflated.

---

[18] Relevant excerpts of the testimony of Chief Probation Officer Dooley accompany this Report as Exhibit 106. In contemporaneous notes from 2005, Regional Supervisor Ellen Slaney recorded Dooley relaying this story to her. A copy of Ellen Slaney's notes, marked during her testimony as Exhibit 5, accompany this Report as Exhibit 135.

[19] A copy of the Seventh Circuit's opinion in *Sorich* accompanies this Report as Exhibit 16.

The Seventh Circuit upheld the fraud convictions of Sorich and the department managers against an insufficiency of the evidence challenge for reasons applicable here. The court explained that "by setting up a false hiring bureaucracy, the defendants arguably cheated the city out of hundreds of millions of dollars." *Id.* at 712. It rejected the defendants' argument that since the city would have filled these jobs and paid these salaries anyway, it did not suffer a loss of property, explaining:

> [H]ere the city paid for, and was cheated out of, qualified civil servants. Jobs are a lot like contracts. Neither is a bag full of money but both are immensely valuable: a contract is a promise to pay for services rendered, while a job is the exchange of labor for a paycheck. Hence just as [f]raudulently obtained contracts are property, courts have held that *salaries fraudulently obtained, and job opportunities fraudulently denied, represent property for purposes of mail fraud.*

*Id.* at 713 (internal citations omitted) (emphasis added).[20] The court further noted that the use of the mail to send letters to unsuccessful applicants (a practice shared by Probation) lent a false air of propriety and regularity to the rigged hiring process. *Id.* at 714.

The *Practices and Procedures Manual* requires the Probation Department to select the most qualified candidates based solely on merit. Commissioner O'Brien and his subordinates involved in interviewing did not do that, but in many cases awarded positions and promotions to individuals who were merely the most connected. As in *Sorich*, the mails and wires were used to carry out this fraud, by which the Commonwealth was deprived of substantial money, including

---

[20] Other courts have also upheld the application of the mail fraud theory to rigged employment decisions and/or fraudulently obtained positions. *See, e.g., United States v. Douglas*, 398 F.3d 407, 417-18 (6th Cir. 2005) (upholding mail fraud claim for scheme to deprive union members of rights to compete for jobs); *United States v. Granberry*, 908 F.2d 278, 280 (8th Cir. 1990) (employee who falsified government job application obtained money or property by scheme to defraud, since wages are money within §1341); *United States v. Doherty*, 867 F.2d 47, 55-57(1st Cir. 1989) (upholding §1341 conviction for stealing and selling police promotion exams because increased salary and benefits involved taking of money or property from city).

salaries and benefits paid to Department personnel who were fraudulently provided jobs and promotions, and the expense of the false hiring process.

In addition to potential violations of federal law, the conduct of Probation Department employees in connection with hiring and promotions may also have been in violation of state law. *See, e.g.*, Mass. Gen. Laws c. 268A, § 1 et seq. (conflict of interest laws and regulations regarding conduct of public employees); Mass. Gen. Laws c. 274, § 7 (conspiracy). These state laws include the bribery statute, which may have been violated by O'Brien offering a "[t]hing of value" – positions in the Probation Department for relatives, friends, and supporters – to state legislators, with the intention of influencing their "official acts" on matters important to Probation – such as appropriations for the Department. M.G.L. c. 268A, §2(a). Conversely, O'Brien also may have violated the bribery statute by asking for a "[t]hing of value" for himself and the Department – increased appropriations, expanding the scope of O'Brien's domain – in exchange for his being influenced with respect to his "official acts" – appointing persons to positions within the Department. M.G.L. c. 268A, §2(b).

Former Deputy Commissioner and Legal Counsel Anthony Sicuso underscored the impropriety and illegality of the hiring practices within the Probation Department:

> Q. If as legal counsel you had received credible information that interviewers at either the local panel round or the final round of interviews were receiving names of candidates that they were supposed to favor and score more highly than those candidates deserved on the merits, what would your response have been?
>
> A. The first thing I would have done is gone to the commissioner, and second thing probably go to Paul Edgar.
>
> Q. For what purpose?
>
> A. To have full disclosure of it.
>
> Q. Would there be, as legal counsel --

A. Then to let the Trial Court do what it felt was appropriate.

Q. Would you have seen any legal implications of that kind of practice occurring?

A. What do you mean?

Q. So there is -- you have a contract with the union governing hiring and promotions in some sense. You have the administrative office's practices and procedures manual. If you had been made aware of that practice at the time, were there any concerns that you would have about potential legal liability for the department?

A. Of course.

Q. I guess what I'm trying to get at what are the potential avenues of liability for the department if such practices were occurring?

A. Depending on the situation there are possible criminal issues, possible MCAD issues depending on who was involved.

Testimony of Anthony Sicuso, September 30, 2010 (Exhibit 134), at 90-91.[21]

Independent Counsel recommends that the Massachusetts Attorney General and the United States Attorney be made aware of the findings in this report concerning hiring and promotion so that they may decide what action, if any, should be taken as a law enforcement matter. Potential targets of a criminal investigation include Commissioner O'Brien, Francis Wall, Patricia Walsh, William Burke, Elizabeth Tavares, and Christopher Bulger.

---

21 Relevant excerpts of the testimony of former Deputy Commissioner/Legal Counsel Sicuso accompany this Report as Exhibit 134.

### 8. Probation Department Personnel Were Solicited by Probation Management for Political Contributions in Violation of State Campaign Finance Laws

Massachusetts law is clear that except under limited circumstances, state employees may not solicit or receive contributions for political campaigns, nor may solicitation or receipt of campaign contributions be conducted by anyone on state government property. M.G.L. c. 55, §§ 13, 14.[22] A violation of either section is a criminal act punishable by up to a year in prison and a fine of up to $1000, and any state employee convicted of violating either section may be removed from office without a hearing. These strictures were violated on multiple occasions by high-ranking personnel within the Department, including Commissioner O'Brien and Deputy Commissioner Francis Wall.

The *Globe* Spotlight story reported that numerous Probation Department employees donating to the campaign of Treasurer Tim Cahill shortly before Commissioner O'Brien's wife was hired by the Treasury Department. Independent Counsel confirmed that in July 2005, Commissioner O'Brien and/or Edward Ryan, his "legislative liaison," at O'Brien's request, solicited Probation Department employees in the cafeteria at One Ashburton Place to donate to Treasurer Cahill's campaign.[23] Deputy Commissioner Fran Wall also solicited Department employees to attend this fundraiser. In response to these solicitations, dozens of Probation Department personnel attended the fundraiser on behalf of Cahill. It appears that 34 members of the Department contributed an even $4,000 to Cahill on a single day, July 6, 2005. Strikingly, 28 of those 34 gave to Cahill only on this one occasion.

---

22 Copies of these statutes are appended to this Report as Exhibits 10 and 11.

23 Ryan confirmed generally that he would "talk up" Cahill fundraisers to his fellow Probation Department employees.

Several witnesses recalled Commissioner O'Brien and Deputy Commissioner Wall soliciting contributions on behalf of Representative Thomas Petrolati in the cafeteria at One Ashburton Place. Former First Deputy Commissioner John Cremens had a clear memory of this:

> Q. So you remember – do you have a firm memory of Commissioner O'Brien doing that?
>
> A. I remember Commissioner O'Brien saying on one occasion, there's going to be a party, at someone's table, for Tommy Petrolati. I said, oh, no I'll go, no problem.
>
> * * *
>
> Q. Was the goal to get a bunch of Probation Officers together to all go as a group or –
>
> A. Well, I know that in my situation I gave my money to Frannie Wall who was going to get the tickets for us ....
>
> Q. Who is this for, Petrolati?
>
> A. Petrolati.

Testimony of John Cremens, August 6, 2010 (Exhibit 102), at 86-89.[24]

According to one regional supervisor, the pitch being made by Wall explicitly linked attendance at the fundraiser to Petrolati's assistance to the Department on budget matters:

> Q. Going back to the political fundraiser for Mr. Petrolati, who was kind of the person who marshaled folks together or said, hey, we should –
>
> A. The only one I recall -- and I only went to maybe one; I can't even recall if I went to another one; I just stopped going -- would have been Frannie Wall at the time, "We're going out to see Representative Petrolati. Why don't we all get together and go out and support him? Because he's helping us try to get the funding for the jobs, for the program."

Testimony of Edward Rideout, August 27, 2010 (Exhibit 129), at 144-45.[25]

---

24 Relevant excerpts of the testimony of former Deputy Commissioner Cremens accompany this Report as Exhibit 102.

In addition, one chief probation officer testified that his friend, Senator Marc Pacheco, asked him on more than one occasion to solicit contributions from among his fellow Probation Department employees, and he did so:

> Q. Senator Pacheco asks you to help him sell tickets --
>
> A. In the past he's asked me if I could take tickets to sell to friends.
>
> Q. Has he ever specifically asked you to see if anyone else in the Probation Department would be interested in attending?
>
> A. Yes.

Testimony of Joseph Dooley, September 17, 2010 (Exhibit 106), at 49-50.

These violations of campaign finance laws by state employees and on state property are the more troubling given the politicization of hiring and promotion decisions within the Department. One can reasonably infer considerable pressure on employees to give to the key politicians favored by their superiors, believing that these same politicians wield potentially decisive influence on promotional opportunities. One regional supervisor testified that he felt pressure to attend the Petrolati fundraiser to which Deputy Commissioner Wall invited him, knowing that Commissioner O'Brien and others in the hierarchy would be there. The former head of the probation officers' union and another regional supervisor testified that probation officers told them that they felt they had to contribute to politicians to get promoted.

The statute of limitations has not yet run on some of these incidents. Independent Counsel recommends that the issue of campaign finance violations be referred to the Attorney General and/or the Suffolk County District Attorney.

---

[25] Relevant excerpts of the testimony of former Regional Supervisor Rideout accompany this Report as Exhibit 129.

### 9. O'Brien Solicited Political Contributions to Treasurer Cahill to Assure His Wife's Being Hired by Treasury

In July 2005, Commissioner O'Brien or Edward Ryan, on his behalf, solicited attendance by Probation Department personnel at a fundraiser for Treasurer Cahill in the cafeteria at One Ashburton Place. Other Probation Department employees testified that they were approached by Deputy Commissioner Francis Wall and asked to attend. Nearly three dozen probation department employees, a vast majority of whom never gave to Cahill on any other occasion, did so.

At the time, Commissioner O'Brien's wife, Laurie O'Brien (who also contributed to Cahill on July 6), had a pending application for employment in the Department of the Treasury. Emails within Treasury reveal that, only five days before the fundraiser, Laurie O'Brien's application came up for discussion. Treasury was considering her for a night-shift computer operator position, which was described as undesirable and difficult to fill. Seven days after the fundraiser, Laurie O'Brien's application was again discussed within Treasury, but this time she was "considered" for a far more desirable position in customer service. Contemporaneously, Edward Ryan, who had known Cahill since childhood, called contacts within Treasury on Laurie O'Brien's behalf.

Individuals within the Treasury Department testified that Laurie O'Brien was not hired as a result of the fundraising on behalf of Cahill or as a result of Ryan's calls. They also testified that Cahill was not directly involved in the initial decision to offer a position to Laurie O'Brien though he later approved the hire. Because this investigation is not focused on alleged wrongdoing within the Treasury, Independent Counsel did not pursue nor fully investigate the facts surrounding the two O'Brien hires at Treasury.

However, Independent Counsel does conclude that Commissioner O'Brien, either directly or through his subordinates Wall and Ryan, solicited contributions to Cahill from his employees in the Probation Department for the purpose of assisting his wife in obtaining a desirable position within Treasury. This was an apparent violation of the law and an abuse of O'Brien's position of authority within the Probation Department for personal gain.

### 10. Probation Management May Have Testified Falsely in Grievance Proceedings

On some occasions, candidates passed over for promotion, including those rejected in favor of preferred candidates, filed grievances concerning the promotion process, some of which resulted in arbitration. Independent Counsel believes that Deputy Commissioners Francis Wall and Patricia Walsh testifying in those arbitration proceedings may have perjured themselves concerning the fraudulent promotion system by claiming promotions were merit based.

In particular, during the arbitration proceedings the members of the final interview panel ordinarily were called to testify. The arbitrators' decisions from these proceedings typically recount that final interview panel members' ranking of the candidates was based on the interviewers' consideration of the candidates' answers to interview questions and the candidates' application materials.

Independent Counsel reviewed thirty-eight arbitration files, and in none of them did a final interview panel member (usually Wall and Walsh) ever disclose that the scoring of a candidate was based on receipt of that candidate's name from Commissioner O'Brien or one of his deputies. In fact, in at least two arbitration cases, Deputy Commissioners Wall and Walsh explicitly denied receiving any names, as noted in the arbitrators' decisions:

> They asked each candidate the same four questions, each of which was worth 5 points, and independently scored the responses using a scoring key prepared by the OCP. *According to both Wall and Walsh, no one from OCP expressed a preference for any of the candidates.*
>
> * * *
>
> Both deputies testified that they had reviewed the materials the applicants had submitted prior to the interviews. *They also said that no one had spoken to them one way or the other about any candidate ....*[26]

It is certainly possible that this sworn testimony was truthful, at least with respect to these specific cases. However, witnesses consistently testified that preferred names were handed down for most of the promotional positions for which probation officer union members applied. Independent Counsel believes that it is statistically unlikely that in the thirty-eight cases for which we have arbitration files, no names were communicated as to <u>any</u> candidate who was subsequently relevant to the arbitration. It is probable that on at least some occasions, the final interview panel members falsely described the basis for their decisions without any reference to the Commissioner's expression of a preference for a particular candidate, and/or falsely denied receiving names from OCP.

The potential seriousness of such conduct requires that arbitration testimony be reviewed by appropriate authorities with the resources to do so.

## 11. Fraudulent Hiring And Promotion Has Severe Consequences for the Department

To be clear, some of those hired or promoted as a result of the rigged process would and should have been hired or promoted on their own merits. Many applicants hired on the basis of

[26] A copy of relevant arbitration decisions accompany this Report as Exhibits 8 and 9.

their connections turned out to be professional and competent in their positions. Nonetheless, the fraudulent process has presented, and will continue to present, severe consequences for the Department.

First, the process is unfair to many qualified candidates who, but for the rigged system, could have advanced to subsequent rounds of interviews, and to those qualified candidates who were passed over at the final round in favor of connected candidates. These candidates were the most direct victims of a corrupt process and were defrauded by O'Brien and Deputy Commissioners Wall, Walsh and Tavares, the Regional Supervisors, and other interviewers who reported to O'Brien. There is evidence that other highly qualified candidates, resigned to the existence of the fraudulent process, never even applied for open promotional positions.

Second, the process led in some instances to the hiring of candidates who never should have been hired. As one example, a state senator's son with a felony narcotics record repeatedly was identified to interviewers as a preferred candidate who was ultimately hired. He eventually relapsed into drug use and left the department.

Third, the hiring and promotion process wasted substantial Probation Department and judicial resources, not to mention the time of applicants. The multiple rounds of interviews diverted judges and Department personnel from productive and important public responsibilities. In many cases, interviews were a vacant ritual given that the outcome was predetermined by O'Brien. Public money in the form of salaries and benefits were also obtained by individuals who were not the most qualified and who therefore should not have been employed or promoted.

Fourth, the fraudulent process potentially implicates public safety and the rehabilitation of probationers. The Probation Department is responsible for ensuring that, as best as can be achieved, the public is protected from defendants now on probation. The ostensible goal of the