# EXHIBIT A

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

hiring and promotion process is to determine the most qualified candidates to perform this public safety service. It is clear that in many cases unqualified candidates were hired and promoted. The extent to which this compromised the ability of the Department to ensure public safety and to rehabilitate probationers cannot reasonably be estimated.

Fifth, the fraudulent process seriously damaged morale within the Department. Aware that promotions were rigged, the morale of qualified employees who were repeatedly passed over for promotion (whether on the merits or not) was measurably undercut. Moreover, many of those who were enlisted in committing fraud, who otherwise have had decades-long, honorable careers in Probation, are now at risk for having perpetuated O'Brien's fraud.

Sixth, the fraud has opened the Department to potential legal liability. Candidates passed over for hiring and promotion, particularly those who grieved and arbitrated promotion decisions, may have causes of action against the Department, especially in cases in which perjury may have been committed during arbitration proceedings. During their testimony, some interviewers were able to identify specific individuals who would have made the list of finalists but for the order to place a sponsored candidate on the list. Independent Counsel has not fully explored this consequence, but the amounts in question could be substantial.

Finally, a corrupt process casts doubt on the integrity of the Department as a whole, including the many hardworking and honest Probation Department personnel who either had no knowledge of this system, or were aware of it but felt that had to comply with instructions from the Commissioner or risk retaliation.

36

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

## 12. Changes in Process Can Limit Risk Of Fraudulent Conduct

Commissioner O'Brien had the power to appoint individuals to positions within the Department. Nonetheless, he was required to seek approval for each appointment from AOTC. Independent Counsel believes that AOTC has the authority to take a more interventionist role in ensuring that hiring within the Probation Department is based on merit and, in doing so, curb any future attempt to implement a fraudulent process.

The evidence indicates that as early as 2000, AOTC was aware that there were significant and fundamental problems with the Probation Department's hiring practices. Chief Justice for Administration and Management Barbara Dortch-Okara knew that O'Brien was providing names of "recommended" candidates to the local interview panels and was attempting to improperly influence the hiring process. Chief Justice Dortch-Okara took meaningful steps to address these problems, but before permanent changes could be fully implemented, a hiring freeze in 2001 mooted the effort.

When hiring resumed in 2004, the evidence indicates that certain judges involved in the interview process were aware that Probation employees on the panels were being given names of preferred candidates to pass to final interview rounds.[27] Some even called Commissioner O'Brien to complain about preferred candidates.[28] Though he testified he had no "direct evidence," Chief Justice Robert Mulligan believed that the hiring process for Probation Department employees was "dishonest" and that the Commissioner, either directly or through others, was fixing the process so that Commissioner's choice candidates could be hired.

---

[27] Testimony of Ellen Slaney, August 5, 2010 (Exhibit 135), at 75, 136, 204-205; Testimony of Edward Dalton, August 17, 2010 (Exhibit 103), at 52-53, 63-64, 85; Testimony of Richard O'Neil, August 3, 2010 (Exhibit 124), at 32-34, 36. Relevant excerpts of the testimony of former Regional Supervisor Dalton accompany this Report as Exhibit 103. Relevant excerpts of the testimony of Regional Supervisor O'Neil accompany this Report as Exhibit 124.

[28] Testimony of Richard O'Neil, August 3, 2010 (Exhibit 124) at 33-36.

37

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

Justice Mulligan challenged several appointments for which he perceived a "disconnect" between scoring by the local interview panel and scoring by the final round interviewers – *i.e.* where the final interview panel ranked a candidate significantly higher than the local interview panel. In one instance, Justice Mulligan questioned Deputy Commissioner Patricia Walsh about a particular appointment and testified that he believed Walsh was dishonest when she represented that the most qualified candidate was selected. In 2006, Justice Mulligan had a meeting with regional administrator Edward Dalton about his concern that hiring within Probation was essentially fraudulent. Accordingly, Chief Justice Mulligan did not shrink from confronting the problem.

Despite his efforts and his belief that the hiring process was dishonest, Justice Mulligan was faced with a gargantuan task, a hostile Commissioner determined to subvert him, and pervasive dishonesty among the Commissioner, his senior staff (including Legal Counsel) and their communications with the Court even when the Chief Justice specifically sought assurance that an individual selected was the most qualified candidate.

Chief Justice Mulligan took a narrow view of his authority to reject the Commissioner's proposed candidates:

> A.   I considered my authority overseeing probation's hiring is as follows: One, that probation hired pursuant to the policies which were in the personnel policies and procedures manual, that is, they conducted a process that was consistent with the policies; two, that they had -- my review that they had adequate funds to actually engage in the hiring, which I suppose is the very first step, one; and, three, that their hiring complied with the affirmative action policies in the trial court.
>
> There are, as you say, statutes. And there was outside sections in the budgets for the last several years reinforcing the exclusive appointment power in the commissioner of probation relative to hiring within the probation service.

LIBA/21225629

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

Testimony of Robert Mulligan, October 4, 2010 (Exhibit 122), at 4-5.[29]

The statutes and budget sections Chief Justice Mulligan referenced are M.G.L. 276, § 83, which was amended in 2001 to give the Commissioner the power to appoint probation department employees, and budgetary enactments since 2000, which have purported to give the Commissioner "exclusive" hiring authority. Based on these provisions, Chief Justice Mulligan believed his authority to reject an appointment was limited to situations in which the Commissioner failed to follow Trial Court hiring policies and procedures.

The *Policies and Procedures Manual* requires hiring the most qualified individuals based solely on the merits (with limited accommodation for affirmative action and collective bargaining agreements). Accordingly, if lesser candidates were appointed based on considerations other than merit, the Court could have rejected such appointments. During his testimony, Justice Mulligan agreed that, based on language in the *Policies and Procedures Manual*, he had and has authority to ensure that hiring is merit-based:

> Q. The statutory language or the regulatory language of the policies and procedures manual indicates in the first two paragraphs of Section 4.000 that hiring shall be of, quote, "the most qualified individuals." And it goes on in the second paragraph of 4.0 to say that such hiring shall be, quote, "based on their qualifications."
>
> Didn't that give you the authority to reject, in the event that you determined that hiring with respect to the most qualified individual did not occur?
>
> A. I suppose it -- on the face of it, it may -- I guess it did give me the -- but to -- yeah. I'll answer -- leave the answer the way it is.
>
> Q. Apart from whether you would have known the intricacies of particular recommendations and how you could be expected to fully understand either the qualifications of the

---

[29] Relevant excerpts of the testimony of Chief Justice Mulligan accompany this Report as Exhibit 122.

39

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

proposed appointment or whether an individual was most qualified, am I missing something or does the regulation appear to give you the power to reject, according to the statute, if standards are not met, including the most qualified applicant?

A.   No. I think you're correct. I believe you're correct.

Q.   If you look at page 6 of 17, Section 4.304 on nepotism under Subsection A, it says, quote, "It is the policy of the trial court that all appointments be made solely on the basis of merit," end quote. Then it goes on to talk about nepotism as such.

Q.   Doesn't that reinforce the notion that whatever appointment authority the commissioner had, it was subject to the hiring being solely on the basis of merit?

A.   It does.

Testimony of Robert Mulligan, October 4, 2010 (Exhibit 122), at 21-22.

The Chief Justice currently has statutory authority to amend the Trial Court's *Policies and Procedures Manual* and can enact strict standards to guard against favoritism in the hiring process. M.G.L. 211B, § 8. For example, nothing prevents the Chief Justice from requiring that judges sit on final interview panels as buffers against the kind of fraudulent conduct that has occurred.

While acknowledging the resource limitations on the Chief Justice, who must concurrently oversee the several divisions of the Trial Court, Independent Counsel concludes that AOTC must reassert its role in reforming standards for hiring within the Probation Department. The Chief Justice may wish to consider modifying existing policies and procedures, and implementing strict hiring criteria to guard against abusive patronage hiring.

40

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

## III.   RECOMMENDATIONS

The May 24, 2010 Order requested that Independent Counsel provide "such recommendations as he may deem appropriate to the Justices of the Supreme Judicial Court with respect to indications or findings of misconduct, if any, on the part of any employee of the judicial branch." As set forth above and in the following findings, the evidence of misconduct by employees of the judicial branch is substantial and warrants intervention by the Court.

### A.   <u>Discipline of Employees</u>

It is critical that the Commissioner of Probation be a person of demonstrated ability and unquestionable integrity. Commissioner O'Brien is neither and should not be permitted to return to the Probation Department. The evidence demonstrates that O'Brien engaged in potentially criminal fraud by orchestrating hiring and promotion decisions within the Department, and violated state campaign laws by soliciting employees for political contributions on state property. For these reasons alone he should not be entrusted with the management of an organization whose essential purpose is fundamental to the criminal justice system and dependent upon the integrity of its leader. O'Brien is in no position to serve as the Commissioner of the Department given his conduct.

O'Brien retaliated against individuals who failed to comply with a fraudulent process, and refused to cooperate with this investigation despite posturing that he would do so. He refused even to state whether he was in compliance with the Court's document preservation order. It is impossible to see how O'Brien could be placed in a position of authority over Probation Department employees, many of whom did cooperate in the investigation. The

41

recommendation of Independent Counsel therefore is that Commissioner O'Brien be terminated from the Probation Department pursuant to such procedures as may be required.

First Deputy Commissioner Tavares, by her own admission and through the testimony of others, was extensively involved in the Department's fraudulent hiring and promotion practices. As an attorney and member of the Massachusetts Bar, Tavares should have refused to be an active participant in this scheme. She initially cooperated with the investigation during her early testimony, providing valuable information concerning Commissioner O'Brien's role in fraudulent hiring. Tavares would ordinarily be given credit for doing so, but she subsequently refused to testify on the second day of her testimony, invoking her Fifth Amendment and Article 12 rights. Independent Counsel concludes that disciplinary action against Tavares is merited, up through and including termination. She should be suspended forthwith and referred to the Board of Bar Overseers.

Deputy Commissioner Francis Wall was identified by numerous witnesses as having been extensively involved in the fraudulent hiring and promotion scheme. His role included providing names of sponsored candidates to members of local interview panels; falsely scoring on local interview panels for chief probation officer positions and final interview panels; and implementing retaliatory sanctions against regional supervisors Slaney and Dalton. Wall was also involved in unlawfully soliciting contributions to political candidates from Probation Department personnel at One Ashburton Place.

The evidence further suggests that Wall may have testified falsely during arbitration proceedings following grievances initiated by unsuccessful candidates for promotion. He refused to cooperate with this investigation and refused to state whether he was in compliance with this Court's document retention order. As with Commissioner O'Brien, it is impossible to

42

see, given potentially criminal conduct and his history of retaliation, how Wall can remain in a position of authority within the Department. The recommendation of Independent Counsel is that Deputy Commissioner Wall be terminated from the Probation Department using such procedures as may be required and that he be suspended forthwith.

Deputy Commissioner Christopher Bulger testified that he was unaware until recently of fraudulent hiring and promotion though he "assumed" it was the practice. Independent Counsel did not find Bulger credible. Rather, he was consistently evasive and dishonest. Even were one to accept his testimony, it would reflect poorly on Bulger's competence and judgment as counsel for the Department if he was unaware of a pervasive hiring and promotion scheme that involved virtually all of his fellow Deputy Commissioners, resulted in a back-and-forth letter writing campaign against AOTC in which he participated, and implicated the sworn testimony of Probation Department employees during grievance proceedings.

Furthermore, Bulger acknowledged that throughout this investigation he has regularly informed Commissioner O'Brien of the testimony of witnesses and the direction of the investigation, conduct irreconcilable with his fiduciary duties to the Department and the Trial Court. Independent Counsel recommends that Bulger be suspended forthwith and that his conduct and testimony be reviewed for potential termination by AOTC and sanction by the Board of Bar Overseers.

Three retired Deputy Commissioners – First Deputy Commissioner John Cremens, Deputy Commissioner William Burke, and Deputy Commissioner Patricia Walsh – participated, by their own admission (Cremens, Burke) or the testimony of others (Walsh) in the fraudulent hiring and promotion process. Given their status, it is unclear what, if any, disciplinary action

43

can be taken against them.  Burke and Walsh may be subjects of follow-on criminal
investigations.

Others described in this Report as involved in implementing the hiring and promotion
process – regional supervisors, chief probation officers, and administrative personnel who passed
on names of favored candidates – all bear some responsibility.  Some of these individuals feared
retaliation if they did not comply with the institutionalized fraud.  Independent Counsel
recommends that this Court inform AOTC and the Probation Department of these findings so
that AOTC may consider whether employment sanctions should be imposed.

Independent Counsel notes that not all individuals involved in implementing fraudulent
hiring and promotion are identified in this Report, as undertaking that task was beyond the
resources of this investigation.  It is Independent Counsel's view that while many Probation
employees are culpable in a literal sense, they were pressured to act by the Commissioner and a
systemic imperative that failure to cooperate with the fraud posed risks to their jobs and
opportunities for advancement.  Accordingly, Independent Counsel does not recommend specific
sanctions against any of them.


## B.     Corrective Action

In addition to imposing such disciplinary action as may be appropriate, there is the
question whether remedial action is warranted or even possible with respect to individual hiring
decisions.  Independent Counsel concludes that no such action is feasible in light of time and
complexity.

For example, some may assert that sponsored candidates should be removed from their
positions and replaced with the next highest-ranked, non-sponsored candidates.  This would be

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

unworkable and in selected cases would produce its own inequity. Under the labor agreement between AOTC and the probation officer's union, it does not appear possible to divest the current employees of their positions, even if they obtained those positions unfairly. Institutionally, it would likely be disruptive and imperfect at best. Nor would it necessarily be in the public interest.

Moreover, the testimony was that in some cases the sponsored candidates were themselves the most qualified, or arguably the most qualified candidates. While there was testimony that more qualified candidates were routinely passed over, it may be difficult to identify such cases with confidence. Without the cooperation of Commissioner O'Brien, Deputy Commissioner Wall, or retired Deputy Commissioner Walsh, all of whom have consistently refused to cooperate with this investigation, and the cooperation of First Deputy Commissioner Elizabeth Tavares, who has now refused to cooperate, it would be impossible to establish what the unbiased rankings for each position would have been.

The evidence demonstrated that fraudulent hiring has been occurring since Commissioner O'Brien arrived in the late 1990s. At this point many individuals who may have been hired have been in their posts for up to a decade or more. Whatever the circumstances of their having obtained these positions, it is unclear that disruption of their employment or the Probation Department would be in the public interest.

## C.    **Policy Changes**

No hiring and promotion system, perhaps other than one based entirely on a multiple choice written exam with no oral component – which Independent Counsel does not recommend – is manipulation-proof. Many witnesses, even those critical of hiring and

45

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

promotion practices under Commissioner O'Brien, stated that favoritism in hiring into and

promotions within Probation existed to some extent prior to O'Brien and prior to the 2001

legislative change. Nonetheless, the position of Commissioner demands a highly qualified

professional empowered to select Deputy Commissioners with comparable ability. The

Administrative Office of the Trial Court needs the resources and statutory charter to hire and

promote only the "most qualified individuals," inclusive of union and affirmative action

obligations.

To paraphrase James Madison, if Probation Department employees and judges were

angels, there would be no need to guard against fraudulent hiring and promotion. But they are

not; numerous witnesses testified that influence ridden hiring and promotion occurred in varying

degrees when judges controlled personnel decisions.[30]

Independent Counsel therefore believes that a system of checks and balances might be

implemented to guard against both the corruption which infected the Probation Department, and

favoritism generally. In conducting interviews, the Trial Court and the Probation Department

may wish to consider an equal number of representatives at each level of interview, including the

"final round" in which no judge currently participates. Two representatives of the Court could

be present at regional level interview (as is presently the case only for chief probation officer

positions), and two representatives of the court at final interviews. Screening level interviews for

probation officer candidates and initial interviews for associate probation officers may also

warrant judicial participation or a designee of the Court.

While not perfect, such a system has the potential to improve the current process. First, it

will ensure that a candidate, before moving on to the next round of interviews, has at least some

46

support from judicial and Probation interviewers, eliminating the risk of wholly unqualified candidates being selected solely on the basis of connections. Second, the presence of judicial representatives at final interviews will prevent outright fraud, such as the rescoring of "Commissioner's Choice" candidates.

Independent Counsel further recommends that training concerning the legal aspects of hiring be given periodically to individuals participating in hiring and promotion as interviewers. Such training might include reflection on current excesses and the consequences to Probation and to interviewers of falsifying scoring and evaluation of candidates.

Finally, Independent Counsel recommends that, to the extent calls are received by OCP from legislators or others with respect to future entry-level and promotional positions, a record of all such calls, and the names of the relevant callers and candidates, be maintained and provided to the Administrative Office of the Trial Courts upon request. That legislators, judges and others may recommend a particular candidate is neither inappropriate nor illegal, and this Report should not be understood to suggest otherwise. But it is for objective interviewers and not those making such recommendations to decide what weight, if any, to be accorded to a recommendation. Legislators, judges and other elected officials should have no expectation that a recommended candidate, otherwise not the best choice, will be hired.

## D. **Referrals to Prosecutorial Authorities**

As discussed above in the Conclusions, the rigging by public employees of a hiring and promotion process in favor of politically-connected applicants may constitute criminal conduct in violation of federal fraud statutes, *United States v. Sorich*, 523 F.3d 702 (7th Cir. 2008), and

---

[30] *See, e.g.,* Testimony of Stephen Bocko, September 13, 2010 (Exhibit 94), at 13-16. Relevant excerpts of the

47

state law.  M.G.L. c. 268A, § 1 et seq. (conflict of interest laws and regulations regarding

conduct of public employees); M.G.L. c. 274, § 7 (conspiracy).  Such practices may also

constitute criminal violations of Massachusetts campaign finance laws.  M.G.L. c. 55, §§ 13, 14.

There is statistical evidence supporting a conclusion that certain state legislators

encouraged persons in the Probation Department to make campaign contributions in exchange

for sponsorship for a Probation position.  If such conduct occurred, it may be in violation of state

and federal bribery statutes.

Independent Counsel expresses no final view on the criminal guilt or innocence of any

individual discussed in this Report.  The observations and conclusions regarding specific

employees are based solely on evidence available at this time and given finite resources.  I do,

however, recommend that the appropriate federal and state law enforcement authorities be made

aware of the findings in this Report so that they may decide what action, if any, should be taken

following submission of this Report.

---

testimony of Deputy Commissioner Bocko accompany this Report as Exhibit 94.

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

## BACKGROUND OF THE INVESTIGATION

### I.   THE *BOSTON GLOBE* SPOTLIGHT STORY

1.      The Administrative Office of the Trial Court has been concerned with

Commissioner O'Brien's hiring and promotion decisions for years.  Some press attention, for

example from Commonwealth Magazine, had also been directed to the issue.  The immediate

impetus for this investigation, however, was a story that ran on May 23, 2010, in the *Boston

Globe,* written by the *Boston Globe* Spotlight Team, entitled An Agency Where Patronage is Job

One.[31]

2.      In that story, the *Globe* reported that applicants for hiring into or promotion

within the Probation Department stood a far greater chance of success if they were "friends,

relatives or financial backers" of Massachusetts elected officials, judges, or Commissioner

O'Brien himself.  This conclusion was reached based on interviews with witnesses, a review of

publically-available contribution information, and an analysis of family relationships among

Probation Department employees and politicians and judges.  The *Globe* also provided examples

of "connected" individuals being shielded from discipline or termination.

3.      All told, the *Boston Globe's* findings could be grouped into four categories:  (1)

"[t]he department is beset by a 'pay to play' mentality in which ambitious employees, whether

qualified or not, make campaign contributions to key politicians in hopes of advancing their

careers"; (2) "[p]romising candidates who don't have political connections are routinely passed

over to make way for the politically wired"; (3) "[l]ax oversight of the collection of fines and

court costs paid by probationers has left the department, which handles more than $70 million a

---

[31]  A copy of the *Boston Globe* story accompanies this Report as Exhibit 19.

49

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

year in cash, vulnerable to theft"; and (4) "politically connected employees with histories of alleged misconduct or sloppy work avoided serious career fallout."

4.     Troublingly, the *Globe* reported that O'Brien and the Probation Department received certain benefits in exchange for the Commissioner's and the Department's practice of hiring and promoting the friends, family, and financial backers of elected officials.  In particular, the *Globe* reported that the Legislature increased the Department's budget by "more than 160 percent from 1998 to 2008, a period in which other public safety agencies' spending increased by 20 percent or less …"

## II.    THE ORDER ESTABLISHING THIS INVESTIGATION

5.     On May 24, 2010, Chief Justice Margaret Marshall of the Supreme Judicial Court and Chief Justice for Administration and Management Robert Mulligan issued a joint statement observing that:

> the recent media coverage of the Office of the Commissioner of Probation raises serious issues concerning the hiring and promotion of probation officers and other management practices within the Probation Department of the Trial Court. We are deeply concerned with not only the proper administration of the Probation Department, but with how such reports may affect the public's perception of the integrity of all aspects of the judicial branch. The reporting by the *Boston Globe* Spotlight Team requires a full, prompt and independent inquiry.[32]

6.     Accordingly, by order dated May 24, 2010, the Justices of the Massachusetts Supreme Judicial Court appointed Paul F. Ware of Goodwin Procter LLP to serve as Independent Counsel for purposes of investigating the alleged wrongdoing.

7.     In that order, the Court instructed that:

(1)     Paul F. Ware, Jr. Esquire of Boston be, and hereby is, appointed Independent Counsel with the powers of Special

---

[32]  A copy of the May 24, 2010 joint statement accompanies this Report as Exhibit 2.

50

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

Master and Commissioner to conduct a prompt and
thorough administrative inquiry into alleged improprieties
with respect to the hiring and promotion of employees
within the Probation Department, as well as other practice
and management decisions within the Probation
Department that have been called into question, and to file
with this Court within ninety days of this date, or as soon as
possible, a report of his findings, conclusions, and
recommendations;

(2) the Independent Counsel shall also make such
recommendations as he may deem appropriate to the
Justices of the Supreme Judicial Court with respect to
indications or findings of misconduct, if any, on the part of
any employee of the judicial branch; and

(3) the Independent Counsel shall have, in addition to the usual
powers of a Special Master and Commissioner, the power
to subpoena witnesses and to administer oaths.

8. On May 27, 2010, this Court issued an order to employees of the Probation

Department, requiring them to retain documents "concerning the Probation Department,

including but not limited to the business of the Probation Department (including third-party

contractors) and personnel decisions of or affecting the Probation Department (such as hiring or

promotion decisions)."[33]

9. On June 30, 2010, the Court issued an additional order permitting Independent

Counsel to delegate work to other attorneys at Goodwin Procter, subject to his supervision:

In furtherance of the Order of May 24, 2010, appointing
Independent Counsel to conduct a prompt and thorough
administrative inquiry regarding the practices and procedures of
the Probation Department that have been called into question, It Is
Further Ordered that Independent Counsel shall be authorized in
his discretion to delegate to persons at Goodwin Procter LLP such
functions as he deems necessary and appropriate to the
investigation, including the review of documents, interviews of
individuals, and taking of testimony under oath in furtherance of
the investigation. Such delegation shall occur only to the extent

---

[33] A copy of the May 27, 2010 order accompanies this Report as Exhibit 3.

51

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

> that the investigation and all delegated functions occur under the
> direct supervision of the Independent Counsel, who shall be
> responsible for all such activities.[34]

10.     A list of the attorneys at Goodwin Procter to whom responsibility was delegated

during the course of this investigation appears in this Report as Appendix 1.

## III.   THE COURSE OF THE INVESTIGATION

### A.   Overview

11.     The May 24, 2010 Order appointing Independent Counsel granted Independent

Counsel, "in addition to the usual powers of a Special Master and Commissioner, the power to

subpoena witnesses and to administer oaths." *Id*. at ¶ 3.

12.     Pursuant to these powers, Independent Counsel conducted an administrative

inquiry into alleged improprieties with respect to the hiring and promotion of employees within

the Probation Department, as well as the other practices and management decisions within the

Probation Department that had been called into question.  The investigation included, but was

not limited to: (1) the taking of sworn testimony from sixty-eight (68) witnesses; (2) twenty-

seven (27) informal interviews; and (3) the review of over 525,000 documents from the

Probation Department and AOTC, including personnel and hiring files of Probation Department

employees; other documents relating to hiring and promotions within the Department, including

files relating to the grievance and arbitration process; email and letter communications between

relevant individuals; and documents provided by numerous witnesses and confidential

informants.  Finally, Independent Counsel reviewed emails and documents from computer hard

drives.

---

[34] A copy of the July 1, 2010 Order accompanies this Report as Exhibit 4.

52

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

13.     This exhaustive examination and analysis serves as the basis for the findings of fact discussed in detail in the remainder of this Report.

**B.      Informal Interviews**

14.     The investigation began with background interviews of persons who were considered likely to have information pertinent to the investigation. The witnesses interviewed included not only present employees of the Probation Department, but also former employees of the Department, present and former employees of the executive branch of the state government, one state legislator, and various other non-employees.

15.     The information obtained from these voluntary interviews was extremely useful in the early stages of the investigation.

16.     An alphabetical listing of all individuals informally interviewed appears in this Report as Appendix 2.

**C.      Sworn Testimony**

17.     During the course of this investigation, 67 witnesses appeared pursuant to subpoenas issued by the Independent Counsel. As with the informal interviews, the witnesses included present and former employees of the Probation Department, present and former employees of the executive branch of the state government, several state legislators, and other non-employees.

18.     Each witness who appeared to provide sworn testimony was provided a copy of a written warning, setting forth several potential uses that might be made of the testimony by the Court and/or other entities such as federal and state law enforcement organizations. Witnesses were provided a chance to review the warning and, if represented by counsel, to discuss the warning with counsel. Independent Counsel then asked the witness if he or she had any

53

questions concerning the content of the warning. If there were no questions, or any questions were answered, the witness was asked to sign the warning to acknowledge its receipt.[35]

19.     In the course of taking sworn testimony, a question arose whether counsel for the witnesses should be permitted in the examination room during questioning. In response to a motion this Court clarified, in a non-precedential order dated August 16, 2010, that, in the exercise of its discretion, the Court would permit counsel for witnesses to be present.[36]

20.     One witness subpoenaed by Independent Counsel, Representative Thomas Petrolati, moved this Court to quash the subpoena issued to him. He argued that the subpoena was *ultra vires* the Court's statutory authority and ran afoul of the constitutional separation of powers. By order dated September 16, 2010, this Court denied that motion.[37]

21.     An alphabetical listing of all individuals who were subpoenaed and have appeared to testify appears in this Report as Appendix 3. A separate alphabetical listing of all individuals who were subpoenaed, but, as of the date of this Report, have not yet appeared to testify, appears in this Report as Appendix 4. In some cases we learned that, for health or other valid reasons, the subpoenaed individuals were not available. In other cases we were unable to locate the subpoenaed individuals. A list of the unavailable witnesses appears in this Report as Appendix 5.

22.     Several witnesses who appeared invoked their right, under the Fifth Amendment to the U.S. Constitution and/or Article 12 of the Massachusetts Declaration of Rights, not to testify on the basis that their answers could be self-incriminating. In several instances, current Probation Department employees invoked their Fifth Amendment and/or Article 12 rights,

---

[35] A copy of the warning accompanies this Report as Exhibit 91.

[36] A copy of the August 16, 2010 order accompanies this Report as Exhibit 5.

[37] A copy of the September 16, 2010 order accompanies this Report as Exhibit 6.

54

thereby refusing to cooperate with this investigation. The questions that some such employees refused to answer included whether they complied with this Court's May 27, 2010 document retention order.

23.     The Probation Department employees who refused to testify under oath concerning the substance of this investigation were Commissioner John O'Brien; Deputy Commissioner Francis Wall; Former Deputy Commissioner Patricia Walsh; Regional Program Manager Eugene Irwin; Regional Program Manager Kathleen Petrolati; Chief Probation Officer Richard Bracciale and Chief Probation Officer Joseph Hamilton. First Deputy Commissioner Elizabeth Tavares testified on the first day on which she was called to testify in July 2010, but in a second day of testimony in October 2010 refused to testify further.

24.     The non-employees who refused to testify under oath concerning the substance of this investigation were former Speaker Thomas Finneran and Representative Thomas Petrolati.

## D.     Documents Collected

25.     Our investigation required the examination and analysis of more than 525,000 documents in electronic and paper format. Independent Counsel issued *subpoenas duces tecum* to nearly all the individuals who testified under oath, and many of these witnesses provided responsive documents to the Independent Counsel.

26.     In addition, many of the individuals whom we interviewed informally provided relevant documents. Further, unsolicited individuals sent the Independent Counsel letters and other documents that warranted review. Some of these individuals contacted the Independent Counsel's office by telephone or email.

27.     Electronic document collection efforts included the retrieval and search of hard drives seized from some OCP employees. We also retrieved and reviewed over 150,000 emails

55

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

from the files of OCP employees. The list of employees whose email and/or computers were searched appears in this Report as Appendix 6.[38]

28.     For the purpose of identifying and analyzing hirings and promotions within the Department that may have involved impropriety, Independent Counsel collected over 150 hiring and personnel files from AOTC. Independent Counsel collected and reviewed over 25 additional personnel files from OCP offices, including reviewing the files of various OCP management-level employees and certain employees against whom allegations of impropriety had been made. Document collection efforts at OCP further included the collection of 25 boxes of materials from the files of the Commissioner's Office, including boxes of communications, memoranda, and internal documents.

29.     Independent Counsel also took possession and custody of all scoring sheets relating to any hiring or promotion which totaled 100 additional boxes of materials.

30.     Finally, Independent Counsel collected and reviewed files from grievances initiated by employees who had failed to obtain promotions within the Department, and files from 38 arbitrations between the probation officers' union and AOTC following unsuccessful grievances.

---

[38]     Late in the investigation Independent Counsel learned that there is a server which houses Probation Department documents. We have not reviewed the contents of the server.

LIBA/21225629

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

## BACKGROUND OF THE MASSACHUSETTS PROBATION DEPARTMENT

### I.      HISTORY OF THE DEPARTMENT

31.     Massachusetts has a long-standing tradition of using probation as a court-ordered sanction and rehabilitative tool for individuals convicted of crime.  Massachusetts implemented a system of probation in 1841, which was officially incorporated into the court system in 1878.

32.     The Office of the Commissioner of Probation ("OCP") is a department of the Massachusetts Trial Court and is comprised of the Massachusetts Probation Service (often referred to as the "Probation Department") and the Office of Community Corrections ("OCC").

33.     The Office of the Commissioner was established by M.G.L.A. c. 276, § 98  in 1956.  Prior to that time, there was a Board of Probation appointed by the Chief Justice of the Superior Court.[39]  In 1956, when the position of Commissioner was established, the power to appoint the Commissioner was also vested in the Chief Justice of the Superior Court.  In 1978, the statute was amended to give the Chief Justice for Administration and Management the power to appoint the Commissioner of Probation.[40]

34.     M.G.L.A. c. 276, § 98 originally limited the Commissioner to a 6-year term.  In 1993, the Legislature amended the statute and the term limit was removed.  As of July 1, 2010, however, a new term limit of five years was established.

### II.     COMPOSITION AND RESPONSIBILITIES OF THE DEPARTMENT

35.     The Office of the Commissioner is comprised of 118 employees and is responsible for administrative functions and oversight of the Probation Service and Office of Community Corrections, including hiring, promotion and discipline of employees; overseeing financial and budget related matters; performing audits of the various Probation Departments to

---

[39]     M.G.L.A. c. 276, § 98.  A copy of this statute accompanies this Report as Exhibit 14.

57

ensure they are functioning properly; training of Probation Department employees; drafting and tracking legislation related to the Probation Department; and overseeing the electronic monitoring of probationers, among other responsibilities.

36.    The Programs Division of OCP is further responsible for system-wide initiatives, such as the Department's Electronic Monitoring ("ELMO") program. The ELMO program has an additional 48 employees.

37.    The Probation Service is comprised of 1,807 employees in 105 individual Probation Departments located in each of the Superior, District, Juvenile, Probate and Family and Boston Municipal Courts. Within the various Departments, probation officers are responsible for overseeing individuals placed on probation as a condition of disposition of criminal matters before the Court. Their work includes supervising probationers, reporting findings and making recommendations to the court, enforcing court orders, and electronic monitoring of certain probationers. In the probate and family courts, probation officers serve more as investigators and mediators on contested probate and family court issues, such as child custody and divorce disputes.

38.    The Office of Community Corrections was created in 1996. It is comprised of 21 Community Corrections Centers throughout Massachusetts and employs 97 people. [41] Community Corrections Centers are "community-based supervision sites where offenders must check-in regularly." Individuals assigned to the Community Corrections Centers must also perform community service projects. Community Corrections Centers are manned by probation officers with the title "probation officer in charge."

---

[40]    M.G.L.A. c. 276, § 98 (Exhibit 14).

[41]    A Probation Primer: A Guide to the Massachusetts Probation Service and the Office of Community Corrections, available at http://www.mass.gov/courts/probation/.

58

## III. LEADERSHIP OF THE DEPARTMENT

### A. Commissioner John O'Brien

39. The Commissioner of Probation from 1998 until his suspension on May 24, 2010 was John O'Brien. O'Brien was appointed as Commissioner on December 2, 1997 by then-Chief Justice for Administration and Management John Irwin. O'Brien took office on January 1, 1998.

40. Numerous witnesses stated that Commissioner O'Brien and Chief Justice Irwin had developed a close relationship in the years preceding O'Brien's appointment. Among other factors contributing to this relationship, witnesses identified O'Brien's having attended Irwin's alma mater, Boston College; Irwin's being a judge in Suffolk Superior Court when O'Brien worked as a probation officer and then assistant chief probation officer in that Court; O'Brien's work as the Regional Coordinator for the Superior Court Administrative Office when Irwin was Chief Justice of the Massachusetts Superior Court; and O'Brien's work as Coordinator of Intergovernmental Relations and then Executive Director of the Office of Community Corrections for AOTC under Chief Justice Irwin.[42]

41. O'Brien's appointment as Commissioner was controversial at the time. Witnesses told us that many believed Ronald Corbett, then First Deputy Commissioner in the Department, was the logical choice for Commissioner and should have been appointed instead of O'Brien.[43] Among other qualifications, Corbett has a Ph.D. in education and, at the time, had 24 years experience in the Probation Department, including seven years as a Deputy Commissioner.[44]

---

[42] Testimony of Robert Mulligan (Exhibit 122), October 4, 2010, at 13, 27; Informal interview of Donald Cochran; Informal interview of Ronald Corbett. A copy of O'Brien's resume accompanies this Report as Exhibit 24.

[43] *See, e.g.,* Informal interview of Donald Cochran.

[44] Informal interview of Ronald Corbett.

LIBA/21225629

Corbett was involved in several national probation organizations and is highly regarded by O'Brien's predecessor, Commissioner Donald Cochran.[45] In comparison, O'Brien has no graduate degree and had only achieved the rank of assistant chief probation officer within the Probation Department.[46] For the several years prior to his appointment as Commissioner, O'Brien was not even working in the Probation Department.[47]

42. There is evidence that Chief Justice Irwin made the qualifications for Commissioner less rigorous so that O'Brien would qualify. When Don Cochran was appointed Commissioner in 1984, the position required a "master's or doctor's degree" and no fewer than 10 years of experience in probation, corrections, parole or other criminal justice-related employment, including three years in an administrative capacity.[48] When the Commissioner's position was posted in 1997, however, the qualifications were changed and the educational requirement was decreased – the requirement of a master's or doctorate degree was eliminated. The only requirement was that a candidate have "extensive knowledge of the criminal justice system and probation service as would normally be acquired through graduate study and experience within the fields of probation, criminal justice or parole or an equivalent combination of education and experience."[49]

43. Since O'Brien's suspension on May 24, 2010, Ronald Corbett has been serving as Acting Commissioner.

---

[45] Informal interview of Donald Cochran.

[46] O'Brien's resume (Exhibit 24).

[47] O'Brien's resume (Exhibit 24).

[48] A copy of the 1984 Position Vacancy Announcement for the position of Commissioner of Probation accompanies this Report as Exhibit 21.

[49] A copy of the 1997 Position Vacancy Announcement for the position of Commissioner of Probation accompanies this Report as Exhibit 22.

60

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

## B.     The Probation Department Hierarchy

44.     The Probation Department has an extensive management structure, beginning with the Commissioner and reaching down to assistant chief probation officers assigned to the local courts. A copy of an organizational chart setting forth the hierarchy within OCP itself accompanies this Report as Exhibit 30.

45.     Reporting to the Commissioner are the Deputy Commissioners, beginning with the First and Second Deputy Commissioners. Elizabeth Tavares presently is the First Deputy Commissioner. Tavares was promoted from Second Deputy Commissioner to First Deputy Commissioner in 2008, when then-First Deputy Commissioner John Cremens retired.

46.     The position of Second Deputy has been vacant since Tavares was promoted to First Deputy. Deputy Commissioner Francis M. Wall (Deputy Commissioner, Field Services), has been functionally acting as Second Deputy during this period.[50]

47.     The current Deputy Commissioners are: Francis M. Wall, Stephen T. Bocko (Deputy Commissioner, Research and Training), Christopher J. Bulger (Deputy Commissioner, Legal Counsel[51]), and Paul Lucci (Deputy Commissioner, Programs Division and Electronic Monitoring). Patricia Walsh also served as Deputy Commissioner (Regional Administration and Juvenile Court Liaison) until she retired in the fall of 2009.

48.     There are thirteen Supervisors of Probation Services employed by OCP. There are nine Supervisors responsible for overseeing the Probation Departments in the various courts in assigned geographic regions. These regional supervisors during the course of this

---

[50]   Testimony of Nilda Rios, August 4, 2010 (Exhibit 130), at 31-32; Testimony of Paul Lucci, August 23, 2010 (Exhibit 114), at 13; Testimony of Lucia Vanasse, July 20, 2010 (Exhibit 138), at 28-29. Relevant excerpts of the testimony of Deputy Commissioner Lucci accompany this Report as Exhibit 114. Relevant excerpts of the testimony of Administrative Assistant Vanasse accompany this Report as Exhibit 138.

[51]   Though Bulger functions as Legal Counsel, employment records indicate that he has never actually been appointed to the position.

61

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

investigation were Jeffrey Akers, Maribeth Borsari, Francis Campbell, Edward Dalton,[52] Edward Driscoll, Mark McHale, Brian Murphy, Ellen Slaney and Francine Ryan.[53]  In addition, there are four supervisors who oversee  different functions of the Probation Service and OCP.  Richard O'Neil supervises the Probation Departments within the probate and family courts state-wide. Edward Rideout supervises the Probation Service training facility in Clinton, Massachusetts. Nilda Rios, while designated as a Supervisor, is currently tasked with working in the electronic monitoring division.  Dianne Fasano is Supervisor of Probation Services for Superior Courts.

49.      OCP also employees individuals who, since O'Brien has been Commissioner, have been assigned as "liaisons" to deal with legislators and legislative staffs on matters concerning the Probation Department.  These individuals have been Michelle Cahill Martino (1998-2004); Maria Walsh (1998-present); and Edward Ryan (2005-2007).[54]

50.      Probation operations at a particular court are overseen by a chief probation officer.  Depending upon the number of probation officers at a given office, there may also be one or more assistant chief probation officers assigned to the court and, if there are multiple assistant chiefs, a first assistant chief probation officer may be designated.

51.      Probation officers are the front line of the Probation Department, responsible for overseeing the probationers to whom they are assigned.  To free up probation officers for field work, associate probation officers handle much of the back office and in-court administrative work.

---

[52]     Dalton retired on August 13, 2010.

[53]     Probation Department Organizational Chart, Exhibit 30.

[54]     Testimony of Michelle Cahill Martino, July 19, 2010 (Exhibit 97), at 23, 88-91; Testimony of Edward Ryan, June 29, 2010 (131), at 39-40; Testimony of Maria Walsh, July 19, 2010 (Exhibit 139), at 5-17.  Relevant excerpts of the testimony of Administrative Assistant Martino accompany this Report as Exhibit 97.  Relevant excerpts of the testimony of Manager of Intergovernmental Relations Maria Walsh accompany this Report as Exhibit 139.

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

## IV.    THE PROBATION DEPARTMENT BUDGET

52.    Reviewing the Probation Department's budget year-to-year is complicated by changes during the past decade in how funds are appropriated for Probation activities.

53.    Prior to FY 2004, funds were appropriated for OCP directly, in order to support its oversight role with respect to local Probation offices assigned to each court and the Department's programmatic activities. Funding for the local Probation offices, however, was included within the allocations for those Courts. Thus, looking at the funding for OCP before FY 2004 does not reveal the full extent of "Probation" funding.

54.    In FY 2004 funding for Department activities was consolidated in OCP. From 2005 through 2009, allocations for Probation increased steadily, from $114.6 million in 2005 to $142.4 million in 2009. This represents an aggregate increase of 24.2% and an average annual increase of approximately 5.6%. During this same period, the total budget for the Trial Court, of which Probation is a part, increased from $470 million to $576 million, an aggregate increase of 22.5% and an average annual increase of about 5.2%. Spending overall for the Commonwealth (excluding public assistance) increased from $12.4 billion to $14.6 billion, an aggregate increase of 17.7% and an average annual increase of about 4.2%.

55.    Accordingly, the budget for Probation grew substantially faster than the Commonwealth's total budget, but not much faster than the overall budget for the Trial Court.

56.    While Probation's budget growth did not outpace the Trial Court's budget growth by much, it is worth noting that the legislature repeatedly appropriated more money for Probation than the amount that AOTC requested. Each fiscal year from 2006 through 2009, funding for Probation exceeded the requests made in amounts ranging from $1.9 million in 2008,

63

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

to $7.4 million in 2006, $7.6 million 2009, and $8.5 million in 2007 – an aggregate total of $25.4 million above what was requested by AOTC for the Department.[55]

## V.   RELATIONSHIP BETWEEN THE DEPARTMENT AND THE COURTS

57.     The Probation Department is an integral part of each court.  On a daily basis, Probation Department employees interact with the judges of the court to which they are assigned and oversee probationers within those courts.

58.     On an administrative level, there is extensive interaction between the Chief Justice for Administration and Management and OCP.  OCP and its departments are part of and are overseen by the Trial Court.  The Chief Justice for Administration and Management, in addition to having the authority to appoint the Commissioner, must approve and consent to the appointment of deputies, supervisors and assistants within the Probation Department and set the salaries for all OCP and Probation Department employees.  While the Commissioner has the authority to establish reports and forms, and procedures and rules of Probation work, those must be approved by the Chief Justice for Administration and Management.  The Commissioner is also tasked with assessing the needs of the Probation offices for staffing and recommending the assignment of additional personnel to the Chief Justice for Administration and Management.[56] As a consequence, the Chief Justice for Administration and Management and Commissioner must constantly interact and collaborate on various efforts.

---

[55]   A copy of a chart setting forth budgeting information, provided to Independent Counsel by AOTC, accompanies this Report as Exhibit 18.

[56]   M.G.L. c. 276, §§ 98, 99.  A copy of these statutes accompany this Report as Exhibits 14 and 15.

LIBA/21225629

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

## FINDINGS – HIRING AND PROMOTIONS

I.     **HIRING AND PROMOTION AUTHORITY IN THE PROBATION
       DEPARTMENT**

59.     Although the investigation considered evidence of other alleged wrongdoing

within the Probation Department, the principal focus was on hiring and promotion practices

during the tenure of Commissioner John O'Brien.  To understand the manner in which those

practices were compromised to favor connected candidates, it is useful to understand how, in

theory, the process by which hiring and promotion decisions within the Department should have

been made.

       A.     **Pre-2001**

60.     Prior to 2001, while OCP played a role in the hiring and promotion of probation

officers, the authority to appoint, dismiss and assign probation officers was vested in the Chief

Justice for Administration and Management.

61.     Because the appointing authority was ultimately vested in the Chief Justice for

Administration and Management and the judges, judges were  more heavily involved in the

hiring process than today.[57]  For probation officers, the presiding justice for the court in question

selected the candidate to be presented to the Chief Justice for Administration and Management

for final approval.  In any court with two or more probation officers, the first justice of that court,

subject to the approval of the Chief Justice for Administration and Management, had the

authority to designate a chief probation officer and assistant chief probation officers "as he

---

[57]     Testimony of John Cremens, August 6, 2010 (Exhibit 102), at 16-17; Testimony of Edward Dalton, August 17,
       2010 (Exhibit 103), at 26-27; Testimony of Elizabeth Tavares, July 13, 2010 (Exhibit 137), at 16-17; Testimony
       of Richard O'Neil, August 3, 2010 (Exhibit 124), at 17-19.

65

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

deem[ed] necessary for the effective administration of justice."[58]  Administrative Order No. 4, *infra* at 113 – 115, enacted in 1989, governed the process for hiring chief probation officers.

**B.    Post-2001**

62.    In 2001, M.G.L.A. c. 276, § 83 was amended and the authority previously vested in the Chief Justice for Administration and Management and the first justices was transferred to the Commissioner of Probation.  The Commissioner was granted authority to "appoint, dismiss and assign" probation officers to the trial courts and designate chief probation officers and assistant chief probation officers.

63.    Anthony Sicuso, Deputy Commissioner/Legal Counsel at the time, testified that he wrote the first draft of the 2001 amendment in consultation with Commissioner O'Brien.[59]

64.    This amendment was controversial at the time.  Some in the press raised (prescient) concerns that centralizing hiring authority in Commissioner O'Brien would result in increased patronage hiring.[60]

65.    Beginning in 2001, the budget line-item for OCP included the following language appearing to grant additional authority to the Commissioner: "For the office of the commissioner of probation provided, that notwithstanding any general or special law or rule or regulation to the contrary, the commissioner, subject to appropriation, shall have *exclusive authority* to appoint, dismiss, assign and discipline probation officers, associate probation officers, probation officers-in-charge, assistant chief probation officers and chief probation officers..." (emphasis added).

66.    The Chief Justice for Administration and Management, however, retained the power to reject any appointment not in compliance with M.G.L. c. 211B, § 8 which governs the

---

[58]    M.G.L.A. c. 276, § 83 (1992).  A copy of M.G.L.A. c. 276, § 83 accompanies this Report as Exhibit 13.

[59]    Testimony of Anthony Sicuso, September 30, 2010 (Exhibit 134), at 98-99.

66

hiring of all trial court employees, except judges, clerks and registers of probate. M.G.L. c

211B, § 8 gives the Chief Justice for Administration and Management the power to "establish

and promulgate standards for the appointment, performance, promotion, continuing education

and removal of all personnel within the trial court…" "The Chief Justice for Administration and

Management shall have the power to reject any [appointment governed by c. 211B, § 8] within

fourteen days after receipt of the certification of compliance by the appointing authority but such

power to reject any such appointment shall be limited to non-compliance with the standards for

appointment."

      67.     This residual authority of the Chief Justice for Administration and Management

was confirmed by this Court. In addressing a challenge brought against the statutory amendment

by sitting judges, the Court explained that "it remains entirely within the Chief Justice's power to

establish a set of conditions that the commissioner would be required to follow in the

appointment of probation officers, including strict compliance with all aspects of the personnel

manual." *First Justice of the Bristol Div. of the Juvenile Court Dep't v. Clerk-Magistrate of the

Bristol Div. of the Juvenile Court Dep't*, 438 Mass. 387, 407 (2003).

      68.     As a practical matter, since 2001 the judges have become less involved in hiring.

At most, judges sit on a first round of interviews for their respective courts, but their vote in

hiring garners no more weight than that of the two designees from OCP.

## II.    OVERVIEW OF THE HIRING AND PROMOTION PROCESS SINCE 2001

      69.     During the tenure of Commissioner O'Brien, the Probation Department has

employed extensive procedures for the hiring of associate probation officers and probation

officers, as well as for promotions to assistant chief probation officer and chief probation officer.

---

[60]    A copy of the article "A Bid To Boost Patronage in State Courts," The Metro West Daily News, November 30, 2001, accompanies this Report as Exhibit 20.

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

70.     In short, applicants for each position go through one or two rounds of initial interviews (depending upon the position), after which the high-ranked or high-scoring candidates are referred to the next round of interviews, culminating in a final round in which candidates were purportedly ranked on their responses to standard questions.

71.     Candidates who are unsuccessful in being hired or promoted are mailed a letter, signed by the Commissioner, suggesting that the candidate was simply outmatched by the successful candidate.  As commonly stated in such letters:

> Thank you on behalf of the screening committee for interviewing
> .... Deputy Commissioners William Burke and Francis Wall were
> very impressed with your qualifications.
>
> The selection of the final candidate(s) was a difficult process.
> Although you were not chosen for this position, I encourage you to
> persist in your efforts.  The interview committee enjoyed talking
> with you at your interview and wish you the best in your career
> endeavors.

A copy of a sample rejection letter accompanies this Report as Exhibit 33.

72.     These procedures provide a veneer of authenticity to hiring determinations, supporting a fiction that the most qualified candidate is always being hired.  In fact, and as discussed later in this Report, the processes described are fraudulent, with candidates favored by the Commissioner, often on the basis of their legislative or other sponsors, being given artificially inflated scores and rankings.

### A.     Hiring Procedures Prior to 2001

73.     Although the Commissioner only obtained appointment authority in 2001, prior to 2001 the Probation Department still was involved in hiring and promotion procedures for Department personnel.

74.     For probation officers, OCP collected applications for open positions and determined if the applicants met the minimum qualifications for an interview.  All candidates

68

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

who met the minimum qualifications were interviewed. Interviews often took several days due to the large volume of candidates.[61]

75.     There were two rounds of interviews. The first round interview panel typically consisted of a regional supervisor from the Commissioner's Office, the chief probation officer of the court in which the vacancy existed, and a representative from the district court. In the years just prior to 2001, the district court representative who was typically a regional coordinator for the District Court Department or a District Court judge.[62]

76.     The first round interview panel asked a set of standardized questions. At the end of the process, the panelists ranked and scored the candidates. Some discussion among the panelists often occurred prior to each panelist determining his or her individual rankings.[63]

77.     After 1998, the interviewer from the Commissioner's Office was the de facto head of the interview panel and was charged with consolidating the individual panelists' scores and rankings to determine the final rankings. Prior to that time, the judges or their representatives were heads of the panel. [64]

78.     Regardless who was the head of the panel, the eight to ten highest ranking candidates were sent to the presiding justice of the court in which the vacancy existed for a final

---

[61] Testimony of Jill Ziter, September 23, 2010 (Exhibit 140), at 18-19; Testimony of Rita McCarthy, September 27, 2010 (Exhibit 115), at 37-39; Testimony of Richard O'Neil, August 3, 2010 (Exhibit 124), at 17-19. Relevant excerpts of the testimony of former Regional Coordinator Ziter accompany this Report as Exhibit 140. Relevant excerpts of the testimony of Chief Probation Officer McCarthy accompany this Report as Exhibit 115.

[62] Testimony of Jill Ziter, September 23, 2010 (Exhibit 140), at 18-19.

[63] Testimony of Jill Ziter, September 23, 2010 (Exhibit 140), at 18-19, 23-25.

[64] Testimony of Rita McCarthy, September 27, 2010 (Exhibit 115), at 34, 39-40. McCarthy further testified that in the mid-1980s the panel was composed of the First Justice, the presiding judge of the court and chief probation officer. *Id.* at 23-24. The Commissioner's representative was added to the panel in late-80s or early 90s though the overall process was generally the same over time. *Id.* at 25-28.

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

interview.[65] The presiding justice could select a candidate and then send that candidate to the

Commissioner for his consent, and the Chief Justice for Administration and Management for

final approval.[66]

## B. The Hiring and Promotion Process Required by the Administrative Office of the Trial Court After 2001

79.     In 2001, the Trial Court established general policies and procedures governing the

hiring of all Trial Court employees, including those within the Probation Department. Section

4.000 of the *Personnel Policies and Procedures Manual* sets forth these policies and procedures.

80.     At the outset, the Manual emphasizes hiring the most qualified individual for the

position. Specifically, the first paragraph of Section 4.000 states:

> The successful operation of the Trial Court depends directly on the
> abilities and contributions of each employee in the organization.
> *Therefore, the objective of the hiring process is to select the most*
> *qualified individuals who can carry out their responsibilities in a*
> *competent and professional manner.*

(emphasis added).

81.     Section 4.304 of the Policies and Procedures manual addresses nepotism and

establishes merit as an unambiguous criterion for hiring. Section 4.304(A) reads,

> *It is the policy of the Trial Court that all appointments be made*
> *solely on the basis of merit.* The practice and appearance of
> nepotism *or favoritism* in the hiring process are to be avoided.

(emphases added).

82.     The remainder of the Manual sets forth various processes for hiring within the

Trial Court, including sections addressing relating to job postings, the review of applications, and

---

[65]     Testimony of Rita McCarthy, September 27, 2010 (Exhibit 115), at 19-21; 22-24; Testimony of Richard O'Neil, August 3, 2010 (Exhibit 124), at 17-20.

[66]     Testimony of Richard O'Neil, August 3, 2010 (Exhibit 124), at 18-21.

interviews. The Manual stresses the importance of having interviews conducted in an objective

manner to determine the best candidate for the position. Section 4.302(A) and (C) state that:

> (A) all applicants meeting the minimum qualification for the
> position must be interviewed.
>
> * * *
>
> (C) Interviews must be objectively tailored to measure the
> applicant's knowledge, skills and abilities for the position under
> consideration. To achieve this, the appointing authority must
> develop a standard set of questions designed to measure the
> knowledge, skills and abilities of applicants based on the job
> description for the specific position.

83.     Subsection (E) of 4.302 specifically applies to hiring within the Probation

Department. It adopts broad guidelines for hiring and interviewing and provides further specifics

with respect to the composition of the interview panel and the number of candidates who may be

recommended by the interview panel for appointment to the Commissioner.

> In the case of a Probation Officer, Probation Officer In Charge,
> Assistant Chief Probation Officer, or First Assistant Chief
> Probation Officer vacancy, an interview committee consisting of
> the Commissioner of Probation (Chair) or his/her designee, the
> Chief Probation Officer of the Division, and a representative of the
> Chief Justice of the Department shall interview applicants
> consistent with the guidelines set forth in this section. Each
> candidate selected for an interview shall be evaluated and
> determined to be recommended or not recommended. A list not to
> exceed 8 names of recommended candidates for each open position
> shall be forwarded to the First Justice.

84.     By letter of November 22, 2004, Chief Justice for Administration and

Management Mulligan amended this section to reflect the statutory shift in appointment authority

in 2001.[67] As modified, the last sentence of Section 4.302(E) now reads,

> A list not to exceed 8 names of recommended candidates for each
> open position shall be forwarded to the Commissioner of Probation

---

[67]   November 22, 2004 letter (Exhibit 36).

71

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

> for appointment subject to the approval of the Chief Justice of
> Administration and Management.

85.     This amendment to 4.302(E) followed a proposal from Commissioner O'Brien to eliminate section 4.302(E) of the *Manual* altogether, and instead to grant the Commissioner the authority to establish the process for hiring within the Department.[68]  Failing that, O'Brien sought to simply remove the Chief Justice from the interview committee.  Mulligan refused to grant O'Brien's request and instead simply agreed to modify the last sentence of section 4.302(E), as above.[69]

## C.     Probation Officers

86.     Hiring for probation officers takes place in "rounds" for each local court.  For any given round, the local court may have one or several probation officer positions available.  When the hiring of probation officers for a particular court is about to commence, the availability of positions is posted.

87.     It is typical for hiring for probation officers to occur for multiple courts at the same time.  In order to maximize their chances of receiving a position, it is a common practice for applicants to file separate applications for each of the several courts conducting hiring.  Consequently, the same applicant may be interviewed on multiple occasions within a short period, and may come before the same interviewer on multiple occasions for different courts.[70]

88.     Applications for probation officer positions are received by OCP.  There an initial "screen" is performed to ensure that the applicants meet the minimum qualifications for a probation officer.  These qualifications include an undergraduate degree and one year of "human service" employment, which can be in any field that requires regular interaction with the public.

---

[68]     November 22, 2004 letter (Exhibit 36).

[69]     November 22, 2004 letter (Exhibit 36).

72

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

That experience is not required if a candidate has a graduate degree in a relevant field. This initial screen is performed most commonly by Janet Mucci, the department's Personnel Director.[71]

89.     After Mucci screens out candidates who fail to meet the basic qualifications, applicants are scheduled for a first round of interviews. Until early 2005, this first round was conducted at the local court level. The local interview panel consists of the First Justice for the court, the chief probation officer assigned to the court, and a designee of the Commissioner, commonly the regional supervisor responsible for the county in which the court is located.

90.     Beginning in 2005, Chief Justice Mulligan asked that the Probation Department decrease the number of candidates coming before these local interview panels. Chief Justice Mulligan's stated concern was the drain on judicial resources, as judges were sitting for days at a time doing interviews of dozens of candidates for even a single position.[72]

91.     To address this concern, the Probation Department created a level of interviews known as the screening panel. The screening panel commonly consisted of Regional Supervisor Nilda Rios and Regional Supervisor Frank Campbell.[73]  A second screening panel to perform these initial interviews was also formed consisting of Chief Probation Officer Richard Bracciale and former Chief Probation Officer Kevin Cunniff.[74]

92.     The screening interview panel is required to ask candidates for probation officer positions a number of standardized questions provided by Deputy Commissioner Tavares. The

---

[70]   *See, e.g.*, Testimony of Richard O'Neil, August 3, 2010 (Exhibit 124), at 25-26.

[71]   Testimony of Janet Mucci, June 24, 2010 (Exhibit 121), at 8-9, 24-25.

[72]   A copy of the March 10, 2005 letter accompanies this Report as Exhibit 39.

[73]   Testimony of Francis Campbell, August 10, 2010 (Exhibit 98), at 31-32.  Relevant excerpts of the testimony of Regional Supervisor Campbell accompany this Report as Exhibit 98.

[74]   Testimony of Francis Campbell, August 10, 2010 (Exhibit 98), at 32-33.

73

panel members then score the candidates based on their answers to the questions, aggregate the scores, and pass along the top eight candidates for each open probation officer position to the local round of interviews. If more than one position is open in that court, eight candidates may be referred for each opening.[75]

93.     The local interview round (whether or not following a screening round) is intended to further narrow the field of candidates who receive a final round interview. Again, the interviewers are provided with a list of standard questions from Deputy Commissioner Tavares. Each of the three interviewers is required to rank order the candidates based on their responses. Typically these rankings are averaged to determine a total ranking for the candidate. Up to eight candidates per position are then recommended for a final round interview. There is no requirement that eight candidates be referred if the panel believes fewer are qualified, but under the instructions provided to the panel and under Section 4.302(E) of the *Policies and Procedures Manual* no more than eight per position are permitted.[76]

94.     Importantly, a candidate must not only appear in the top eight when averaged, but at least two of the three interviewers must place the candidate among their own top eight. In other words, if one panel member ranked a candidate first, but the other two panel members each ranked that candidate ninth, the candidate cannot be referred, even if his average ranking placed him in the top eight. At the same time, if two panel members ranked a candidate eighth, but the third panel member ranked the candidate far lower (*e.g.*, 20th), that candidate might fall out of the top eight based on his average ranking, and thus be ineligible for a final round interview.[77]

---

[75]     Testimony of Francis Campbell, August 10, 2010 (Exhibit 98), at 35-38.

[76]     A copy of the Interview Process Memorandum from Tavares accompanies this Report at Exhibit 27. *See also* March 29, 2005 letter from Chief Justice Mulligan to Commissioner O'Brien. A copy of this letter accompanies this Report as Exhibit 42.

[77]     Interview Process Memorandum (Exhibit 27); March 29, 2005 letter (Exhibit 42).

74

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

95.     Under limited circumstances, a list of finalists may have nine or more candidates. In particular, under the union contract for probation officers, some current probation officers applying to move to another Court must be automatically added to the list of finalists.[78]

96.     Candidates making it through the local round of interviews receive a final round interview. This round is held before an interview panel consisting of two Deputy Commissioners from OCP working directly for Commissioner O'Brien. For most of the time period in question, this panel consisted of Deputy Commissioners Francis Wall and Patricia Walsh. Other individuals who sat in on this final round included Administrative Assistant to the Deputy Commissioner for Field Services Edward McDermott, Deputy Director of the Office of Community Corrections Patricia Horne, Deputy Commissioner William Burke, and Regional Supervisor Edward Rideout.[79]

97.     At the final round interview, candidates are also asked a series of standard questions, different from the questions asked at the local round of interviews. The two interviewers score each candidate, tally the scores, and rank order candidates based on their aggregate scores.[80] The final panel is not provided prior rankings from the local round interviews. Accordingly, the local panel's views of the candidates are not considered in any way in determining the final rankings of candidates to be sent to O'Brien.[81]

---

[78]   National Association of Government Employees: Service Employees International Union, Local 5000, Employment Agreement, § 16.03 at 41. A copy of this Agreement accompanies this report as Exhibit 29.

[79]   Testimony of Elizabeth Tavares, July 13 (Exhibit 137), at 18, 38;Testimony of Edward McDermott, August 25, 2010 (Exhibit 116), at 24-27, 33-34; Testimony of Patricia Horne, October 4, 2010 (Exhibit 112), at 38-39; Testimony of William Burke, July 22, 2010 (Exhibit 96), at 49-50; Testimony of Edward Rideout, August 27, 2010 (Exhibit 129), at 59. Relevant excerpts of the testimony of OCC Deputy Director Horne accompany this Report as Exhibit 129.

[80]   Testimony of Edward McDermott, August 25, 2010 (Exhibit 116), at 47-448, 52-53.

[81]   October 17, 2006 letter from Chief Justice Mulligan to Commissioner O'Brien, a copy of which accompanies this Report as Exhibit 51.

75

98.     The rank ordering from the final interview panel is provided to Commissioner
O'Brien. First Deputy Commissioner Tavares testified that O'Brien always selects the highest
ranked candidate for the first probation officer opening in the particular court, and if additional
vacancies exist in that court, O'Brien appoints candidates in priority of their rank ordering by the
final pane.[82]

99.     In addition, the list of finalists is used to fill additional vacancies appearing within
a set period of time, which some witnesses recalled being nine months. As a result, even if a
rank ordering was initially created to fill only one position, persons ranking second or lower
could eventually be appointed without being required to re-interview.[83]

### D.     Associate Probation Officers

100.     The qualifications to become an associate probation officer are less than those
necessary to become a probation officer. For example, no bachelors degree is required, only a
high school degree or equivalent.

101.     Hiring for associate probation officers is considerably less rigorous than hiring for
probation officers. According to Deputy Commissioner William Burke, typically he and one
other individual – normally a chief probation officer or a regional supervisor – performed a
round of screening interviews for all applicants for associate probation officer positions. He
agreed that as long as the candidate met the minimum qualifications (a high school degree) and
was not "blatantly uncooperative," "vulgar," or "manifestly unqualified," these applicants were
passed to Commissioner O'Brien for his selection.[84]

---

[82]    Testimony of Elizabeth Tavares, July 13, 2010 (Exhibit 137), at 40-41.

[83]    Testimony of Richard O'Neil, August 3, 2010 (Exhibit 124), at 119-20; Testimony of Francine Ryan, August 9,
2010 (Exhibit 132), at 58-59. Relevant excerpts of the testimony of Regional Supervisor Ryan accompany this
Report as Exhibit 132.

[84]    Testimony of William Burke, July 22, 2010 (Exhibit 96), at 22.

76

102.    Regional Supervisor Dianne Fasano, who sometimes sat on these panels with

Burke, described the interviews for associate probation officers as a farce:

> Q.    Did Billy Burke ever provide you with any names?
>
> A.    I did interviews with Bill Burke for associate probation
>        officers. And those interviews were -- I don't know how
>        else to describe it other than ridiculous because they were
>        about ten days in a row of people every ten minutes. And
>        at the end we didn't make a list and I don't remember
>        scoring people.
>
>                                * * *
>
> Q.    What was the process for associate PO hires?
>
> A.    I don't know what the process was. I know I just sat in
>        interviews ten minutes a person and took notes about their
>        answers. I don't recall any scoring, any listing, any
>        anything.
>
> Q.    I take it then you weren't rank ordering any candidates?
>
> A.    Not as far as I remember.
>
> Q.    And –
>
> A.    It would have been impossible to rank.
>
> Q.    Just because there were so many of them?
>
> A.    Right. And I didn't do all of them so that wouldn't have
>        been fair if I tried to rank people I hadn't even seen.
>
> Q.    Did you score them numerically?
>
> A.    Not that I remember.
>
> Q.    Did you give them a thumbs up or thumbs down vote?
>
> A.    Not that I remember.
>
> Q.    So separate and apart from perhaps jotting down some
>        notes on these candidates that you were seeing for days at a
>        time, there was to the best of your memory no process of
>        when going down the list of candidates of ranking them or
>        scoring them?

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

A.    No.

Q.    How then were associate POs hired?

A.    I have no idea. They were hired by OCP and they -- I don't
       know. I don't know. My understanding is they were hired
       for a county but then placed in a particular court. But I
       don't know who picked them or how or how they were
       informed or anything like that.

Testimony of Dianne Fasano, September 3, 2010 (Exhibit 109), at 102, 104-105.[85]

103.    Regional Supervisor Francine Ryan also participated in associate probation

officer interviews and testified that the interviews had no bearing on who was hired. She stated

that the interviews were ten-minutes long and the interviewers did not rank or score the

candidates. At most, a few notes were made regarding the candidates' responses, but no effort

was made to compare the candidates. Ryan testified that she had no idea how the decision was

made which candidates to hire.[86]

104.    After receiving names from the interviewers, Commissioner O'Brien had the

option to select any candidate he wanted for associate probation officer positions.[87] Because the

majority of applicants made it past the screening round, O'Brien had, in effect, absolute

discretion in naming associate probation officers.

### E.    Assistant Chief Probation Officers

105.    Smaller probation offices consist of a chief probation officer and a discrete

number of probation officers. Once an office has reached a certain size, it may designate

assistant chief probation officers who function as middle management. The number of assistant

---

[85]    Relevant excerpts of the testimony of Supervisor Fasano accompany this Report as Exhibit 109.

[86]    Testimony of Francine Ryan, August 9, 2010 (Exhibit 132), at 42-43.

[87]    Testimony of William Burke, July 22, 2010 (Exhibit 96), at 21.

78

chief probation officers designed in a given court is determined by a formula, with one assistant chief probation officer authorized for every five probation officers assigned to the court.[88]

106.    To become an assistant chief probation officer, one first needs to be a probation officer (or a probation officer in charge). The pool of potential applicants is thus far smaller than the pool of applicants for probation officer positions. Accordingly, there is no screening round as there is for probation officer hiring.[89] Generally speaking, every probation officer in a given court applies for assistant chief probation officer when a position becomes available.

107.    As with probation officer hiring, candidates for assistant chief probation officer first must interview at the local level before proceeding to a final round at OCP. And as with probation officer hiring, the panel for assistant chief hiring consists of the First Justice for the particular court, the chief probation officer for that court, and a designee of the Commissioner, commonly the regional supervisor responsible for the county in which the court sits.

108.    In many cases, the First Justice of the local court and the chief probation officer of that court are personally familiar with each candidate's strengths and weaknesses based on his or her performance as a probation officer in that court. However, as with probation officer hiring, the procedure is for panel members to rank candidates based on their responses to a series of standard questions provided by First Deputy Commissioner Tavares. Again, the top eight candidates appearing on at least two panel members' lists of top eight are forwarded for a final round interview.[90]

---

[88]    September 26, 2006 letter from Chief Justice Mulligan to O'Brien. A copy of the letter accompanies this Report as Exhibit 47.

[89]    Testimony of Janet Mucci, June 24, 2010 (Exhibit 121), at 65-66.

[90]    *See, e.g.*, Memorandum from Elizabeth Tavares to the Interview Committee regarding Interview Process for Assistant Chief Probation Officer. A copy of the memorandum accompanies this Report as Exhibit 26.

79

109.    Finally, as with probation officer hiring, the final round interview is held before
Deputy Commissioners Wall and Walsh, or on occasion, before one of the Deputy
Commissioners and another individual such as Edward McDermott or Edward Rideout.  Final
round candidates are rank ordered based on their answers to standard questions.  O'Brien selects
the assistant chief probation officer based on the order of this ranking.[91]  The rankings compiled
by the local interview panel are not reviewed in this process despite the fact that the local panel
often has extensive first-hand knowledge of the applicants.

110.    In addition to assistant chief probation officers, some of the larger Probation
offices have a first assistant chief probation officer.  The process of being promoted to first
assistant chief is identical to the process for being promoted to assistant chief.

### F.    Chief Probation Officers

111.    Chief probation officers are responsible for the operations of the Probation
Department at each local court, and each court accordingly has only one chief probation officer.
There are also chief probation officers assigned in supervisory roles throughout the non-court
divisions of the Probation Department, such as Electronic Monitoring.

112.    Probation officers, assistant chief probation officers, first assistant chief probation
officers, and probation officers in charge may apply for chief probation officer positions.  There
are additional qualifications for a chief probation officer position, including three years of human
services experience, at least one year of management experience (or thirty hours of management
training approved by the Commissioner), and a graduate degree (although three years experience
as a probation officer can be substituted for this educational requirement).[92]  Typically all

---

[91]    Testimony of Elizabeth Tavares, July 13, 2010 (Exhibit 137), at 40.

[92]    *See, e.g.*, Job Descriptions and Qualifications for Chief Probation Officer, Salem District Court, posted
March 1, 2005.  A copy of which accompanies this Report as Exhibit 28.

80

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

probation officers, assistant chief probation officers, and any first assistant chief probation officer in a particular court meeting the minimum qualifications apply for a chief probation officer opening.

113.    Administrative Order No. 4, enacted in March 1989 by then-Chief Justice for Administration and Management Arthur Mason, establishes the procedure for the hiring of Chief Probation Officers and:

> [was] promulgated to bring about a more coordinated approach to the administration of the Probation Service of the Commonwealth and to meet the requirements of the Trial Court in promoting a comprehensive and uniform method for assessing the needs of probation officers and for guiding appointing authorities in the filling of the position of Chief Probation Officer.[93]

114.    Administrative Order No. 4 sets out a three-part process for reviewing an applicant:  (1) a review of the candidate's resume; (2) a personal interview; and (3) a written and oral practical exercise.

115.    The Order specifically enumerates eleven objective criteria on which a candidate should be evaluated including familiarity with probation standards and laws, knowledge of effective management principles, interpersonal and leadership skills, knowledge of community resources, positive working relationships, and quality of work in previous positions.

116.    There is no screening round of interviews for chief probation officers.  As with assistant chief probation officers, interviews for promotions to chief probation officer positions take place at both the local and OCP levels.  The composition of the interview panels, however, differs.

117.    At the local interview level the panel consists of four individuals:  the First Justice of the court, another judge from that court, and two designees of the Commissioner, most

81

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

commonly the regional supervisor responsible for the county in which the court is located and a deputy commissioner. The interview panel scores each of the candidates' answers to a standard set of questions. Administrative Order No. 4 dictates that only candidates receiving an average aggregate score of 80 or higher from the local interview panel can be referred on to the final round of interviews.

118. The final interview panel for chief probation officers consists of Commissioner O'Brien and the First and Second Deputy Commissioners. During most of the period in question these individuals were First Deputy Commissioner John Cremens and Second Deputy Commissioner Liz Tavares. When Cremens retired and Tavares became First Deputy Commissioner, the third slot on the panel was filled by Deputy Commissioner Francis Wall. As with the other positions discussed above, panel members score candidates on their responses to standard questions, and aggregate and average their scores to determine the top candidate.[94]

## G. Community Corrections Centers

### 1. Probation Officers in Charge

119. Probation officer in charge positions are Probation Department positions, but the probation officers in charge work within Community Corrections Centers. There is at least one probation officer in charge assigned to each Community Corrections Center.[95] They serve as conduits of information between the Probation Department in OCC and track probationers that are assigned to OCC. Probation officers in charge conduct meetings with those probationers as

---

[93] A copy of Administrative Order No. 4 accompanies this Report as Exhibit 23.

[94] Testimony of Elizabeth Tavares, July 13, 2010 (Exhibit 137), at 47.

[95] Testimony of John Quinn, November 1, 2010 (Exhibit 128), at 23. Relevant excerpts of the testimony of OCC Regional Program Manager Quinn accompany this Report as Exhibit 128.

82

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

needed and weigh in on their OCC program assignments as the probation officers in charge deem necessary.[96]

120.    Probation officers in charge are supervised by the Probation Department and OCC plays no role in their hiring or oversight. Candidates submit their applications to the Commissioner's Office which prescreens the candidates to determine if they met the minimum qualifications for a probation officer in charge position – two years of work experience as a probation officer and a bachelors degree in a criminal justice-related field.[97]

121.    The Commissioner's Office created probation officer in charge positions in late 1999 or early 2000 and undertook a large scale hiring around that time to fill the new positions.[98] Qualified candidates went through a single round of interviews conducted by Deputy Commissioners Elizabeth Tavares and Francis Wall and Office of Community Corrections Regional Program Manager John Quinn. In a subsequent round of hiring in 2005, the panels consisted of two interviewers, Quinn and either Regional Supervisor Frank Campbell or Regional Supervisor Edward Rideout.[99]

122.    During the interviews the panel asks the candidate a set of four standardized questions and scores each response on a scale of 1 through 25. The interview panel scored each candidate immediately following his or her interview, although there was sometimes following discussion among the interviewers.[100]

---

[96]    Testimony of Stephen Price, October 21, 2010 (Exhibit 126), at 91-93. Relevant excerpts of the testimony of OCC Executive Director Stephen Price accompany this Report as Exhibit 126.

[97]    Testimony of John Quinn, November 1, 2010 (Exhibit 128), at 29-31.

[98]    Testimony of John Quinn, November 1, 2010 (Exhibit 128), at 26-27.

[99]    Testimony of John Quinn, November 1, 2010 (Exhibit 128), at 57-58, 59.

[100]    Testimony of John Quinn, November 1, 2010 (Exhibit 128), at 33-35, 61-62.

83

123. At the end of the interview process, the scores for each candidate are averaged to come up with a "total" overall score for each candidate. The individual and composite scores are then sent to the Commissioner's Office.[101]

124. The Commissioner selects the person for the probation officer in charge position based on this first and only round of interviewing.[102]

### 2. Community Corrections Positions

125. The Office of Community Corrections is an independent branch of OCP. Hiring decisions within OCC are made by the Executive Director, subject to the approval of the Chief Justice for Administration and Management. The Commissioner of Probation does not have a role in OCC hiring.[103] Employees within OCC include those who hold union positions, such as entry level community service positions, court services coordinators, program specialists and administrative assistants, and those who hold non-union managerial positions such as regional program manager, program managers and clinical managers. Generally, those within the Community Service Division are responsible for working with and overseeing individuals assigned to perform community service as part of their probation. The program specialists and program managers are responsible for overseeing the various programs, such as substance abuse programs and testing services, that are run out of the OCC centers.[104]

126. The interviewing and hiring process within OCC is not as structured as within the Probation Department, although it is still governed by Section 4.000 of the *Personnel Policies and Procedures Manual*. Candidates submit applications for employment to OCC. OCC has no

---

[101] Testimony of John Quinn, November 1, 2010 (Exhibit 128), at 46-47, 61-62, 74-75, 86, 110.

[102] Testimony of John Quinn, November 1, 2010 (Exhibit 128), at 27-29, 44.

[103] Testimony of Stephen Price, October 21, 2010 (Exhibit 126), at 91; Testimony of Patricia Horne, October 4, 2010 (Exhibit 112), at 36.

[104] Testimony of Stephen Price, October 21, 2010 (Exhibit 126), at 32-33, 37-40.

84

personnel director or hiring coordinator, but typically the office manager compiles the resumes. OCC prescreens the candidates to ensure they meet the minimum qualifications.[105] All candidates who meet the minimum qualifications are given an interview.[106]

127.    Depending on the position and the number of candidates interviewing, there may be one or two hiring panels that ask candidates a set of standardized questions and rank and score the candidates based on their responses.[107] For non-union management positions, there typically is only one round of interviewing conducted by Executive Director Steve Price and Deputy Director Patricia Horne. For union positions, there is typically a preliminary round of interviewing to narrow the field of candidates and then a final round interview conducted by senior management. The union position interview panels may consist of two or three interviewers.[108] Price testified that hiring within the Community Service division of OCC is largely done by the head of that division, subject to his approval.[109]

128.    In instances where there is more than one interview round, the second interview panel would receive the scoring and ranking information from the candidates' first interview, but that information typically did not factor into the scores and rankings given by the second panel.[110]

129.    Price, as Executive Director, selects the candidate for the position (whether in OCC or within the community service division) based on the ranking and scoring from the interview rounds and submits that name to the Chief Justice for Administration and Management

---

[105]  Testimony of Stephen Price, October 21, 2010 (Exhibit 126), at 54-55.

[106]  Testimony of Stephen Price, October 21, 2010 (Exhibit 126), at 55-57.

[107]  Testimony of Stephen Price, October 21, 2010 (Exhibit 126), at 57-58, 61-62.

[108]  Testimony of Stephen Price, October 21, 2010 (Exhibit 126), at 68-70, 80-82.

[109]  Testimony of Stephen Price, October 21, 2010 (Exhibit 126), at 58-61, 86; Testimony of Patricia Horne, October 4, 2010 (Exhibit 112), at 24-25

85