# EXHIBIT A

for approval. If there is more than one round of interviewing, Price typically receives the scoring

information only from the final round. Price testified, and Horne confirmed, that he typically

selects the candidate with the highest ranking. [111]

## H.    Hiring within Electronic Monitoring

130.    Under Massachusetts law, as a condition of probation and parole judges may

require individuals to wear electronic monitoring devices. Such a condition has been mandatory

with respect to persons convicted of sex crimes since 2006.[112]

131.    The Electronic Monitoring ("ELMO") division of the Probation Department is

responsible for overseeing GPS and radio frequency monitoring of offenders. The ELMO

division has been monitoring offenders via radio frequency since 2001, and has been monitoring

individuals via GPS since 2005. Since 2005, the number of offenders monitored via GPS has

increased each year.

132.    Independent Counsel questioned Deputy Commissioner Paul Lucci, who is

responsible for the Programs Division and ELMO, regarding the interview process for positions

within ELMO. At first, Lucci testified that while he assumes there must be interviews and

believes that if there are interviews he would be on the panel, he did not remember any

interviews ever having occurred. For example, he was unable to recall interviewing the three

---

[110]   Testimony of Stephen Price, October 21, 2010 (Exhibit 126), at 78, 82-83.

[111]   Testimony of Stephen Price, October 21, 2010 (Exhibit 126), at 52-53, 62-64, 80; testimony of Patricia Horne, October 4, 2010 (Exhibit 112), at 33-34.

[112]   M.G.L. c. 127, § 133D ½ ("Any person under court ordered parole supervision or under community parole supervision for life for any offense listed within the definition of 'sex offense', a 'sex offense involving a child' or a 'sexually violent offense', as defined in section 178C of chapter 6, shall, as a requirement of such parole, wear a global positioning system device, or any comparable device, administered by the board at all times for the length of his parole for any such offense."); GL c. 265, § 47 ("Any person who is placed on probation for any offense listed within the definition of 'sex offense', a 'sex offense involving a child' or a 'sexually violent offense', as defined in section 178C of chapter 6, shall, as a requirement of any term of probation, wear a global positioning system device, or any comparable device, administered by the commissioner of probation, at all times for the length of his probation for any such offense.").

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

individuals who serve as his regional ELMO supervisors: Edward Ryan, Kathleen Petrolati (wife of Thomas Petrolati), and Eugene Irwin (son of former Chief Justice for Administration and Management John Irwin).[113]

133.    Later in his testimony, Lucci amended his response. He stated that while the final decision belongs to Commissioner O'Brien, he does sit on interview panels together with one of the chief probation officers assigned to the Programs Division. During these interviews candidates are asked a standard set of questions provided by Deputy Commissioner Tavares.[114] No judges sit on the interview panels for ELMO hiring.[115]

134.    Independent Counsel also questioned ELMO Regional Program Manager Edward Ryan about ELMO hiring practices and procedures. Ryan was similarly unable to provide a clear picture of how ELMO hiring works. Ryan testified that to his recollection, for the time period from 2002-2007, the Commissioner's Office was responsible for hiring within ELMO. Ryan believes that he sat on one or two interview panels with someone from the Commissioner's Office.[116]

## I.    Other Hiring

135.    OCP also oversees the hiring of all administrative and training staff within the Probation Department. Hiring for these positions, like hiring for probation officers, is governed by the *Personnel Policies and Procedures Manual.*

136.    For the administrative positions, more discretion is given to the individual probation offices, although all hires still must be approved the Commissioner's Office.

---

[113]    Testimony of Paul Lucci, August 23, 2010 (Exhibit 114), at 38-42.

[114]    Testimony of Paul Lucci, August 23, 2010 (Exhibit 114), at 60-62.

[115]    Testimony of Paul Lucci, August 23, 2010 (Exhibit 114), at 70-71.

[116]    Testimony of Edward Ryan, June 29, 2010 (Exhibit 131), at 105-109.

LIBA/21225629

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

Typically interviews are conducted only at a local level with the chief probation officers generating a list of the top candidates.[117]

137.    Hiring for positions within the Training Academy consists of a single round of interviews conducted by a two-person interview panel. No judge is assigned to these interview panels because Training staff do not work in the courts.[118]

### J.    Hiring Freezes and Acting Positions

138.    From time to time during Commissioner O'Brien's tenure, hiring freezes have been ordered by AOTC. Based on the Probation Department's interview records and witness testimony, it appears that such freezes were in place from January 2001 – November 2004, from May 2005 – June 2005, April 2007 – May 2007, August 2007 – October 2007, and since October 2008.

139.    During such a hiring freeze, new probation officers and associate probation officers cannot be hired, and no permanent promotions can be made to assistant chief probation officer, first assistant chief probation officer, or chief probation officer positions.

140.    During these freezes, some chief probation officers retire or leave the Probation Department. Because it is necessary for each court of a certain size to have a chief probation officer, a practice has developed of appointing "acting" chief probation officers.

141.    The process to designate an acting chief probation officer during a hiring freeze is not the same as the process used to appoint chief probation officers. In particular, there are no interview panels and no interviews prior to the selection of an acting chief. First Deputy

---

[117]   Testimony of Michael LaFrance, September 29, 2010 (Exhibit 113), at 23-24, 26, 94. Relevant excerpts of the testimony of Chief Probation Officer LaFrance accompany this Report as Exhibit 113.

[118]   Testimony of Stephen Bocko, September 13, 2010 (Exhibit 94), at 87.

LIBA/21225629

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

Commissioner Tavares and former First Deputy Commissioner Cremens testified that, to the best of their memories, O'Brien simply selects someone to fill the acting position.[119]

142.    According to Tavares, the Commissioner asked others in OCP for advice before filling some positions.[120] In most instances, O'Brien selected the assistant chief probation officer or first assistant chief probation officer in the particular court for the acting chief position.[121] Tavares, however, testified that on one occasion O'Brien selected a probation officer in charge as acting chief, rather than the assistant chief probation officer, after he received a call from "the Senate President" in support of the probation officer in charge.[122]

143.    In practice, "acting" chief probation officers have an advantage when later applying for the permanent position. In December 2004, the acting chief probation officers in two courts in Bristol county were both selected to be chief probation officers following a hiring freeze.[123]

## III.    MANIPULATION OF THE INTERVIEW PROCESS

### A.    Introduction

144.    As set forth above, the Probation Department, in a seeming effort to comply with the dictates of the *Policies and Procedure Manual* of the Trial Court that the "most qualified individuals" be selected for employment "solely on the basis of merit," established extensive procedures around hiring and promotions. Pursuant to these procedures, many thousands of candidates were interviewed and ranked in order to fill positions within the Department. Judges,

---

[119]    Testimony of Elizabeth Tavares, July 13, 2010 (Exhibit 137), at 126-27; Testimony of John Cremens, August 6, 2010 (Exhibit 102), at 20.

[120]    Testimony of Elizabeth Tavares, July 13, 2010 (Exhibit 137), at 127.

[121]    Testimony of Elizabeth Tavares, July 13, 2010 (Exhibit 137), at 126-27.

[122]    Testimony of Elizabeth Tavares, July 13, 2010 (Exhibit 137), at 129.

[123]    Testimony of Ellen Slaney, August 5, 2010 (Exhibit 135), at 28-30.

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

Department employees, and applicants spent countless hours and dedicated substantial resources to preparing for and participating in such interviews.

145.    The interview procedures used by Probation to hire and promote were, however, in large measure a façade and a sham.  The evidence is unambiguous that for most open positions, interviewers at each stage of the hiring process were provided the names of one or more candidates favored by Commissioner O'Brien with the direction that the favored candidates be given preferential ranking and/or scoring.  These names were provided by First Deputy Commissioner Liz Tavares, Deputy Commissioner Francis Wall, Human Resources director Janet Mucci, and Regional Program Manager Edward Ryan.  The preferred names came directly from O'Brien.

146.    For the most part, interviewers in preliminary interview rounds complied with the order to select favored candidates for the next round interviews.  Regional Supervisors admitted increasing the scores or rankings of favored candidates to ensure that the favored candidates made it to the next round of interviews.  This occurred even where it meant another, more qualified candidate did not.  Participants in the final round of interviews for different positions – including Deputy Commissioner Cremens with respect to the promotion of chief probation officers, and Edward McDermott with respect to the hiring of probation officers – admitted that they scored favored candidates higher than they would have if such candidates had not been identified to them as favored by O'Brien, so that O'Brien could claim that he chose the highest ranked candidate.

147.    This process lent a fraudulent air of objectivity and fairness to what was in reality a rigged process of patronage hiring.

LIBA/21225629

**B.      O'Brien's Identification of Preferred Candidates**

148.    With limited exceptions involving Representative Petrolati, O'Brien was the

person who determined the candidates on behalf of whom the hiring and promotion process

would be rigged.

149.    Deputy Commissioner Christopher Bulger testified that O'Brien admitted, in a

conversation with Bulger that occurred during the pendency of the investigation, that he had

passed names of preferred candidates to interviewers:

> Q.    The commissioner has told you that he passed along names
>       to interview panels prior the interviews; is that correct?
>
> A.    Yeah.  He passed names along to the interviewers and I
>       presume it would be before.  I presume it was before an
>       interview.

Testimony of Christopher Bulger, October 13, 2010 (Exhibit 95), at 43.

150.    First Deputy Commissioner Liz Tavares and Deputy Commissioner Francis Wall

were at the center of the process and were the individuals to whom O'Brien most frequently gave

the names he had selected.

151.    Tavares, a lawyer, testified extensively to the fraud and her role in receiving

names of favored candidates directly from O'Brien:

> Q.  … [D]id you ever have conversations with Commissioner
>       O'Brien about persons that he wanted to make it through
>       the screening interview process and the local interview
>       process so that they could get to the [final] round of
>       interviews?
>
> A.    Yes, the Commissioner informed me that he had received
>       recommendations from certain individuals.
>
>                             * * *
>
> Q.    So describe for us the conversations you had with the
>       Commissioner.

91

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

      A.    The Commissioner would say, so and so, John Smith was recommended, see if you can – see if you can contact the local level and see if they can advance that person to the final round.

* * *

      A.    … I mean, he just provided me with people that were recommended and instructed me to call the local RAs [regional administrators] involved in the interview process and see if we could move these folks along.

Testimony of Elizabeth Tavares, July 13, 2010 (Exhibit 137), at 55-56, 59, 62-63.

152.    According to Tavares, she was given names by O'Brien in "more than a majority"

of cases.[124]

153.    As an example, Tavares described her conversation with O'Brien concerning

Brian Mirasolo, the son of an aide to House Speaker DeLeo, who is currently a chief probation

officer in the Programs Division:

      Q.    So a Speaker of the State House of Representatives gave Brian Mirasolo's name to Commissioner O'Brien?

      A.    I believe so.

      Q.    And then what did Commissioner O'Brien communicate to you concerning Brian Mirasolo?

      A.    That he was recommended and contact the local level to see if we could move him to the next round.

Testimony of Elizabeth Tavares, July 13, 2010 (Exhibit 137), at 60.

154.    She also recalled O'Brien identifying James Rush, the father of State

Representative Michael Rush, as a preferred candidate for a chief probation officer position in

the West Roxbury division of the Boston Municipal Court:

      Q.    …. would the Commissioner tell you the names of the people that he was receiving recommendations from?

---

[124]  Testimony of Elizabeth Tavares, July 13, 2010 (Exhibit 137), at 113.

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

A.   Who recommended a particular candidate when he gave me
     the name of the candidate?

Q.   Right.

A.   Yes, he would.

Q.   And who was he receiving recommendations from?

A.   I know that – let me think back.  It's been a while since
     we've done Chief Probation Officer positions.  I know that
     when we did West Roxbury, I think the Assistant Chief
     Probation Officer, Jim Rush was recommended by his son,
     Representative Rush.

Testimony of Elizabeth Tavares, July 13, 2010 (Exhibit 137), at 117.

155.   Similarly, Deputy Commissioner Paul Lucci testified that he received names of

favored candidates directly from Commissioner O'Brien.[125]

156.   Edward Ryan testified that on numerous occasions he received the names of

favored candidates from the Commissioner:

Q.   Did you ever make calls before the interview and say, make
     sure these candidates are on the list?

A.   I may have.

Q.   When you say you may have, do you remember that you
     did do that?

A.   I don't remember specifically, but I'm sure I did.

                          * * *

Q.   Did you transmit the names of the final few candidates to
     Walsh and Wall for the last and final interview, or were
     those names given only by Mr. O'Brien to Wall and
     Walsh?

A.   He could have given them to me to give to Ms. Walsh and
     Fran Wall.

---

[125]   Testimony of Paul Lucci, August 23, 2010 (Exhibit 114), at 63-64.

93

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

Testimony of Edward Ryan, June 29, 2010 (Exhibit 131), at 86; July 15, 2010
(Exhibit 131), at 213-14.

      157.    O'Brien gave names of favored candidates to Edward Ryan to pass along to Wall

and Walsh to ensure that those favored candidates made it back to him on the final list from

which he selected the person for the position.

> Q.    It was always the Commissioner who made that decision, and sometimes, as I understand you, he gave the names directly to Wall and Walsh; other times, he may have asked you to give the names?
>
> A.    Sure.
>
> Q.    What did you understand the names being given to Wall and Walsh to be? They were obviously the finalists, and one or more of them was to be selected for the position in question, correct?
>
> A.    Yes.
>
>             * * *
>
> Q.    …When you say you don't know what Wall and Walsh did, you know that the Commissioner had already chosen names that were to go to Wall and Walsh and that what was then going to happen was an interview process, correct?
>
> A.    Yes.
>
> Q.    So the people who came out of that interview process for a final selection were names which Mr. O'Brien had already put into the process, correct, through Wall and Walsh?
>
> A.    Yes.
>
> Q.    So he knew that the names from which he would make final selection were the very people that he had already given to Wall and Walsh; one of them or more was ultimately going to get the job?
>
> A.    Yes.

Testimony of Edward Ryan, July 15, 2010 (Exhibit 131), at 214-217.

94

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

158.   O'Brien on several occasions provided the names of favored candidates to Janet Mucci, his director of personnel.  Mucci repeatedly denied receiving names from O'Brien during her informal interview and under oath on June 24, 2010:

A.   So yeah, I firmly believe I did not give names.

* * *

A.   I did not pass any names on.

* * *

A.   … But prior to the interview, I swear, I never was the person doing it.

* * *

A.   But I didn't hear the names; I don't have the names.

* * *

A.   No, not me.  I wouldn't be the one to do that, no.

* * *

A.   …But me telling them to put somebody on a list, I don't think I've ever done that.  I'm positive I've never done that. …  But for me to be the one communicating the name to them, no, that's not me; that wouldn't be me.  I'm positive I never did that.

* * *

A.   …[Commissioner O'Brien] wouldn't even think of coming in to have me make that call ….

* * *

A.   Oh Lord, no, no.

Testimony of Janet Mucci, June 24, 2010 (Exhibit 121), at 43, 44, 46, 48, 67-69.

95

159.    Only in subsequent testimony on October 5, 2010, after being confronted with

recordings of messages she left at the home of a regional supervisor, did Mucci concede that

O'Brien had given her names of favored candidates:

> Q.    So you're satisfied that on this occasion you in fact gave
> names of proposed finalists to Mr. Dalton or to his
> voicemail, is that correct?
>
> A.    Absolutely. Yeah. I can tell by what I'm saying that I'm
> absolutely doing that, yes.
>
> Q.    Where did you get the names?
>
> A.    It had to be from Jack [O'Brien]. He would be the only one
> that would give me names.

Testimony of Janet Mucci, October 5, 2010 (Exhibit 121), at 161-62.

160.    Moreover, the recordings are explicit that O'Brien expected the regional

supervisor to find a way to advance O'Brien's candidates:

> I'll talk about Falmouth. I won't give them to you right now
> because it's so far off, but there's one, two, three, four, five, there's
> 6 people to be finalists in Falmouth for this one job, so the only
> thing I can think of, as I said to him, the only thing that's going to
> bail these guys out on this is if they tie people. So, we'll talk about
> those 6 people but [*whispering*] if you can only come up with 8
> numbers, maybe you got a whole bunch tied for eight, or 6 or 7,
> gonna have to do something like that to accommodate these things
> because he had a meeting at the State House yesterday and he has
> no choice.
>
> * * *
>
> But I would say when you're going through these if you have any
> problem getting any of them on, [whispering] I'd, I'd pick up the
> phone to call, call I don't know what to tell you ... [inaudible]
> Burke, to call Paul, I don't know. But he's real insistent that these
> people be there, see I know that makes it really tough. If Rita
> would at least go along with putting on 2 out 3, I guess you can get
> them on somehow by that, but if you think anybody's not going to

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

make it, I'd [whispering] pick up the phone and call. I don't know, I don't know what else to tell you to do.[126]

161. Former First Deputy Commissioner John Cremens recalled at least one occasion in which he was present in O'Brien's office, and overheard O'Brien pass along a list of names of individuals to whom a "good look" should be given, which he interpreted to be a list of individuals who should make the list of finalists.[127]

162. Finally, individuals also testified that they received names from Wall, with the explanation from Wall that he had obtained the names from the Commissioner.[128]

## C.   O'Brien Was Communicating Instructions, Not "Recommendations"

163. Some witnesses from whom Independent Counsel took testimony described what they received from OCP as a "recommendation" for a particular candidate, a euphemism for an instruction from O'Brien. The process put in place by Commissioner O'Brien was not one in which "recommendations" were communicated to interview panel members for their consideration with other pertinent information, such as the candidates' performance during interviews and work experience. Rather, O'Brien was issuing instructions which candidates to score or rank most highly, instructions that could be disregarded only with respect to the most unqualified candidates.

164. As an initial matter, if the Commissioner intended simply to convey to the interview panel that a particular candidate came highly recommended, one would expect that recommendation to have been shared with the judges who sat on the local interview panels. That

---

[126] Voicemail recordings (Exhibit 31).

[127] Testimony of John Cremens, August 6, 2010 (Exhibit 102), at 43-44.

[128] Testimony of Francis Campbell, August 10, 2010 (Exhibit 98), at 93-95; Testimony of Edward McDermott, August 25, 2010 (Exhibit 116), at 30; Testimony of Edward Dalton, August 17, 2010 (Exhibit 103), at 58-59; Testimony of Nicholas DeAngelis (Exhibit 104), August 24, 2010, at 42; Testimony of William Burke, July 22, 2010 (Exhibit 96), at 45.  Relevant excerpts of the testimony of former Regional Supervisor DeAngelis accompany this Report as Exhibit 104.

did not happen. Regional supervisors whom we interviewed typically testified that they did not share names of sponsored candidates with the judges on their interview panels.[129]

165. Moreover, for a "recommendation" to have any value, the person receiving the recommendation would need to know the basis for the recommendation. A "recommendation" from someone who has no knowledge of the candidate's work experience, ethic, or ability is essentially worthless. Even more worthless is a "recommendation" for which even the identity of the sponsor is not provided.

166. First Deputy Commissioner Tavares testified that typically none of the information regarding a recommendation was shared with her, let alone with the panel members:

> Q.   So all you and the Regional Supervisor know are that these
>       are the names the Commissioner has received
>       recommendations for but not anything else about why that
>       recommendation should be given any weight in the
>       interview process?
>
> A.   That's true.
>
>                        * * *
>
> Q.   Were there instances in which you did have additional
>       information about the individual and why the
>       Commissioner wanted to see them passed through?
>
> A.   Why? No. I mean, at times he would tell me who
>       recommended the person, but that wasn't consistent when I
>       passed the names down to the Regional Supervisors.
>
> Q.   Would you tell the Regional Supervisors who the
>       recommendation was coming from?

---

[129] Testimony of Brian Murphy. August 13, 2010 (Exhibit 123), at 96; testimony of Ellen Slaney, August 5, 2010 (Exhibit 135), at 73, 83; testimony of Dianne Fasano, September 3, 2010 (Exhibit 109), at 53; testimony of Francis Campbell, August 10, 2010 (Exhibit 98), at 136; *but see* testimony of Richard O'Neil, August 3, 2010 (Exhibit 124), at 133 ("Q.  Is this one of the instances where you shared the name you were given with the Chief and the judge prior to the interview process?  A. Yes."); testimony of Nicholas DeAngelis, August 24, 2010 (Exhibit 104), at 55 ("...if I knew the judge I would just say, 'hey, look, these three people or these four people have to make the list.'").  Relevant excerpts of the testimony of Regional Supervisor Murphy accompany this Report as Exhibit 123.

LIBA/21225629

A.    No.

Testimony of Elizabeth Tavares, July 13, 2010 (Exhibit 137), at 69, 71.

167.    Consistent with Tavares' testimony, witnesses consistently stated that they were

never told why particular candidates had been "recommended" or by whom.

168.    This was not lost on the interview panel members. Regional Supervisor Dianne

Fasano, for example, noted the distinction between recommendations she might receive from

persons with first hand knowledge of a candidate, and the instructions she received from OCP:

> Q.    Going back to the calls you were getting from other
> individuals not in OCP, how did you treat those calls?
> Were those also names that you thought had to make it
> through or were they simply recommendations?
>
> A.    No. No. I think those were different. Those were people
> that were -- had personal knowledge of people's work and
> abilities and things of that nature. And it was never like
> you have to do this or you have to do that. It was more just
> a, you know, a more personal thing and it was more related
> to their work.
>
> Q.    And I guess in contrast to people who were conveying
> personal recommendations based on their experience with
> or knowledge of a particular candidate, you're also
> receiving, I guess, calls from Miss Tavares and Mr. Ryan
> who were essentially providing you names that you were
> instructed to pass along to the next round?
>
> A.    Yes.

Testimony of Dianne Fasano, September 3, 2010 (Exhibit 109), at 39; *see also* Testimony of

Anthony Sicuso, September 30, 2010 (Exhibit 134), at 52-54 (testifying that during grievance

proceedings, recommendations that lacked substance were "not relevant" and would not be given

any weight).

169.    The Commissioner's Office received letters of recommendation, some of which

(including letters from legislators) reflect first hand knowledge of the candidate of a kind that

99

might be useful in evaluating the recommendation. However, there is no evidence that such

letters played any role in the Commissioner's identification of candidates whose names he

provided to interview panels.

## D.     The Screening Panels

170.     Tavares admitted during her testimony that she took the names of favored

candidates from Commissioner O'Brien and, in turn, provided them to the regional supervisors

conducting screening level interviews for probation officer positions, thus injecting the fraud into

the first stages of the hiring process:

> Q.     Did this happen at the screening level, too; were names
> given to the two individuals who were conducting the
> screening interviews of folks that the Commissioner
> wanted to see make it through to the local interviews?
>
> A.     Yeah, at the basic level, he got recommendations, and we
> provided names.
>
> Q.     Were you the person who provided names to the people on
> the screening panel?
>
> A.     Yes.

Testimony of Elizabeth Tavares, July 13, 2010 (Exhibit 137), at 105.

171.     Both Regional Supervisors Rios and Campbell confirmed that they received

names of favored candidates from OCP with the understanding that every effort should be made

to rank these individuals so that they successfully passed from the screening panel through to the

next round of interviews.

172.     Regional Supervisor Campbell testified that when the screening round of

interviews was first established, he was provided an overview by Tavares of how that round of

interviews was to be conducted. He was told by Tavares that he was going to be given names of

favored applicants:

100

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

Q.   So in 2005 you were new to the screening interview
     process –

A.   Yes, I was.

Q.   – and Liz Tavares was providing you an overview of how it
     would work.  Is that accurate?

A.   Yes, I was totally new to it.  I had never done any screening
     interviews as you've described.

Q.   And so as part of this overview that Liz Tavares was
     providing you, as I understand it, she mentioned that she
     may be providing names of recommended candidates to
     you?

A.   Yes.

Q.   Did she say that in so many words?  Did she say I'll give
     you the names of recommended candidates?

A.   Yes, she did, yes.

Testimony of Francis Campbell, August 10, 2010 (Exhibit 98), at 52.

173.   As Tavares told Campbell she would, she provided him with lists of

"recommended" candidates prior to his conducting rounds of screening interviews.  The message

that accompanied the list of names was to give these candidates a "good look":

Q.   And putting aside receiving letters from personnel, did
     anyone within OCP ever provide you a list of names of
     recommended candidates?

A.   Well, when you say a list of recommended candidates,
     names were presented.  Recommended candidates were
     presented to me, yes.

Q.   And what do you mean by that?  When you say
     recommended names were presented to you, just flesh that
     our for us.

A.   I would be asked to give a recommended candidate.
     Oftentimes the expression would be used to please try to
     give this candidate a good look.

Testimony of Francis Campbell, August 10, 2010 (Exhibit 98), at 43-44.

101

174.    Campbell further testified that he shared these lists of names with Regional

Supervisor Rios prior to their conducting screening interviews.[130]  Rios confirmed in her

testimony that she received the names of favored candidates from Campbell.[131]

175.    In passing along the list of "recommended candidates" to Campbell, Tavares and

Ryan did not pass along any information concerning who had recommended the candidates or

why.  Campbell was provided no basis to weigh the strength or value of the "recommendation."

Campbell was just told that the candidates were "recommended":

> A.    … I wouldn't know where the recommendation came from.
> It could come from anywhere. I have no knowledge of
> that. I don't ask. I feel it's none of my business, quite
> honestly. I just do what I'm told to do.

Testimony of Francis Campbell, August 10, 2010 (Exhibit 98), at 50-51.

176.    In receiving these names, Campbell understood that the real message he was

receiving was to rank the "recommended" candidates higher than they merited based on their

answers to the standard questions asked of all candidates:

> Q.    … My question is simply, did you understand that the
> reason Liz Tavares and Ed Ryan were giving you these
> names and saying to give them a good look was that they
> hoped or expected that that would cause you to put them
> through to the next round even if they maybe otherwise
> would not –
>
> Q.    – have made it through to the next round?
>
> A.    And I attempted to respond by saying I think that any
> reasonably intelligent person would draw the same
> inference, sir.

* * *

---

[130]  Testimony of Francis Campbell, August 10, 2010 (Exhibit 98), at 62.

[131]  Testimony of Nilda Rios, August 4, 2010 (Exhibit 130), at 94.

Q.   But at the time you're saying you gave no thought to what
     message they might be trying to communicate by giving
     you these names?

A.   I can't honestly give you an exact recall of what I thought,
     quite honestly, on a given day when names were presented
     to me, other than that obviously if a name was being
     presented to me, somebody was interested in that
     recommended candidate. Obviously. Again, that's
     virtually almost a no-brainer.

Q.   That is a no-brainer. And it is also a no-brainer that by
     telling you of the interest in that person, they were hoping it
     would be more likely that you would score that person high
     enough that they would get through to the next round?

A.   Well, you used the word "hope." I guess that would be my
     understanding.

Testimony of Francis Campbell, August 10, 2010 (Exhibit 98), at 56-57, 78-79.

177.   Regional administrator Rios, who sat on the screening interview panels with

Campbell, testified that she received names of preferred candidates in conversations with Deputy

Commissioners Tavares and Wall with the understanding that they were to advance to the second

round even if they did not deserve do so:

Q.   During your involvement [in] hiring, were you ever given
     names of individuals who were supposed to make it onto
     the next round of interviewing?

A.   Yes.

Q.   How did that happen?

A.   Someone might tell me verbally or someone might leave a
     list in my mailbox.

Q.   Who would you speak to if it was given to you verbally?
     Who would have communicated the names to you?

A.   I believe – well, different people at different times, but I
     think Fran Wall, probably; Liz Tavares, probably.

Q.   Would they contact you?

103

A. Yes.

Q. And assuming it's a phone conversation, what would they say?

A. Just that so and so should make it on the list.

Q. What did you understand that to mean?

A. Put their name on the list.

Q. That the person would be put on the list of candidates to advance to the next round?

A. To the second round, yes.

Testimony of Nilda Rios, August 4, 2010 (Exhibit 130), at 76-77.

178. Rios also received lists of preferred candidates in writing from Edward Ryan,

with the same expectation that she would advance the preferred candidates to the second round

interviews:

Q. What would Eddie Ryan tell you?

A. Wouldn't tell me anything. Just leave the list and say, these folks would make it to the second round.

Q. It was your understanding that those people were, regardless of their qualifications, to make it to the next round of interviewing?

A. Yes.

Testimony of Nilda Rios, August 4, 2010 (Exhibit 130), at 78.

179. Rios unambiguously stated that she too carried out the fraud by advancing

O'Brien's candidates through the screening round of interviews, even if they were not deserving

candidates:

Q. Was it your understanding that they were to advance to the second round regardless of whether or not they would have otherwise been ranked in the top ten to make it to the next round?

104

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

A.    Yes.

Q.    Did you do that?

A.    Yes.

\* \* \*

Q.    How successful would you say you were in putting people onto the next round whose names you had been given by the Commissioner's office?

A.    I don't understand the question. I mean, you were told to put a name on; you put the name on.

Q.    So, in every instance where you were given a name, it then made it onto the list of candidates to be advanced to the next round?

A.    I believe so.

Testimony of Nilda Rios, August 4, 2010 (Exhibit 130), at 77, 81.

180.    Campbell testified that his receipt of names from Tavares and Ryan caused him to

"subconsciously" provide higher rankings to favored candidates, but resisted admitting that he

did so intentionally :

Q.    So is it accurate that your testimony today has been that you never gave candidates at the screening round of interviews more points than you would have if you have not been given their name by Liz Tavares or Ed Ryan?

A.    On occasion, if I'm understanding how you're framing your question or summarizing my responses earlier, on occasion that's not accurate. Obviously, if I was asked to give consideration or to give a candidate a good look, it's very possible that entered into it. For me to actually tell you on a given day or at a given time or a given interview with a given candidate that I can recall what the stream of consciousness was going on in my mind at the time, but it's quite possible and more than likely that if a candidate's name was presented to me to give that candidate a good look, it already had some kind of impact on my objectivity.

\* \* \*

LIBA/21225629

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

> I would have to – I can't feel that I'm responding honestly
> to the question if I didn't suggest that it must have had
> some kind of bearing on my objectivity. Obviously.
> Anytime a name is mentioned, it's very difficult to be
> completely objective. But if you knew that there was a
> certain interest in a candidate, I'm sure it had a bearing on
> how I would score or view that candidate's articulation or
> response to a particular question ….

* * *

> Q. Did you ever consciously decide to provide additional
> points to a candidate because that person's name had been
> given to you by Liz Tavares or Ed Ryan prior to the
> interview?

> A. It's quite possible I may have. It's a long time. We're
> going back almost five years ago in some instances, at least
> four and a half years or more. I quite possibly did. I very
> well may have.

Testimony of Francis Campbell, August 10, 2010 (Exhibit 98), at 80-82.

181.    Rios, however, testified that the scores of preferred candidates were fraudulently

inflated, and that Campbell was a knowing participant in it. She testified that after she and

Campbell separately scored the candidates (taking into account their preferred status), they

checked to see if the favored candidates had high enough scores to be advanced. If the favored

candidate did not, they fraudulently changed the scores of the favored candidate:

> Q. When you had candidates who were preferred who had to
> make it onto the next round, was it your practice that you
> would keep that in mind as you were scoring them initially,
> or did you more resolve it on the back end, just interview
> everyone normally and, if people didn't make it, then try to
> shift them around to get them into the top ten?

> A. I probably would have tried to keep it in mind as I was
> scoring them.

> Q. So your initial scoring may have scored them higher than
> they normally would have based on their merit if they were
> a preferred candidate?

106

A.    Probably.

* * *

Q.    If you were given names and either you informed your co-interviewer that these were the names to make it through or they were given names on their own, did you discuss at all how you were going to get this person through to the next round?

A.    No, you scored all the people and then, if the person didn't score high enough, you gave them a, you know, one or two points, whatever it is, to get them on the list.

* * *

Q.    ... If you had an individual whose name you were provided as someone who had to make the list for the next round, and assume you had ten spaces and they were 15th, based on your initial combined scoring, what would you do in order to get them on to the top ten?

A.    Just raise their score.

Testimony of Nilda Rios, August 4, 2010 (Exhibit 130), at 99-100, 94-96.

182.    Based on the unambiguous testimony of Rios, and Campbell's tortured effort to avoid admitting that he deliberately inflated scores, Independent Counsel concludes that Campbell's denial of ever awarding bonus points or rescoring candidates is not credible.[132]

183.    Campbell testified that he and Rios did not always put the favored candidates through to the next round – sometimes the candidate's performance at the interviews was so poor that putting them through could not be justified.

184.    On at least some occasions when that occurred, Campbell told us that Tavares became "disappointed" and "upset" with Campbell.

A.    I recall on at least one, there may have been two occasions, where a candidate wasn't recommended on to the next round and Liz was disappointed.

---

[132] Testimony of Francis Campbell, August 10, 2010 (Exhibit 98), at 83-84.

107

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

* * *

Q. Disappointed because you didn't get the job done?

A. Well, I don't know. It appeared that she viewed it that way. And if that be the case, you know, you can't get a hundred percent all the time. I'll take 97 and live with it very comfortably. So without a doubt in my mind, knowing her as well as I do, and my association or affiliation with Liz is only professional, but just based on the way she presented her demeanor and her expression, I could tell that she was disappointed; upset. She seemed to be upset.

Testimony of Francis Campbell, August 10, 2010 (Exhibit 98), at 57, 59.

185.    In addition to Campbell and Rios, screening panel member Richard Bracciale was subpoenaed concerning the screening panel practices. Bracciale invoked his right to remain silent and refused to testify. Attempts to locate and subpoena Bracciale's partner on screening panels, Kevin Cunniff, have been unsuccessful.

## E.    The Local Interview Panels

### 1.    Introduction

186.    Names of favored candidates were also provided to the local interview panels considering candidates for associate probation officer, probation officer, assistant chief probation officer, and chief probation officer positions. Each of the regional supervisors sitting on local interview panels testified that he or she received the names of favored candidates from OCP.

187.    As with the screening panel, OCP's goal in providing names of preferred candidates to the local interview panels was to have those candidates scored or ranked high enough to proceed to the next, in this case final, round of interviews. First Deputy Commissioner Tavares was quite clear:

Q.    ... So long as somebody was in some sense qualified, even if they really weren't one of the best eight people who

> interviewed that day, if they got a recommendation, then
> you should list their name among the top eight?
>
> A.    If they were responsive and two committee members
>       agreed, yes.

Testimony of Elizabeth Tavares, July 13, 2010 (Exhibit 137), at 102.

### 2.    Interference Prior to 2001

188.    Despite the fact that the presiding justice had the authority to select the candidate
for positions prior to the statutory change in 2001, there were early attempts by Commissioner
O'Brien to influence the hiring process. In 2000, Janet Mucci, Human Resources Director for
the Commissioner's Office, left a series of messages on the home answering machine of
Regional Supervisor Edward Dalton, *infra* at ¶ 221, providing names of candidates to advance to
the second round of interviewing. Dalton testified that he did, in fact, provide names to others on
the regional panels on which he served during this time period.

189.    Jill Ziter, Regional Coordinator for the District Court (and identified in Mucci's
messages), testified that during the process of interviewing for probation officer positions in
2000 or 2001, the representative from the Commissioner's Office, probably Francis Wall,
expressed annoyance with her ranking all candidates on the merits. Ziter testified that Wall was
unhappy because she had not given a high enough ranking to a candidate to whom he asked her
to give "consideration." Ziter believed that Wall was either going to change his scores or, if he
had not yet scored the candidate, he was going to do so in a way to get the result he wanted.[133]
In a memorandum to Jerry Berg, who held a high ranking position in the District Court
Department, Ziter detailed this incident:

> In Wareham, the Commissioner's representative [Francis Wall]
> waited until the other lists were complete, asked for a copy, and

---

[133]   Testimony of Jill Ziter, September 23, 2010 (Exhibit 140), at 25-28, 33-34.

109

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

> then created his list based on his 'crunching' the numbers around
> my list. That way he technically created his own list, but it was not
> based solely on his ranking of the candidates. Instead it was
> created to undermine my list and resulted in bumping off my
> highest ranked candidate in order to reach his candidates. In fact,
> the candidate that was eventually hired in Wareham did not make
> the actual ranked list, but was added on, according to policy so I'm
> told, because she was an existing PO in another court.

A copy of Ziter's January 30, 2001 memorandum accompanies this report as Exhibit 61.

190.    Ziter also testified that while on other occasions individuals from the

Commissioner's office requested "consideration" for a candidate, it was never raised during the

post interview discussions.[134] Ziter testified that she understood the Commissioner's

representatives to be telling her to place selected candidates on the list of finalists:[135]

> Q.    Recognizing you probably don't remember the exact
>       words, what was essentially the substance of what you were
>       asked to do?
>
> A.    My understanding was they were asking, the
>       commissioner's office was asking for consideration of
>       certain candidates so that those individuals would make it
>       on to the final list of the top eight or ten that could be
>       advanced to the next level.
>
> Q.    Was it your understanding that you were essentially being
>       asked to put those recommended candidates in the group of
>       top eight or ten to advance them further?
>
> A.    Yes.
>
> Q.    In other words, regardless of the individual merit or the
>       relative merits of that particular candidate, you took give
>       consideration to that particular candidate to really mean,
>       hey, move them along to the next round and that's what the
>       commissioner's office wants to see; is that your
>       understanding?
>
> A.    That was my understanding, yes.

---

[134]   Testimony of Jill Ziter, September 23, 2010 (Exhibit 140), at 28-29, 36-37.

[135]   Testimony of Jill Ziter, September 23, 2010 (Exhibit 140), at 28-29.

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

Q.   This was also in the 2001 time period; is that correct?

A.   Yes.  It was either in 2000 or 2001, yes.

Testimony of Jill Ziter, September 23, 2010 (Exhibit 140), at 28-29.

191.   Ziter also testified that the other District Court Regional Coordinators reported

similar incidents.[136]  The regional coordinators brought the issue to the District Court

administration and the judges.[137]  She and her colleagues were instructed by the Chief Justice of

the District Court to honestly and fairly rank the candidates.[138]  However, Ziter explained that

she believed the chief probation officers sitting on the interview panels felt pressure to advance

the candidates the Commissioner's Office requested:

> Definitely in general conversation with my colleagues it was my
> impression that the chief probation officers felt pressured to give
> consideration to the commissioner's or the commissioner's office's
> choices.  The person sitting on the panel sitting next to them was
> their supervisor and that was the person saying we're asking
> consideration for a certain candidate.  It was my impression that
> they felt pressured to comply and that they were looking to the
> regional coordinators to rank people or candidates according to
> merit and that the chief probation officers wanted good candidates
> ranked and were relying on us to assist in that process.

Testimony of Jill Ziter, September 23, 2010 (Exhibit 140), at 73.

### 3.   *Testimony of Ellen Slaney*

192.   Regional administrator Ellen Slaney provided contemporaneous, type-written and

hand-written notes concerning the rigged hiring process.[139]  These included note cards on which

she had written the names of many favored candidates that she had received as she received

---

[136]   Testimony of Jill Ziter, September 23, 2010 (Exhibit 140), at 30-31, 35-36.

[137]   Testimony of Jill Ziter, September 23, 2010 (Exhibit 140), at 41-43, 45-46.

[138]   Testimony of Jill Ziter, September 23, 2010 (Exhibit 140), at 31.

[139]   A set of Ellen Slaney's notes, marked during her testimony as exhibit 5, accompanies this Report with the
excerpts of that testimony, Exhibit 135.

111

them.[140]  Slaney began creating the notes in 2004 because she feared retaliation over the hiring

process and wanted to have her facts straight in case that happened.[141]  Slaney's notes and

testimony paint a portrait of corruption sponsored by O'Brien and his deputy commissioners to

implement and enforce a sham hiring process.

193.    Slaney advised that the first instance in which she was provided the name of a

favored candidate was in December 1999 or 2000.  The incident involved Doug MacLean, the

son of former Senator William "Biff" MacLean.

194.    According to Slaney, she was provided MacLean's name sometime prior to the

interview.  MacLean then volunteered during his local round interview before Slaney that he had

been incarcerated.  For this reason, the local interview panel did not list him among candidates to

refer to the final round interview. [142]

195.    Thereafter, O'Brien angrily demanded to know from Slaney why MacLean had

not made the final list, and "offered" to relieve Slaney of hiring responsibilities if she did not go

along with his instruction.  Slaney accepted this "offer":

> Q.    And as best you can recall, what conversation did you have
> with the Commissioner concerning this round of hiring?
>
> A.    He was – seemed physically upset with me.  When I went
> in, I got called into his office, and he wanted to know why I
> hadn't put Doug M[a]clean's name on the final list.
>
> Q.    And what did you say in response?
>
> A.    That I didn't think he was an appropriate candidate because
> he was a convicted felon and that I thought my position
> was one to make sure the best candidates got the job, and I

---

[140]    A set of Ellen Slaney's note cards, marked during her testimony as exhibit 4, accompanies this Report with the excerpts of that testimony, Exhibit 135.

[141]    Testimony of Ellen Slaney, August 5, 2010 (Exhibit 135), at 20-22, 162.

[142]    Testimony of Ellen Slaney, August 5, 2010 (Exhibit 135), at 14-19.

112

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

> didn't think he was the best candidate or an appropriate candidate.

> Q.   What was said next in this conversation, as best you can recall?

> A.   … And I told him that I thought that having the names ahead of time was unethical, and I felt that it was cheating and that I couldn't do that. And he eventually told me that he understood and that he would not insist that I continue to be on the hiring panels if I did not want to do it, and I said I did not.

Testimony of Ellen Slaney, August 5, 2010 (Exhibit 135), at 18-19.

196.   Despite Slaney's removal from hiring, she was, following the lifting of a hiring freeze that had lasted from 2001 until the end of 2004, again assigned to hiring panels (probably by mistake). Slaney testified that she was not provided names with respect to the first two rounds of local panel interviews that she conducted. [143]

197.   In February 2005, however, Tavares provided Slaney the names of certain candidates for an opening in the Dedham District Court, explaining that "the Commissioner had an interest in having these names appear on a second round of interviews."[144] Slaney also produced an index card on which she had contemporaneously recorded the names she was provided by Tavares.[145]

198.   Based on her earlier experience involving MacLean, Slaney testified that she viewed this as an instruction to make sure the favored candidates appeared on the list of finalists:

> Q.   Did you understand that to mean that you should try to get them onto the round -- onto the list for the next round of interviews even if ordinarily they wouldn't make the cut according to your standards?

---

[143]   Testimony of Ellen Slaney, August 5, 2010 (Exhibit 135), at 21, 29-30.

[144]   Testimony of Ellen Slaney, August 5, 2010 (Exhibit 135), at 36.

[145]   Testimony of Ellen Slaney, August 5, 2010 (Exhibit 135), at 54-55.

LIBA/21225629

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

A.      Yes.

Q.      Did you ever obtain confirmation of that understanding
        from either Liz Tavares or from the Commissioner?

A.      Well, for example, you know, to go back to the 2000 Doug
        M[a]clean entry, I think that sort of was confirmation that
        those names had to be on the list, and it wasn't an option.

Q.      So, in 2005 when Liz Tavares was giving you names that
        the Commissioner had an interest in, you understood that
        you were supposed to try to get them on the list even if they
        ordinarily wouldn't make the cut, based on your earlier
        conversation with the Commissioner back in 1999 or 2000
        concerning Doug Maclean, is that right?

A.      That's right.

Testimony of Ellen Slaney, August 5, 2010 (Exhibit 135), at 36-37.

199.    Slaney stated that after receiving these names, she shared them with the chief

probation officer sitting on the interview panel, Rita McCarthy. Her impression was that

McCarthy was expecting to receive names of preferred candidates.[146] McCarthy testified,

however, that she never received favored names from Slaney, or any other individual at OCP, on

any occasion.[147]

200.    Slaney's next interviews, also in February 2005, were for an assistant chief

probation officer position in Fall River. Slaney's notes and testimony describe Tavares as

providing Slaney with the names of five preferred candidates for the position. Slaney testified

that she shared these names with the chief probation officer for that court, James Flannery, in

advance of the interviews.[148]

---

[146]   Testimony of Ellen Slaney, August 5, 2010 (Exhibit 135), at 39-41.

[147]   Testimony of Rita McCarthy, September 27, 2010 (Exhibit 115), at 91.

[148]   Testimony of Ellen Slaney, August 5, 2010 (Exhibit 135), at 42-43.

114

201. Slaney confirmed that she understood she was to try to get the preferred candidates for the Fall River assistant chief probation officer position onto the list of finalists, no matter how they actually performed during their interviews. Notably, Slaney herself wanted to move yet another candidate to the next round no matter how she performed during the interviews, and obtained permission from Tavares to do so.[149]

202. During this round of interviews, both Slaney and Flannery listed all the preferred candidates among their top eight. One of the preferred candidates, however, Lucy Ligotti, was ranked only eighth by Slaney and eighth by Flannery. Ligotti was ranked 14th (second to last) by the judge sitting on the panel, which resulted in her not being among the top eight candidates based on an average ranking. She was tenth overall, and eliminating one candidate who did not appear on two lists she was ninth. Accordingly, Ligotti was excluded from the list of finalists.[150]

203. Ligotti's father-in-law is the clerk magistrate in Hingham. At the time she was interviewed, this was known to the interview panel, and Slaney assumed it was why Ligotti was a preferred candidate.[151]

204. Slaney testified she had a conversation with Tavares the following day concerning the Fall River hiring, in which Tavares stated "[t]here's a name missing from the list." Slaney understood this to be a reference to Ligotti, and explained that she was excluded because she was not among the top eight candidates appearing on both lists. Tavares responded that based on the instructions she had given Slaney, any candidate appearing among the top eight in two lists

---

[149] Testimony of Ellen Slaney, August 5, 2010 (Exhibit 135), at 43-44.

[150] Testimony of Ellen Slaney, August 5, 2010 (Exhibit 135), at 53-54.

[151] Testimony of Ellen Slaney, August 5, 2010 (Exhibit 135), at 85.

115

should become a finalist, and insisted that Slaney go back to the other two interview panel

members to obtain their signatures on a new list that included Ligotti.[152]

205.    Tavares's "interpretation" of the interview instructions was deliberately false.

The instructions provided to the local round interview panel did not state that all candidates

ranked in the top eight by any two panelists must go to the second round:

> At the conclusion of all interviews, each Interview Committee
> member shall rank all candidates, but submit only the top eight
> candidates per position. Candidates must appear on at least two
> interview committee members' lists in order to be eligible for
> recommendation to the Commissioner of Probation.[153]

Thus, apart from special circumstances called for in the union contract, only eight candidates per

position could advance to the final round, not nine or potentially even more. If there were any

doubt, Section 4.302(E) of the *Policies and Procedures Manual* is unambiguous that only eight

names may be forwarded to the Commissioner. *See supra* ¶¶ 83-85, 94-94.

206.    In response to this call with Tavares, Slaney did create a new list that included

Ligotti as a ninth finalist. The next day, and following a call from Tavares' secretary asking if

the new list had been finalized, Slaney sought the signatures of the two other panelists, Chief

Probation Officer Flannery and Judge Gilbert Nadeau.[154]  She testified that when she approached

Judge Nadeau for his signature, he was angry over Tavares's insistence on a departure from

ordinary practice:

> A. … He said Liz Tavares had a nerve coming up to
> Williamstown, which is where the judges had their conference
> every year, and lecturing us on following procedures when she
> isn't willing to -- he never finished saying that. He said, "Never
> mind, I shouldn't say anything here."

---

[152]    Testimony of Ellen Slaney, August 5, 2010 (Exhibit 135), at 61-64, 68-69.

[153]    Interview Process Memorandum (Exhibit 27).

[154]    Testimony of Ellen Slaney, August 5, 2010 (Exhibit 135), at 69, 74, 80-81.

116

\* \* \*

> Then he said, "Ellen, I'm not mad at you; I know this isn't your
> decision." I indicated I knew he was going to make some calls.
> Wait a minute. I knew he knew I concurred with his number 1
> choice, and she was mine, too. He said he was going to make
> some calls, and they hadn't seen the last of him yet. Again he said
> maybe he shouldn't say anything now. I agreed that it was
> probably better if neither one of us said anything further but urged
> him to wait in making his calls at least until a selection was made.
> I suggested that this might be a "courtesy interview" for Lucy
> Ligotti and indicated that they had not told me definitely that she
> would be the final choice.

\* \* \*

> Again, he said he wasn't upset with me and probably shouldn't be
> upset with Liz either because he knew she probably had her
> marching orders, too. I agreed this was a difficult system to work
> in when we're depending upon the legislature's goodwill for our
> budget. He said he didn't really care who their appointments were,
> but if this hiring process was going to be a farce, they shouldn't
> ask him to waste his time on it. He signed the list, and I left.

Testimony of Ellen Slaney, August 5, 2010 (Exhibit 135), at 61, 82-83, 85-86.

207.    Independent Counsel interviewed Judge Nadeau about this incident. He stated to

Independent Counsel "I knew full well that the process was political, and I probably should not

have done it, but I signed off on her." According to Judge Nadeau, he did so because he

"perceived the Commissioner had a lot of drag, and Flannery was very nervous when he

approached [Nadeau] about this." The Judge was clearly disgusted at the fraudulent process

O'Brien had created but believed little could be gained by refusing to sign on this one occasion.

208.    Judge Nadeau also had sent a memorandum, at Judge Connolly's suggestion, to

Chief Justice Mulligan concerning the incident, in which, after recounting what had happened, he

wrote:

> I fully understand that the authority to appoint to this position rests
> with the Commissioner. Apart from any concerns I have about the
> relative qualifications of the candidates, the specified procedure

117

was abused in this instance. I frankly do not see the value of judicial participation in such a process.[155]

209.     According to Slaney's testimony and contemporaneous notes, when she provided the new nine-person list to Tavares, Tavares stated that "she hoped [Slaney] would support the Commissioner in his decision and that sometimes the political thing needed to be done." Slaney understood this to be a reference to keeping the legislature happy.[156] In a subsequent conversation Tavares also asked Slaney to "present a united front" with respect to anyone questioning the integrity of the process.[157]

210.     At the final round of interviews, Ligotti was in fact selected for the position. When the issue of Ligotti's appointment went up to Chief Justice Mulligan for approval, however, he rejected her appointment on the basis that the prescribed process had not been followed: Ligotti was not among the top eight candidates appearing on both lists, and so was ineligible for a final round interview. [158]

211.     Commissioner O'Brien thereafter filled the position with another of the preferred candidates whose name he had given to Slaney, Larry Lopes.[159]

212.     Following the Ligotti incident, Slaney sat on only three more interview panels (for each she was again given the names of preferred candidates[160]) before being removed from interviewing and reassigned to audits, a subject discussed below in the section on retaliation. During one of these panels, Slaney received a call from Deputy Commissioner Tavares'

---

[155]   A copy of the memorandum from Judge Nadeau to Chief Justice Connolly (forwarded to Chief Justice Mulligan) accompanies this Report as Exhibit 69.

[156]   Testimony of Ellen Slaney, August 5, 2010 (Exhibit 135), at 79, 86.

[157]   Testimony of Ellen Slaney, August 5, 2010 (Exhibit 135), at 91.

[158]   A copy of the March 29, 2005 letter from Chief Justice Mulligan to Commissioner O'Brien rejecting Ligotti's appointment and explaining his reasoning, accompanies this Report as Exhibit 42.

[159]   Testimony of Ellen Slaney, August 5, 2010 (Exhibit 135), at 152-53.

LIBA/21225629

secretary checking to make sure that the favored candidates was going to make the list of

finalists:

> Q.   On the next page, still on March 8, you note that Yvonne
>       Roland called during a break in the interviews and wanted
>       to know on behalf of Deputy Commissioner Tavares how
>       the interviews were going?
>
> A.   Yes.
>
> Q.   Did you have an understanding of what she meant by how
>       they were going?
>
> A.   Since she had indicated that the Commissioner was
>       interested in Joe Dooley and Mary Santos, I assumed that
>       she was checking to see if that was going to happen.
>
> Q.   Was it typical that you would get a call either from Deputy
>       Commissioner Tavares or Yvonne Roland on behalf of
>       Deputy Commissioner Tavares to see how interviews were
>       going while they were going?
>
> A.   I interpreted that as pressure to do what they told me to do.
>       I don't think that's the norm.

Testimony of Ellen Slaney, August , 2010 (Exhibit 135), at 137.

213.    Independent Counsel asked Slaney why she went along with the request to fix

hiring in 2005 when she had resisted doing so in 1999 and 2000. Her response was essentially

that she had convinced herself that as the Commissioner's representative on the panel, she had no

choice, even if that overrode her own evaluation of the candidates:

> Q.   So it was your approach to hiring that no matter what you
>       have may have known as the Regional Supervisor for many
>       of these people or what you may have seen in the interview
>       room, that if the Commissioner had an interest in someone
>       making the list of finalists, you should put them on your list
>       of top eight?
>
> A.   Yes.

---

[160]   Testimony of Ellen Slaney, August 5, 2010 (Exhibit 135), at 72, 132-33.

LIBA/21225629

Testimony of Ellen Slaney, August 5, 2010 (Exhibit 135), at 78.

### 4.    *Testimony of Edward Dalton*

214.    Edward Dalton was a regional supervisor responsible for Barnstable County until

his retirement earlier this year.

215.    Dalton testified that he began receiving names from the Commissioner's office

during the period between Commissioner O'Brien's appointment in 1998 and the hiring freeze in

early 2001.[161] His understanding was that the individuals whose names he was being given were

to make the list of finalists, whether or not they were among the most qualified:

> Q.    Did you feel pressure yourself to include names of
> individuals from the commissioner's office whom you did
> not believe should have been on the list of finalists?
>
> A.    I did.
>
> Q.    And on some occasions did you feel forced to include those
> names?
>
> A.    I did.

Testimony of Edward Dalton, August 17, 2010 (Exhibit 103), at 54-55.

216.    For example, Dalton described one occasion in which he rated a candidate whose

name he had been given by the Commissioner's office (the son of a presiding judge) in the top

eight only because he had been told to do so:

> Q.    Do you believe that both you and Mr. Teixeira rated
> Kelleher eighth in deference to who he was as opposed to
> his qualifications?
>
> A.    Yes.

Testimony of Edward Dalton, August 17, 2010 (Exhibit 103), at 63-65.  That same candidate

was ranked 24th out of 30 by the judge on the panel.  *Id.* at 66.

---

[161]    Testimony of Edward Dalton, August 17, 2010 (Exhibit 103), at 31-32.

217.    On another occasion, Dalton was unable to get all of the candidates whose names

he had been given onto the list of finalists. He testified that Deputy Commissioner Wall

followed up with him to find out why he had been unsuccessful. Dalton responded to Wall that

the candidates who were left off the finalist list were "horrible."[162] Wall then informed Dalton

that the "Commissioner was not happy":

> Q.    What did you understand that to mean?
>
> A.    I understood it to mean that unless all of the candidates
>        whose names I was provided made the list all of the time,
>        people would not be happy.
>
> Q.    And by people, to whom to you refer?
>
> A.    The commissioner.

Testimony of Edward Dalton, August 17, 2010 (Exhibit 103), at 48-49.

218.    According to Dalton, Wall ended the conversation by instructing Dalton that if he

could not do what he was "was supposed to do," then he should call OCP for assistance.[163]

219.    On another occasion, the same Douglas MacLean who came before Regional

Supervisor Slaney also came before Dalton. Dalton actually ranked him 16th, high enough to

make the list of finalists because there were two positions open. The other two panel members

ranked MacLean below 16 so he did not make the list. Dalton admitted that his ranking

MacLean 16th was not based on the merits.[164]

220.    Dalton testified that after MacLean failed to make the list of finalists,

Commissioner O'Brien called Dalton and asked "Why didn't McLean make the finalists?"

---

[162]    Testimony of Edward Dalton, August 17, 2010 (Exhibit 103), at 42-48.

[163]    Testimony of Edward Dalton, August 17, 2010 (Exhibit 103), at 50-51.

[164]    Testimony of Edward Dalton, August 17, 2010 (Exhibit 103), at 84.

Dalton responded by noting MacLean's criminal record, at which point O'Brien ended the conversation.[165]

221.    Dalton provided Independent Counsel a series of tapes he made from answering machine recordings left in October 2000 by Janet Mucci, the Department's Human Resources Director. In these voicemails, the authenticity of which was confirmed under oath by Dalton and Mucci, Mucci can be heard passing along the names of candidates that the Commissioner wanted to see become finalists, discussing strategies Dalton might employ to get all of the favored candidates onto the list of finalists, and addressing retaliation against uncooperative interviewers:

> Hi Ed, it's Janet. I know you are not doing interviews today but in Dedham there are people that have to be finalists, I was just thinking about that now. I think there's only three. Jack had given me, one, two, three, four, like 7 names to be interviewed, some were definitely just interviews. When he comes in Monday, I mean, I'm going to check with him again, I don't know about a couple of them. I don't have them down as a finalist, so I'm assuming they're not, but there are three. There's an APO David Maceachern, M-A-C-E-A-C-H-E-R-N, a Jean Roche, R-O-C-H-E, (*whispering*: I think she's a neighbor or something [inaudible], I don't know, I don't what she is), and the other one is Daniel Disangro, D-I-S-A-N-G-R-O – he looks good on paper, I don't know what he's really like, but, he's in for a few of them, I think, but those are the three that he wants on there. And I will, I, I know he's going to do a letter to Rita saying she can fill the second slot, I know that's not an issue so you definitely can pick 16 finalists. We didn't send out, I don't believe, the last day of the 16th to you, but I don't think there's very many on that day anyway but I think Jackie's holding that because I figure by the time he gets in Monday, there could be a couple of throw-in's. I think there's only about 4 people on that Monday. Oh no, Monday's the long day now, I'm sorry, it's the 18th, that's short. That's the day that I'm afraid he might throw more on, but I will definitely touch base with you at the beginning of the week but I wanted to tell you about these three anyway. Ok. Thanks. Bye.

* * *

---

[165]    Testimony of Edward Dalton, August 17, 2010 (Exhibit 103), at 128-29.

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

Ed, it's Janet. I've got some names for finalists in the Dedham
District Court. I know I had left a couple on your machine the
other day but, I've got to give you these. There's a Douglas
Maclean, M-A-C-L-E-A-N, Jennifer McHugh (she was the one
that you had asked about for the interview but somebody obviously
called), Daniel Disangro, D-I-S-A-N-G-R-O, Jean Roche, R-O-C-
H-E, and David Maceachern, M-A-C-E-A-C-H-E-R-N. I mean,
that's 5. She can have 16, thank God, but can you just make sure
they're in there somewhere. I just wanted to let you know too Jack
was sort of praising you in there today. Now, don't, don't fall off
your shoes laughing at that, [*Whispering:*] but he was saying
something about you doing a good job getting people on for
finalists or something, um, I think that's what he was talking about.
So, anyway, so now that I just beefed you up a little bit, you gotta
do this. And he was saying if people were real uncomfortable with
this, he's going to have to remove people from doing interviews.
He wasn't talking about you in that statement, but he has no choice
for these finalists so, you know, the worst is, oh in Dedham you're
not going to have a problem because there's 16 but the worst is tie
people if you have to and that's what I'm going to say you
should… I think yours is Falmouth … I'll talk about Falmouth. I
won't give them to you right now because it's so far off, but
there's one, two, three, four, five, there's 6 people to be finalists in
Falmouth for this one job, so the only thing I can think of, as I said
to him, the only thing that's going to bail these guys out on this is
if they tie people. So, we'll talk about those 6 people but
[*whispering*] if you can only come up with 8 numbers, maybe you
got a whole bunch tied for eight, or 6 or 7, gonna have to do
something like that to accommodate these things because he had a
meeting at the State House yesterday and he has no choice. So,
anyway, will you just leave me a message Ed and let me know that
you got that message. Thanks. Bye.

\* \* \*

Ed, it's Janet. I just got your message that you got my message so
that was the Dedham thing … [*whispering*] [inaudible] …
Falmouth and I'll talk to you later about those further dates
[inaudible]… Don't need to worry about that now but that one
might be a little bit more difficult. The only good thing is it's Jill
Ziter [*regional coordinator for District Court Chief Justice*] …
[*whispering*] … and I'm not sure if you interviewed with Jill or
not, but Brian [*Murphy*] interviewed with her last year in New
Bedford [inaudible] … she was accommodating … she'd kind of
go along with anything anybody wants … that's the one that has so
many finalists and [*whispering*] there's only, you know, you're

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

only supposed to come up with eight that you may have to be creative and tie people. Like I said, I think I left on your message and I was talking to Ellen yesterday, you can … we found last year, and I have a feeling this is for some of the people that may have gotten these people on … we tied them … you know so you have 2 tied for eighth …[*whispering*] 2 tied for sixth; anything like that just to get them in there. Then you end up with more than 8 finalists but Tony has never questioned when he's seen ties. [*whispering*] I know Paul Lucci tied and I think Bill Burke did last year and you may have too but it just seems like a way to kind of accommodate this and get the people the core ones, because it is tough, at least in the Dedham situation you've got 16 finalists, so it makes it a little bit easier but Falmouth's going to be tough because there is about, I think there's 5 or 6 finalists and that out of eight is crazy. But Jack had had a meeting over at the State House yesterday, and I think, or the day before, and again that triggered a lot of this. You know [*whispering*] when he got everything he wanted this year in the budget moneywise, so they feel like they did that for him, you know, and obviously he needs to do this for them. So that's why he was saying to me [*whispering*] he's more than willing to take people off of interviews … [inaudible] … making it real uncomfortable. So, I have a feeling Ellen might bail on hers and that's ok, he's really ok with that. But he was very complimentary about you yesterday, I think I told you that a little bit on machine, I'll talk to you more about it, but it was just with the interviews and stuff. I mean, he says you accommodated him all the time [inaudible] [*whispering*] … I forget. You know you tried your damnedest if you didn't, but he also made a comment to me that, I believe he was referring to the interviews for the Deputy and telling people that they didn't get jobs and stuff, I think, he sort of said it like I, like I was supposed to know about what he was talking about, but he said [*whispering*] even recently with what went on, he said Ed was a real trooper and he was a team player in all this. That was a, for him, like a big compliment. [*Laughter.*] So, just so you know. So that was [*whispering*] interesting you didn't get the job but at least if you think it through … [inaudible] … But I would say when you're going through these if you have any problem getting any of them on, [*whispering*] I'd, I'd pick up the phone to call, call I don't know what to tell you … [inaudible] Burke, to call Paul, I don't know. But he's real insistent that these people be there, see I know that makes it really tough. If Rita would at least go along with putting on 2 out 3, I guess you can get them on somehow by that, but if you think anybody's not going to make it, I'd [*whispering*] pick up the phone and call. I don't know, I don't know what else to tell you to do. I have a dentist appointment, so I'm leaving at 1:30, I don't know

LIBA/21225629

[*whispering*] when he'll be in.  Otherwise, you can call me and I'll
go get him if you want.  [*whispering*]  I wouldn't hesitate to pick
the phone up and call him and tell him that you [inaudible]
[*laughter/giggle*] or something.  At least it will cover you on your
end, you know.  Hey, have a good day, bye.[166]

222.    From early 2001 until the end of 2004 a hiring freeze was in place.  In February

2005, following the lifting of that freeze, Dalton sat on a local panel interviewing for an assistant

chief probation officer position in Barnstable District Court.  Prior to the start of that interview

Dalton received a number of names from Tavares of preferred candidates from the

Commissioner's Office, including a probation officer in charge named Elzy Tubbs.[167]

223.    Dalton testified that Tavares also gave him the names of two candidates who were

*not* to make the list of finalists – Joseph Zavatsky and Barry Nunes.  Dalton's understanding was

that they were blacklisted for previously filing grievances concerning another round of hiring in

which they were unsuccessful.[168]

224.    Tubbs missed his interview time, apparently due to a miscommunication.  Dalton

testified that he attempted using every means to contact Tubbs, all to no avail.  The panel scored

the remaining candidates, and created a list of finalists without Tubbs.  Both Zavatsky and Nunes

were on the list of finalists, although Dalton ranked them both below 8th.[169]

225.    Later in the day, Tubbs arrived, but the judge sitting on the panel refused to

reopen the interviews, noting the unfairness to those who were on time and claiming further

interviews would be in breach of laws governing the holding of meetings.[170]

---

[166]  Voicemail recordings (Exhibit 31).

[167]  Testimony of Edward Dalton, August 17, 2010 (Exhibit 103), at 90, 95.

[168]  Testimony of Edward Dalton, August 17, 2010 (Exhibit 103), at 101-102.

[169]  Testimony of Edward Dalton, August 17, 2010 (Exhibit 103), at 103 & exhibit 10.  A copy of exhibit 10 to the
testimony is found with the excerpts of the testimony as Exhibit 103 to this Report.

[170]  Testimony of Edward Dalton, August 17, 2010 (Exhibit 103), at 91-94.

226.    Ultimately, following consultations among judicial and Probation Department personnel, an entirely new local round of interviews was held so that Tubbs could participate. The general sense among both groups was that Tubbs may have been the victim of a legitimate miscommunication. Dalton was not permitted to participate.[171] This new panel ranked Tubbs on the list of finalists, and did not include Zavatsky and Nunes.[172] Tubbs was ultimately selected for the position.

227.    Following his "failure" to get Tubbs on the list of finalists the first time and/or to have Zavatsky and Nunes blacklisted, Dalton was removed from interviewing altogether, as discussed further below in the section dealing with retaliation.

### 5.    Testimony of Francis Campbell

228.    Frank Campbell served on the screening panels beginning in 2005, but did not generally participate in the local rounds of interviews. He did, however, participate in such interviews in 2001 and also in 2008. In total, he conducted interviews for one court in 2001 and five courts in 2008.[173]

229.    Campbell testified that he was provided with names of two preferred candidates for probation officer positions in 2001, and both were ultimately hired. He could not, however, recall who provided him with the names.[174]

230.    With respect to each round of interviews in 2008, Campbell recalled either being contacted by Deputy Commissioner Francis Wall, or himself contacting Wall, so that Wall could provide him with a list of "recommended" candidates.[175]

---

[171]    Testimony of Edward Dalton, August 17, 2010 (Exhibit 103), at 104.

[172]    Testimony of Edward Dalton, August 17, 2010 (Exhibit 103), at 105 & exhibit 9. A copy of exhibit 9 to the testimony is found with the excerpts of the testimony as Exhibit 103 to this Report.

[173]    Testimony of Francis Campbell, August 10, 2010 (Exhibit 98), at 98, 123.

[174]    Testimony of Francis Campbell, August 10, 2010 (Exhibit 98), at 100-101.

126

231.    In some instances, Campbell recalled the names of preferred candidates that he

received from Wall. For example, he recalled receiving the name of Patrick Lawton for a round

of hiring at the Plymouth County Probate and Family Court. Lawton is the son of Judge Mark

Lawton.[176]

232.    On most occasions, Campbell shared the names he had received from Wall with

the chief probation officer sitting with him on the interview panel. He did so with the purpose

that it might cause the chief probation officer to rank the preferred candidates higher than the

chief probation officer otherwise would have:

> Q.    Was it your goal in sharing the names with the CPO in
> Plymouth District Court to have the CPO rank the
> recommended candidates higher than he ordinarily might
> have if he did not know that these were the recommended
> candidates?
>
> A.    I think one could certainly draw that conclusion.
>
>                * * *
>
> Q.    [T]he point you're trying to make to the CPOs – right? – is
> that the front office, the OCP, wants to see these people in
> the next round and so, if you can, rank them higher than
> you otherwise might have so that we can get them into the
> next round?
>
> A.    I will concur to the way you frame the question.

Testimony of Francis Campbell, August 10, 2010 (Exhibit 98), at 131, 133-34.

233.    Campbell testified that there only was one occasion on which he did not pass the

names along to the chief probation officer. Tellingly, his explanation for not doing so was that,

based on his review of the favored candidate's qualifications, he knew they would "shine" during

---

[175]    Testimony of Francis Campbell, August 10, 2010 (Exhibit 98), at 94-95, 123-24.

[176]    Testimony of Francis Campbell, August 10, 2010 (Exhibit 98), at 116.

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

the interview on their own merits. Therefore it was unnecessary to notify the chief probation

officer that the candidate was favored by the Commissioner.[177]

234.    Campbell testified that he never shared the names of the recommended candidates

with the judges on the interview panels.[178]

235.    Campbell could not recall any occasion in which a preferred candidate failed to

make the list of candidates for a final round interview, and his best memory was that all of them

did.[179]

236.    Campbell further testified that, based on his receipt of names of preferred

candidates from Wall, and although he tried always to be accurate and fair, he was "sure" that he

had ranked some preferred candidates more highly than he otherwise would have, based on his

knowledge that they were preferred:

> Q.    Did you ever rank a candidate more highly than you
> otherwise would have because you received that
> candidate's name from Fran Wall?
>
> A.    Possibly. I'm sure I did at some point. Again, knowing
> that the candidate is a recommended candidate, it's difficult
> without question to even unconsciously be as objective
> with the candidate's interview for certain if you know
> there's an interest in that candidate. So quite possibly I did,
> unwittingly, rank a candidate higher.

Testimony of Francis Campbell, August 10, 2010 (Exhibit 98), at 138.

237.    For example, although he had other reasons for ranking him high, Campbell

testified that it was "very possible" he ranked Patrick Lawton higher than other interviewers did

---

[177]    Testimony of Francis Campbell, August 10, 2010 (Exhibit 98), at 181-82.

[178]    Testimony of Francis Campbell, August 10, 2010 (Exhibit 98), at 136-37.

[179]    Testimony of Francis Campbell, August 10, 2010 (Exhibit 98), at 120.

LIBA/21225629

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

(Campbell ranked him 3rd, the other panel members ranked him 10th and 11th) because he was aware that Lawton was a preferred candidate.[180]

### 6. Testimony of Richard O'Neil

238.    Regional Supervisor Richard O'Neil, who is responsible for the Probate and Family Courts, also testified that he received the names of preferred candidates from the Commissioner's Office with instructions to get them onto the list of finalists.[181]

239.    According to O'Neil, the Probate Court was not popular for people seeking jobs in the Probation Department, and at first, the pace of his receiving names, typically from Deputy Commissioner Tavares, was slow.  However, over time the provision of names of preferred candidates became common. [182]

240.    O'Neil explained that when he received names from OCP, he shared them with the chief probation officer sitting on the local interview panel, and the two of them arranged to have the preferred candidate make the list of finalists:

> So I would have a dialogue with the Chief Probation Officer, either in person on the day of the interview or in advance, and give them an indication of who the Commissioner had an interest in making the next round.  A lot of my Chiefs were newer appointments, so they generally went along.  They understood what was expected of them, meaning this person should make it to the next round.  And kind of the methodology for getting somebody to the finals was three panelists.  If there was going to be a list of eight names, let's say, to make it to the finals, two of the three panelists had to have that person's name in the top eight.

Testimony of Richard O'Neil, August 3, 2010 (Exhibit 124), at 30.

241.    O'Neil admitted that this resulted in some candidates making it to the final round of interviews who did not deserve to on the merits:

---

[180]    Testimony of Francis Campbell, August 10, 2010 (Exhibit 98), at 152-53.

[181]    Testimony of Richard O'Neil, August 3, 2010 (Exhibit 124), at 24-25.

129

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

> So, you know, it didn't take too long before some of the folks that
> made it to the top eight shouldn't have been in the top eight. I
> mean, some were very qualified, and some were not.

Testimony of Richard O'Neil, August 3, 2010 (Exhibit 124), at 30.

242.     According to O'Neil, the discrepancy in scoring for favored candidates between

himself and the chief probation officer on the one hand, and the judge on the other, was on

occasion so great that judges could not help but infer that some manipulation of the process was

occurring. Consequently he thereafter was open with the judges on his panels about the

Commissioner's attempt to game the system:

> So, for instance, if I was given a name and I talked to the Chief
> about it and, initially, that's the only person that I had a dialogue
> with -- and when I say initially, I mean the first few rounds of
> interviews, regardless of what division I was in -- so the judge had
> somebody 50th, and I had them fifth. All of a sudden there was
> questions being asked by the judges: Are you seeing something,
> Rick, in this person that I'm not seeing? And I started to be
> concerned about my own integrity and reputation with the judges,
> and I knew the judges were talking to one another, and some of the
> judges would even say to me as time went on: Okay, Rick, who's
> on the list today? And I would, as time went on, I would say
> openly before we started the entire process: The Commissioner
> has an interest in these names – name or names. You can choose
> to do with that whatever you want.

Testimony of Richard O'Neil, August 3, 2010 (Exhibit 124), at 32.

243.     O'Neil recounted that some of the judges called the Commissioner to express

concern about preferred candidates who had made the list of finalists.[183] For example, Douglas

MacLean also came before an interview panel on which O'Neil was sitting and shared his

---

[182]  Testimony of Richard O'Neil, August 3, 2010 (Exhibit 124), at 29-30.

[183]  Testimony of Richard O'Neil, August 3, 2010 (Exhibit 124), at 33-34.

LIBA/21225629

criminal background with the panel. This prompted the judge on the panel, Elizabeth LaStaiti, to call Commissioner O'Brien.[184]

244.     While some of the candidates whose names he was given no doubt deserved to make the final round of interviews on their own merits, as quoted above "some of the folks that made it to the top eight shouldn't have been in the top eight." Indeed, O'Neil stated that "99 if not a hundred percent of the time, the names that [he] was given made the list."[185]

245.     Furthermore, O'Neil testified that, at least in his experience, if there were one or more favored candidates in an interview pool, a favored candidate got the job:

> Q.     Yes, are you aware of any instance where if at least one favorite candidate was on the list, a non-favorite candidate got the job?
>
> A.     I don't believe so. I believe – from my recollection, if there was a favorite candidate on the list, they got the job.

Testimony of Richard O'Neil, August 3, 2010, at 129-30.

### 7.     Testimony of Mark McHale

246.     Like others, Regional Supervisor Mark McHale testified that he received the names of favored candidates from the Commissioner's Office.

247.     In particular, he testified that he received names of favored candidates from First Deputy Commissioner Tavares, Deputy Commissioners Francis Wall and Patricia Walsh, and Edward Ryan.[186]

---

[184]   Testimony of Richard O'Neil, August 3, 2010 (Exhibit 124), at 130-34, 139-40, 157-59.

[185]   Testimony of Richard O'Neil, August 3, 2010 (Exhibit 124), at 33-34, 36.

[186]   Testimony of Mark McHale, July 30, 2010 (Exhibit 117), at 50. Relevant excerpts of the testimony of Regional Supervisor McHale accompany this Report as Exhibit 117.

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

248.    McHale testified that the message which accompanied these names was to give

the specified candidates "some consideration," which he understood to mean that he should get

these candidates through the local panel and onto the next round of interviews:

> Q.    During your involvement in hiring over your tenure as a
>        Regional Supervisor, were there instances when you were
>        given names of preferred candidates during the hiring
>        process?
>
> A.    The way it was, I was given names, and they said "In
>        consideration of how these people do during the interview
>        process, could you give them some consideration."
>
> Q.    Was "consideration" the word used?
>
> A.    Yes.
>
> Q.    And what did you take that to mean?
>
> A.    If they did well in the interview, is there any way, you
>        know, that you'd feel a consideration to move them on, if
>        they did well in the interviews.  And I said, we'll see how
>        they do in the interviews.
>
> Q.    Well, everyone who was being interviewed was given
>        consideration, right?
>
> A.    Oh, absolutely.  But you asked me, were you given names.
>
> Q.    Well, the names that you were given wasn't just that they
>        were supposed to be given the normal consideration in the
>        interview process, correct?
>
> A.    I never knew how to take that, just, "Could you use
>        consideration on these names that were given to you."
>
> Q.    Was it your understanding that those candidates whose
>        names you were given were supposed to make it through to
>        the next round?
>
> A.    I'd have to say yes.

Testimony of Mark McHale, July 30, 2010 (Exhibit 117), at 48-49.

132

249.    McHale testified that he understood he was to put the preferred candidates on the

list for final round interviews, even if they were not among the most qualified candidates

interviewed:

> Q.    … Your understanding of what they were trying to
> communicate, even if they didn't say it explicitly, was try
> to get these people through even if ordinarily they won't
> make the cut for the top eight to go to the next round?
>
> A.    Yes.

Testimony of Mark McHale, July 30, 2010 (Exhibit 117), at 82.

250.    McHale testified that he was never provided the basis on which the

Commissioner's office was asking him to pass these preferred candidates through to the next

round of interviews.[187]

### 8.    *Testimony of Jeffrey Akers*

251.    Regional Supervisor Jeffrey Akers testified that he received names of preferred

candidates for probation officer and assistant chief probation officer positions from the

Commissioner's office prior to or during interviews.

252.    Typically, Deputy Commissioner Tavares or Edward Ryan provided Akers with

the names of preferred candidates, explaining that these were candidates that "they were

interested in having on the list."[188] Akers explained that he understood that these were

candidates that the Commissioner's Office wanted to see on the final list of candidates that was

passed on to the next round of interviewing.

> Q.    And it was your understanding when you were being given
> these names that these candidates needed to make it
> through to the next round of interviewing?

---

[187]    Testimony of Mark McHale, July 30, 2010 (Exhibit 117), at 54.

[188]    Testimony of Jeffrey Akers, August 25, 2010 (Exhibit 92), at 54. Relevant excerpts of the testimony of
Regional Supervisor Akers accompany this Report as Exhibit 92.

**PRIVILEGED AND CONFIDENTIAL**
**BY ORDER OF THE SUPREME JUDICIAL COURT**

> A.    Correct.

Testimony of Jeffrey Akers, August 25, 2010 (Exhibit 92), at 59.

253.    On at least one occasion, Akers passed on the names of the candidates he received

to the Chief Probation Officers with whom he was conducting the interviews.

> Q.    …What did you tell [the chief probation officer]?
>
> A.    I said "These are individuals that need consideration."
>
> Q.    Is that the word you used, consideration?
>
> A.    Best of my knowledge, yes.
>
> Q.    And by consideration, you meant that they needed to get
> through to the next round?
>
> A.    Correct.

Testimony of Jeffrey Akers, August 25, 2010 (Exhibit 92), at 58-59

254.    During his testimony, Akers was unable to recall any occasion in which the

recommended candidates did not make it to the final round of interviews:

> Q.    Are there any instances you can recall where you were
> given names of individuals to make it through to the next
> round of interviewing and that didn't happen in the PO
> position context?
>
> A.    Not that I can recall, no.
>
> Q.    So each time you were given names of individuals to make
> it through to the next round of interviewing, all those
> candidates made it through?
>
> A.    To the best of my knowledge.

Testimony of Jeffrey Akers, August 25, 2010 (Exhibit 92), at 59.

134

255.    Akers also testified, however, that he believes that all of the candidates whose names he was given in advance would have made it to the next round of interviewing regardless of whether they had been recommended by the Commissioner's Office.[189]

256.    Akers told us that he had no problem with an interviewing process where the candidates were essentially pre-determined before the interviews even began. According to Akers, if the Commissioner or Tavares thought these individuals were qualified and wanted them on the final list, "it wasn't up to [him] to tell them no." [190]

### 9.    Testimony of Brian Murphy

257.    Regional Supervisor Brian Murphy testified that he received names of preferred candidates from the Commissioner's Office with respect to probation officer hiring, although, unlike other witnesses, he testified that he did not receive names with respect to assistant chief probation officers positions.[191]

258.    Murphy explained that in the early years of Commissioner O'Brien's tenure, these calls came from one of the legislative liaisons, Michelle Cahill Martino:

> Q.    Describe for me what one of these calls from Ms. Cahill would consist of.
>
> A.    "You're doing interviews in a particular court. You need to – Can you please give these three people, give them a good look, given them consideration," you know, put it that way, "and see if they can be moved on." If they're really good, see if they can be moved on to the final, something to that effect.

Testimony of Brian Murphy, August 13, 2010 (Exhibit 123), at 73.

---

[189]    Testimony of Jeffrey Akers, August 25, 2010 (Exhibit 92), at 40-41, 59-60.

[190]    Testimony of Jeffrey Akers, August 25, 2010 (Exhibit 92), at 44, 62-63.

[191]    Testimony of Brian Murphy, August 13, 2010 (Exhibit 123), at 71-72.

135