# EXHIBIT A

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

259.   When pressed that he should be giving everyone a good look, Murphy agreed that

his understanding of what he was being asked to do was far more definitive:

> Q.   And again, I'm sure you gave everyone a close look that
> you interviewed.  Correct?
>
> A.   Yes, absolutely.
>
> Q.   So you were being asked to essentially move these people
> along to the next stage?
>
> A.   Yes.  I would say yes.

Testimony of Brian Murphy, August 13, 2010 (Exhibit 123), at 74.

260.   In later years, Murphy stated that the names came from Deputy Commissioner

Tavares and from Edward Ryan.[192]  According to Murphy, he received the names of favored

applicants for approximately 75% of the interview panels on which he sat.[193]

261.   If Murphy did not believe that a preferred candidate was qualified to serve as a

probation officer, he called Tavares or Ryan during the interviews to tell them so.  Unlike many

other interviewers who stated that the reaction to such calls was frequently anger, Murphy stated

that Tavares always accepted his representation and did not push back, although Ryan did.[194]

Murphy deliberately set a very low bar in judging which preferred candidates could move on to

the next round of interviews:

> Q.   What were the sorts of issues that would cause you pause in
> moving along someone who was told to you to give special
> consideration to?
>
> A.   If a particular person did not present well.  When I say
> present well, really did not articulate their issues at all,
> didn't answer the questions appropriately, maybe didn't
> have an idea as to what being a probation officer was really

---

[192]   Testimony of Brian Murphy, August 13, 2010 (Exhibit 123), at 80.

[193]   Testimony of Brian Murphy, August 13, 2010 (Exhibit 123), at 81, 83.

[194]   Testimony of Brian Murphy, August 13, 2010 (Exhibit 123), at 83-85, 87-88.

136

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

> all about. Just, I mean, it would kind of jump out at me.
> Of if I had an issue with a particular person.
>
> * * *
>
> Q.    And what if you didn't have an issue with the name? Let's
>        just say it was a candidate you weren't high on but they
>        didn't have any glaring issues.  Were you expected to move
>        those people along?
>
> A.    I was expected to do whatever I could. …

Testimony of Brian Murphy, August 13, 2010 (Exhibit 123), at 84, 89.

262.    Murphy estimated that 75% of the time the preferred candidates whose names he
had been given moved on to the final round of interviews.[195]

263.    One of the favored candidates that Murphy did rank high enough to make the list
of finalists was Douglas MacLean, the candidate with a felony criminal record, and who
appeared before Regional Supervisors Slaney, Dalton and O'Neil at different points.

264.    Murphy testified that he knew of MacLean's criminal history and was given
MacLean's name as a preferred candidate during interviews in Fall River District Court in
approximately 2001.[196]  He said MacLean openly discussed the fact that he had a criminal record
but stated that it was "behind" him.[197]  Murphy said that prior to interviewing MacLean, he had
spoken with Rick O'Neil who was bothered by MacLean's name appearing on the list of favored
candidates, but Murphy testified he thought MacLean performed well during the interview.[198]
Murphy put MacLean through to the next round of interviewing after speaking with a judge
whom MacLean listed as a reference.[199]  MacLean was not selected for that position.

---

[195]   Testimony of Brian Murphy, August 13, 2010 (Exhibit 123), at 91.

[196]   Testimony of Brian Murphy, August 13, 2010 (Exhibit 123) at 100-102.

[197]   Testimony of Brian Murphy, August 13, 2010 (Exhibit 123), at 103.

[198]   Testimony of Brian Murphy, August 13, 2010 (Exhibit 123), at101-103.

[199]   Testimony of Brian Murphy, August 13, 2010 (Exhibit 123), at 102-103.

137

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

### 10. Testimony of Dianne Fasano

265. Regional Supervisor Dianne Fasano, like the other regional supervisors, testified that she received calls from Tavares or Ryan providing her the names of "people [who] had to make the final list." [200] According to Fasano, this happened on approximately three out of the 20 occasions on which she sat on an interview panel. [201]

266. Fasano testified that with respect to some of the candidates whose names she was given, they were well qualified and would have made the final round of interviews even without the intervention of OCP. However, she testified that it was "true" that on at least one occasion, she was given the name of a candidate "who if taken solely on merit may not have advanced to the next round." Nonetheless, Fasano passed that candidate along because she had been given her name by OCP. [202]

### 11. Testimony of Edward Rideout

267. Regional Supervisor Edward Rideout is presently responsible for the Department's Training group. He recalled one occasion on which he participated in the local round of interviews for a probation officer position, and testified that he received names of favored candidates from OCP.

268. Rideout recounted that Tavares provided him the names of candidates that "should be entered into the next round of interviews." [203] Rideout shared them with the chief probation officer sitting on the interview panel. [204] Of the three candidates whose names he was

---

[200] Testimony of Dianne Fasano, September 3, 2010 (Exhibit 109), at 37-38.

[201] Testimony of Dianne Fasano, September 3, 2010 (Exhibit 109), at 39-40.

[202] Testimony of Dianne Fasano, September 3, 2010 (Exhibit 109), at 49-53.

[203] Testimony of Edward Rideout, August 27, 2010 (Exhibit 129), at 47-50.

[204] Testimony of Edward Rideout, August 27, 2010 (Exhibit 129), at 51-52.

138

given, Rideout believed he and the chief probation officer were able to get two to the next round,

but the third was ranked so low by the judge that he or she did not make the list of finalists.[205]

### 12. Testimony of Francine Ryan

269.    Regional Supervisor Francine Ryan also testified that she received names of

preferred candidates for probation officer, assistant chief and chief probation officer positions.[206]

Ryan testified that Tavares gave her the names of favored candidates in advance of the

interviews.[207]

> Q.    When that occurred, who provided you with those names
>        for those candidates?
>
> A.    Liz Tavares.
>
>                                  * * *
>
> Q.    What would she say to you?
>
> A.    Just -- I don't know -- "Have these people get a final
>        interview." I don't know what the exact wording was.
>
> Q.    Was it your understanding, though, that the names you
>        were given were to make it on to the final round of
>        interviewing?
>
> A.    Yes.
>
> Q.    And that was regardless of how they actually performed
>        during the interview?
>
> A.    Yes.
>
>                                  * * *
>
> Q.    Was it your understanding, though, that when Ms. Tavares
>        told you these individuals were to make it to the next

---

[205]  Testimony of Edward Rideout, August 27, 2010 (Exhibit 129), at 53.

[206]  Testimony of Francine Ryan, August 9, 2010 (Exhibit 132), at 66, 91-92.

[207]  Testimony of Francine Ryan, August 9, 2010 (Exhibit 132), at 68-69. Ryan testified that Edward Ryan may
       have also contacted her with names of favored candidates, but had done so after the interviews had already
       occurred. *Id.* at 100-101.

139

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

> round, even if they weren't necessarily deserving, they
> were to make it to the next round anyhow?

A.    The names were to be on the list.

Testimony of Francine Ryan, August 9, 2010 (Exhibit 132), at 68-69, 78; *see also*
128-29.

270.    The process was so institutionalized that Ryan sometimes initiated the contact

with Tavares in advance of interviews to see if there were names that had to make it on to the list

of finalists.

Q.    Did you ever have any discussions with Bill Burke about
any candidates' names you were given from the Office of
the Commissioner of Probation who were to make it
through to the next round of interviewing?

A.    Did I ever have a discussion with him?

Q.    Did you ever talk to him about the fact that you were
getting names from the Office of the Commissioner of
Probation of candidates to put through to the next round?

A.    Yes.

Q.    What did that discussion consist of?

A.    He said "Make sure you call Liz.  Did you call Liz?"  And I
said yes.

Q.    What was he saying?  What did he mean when he said to
you, "Did you call Liz?"

A.    Before my interview, did you call Liz to see if there were
names to be passed on.

Q.    Were there instances where you were contacting Ms.
Tavares to get names for the interviews that you were going
to be conducting?

A.    Yes.

Q.    What did you say to Liz Tavares when you contacted her?

A.    "Hi, Liz, I'm doing the interviews tomorrow for such-and-
such a court."

140

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

Q.   Did you say anything else to her?

A.   "Do you have names that need to make the list?"

Q.   And what would she say to you?

A.   She would say either yes or no.

Q.   And she would provide you with the names if she had them?

A.   Yes.

Testimony of Francine Ryan, August 9, 2010 (Exhibit 132), at 97-98.

271.   During the interview process, Ryan passed the names of the recommended candidates to the chief probation officers with whom she conducted the interviews.[208] Ryan testified that in all instances the favored candidates were scored to the next round of interviews. Ryan, however, hedged her admission by claiming that each candidate whose name she was given in advance of interviewing "deserved to be passed on" to the final interview round.[209]

### 13.   Testimony of Nicholas DeAngelis

272.   Retired Regional Supervisor Nicholas DeAngelis testified that he received names of favored candidates from individuals within the Commissioner's Office in advance of every probation officer and assistant chief probation officer interview panel he sat on while he was a regional supervisor.[210] DeAngelis told us that Deputy Commissioners Francis Wall and Elizabeth Tavares (and perhaps Deputy Commissioner William Burke), and legislative liaison Edward Ryan contacted him with names of candidates who "had to make the list" of finalists for the positions:

---

[208]   Testimony of Francine Ryan, August 9, 2010 (Exhibit 132), at 72-73, 93-94.

[209]   Testimony of Francine Ryan, August 9, 2010 (Exhibit 132), at 71-72, 79-80, 92-93.

[210]   Testimony of Nicholas DeAngelis, August 24, 2010 (Exhibit 104), at 43-44.

141

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

Q.   Now, I believe you said Fran Wall, Ed Ryan, and in some
     instances Liz Tavares would contact you?

A.   Correct.

Q.   When Mr. Wall contacted you on those occasions, do you
     recall with any specificity what he would say to you about
     the candidate?

A.   Nothing other than "Nick, these people have to make the
     list."

Q.   And when you say they have to make the list, what list are
     you referring to?

A.   The list we would be sending back to Boston.  We would
     basically cut down the number of applicants to eight for
     each position.

Q.   So these individuals had to make the list of people who
     were sent back to Boston?

A.   People who were sent back to Boston for a second
     interview.

Q.   And when Mr. Ryan contacted you, what would he say to
     you?

A.   Same thing.

Q.   Any difference in what Liz Tavares would say?

A.   No.  Actually, I don't remember her calling that much, but I
     think on one occasion she did call, or maybe two occasions
     she did call.

                              * * *

Q.   And in the first conversation where you were told that
     people had to make it onto the list for the next round, what
     happened during that conversation?  Who did you speak to
     originally about it?

A.   Maybe Bill Burke.  I really don't know if I did talk to
     anybody about it other than that person.  He says "They
     have to make the list.  People called on their behalf."

142

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

Testimony of Nicholas DeAngelis, August 24, 2010 (Exhibit 104), at 42-43, 44-45.

273.    DeAngelis testified that he regularly passed the names of the favored candidates

on to the chief probation officer sitting on the interview panel and, if he knew the judge on the

panel, he also passed the names along to the judge as well.[211]

274.    When he was first approached with names of candidates who had to make the

final list, DeAngelis told us he was not happy about it:

> Q.    What was your response?
>
> A.    I didn't kind of like it. I felt that if I was doing the first
>        round of interviews, it should basically be left up to me and
>        my panel to determine who should make the list.
>
> <div align="center">* * *</div>
>
> Q.    So it was your concern at the outset that this idea of getting
>        names in advance might undermine the process?
>
> A.    Yes.

Testimony of Nicholas DeAngelis, August 24, 2010 (Exhibit 104), at 45, 47.

275.    DeAngelis told us that, despite his misgivings, in nearly all instances he scored

the preferred candidates high enough so that they made it through to the final interview round.

DeAngelis explained that the only time he did not put the preferred candidate through was when

the candidate was "really lousy."

> Q.    Now, I think you said with respect to candidates that you
>        didn't put through that you were asked to put through, they
>        were just lousy I think was your word?
>
> A.    Real lousy. Incompetent? I don't know if I'd go quite that
>        far, but they weren't very good, let's put it that way.

---

[211]  Testimony of Nicholas DeAngelis, August 24, 2010 (Exhibit 104), at 55.

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

Q.   Were there candidates, though, that you put through to the
     next round of interviewing that you didn't think were the
     most qualified candidates?

A.   Yes.

Q.   What was your cutoff between willing to put someone
     through to the next round and refusing to put them through
     to the next round when they were recommended by the
     commissioner's office?

A.   Would they be able to do the job with proper supervision?
     If I thought they would, I didn't mind it too much.

Q.   Were there instances where you put through candidates
     who met your criteria that they would be able to do the job
     with supervision, but there were other candidates who you
     believed were more qualified than those people?

A.   Pretty close.  I wouldn't say that I would prefer Jane Doe
     over Mike Smith because he was on the list.  If Mike Smith
     was far better, I put him on; but if they were similar, I put
     Jane Doe on.

Q.   So in instances where you felt that the candidates
     recommended by OCP were equivalent to another
     candidate, they would get the extra bump for getting the
     recommendation from OCP?

A.   Correct, correct.

Testimony of Nicholas DeAngelis, August 24, 2010 (Exhibit 104), at 59-61.

276.   DeAngelis testified that he did not receive names of preferred candidates in

advance of the chief probation officer interviews he conducted. DeAngelis thought that he likely

did not receive names in those instances because the number of candidates interviewed did not

exceed the number of candidates that could be passed on to the final interview round and,

accordingly, there was no need to ensure that certain candidates "made the list."[212]

---

[212]   Testimony of Nicholas DeAngelis, August 24, 2010 (Exhibit 104), at 54.

144

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

### 14.    Testimony of William Burke

277.    Although a deputy commissioner and not a regional supervisor, Bill Burke also

occasionally sat on local interview panels for probation officers and assistant chief probation

officers, as well as chief probation officers.

278.    As with the regional supervisors, Burke testified that he received the names of

favored candidates from the Commissioner's office in advance of local round interviews:

> Q.    When you participated in panels with respect to hiring as
> Chief Probation Officer, were you given names by the
> Commissioner's office?
>
> A.    Yeah.
>
> &ast; &ast; &ast;
>
> Q.    And in your interviews for Assistant Chief and for
> Probation Officer, were you given names?
>
> A.    Yes.
>
> Q.    And did you also assume that – were those names coming
> from the Commissioner's office?
>
> A.    Yes.

Testimony of William Burke, July 22, 2010 (Exhibit 96), at 45-46.

279.    Burke told us that these names were provided to him by First Deputy

Commissioner Tavares and Deputy Commissioner Wall.[213]

280.    According to Burke, the vast majority of the individuals' whose names he was

given for assistant chief and chief positions made the list for a final interview:

> Q.    Does it follow that all of the individual's names which
> came from the Commissioner's office would be sent back
> to the Commissioner's office at least for the positions of
> Assistant Chief and Chief Probation Officer?

---

[213]    Testimony of William Burke, July 22, 2010 (Exhibit 96), at 26.

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

A.      I'd say yeah, yes.

Q.      So if the Commissioner's office through Liz Tavares or
        some other individual, Fran Wall, gave names to you or to
        the Regional Administrator for a promotion to Assistant
        Chief Probation Officer, those names would be among the
        names that went back to the Commissioner's office?

A.      Mm hmm, yes.

Q.      And that was likewise true for the position of Chief
        Probation Officer?

A.      Correct.

Q.      If names came from the Commissioner's office, at least
        those names went back to the Commissioner's office, is
        that correct?

A.      I'd say 99 percent of them.

Testimony of William Burke, July 22, 2010 (Exhibit 96), at 53.

281.   Burke could think of only one chief probation officer, and no assistant chief

probation officers, appointed in western Massachusetts who were not previously identified to

him as preferred candidates by the Commissioner's office.[214]

### 15. Testimony of Stephen Bocko

282.   Deputy Commissioner Stephen Bocko also sat from time to time on local panels

interviewing for probationer officer positions.

283.   Bocko testified that in the late 1990s, shortly after O'Brien became

Commissioner, he sat on a local panel interviewing for two probation office positions in the

Framingham District Court. According to Bocko, he was contacted by Janet Mucci, and "was

asked to include one person on the final list of candidates." She told him that "the commissioner

---

[214]   Testimony of William Burke, July 22, 2010 (Exhibit 96), at 58-61.

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

wanted a certain person to be on the final list of possible candidates." His response was "oh, okay," and he "tacked" that person on to the bottom of the list.[215]

284.    Asked whether the favored candidate for the Framingham position would have made the list of finalists if not for the intervention of the Commissioner's Office, Bocko testified "absolutely not." According to Bocko, he nonetheless went along with the request to add this person to the list of finalists "[o]ut of loyalty to the commissioner." [216]

285.    Bocko testified that on another occasion in 2000 he was provided, by Deputy Commissioner William Burke, the name of a candidate that the Commissioner wanted to see make the list of finalists. Burke told him that "we needed to have [the candidate], this associate probation officer, be among the candidates presented to the commissioner." [217]

## F.    Associate Probation Officer Hiring

286.    Deputy Commissioner Burke, who testified that he was involved in most associate probation officer hiring during Commissioner O'Brien's tenure, was forthcoming in stating that he did receive names from OCP of preferred applicants for associate probation officer positions, with the expectation that he would pass them through to the Commissioner for potential selection:

> Q.    In the process of hiring Associate Probation Officers, were you ever given names by the Commissioner or the Commissioner's staff or anyone else of individuals whom they understood you were going to interview?
>
> A.    Yeah.
>
> Q.    And what was the purpose of you being given names?
>
> A.    To make sure they make the cut.

---

[215]    Testimony of Stephen Bocko, September 13, 2010 (Exhibit 94), at 57-61.

[216]    Testimony of Stephen Bocko, September 13, 2010 (Exhibit 94), at 62-63.

[217]    Testimony of Stephen Bocko, September 13, 2010 (Exhibit 94), at 65-69.

147

> Q.  When you say to make sure they make the cut, do you mean by that --
>
> A.  To get passed on.
>
>                  \* \* \*
>
> Q.  If I've understood you correctly, with respect to Associate Probation Officer candidates, you were given names, and your understanding was that you were to approve those names and send them back to the Commissioner's office, is that correct?
>
> A.  Correct.

Testimony of William Burke, July 22, 2010 (Exhibit 96), at 22-23.

287.   According to Burke, he received the names of favored candidates from Tavares,

Wall, and Ryan.[218] He stated that he did not receive names directly from Commissioner

O'Brien, but his understanding was that the names were originating from the Commissioner.[219]

288.   As discussed above with respect to probation officer hiring, Burke stated that the

favored candidates did not always make it through the screening round. Sometimes they were so

unqualified that he could not bring himself to advance them.[220] For the most part, however,

favored candidates did make it through to Commissioner O'Brien for appointment:

> Q.  But at the Associate Probation Officer level, when you received a name from the Commissioner's office, you approved the name, isn't that correct?
>
> A.  Yeah, if – unless you were – and I'm not making this as a joke against these people – unless you were really, really – and I mean really bad – everybody kind of made the list. I mean, you had to be really bad.

---

[218]   Testimony of William Burke, July 22, 2010 (Exhibit 96), at 26.

[219]   Testimony of William Burke, July 22, 2010 (Exhibit 96), at 25-27.

[220]   Testimony of William Burke, July 22, 2010 (Exhibit 96), at 32-34.

148

LIBA/21225629

> Q.    If you could walk and talk and you had been recommended
>        by the Commissioner's office for an Associate Probation
>        Officer position, you got approved by Bill Burke?
>
> A.    Yeah.

Testimony of William Burke, July 22, 2010 (Exhibit 96), at 33-34.

289.   Burke also testified that he received calls directly from politicians, including

Representative Petrolati, with respect to associate probation officer hiring. He stated that when

he received such calls, he would not always pass them along to OCP, but might act on them

directly.[221]

290.   Jeff Akers, who also participated in associate probation officer interviewing,

similarly testified that he received named of favored candidates from Deputy Commissioner

Tavares in connection with associate probation officer interviews:

> Q.    Can you just describe for me briefly what happened in
>        those circumstances?
>
> A.    What circumstances?
>
> Q.    If you were given, let's start with prior to interviewing.
>
> A.    Okay. We were given prior to interviewing that certain
>        individuals should be on the top of the list. Those
>        individuals were put on the top of the list.
>
>                                    * * *
>
> Q.    And what did Ms. Tavares say to you?
>
> A.    She would state the names of the people that needed to be
>        put on that list.
>
> Q.    And what did she tell you with respect to those individuals?
>
> A.    That was basically it.
>
> Q.    That they were to be put on the top of the list?

---

[221]   Testimony of William Burke, July 22, 2010 (Exhibit 96), at 39-40.

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

A.    Mm-hmm.

Q.    And what did you do with that information?

A.    I usually used the information to put those individuals on
      the top of the list.

Testimony of Jeffrey Akers, August 25, 2010 (Exhibit 92), at 35-37.

291.    In some instances, Akers told us he was given names of recommended candidates

after the interviewing process had been completed. When that happened, the interview panel

would go back and re-rank the candidates to ensure that the favored candidates made the list:

> Q.    I just want to go back for a minute to the associate
>       probation officer interviewing process, and I believe at one
>       point in time you said there were instances where you were
>       given names after the interviewing process had occurred?
>
> A.    It's possible, yes, that we were given names. Sometimes
>       we would conduct the interviews and then we were called
>       and said these individuals need to be on that list.
>
> Q.    Did this occur before or after you had already ranked the
>       individuals?
>
> A.    Usually before we had ranked them.
>
> Q.    And what did you do with that information you were given
>       about individuals who needed to be ranked highly?
>
> A.    We would go back and review the information and on the
>       occasions when we were called, we were able to rank those
>       people where they needed to be ranked.

Testimony of Jeffrey Akers, August 25, 2010 (Exhibit 92), at 65.

292.    Akers testified that this process began in 2000.[222] It was Akers' understanding

that his co-interviewers were also receiving names of candidates to be ranked at the top of the list

for associate probation officer interviews.[223] In other instances Akers discussed the list of top-

---

[222]    Testimony of Jeffrey Akers, August 25, 2010 (Exhibit 92), at 39.

[223]    Testimony of Jeffrey Akers, August 25, 2010 (Exhibit 92), at 37-38.

LIBA/21225629

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

ranked candidates with others who served on interview panels with him. He testified that with respect to Deputy Commissioner Pat Walsh, "[w]e talked about different people that needed to be there."[224]

293. As with probation officer hiring, Akers testified that he put the candidates recommended by the Commissioner's Office for associate probation officer positions at the top of the list "because that's what [he] was instructed to do."[225]

### G. Final Interview Panels (Other Than Chief Probation Officers)

294. Independent Counsel also confirmed that names of favored candidates were provided to interviewers at the final round of interviews.

295. Deputy Commissioner Tavares testified that, with respect to the final round of interviews for probation officer and assistant chief probation officer candidates, she obtained names of favored candidates from Commissioner O'Brien and provided them to Deputy Commissioners Wall and Walsh in advance of the final interviews.[226]

296. Her understanding was that, in doing so, she was communicating to Wall and Walsh that the designated candidates should be ranked highest:

> Q. And so the Commissioner would say, tell Fran Wall that these are the people I want to see get ranked the highest at his review level?
>
> A. Yeah, take a good look at them, kind of thing.
>
> Q. And when you say, "take a good look at them," presumably they're taking a good look at everybody, right?
>
> A. Presumably, but I think the folks that are recommended, maybe a more keen eye towards them.

---

[224] Testimony of Jeffrey Akers, August 25, 2010 (Exhibit 92), at 37-38.

[225] Testimony of Jeffrey Akers, August 25, 2010 (Exhibit 92), at 40.

[226] Testimony of Elizabeth Tavares, July 13, 2010 (Exhibit 137), at 72-73, 125.

151

LIBA/21225629

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

> Q. And it was you understanding that the Commissioner was really intending you to pass along, these are the people that I want to see at the top of the list?
>
> A. I think so.

Testimony of Elizabeth Tavares, July 13, 2010 (Exhibit 137), at 73-74.

297. Deputy Commissioners Wall and Walsh both invoked their privileges under the Fifth Amendment and/or Article 12 and refused to testify. Independent Counsel does not have direct testimony from them concerning their use of the names provided by Tavares.

298. Other evidence is nonetheless compelling. Edward McDermott, formerly a practicing attorney, who was Administrative Assistant to Deputy Commissioner Wall (with responsibility for Interstate Compact issues), sat on the final interview panels with either Wall or Walsh. He provided unambiguous testimony that scoring for the probation officer and assistant chief probation officer candidates was rigged at the final interview level.

299. According to McDermott, the first time he participated in a final interview panel with Wall, Wall provided him the names of favored candidates and informed him that these candidates needed to be scored most highly:

> Q. Okay. Tell us what the first instance was.
>
> A. We were engaged in the process of interviewing the final panel of applicants and at some point, once we've started the interviews Deputy Commissioner Wall says to me "And, by the way, the commissioner's top choice is Joe Jones or Mary Jones." And I says, "Well, what does that mean?" And he said to me, "That means that that candidate has to get the highest score in the interview."

Testimony of Edward McDermott, August 25, 2010 (Exhibit 116), at 32-33.

300. McDermott further testified that the same practice was followed with Walsh:

> A. ... And what I say with regard to Mr. Wall also occurred with Patricia Walsh. She would come down into the

152

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

> interview room – I never left the interview room – she
> would come down and do the same thing.
>
>                * * *
>
> Q.    But describe the process that actually occurred.
>
> A.    …. [E]ither Fran Wall or Patricia Walsh would tell me
>        before the interview or before the candidate, the selected
>        one as they call, or the commissioner's choice, he or she
>        would tell me that this is the candidate that the
>        commissioner wants to score the highest.

Testimony of Edward McDermott, August 25, 2010 (Exhibit 116), at 34-35.

301.    McDermott testified that "every time there was a panel, Fran Wall made known to

[him] that this candidate was the commissioner's top choice," and that the same was true with

respect to panels on which he sat with Walsh.[227]

302.    McDermott admitted that the instructions he received from Wall and Walsh

dictated his scoring of candidates:

> Q.    …. Do you mean by that that there were occasions in
>        which you scored the commissioner's choice more highly
>        than you believed that candidate should have been given on
>        the merits because you believed that you had been ordered
>        to do so?
>
> A.    I would have to agree with that statement. And I can say I
>        can't quantify it for you, but I will tell you that yes, I did
>        stretch, if you want to call stretch score, that would be a fair
>        statement.
>
>                * * *
>
> Q.    Putting it differently, you were not scoring the candidates
>        strictly on the merits of their qualifications and interview.
>        Is that correct?
>
> A.    I would agree with that.

Testimony of Edward McDermott, August 25, 2010 (Exhibit 116), at 37, 47.

---

[227]  Testimony of Edward McDermott, August 25, 2010 (Exhibit 116), at 33, 35.

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

303.   According to McDermott, Wall looked at McDermott's scoring sheet before

scoring the candidates himself, ensuring that the combined score for O'Brien's top candidate was

in fact the highest:

> Q.   Was it your understanding that [Deputy] Commissioner
> Wall wanted to know your score before he entered his
> scores so that he could be sure that the commissioner's
> choice was the highest score?
>
> A.   Exactly.
>
> Q.   And did you in fact give him your score sheet so that he
> could rank the commissioner's choice the highest? Did you
> understand, in other words, that's what he was doing with
> your score?
>
> A.   I did understand that, yes.

Testimony of Edward McDermott, August 25, 2010 (Exhibit 116), at 54.

304.   On some occasions, Wall asked McDermott to falsely rescore a candidate:

> A.   And once again in a general way, because I can't point you
> to a specific situation, but I do remember Fran Wall after I
> told him my score, whatever that score may be, he said to
> me, paraphrasing, "What'd you get? What did you give the
> candidate on question 2" or whatever the question was. I
> said "I gave him a 2. I have a 2 roughed out." And he said,
> "Can you live with making that a 3?" I would say, "Well,
> okay," and I'd make it a 3.

Testimony of Edward McDermott, August 25, 2010 (Exhibit 116), at 55-56.

305.   In addition to McDermott, Regional Supervisor Rideout also testified that he was

provided the names of sponsored candidates by Deputy Commissioner Wall on the final panel,

but he did not provide much additional detail.[228]

---

[228]   Testimony of Edward Rideout, August 27, 2010 (Exhibit 129), at 132.

154

LIBA/21225629

## H.    Final Interview Panels (Chief Probation Officers)

306.    Both First Deputy Commissioner Tavares and former First Deputy Commissioner

Cremens recall being provided the names of preferred candidates from Commissioner O'Brien in

advance of final round interviews for chief probation officer candidates.

307.    For example, Tavares testified that Commissioner O'Brien "would let John

[Cremens] and I know that somebody was recommended."[229]

308.    Cremens remembered being provided the names of favored candidates by

Commissioner O'Brien. For example, he confirmed Tavares' testimony (*see supra*, ¶ 154) that,

with respect to the hiring of James Rush (father of Representative Michael Rush) to the chief

probation officer position in West Roxbury, the Commissioner had identified Rush as the

preferred candidate:

> Q.    One way or the other, do you remember Commissioner
> O'Brien before Jim Rush or Mark Prisco became the
> successful candidates stating to you that he had a
> preference for them for those positions?
>
> A.    I think Jim Rush, he said that he got calls on Jim Rush's
> case.

Testimony of John Cremens, August 6, 2010 (Exhibit 102), at 53.

309.    In all cases, it was Deputy Commissioner Tavares' understanding that the names

were being provided so that the preferred candidates would be scored more highly by the final

interview panel than they otherwise would have been, absent the indication of preference:

> Q.    Was it your understanding that when the Commissioner
> was giving you a name on the day of the interview that he
> wanted you to try and score that person most highly?
>
> A.    To some degree, I guess.
>
> Q.    Is that a yes?

---

[229]    Testimony of Elizabeth Tavares, July 13, 2010 (Exhibit 137), at 106.

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

        A.     Well, to some degree.

Testimony of Elizabeth Tavares, July 13, 2010 (Exhibit 137), at 115.

      310.     The Commissioner's identification of a "recommended candidate" to Tavares and Cremens almost always resulted in that person being ranked highest by Tavares (as well as Cremens and O'Brien).[230]

      311.     Tavares testified that she could think of only one occasion in which the favored chief probation officer candidate was not scored the highest by the final interview panel. On that occasion, another candidate was so much better than the favored candidate that the panel ranked her most highly, and she received the position.[231]

## I.    Community Corrections Centers

### 1.    Probation Officers In Charge

      312.     There is evidence that the Commissioner's Office influenced the interview process for probation officer in charge positions.

      313.     John Quinn, Regional Program Manager for the Office of Community Corrections sat on many of the probation officer in charge interview panels. Quinn testified that in most of the panels in which he participated, the representatives from the Commissioner's Office provided "recommendations" for particular candidates. Quinn stated that during the probation officer in charge interviews Deputy Commissioners Francis Wall and Elizabeth Tavares and Regional Supervisors Frank Campbell and Edward Rideout each provided him with names of

---

[230]   Testimony of Elizabeth Tavares, July 13, 2010 (Exhibit 137), at 115.

[231]   Testimony of Elizabeth Tavares, July 13, 2010 (Exhibit 137), at 119-21.

156

recommended candidates.[232] Quinn understood these individuals to be offering the recommendations on behalf of the Commissioner's Office.[233]

314. Quinn testified that during the interviews, either before or after a candidate came in, the Commissioner's representative told him that that person was a "very good candidate."[234] Quinn said he was seldom provided with additional information. Quinn was content to take the individuals from the Commissioner's Office at their word that the person would be a good probation officer in charge.[235]

315. Quinn relied on and was "guided by" the deputy commissioner and regional supervisors because he believed they had worked with these candidates and had knowledge of the candidates' capabilities.[236] Having worked in OCC and not the Probation Department, Quinn deferred to the recommendations from the Commissioner's Office and testified that he would often score a recommended candidate higher than he would have based purely on the interview.[237] In instances where Quinn knew the applicants, he felt more comfortable scoring them on his own but that he never disregarded any of the recommendations he was given.[238] The recommendations he received were a factor in how he scored the candidates.[239]

316. Quinn advised that he did not think there was anything improper going on in regard to these recommendations. He did not believe the recommendations were being offered for any other reason that the Commissioner's office felt that these candidates would, in fact, be

---

[232] Testimony of John Quinn, November 1, 2010 (Exhibit 128), at 36-40, 61-63, 85.

[233] Testimony of John Quinn, November 1, 2010 (Exhibit 128), at 53-54, 79-81, 85, 92-93.

[234] Testimony of John Quinn, November 1, 2010 (Exhibit 128), at 37.

[235] Testimony of John Quinn, November 1, 2010 (Exhibit 128), at 64-65.

[236] Testimony of John Quinn, November 1, 2010 (Exhibit 128), at 40-43, 50-51.

[237] Testimony of John Quinn, November 1, 2010 (Exhibit 128), at 40-42.

[238] Testimony of John Quinn, November 1, 2010 (Exhibit 128), at 42-43, 77-82.

157

good probation officers in charge. Quinn became emotional during his testimony when explaining that he believed the goal of the interview process was to get the best candidates and he felt that is what happened.[240]

317.    Despite Quinn's protestations in instances in which the Commissioner's Office recommended a particular candidate, that candidate was scored the highest and ultimately got the job.[241]

318.    Accordingly, in the probation officer in charge context, while the influence the Commissioner's Office exerted was more subtle – Quinn testified that he never felt pressured or obliged to score certain candidates highly – the result was the same: the recommended candidates were scored higher than they should have been based solely on the merits of their interview and were ultimately selected for the probation officer in charge positions.[242]

### 2.    Community Corrections Positions

319.    Within the Office of Community Corrections, there is evidence that Executive Director Stephen Price provided names of recommended candidates to interviewers, although it is less clear that this influenced hiring within OCC.

320.    Executive Director Price testified that he routinely received calls from many politicians or their staff, including Representative Petrolati, former Speaker DiMasi, Speaker DeLeo, former Representative John Rogers, Senator Brewer, Senator Menard, Senator

---

[239]   Testimony of John Quinn, November 1, 2010 (Exhibit 128), at 87.

[240]   Testimony of John Quinn, November 1, 2010 (Exhibit 128), at 51-52, 121.

[241]   Testimony of John Quinn, November 1, 2010 (Exhibit 128), at 47-48, 67-68, 74-75, 85-88, 91-93.

[242]   Testimony of John Quinn, November 1, 2010 (Exhibit 128), at 51.

158

LIBA/21225629

Antonioni, Senator Hart, Representative Walsh, and Representative Haley, recommending candidates for OCC positions.[243]

321.    Price testified that he passed along these recommendations to interviewers only in cases where he had indicated to the legislator that he was going to inform the candidate that a call had been made on his or her behalf.[244]  Price testified that these recommendations were considered as part of the interview process, as was any recommendation, but they did not influence hiring decisions.[245]  Price "did not recall" giving any special consideration to any candidates who received a recommendation for a legislator and did not advance candidates to the next round of interviewing on that basis.[246]

322.    Price stated that he did not keep track of these recommendations in any formal way and at most he wrote the name on a piece of paper that he threw away once he had passed the information along.[247]  Price testified that he believed that any letters of recommendation received were included as part of the candidate's application package.[248]

323.    Patricia Horne, Deputy Director of OCC, testified that she was given names as described by Price.  Horne testified each time she conducted an interview for OCC, she was given the names of candidates and was instructed to inform them that a particular legislator had called on their behalf.[249]  Horne testified that she did not give these candidates any favored or

---

[243]    Testimony of Stephen Price, October 22, 2010 (Exhibit 126), at 95-96, 100,107-08, 113.  Price testified that he knew many of these legislators from speaking to them regarding OCC's budget. *Id.* at 42-45.  O'Brien was often present at these budget meetings as well. *Id.* at 44.

[244]    Testimony of Stephen Price, October 22, 2010 (Exhibit 126), at 118-119.

[245]    Testimony of Stephen Price, October 22, 2010 (Exhibit 126), at 103-104, 120-21, 138.

[246]    Testimony of Stephen Price, October 22, 2010 (Exhibit 126), at 117

[247]    Testimony of Stephen Price, October 22, 2010 (Exhibit 126), at 116-117, 120.

[248]    Testimony of Stephen Price, October 22, 2010 (Exhibit 126), at 120.

[249]    Testimony of Patricia Horne, October 4, 2010 (Exhibit 112), at 75-80.

159

preferential treatment because they had received a recommendation from a legislator.[250]  She similarly testified that such recommendations did not affect her ranking or scoring of the candidates she interviewed.

324.  Independent Counsel does not credit this testimony.  Price described himself as extremely close to Commissioner O'Brien, and it is not credible that O'Brien would rig hiring within the Probation Department, but not within OCC, nor that Price would refuse such instructions from O'Brien.

## J.  Hiring Within ELMO

325.  The names at the top of the ELMO hierarchy create the immediate impression that ELMO has been used by Commissioner O'Brien for patronage appointments.  The group has three regional program managers:  Edward Ryan, Commissioner O'Brien's former legislative liaison; Kathleen Petrolati, wife of Representative Thomas Petrolati; and Eugene Irwin, son of former Chief Justice for Administration and Management John Irwin, who appointed O'Brien as Commissioner.

326.  Deputy Commissioner Lucci confirmed that he received names of preferred candidates from OCP – including from Commissioner O'Brien himself – with the instruction that the identified candidates should make the list of finalists provided to Commissioner O'Brien for his selection:

> Q.  Prior to the interviews, would anyone in the Office of the Commissioner of Probation let you know if there were any candidates that the commissioner wanted to see make it to some final round of interviews?
>
> A.  Yes.
>
> Q.  How would that work?

---

[250]  Testimony of Patricia Horne, October 4, 2010 (Exhibit 112), at 76-77.

160

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

> A.  I'm pretty sure someone would say to me give these people consideration.
>
> Q.  Who would tell you that?
>
> A.  I would think it would come from either the commissioner or Liz Tavares.
>
> Q.  Do you recall instances in which the commissioner asked you to give consideration to particular candidates?
>
> A.  Not specifically, no.
>
> Q.  When you say "not specifically," generally speaking do you remember that there was some conversation with the commissioner where he asked you to do that?
>
> A.  I would say yes.

Testimony of Paul Lucci, August 23, 2010 (Exhibit 114), at 63-64.

327.  Lucci understood that to accomplish this, he should if necessary rank the

preferred candidates higher than they deserved on the merits. He complied with this because he

viewed it as following orders:

> Q.  I'm just trying to figure out what it means to give a good look or give consideration to somebody where you should be giving a good look and consideration to all the candidates. Right? So the reason why the commissioner or somebody else in the office would call you to single out a particular candidate is to try to get you to maybe rank that person a little bit higher than you might otherwise ordinarily. Right?
>
> A.  I would say so, yes.
>
>                          \* \* \*
>
> Q.  Did you view it as sort of following orders if the commissioner said give this person a good look?
>
> A.  Absolutely.
>
> Q.  So you figured, look, I'm being told to do this by the commissioner, I'm not going to question it?

161

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

A.      Right.

Testimony of Paul Lucci, August 23, 2010 (Exhibit 114), at 66-67.

## K.      Other Hiring

328.    Beyond the positions discussed above, there is also evidence of manipulation of

the hiring practices for administrative and training positions within the Probation Department. In

hiring incidents related to these positions, the evidence indicates that the Commissioner's Office

pre-selected the successful candidate and ignored the interview process.

329.    For example, Chief Probation Officer Michael LaFrance testified that the

Commissioner's Office hired an individual who was not on the list of finalists for an entry level

clerical position. LaFrance testified that he and the probation office manager interviewed over

seventy candidates for two clerical positions. They submitted, at most, five or six names to the

Commissioner's Office as finalists for the positions. The Commissioner's Office did not provide

any names of preferred candidates during the interview process, but an individual that was not on

LaFrance's list of finalists was hired for the position. LaFrance testified that the Commissioner's

Office did not conduct any additional interviewing but simply chose one of the less qualified

candidates that LaFrance and his co-interviewer had weeded out during the interview process.[251]

330.    Deputy Commissioner Stephen Bocko also testified that hiring was rigged for

positions at the Probation Training Academy in Clinton.

331.    Bocko testified that in approximately 2004 or 2005, he was involved in interviews

for a chief probation officer position in the Training Academy. Bocko stated that a year prior to

that, the Commissioner's Office, without consulting Bocko, appointed Renee Payne as an Acting

Chief Probation Officer in the Training Academy. The Commissioner then decided to make

---

[251]  Testimony of Michael LaFrance, September 29, 2010 (Exhibit 113), at 93-96, 101-103.

162

Payne a permanent employee without any formal interview process. According to Bocko, AOTC pushed back on the permanent appointment and informed O'Brien that the job had to be posted and opened up to the department as a whole.[252]

332. Following the direction from AOTC but before interviewing began, Deputy Commissioner Tavares told Bocko that the Commissioner wanted Renee Payne to remain in the position.[253] Bocko testified that despite knowing that Payne was going to receive the job, he and Tavares went through the motions of conducting interviews and scoring and ranking the candidates.[254] The Commissioner ultimately selected Payne for the position:

> Q. Do you recall if there was some magic number you were supposed to come up with out of this seven or eight?
>
> A. In terms of scoring the applicants?
>
> Q. In terms of –
>
> A. Final list?
>
> Q. Who could move on to the decisionmaker?
>
> A. I was told more pointedly that Renee Payne was to get the job.
>
> Q. So this was just going through the actions, but everyone knew that she was going to get the job?
>
> A. Well, not everyone. But I was told that she was to get the job.
>
> * * *
>
> Q. ...Describe that conversation with Ms. Tavares?
>
> A. Again, I can't remember the exact words. The substance of it was the commissioner wanted Renee to maintain that chief's job at the training academy.

[252] Testimony of Stephen Bocko, September 13, 2010 (Exhibit 94), at 78-83.

[253] Testimony of Stephen Bocko, September 13, 2010 (Exhibit 94), at 83-85.

[254] Testimony of Stephen Bocko, September 13, 2010 (Exhibit 94), at 83-86.

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

\* \* \*

> Q. But you conducted these interviews knowing that in the end
> Ms. Payne would be selected for the job?
>
> A. I did.

Testimony of Stephen Bocko, September 13, 2010 (Exhibit 94), at 84-85.

333. Bocko testified that in 2006 he also sat on an interview panel with Regional

Supervisor Dianne Fasano for a building supervisor job at the Training Academy. He testified

that the decision who was going to fill the position was "predetermined."[255] Prior to conducting

interviews, Tavares informed Bocko that Commissioner O'Brien made the decision that Bruce

Bazydlo was going to receive the job:[256]

> Q. But for the directive from Ms. Tavares that Mr. Bazydlo
> would be selected for the position, would you have selected
> him for that position?
>
> A. I don't know because I was told ahead of time what was
> going to happen.
>
> Q. Was Ms. Fasano informed of that as well?
>
> A. Yes, Dianne knew that as well.
>
> Q. Did you and Ms. Fasano talk about this fact that the person
> that would fill the position was predetermined?
>
> A. We did briefly.
>
> Q. What was that conversation?
>
> A. I believe I said to her we're just going to be going through
> the motions, but it was necessary, because the
> commissioner had made a decision; and she felt the same
> way; and we did the interviews.

Testimony of Stephen Bocko, September 13, 2010 (Exhibit 94), at 89-90.

---

[255] Testimony of Stephen Bocko, September 13, 2010 (Exhibit 94), at 87-88.

[256] Testimony of Stephen Bocko, September 13, 2010 (Exhibit 94), at 88-89.

164

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

334.    Bocko testified that after Bazydlo had been hired, Bazydlo informed Bocko that he believed he got the job because he was sponsored by Representative Harold Naughton.[257] One of the Sponsor Lists maintained by Maria Walsh reflects that Rep. Naughton offered a recommendation for Mr. Bazydlo for the "Clinton custodian job."

335.    Around the same time, Bocko also conducted interviews for a Program Manager position at the Training Academy.  Deputy Commissioner Tavares told Bocko prior to the interviews that Dianne Richard was "the person the Commissioner thought should get the job" and she was going to be receiving the position.[258]

336.    After she was hired, Richard informed Bocko that she too had also been sponsored by Rep. Naughton.[259]

## IV.   IDENTIFICATION OF CANDIDATES SPONSORED BY POLITICIANS

337.    As detailed above, those involved in the hiring process consistently testified that they received from the Commissioner's office the names of candidates whom, they understood, must be scored higher than was merited.

338.    Commissioner O'Brien's assertion of his Fifth Amendment and Article 12 rights prevented Independent Counsel from receiving direct testimony from him.  The evidence, however, leads to the conclusion that the individuals who were being singled out as "favored" typically were those with the greatest political, and occasionally judicial, connections.

---

[257]   Testimony of Stephen Bocko, September 13, 2010 (Exhibit 94), at 88-89.

[258]   Testimony of Stephen Bocko, September 13, 2010 (Exhibit 94), at 90-91.

[259]   Testimony of Stephen Bocko, September 13, 2010 (Exhibit 94), at 91.

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

## A.    The Collection of Names from Politicians, Judges, and Others

339.    Candidates for hiring into or promotion within the Department were required to list references and could provide letters of recommendation with job applications. Outside of this formal process, however, there was an informal sponsorship process.

340.    Members of the legislature and others called or sent letters to OCP on behalf of a particular candidate. An overwhelming majority of those sponsoring candidates were state legislators. While there were some judges, probation officers, police officers and attorneys, most of the sponsors were state senators and representatives. As legislative liaison Maria Walsh testified:

> Q.    Would you say that legislators were the leading group of
>        people offering recommendations for candidates?
>
> A.    Yes.

Testimony of Maria Walsh, July 19, 2010 (Exhibit 139), at 46.

341.    Names of "sponsored" candidates came into a select few within OCP. State representatives and senators (or members of their staffs), judges and other individuals employed by the Trial Court contacted O'Brien directly (and through his assistant Lucia Vanasse), as well as through legislative liaisons – Michelle Cahill Martino, Maria Walsh, and Edward Ryan.[260] Legislators from Western Massachusetts also contacted Deputy Commissioner Burke to offer their sponsorship, which Burke sometimes acted on directly and sometimes passed along to Boston.[261]

342.    Legislators providing "sponsorship" did so typically by telephone call, although OCP also received some letters of recommendation for particular candidates. Fewer than 100

---

[260]    Testimony of Michelle Cahill Martino, July 21, 2010 (Exhibit 97), at 35-36; Testimony of Maria Walsh, July 19, 2010 (Exhibit 139), at 46-48; Testimony of Edward Ryan (Exhibit 131), June 29, 2010, at 41-42.

[261]    Testimony of William Burke, July 22, 2010 (Exhibit 96), at 24, 28.

LIBA/21225629

letters of recommendation from legislators were produced or found in OCP's files, while there
are thousands of entries recorded on so-called "Sponsor Lists."

343.    Martino testified that from the time she came to OCP and was assigned to work
on legislative matters (sometime in 2004), she fielded calls from legislators sponsoring
candidates for positions within the Department. Commissioner O'Brien and his assistant, Lucia
Vanasse, also provided her with names of candidates who had been sponsored. Martino testified
that she received a large volume of calls, and documents she produced reveal that the number of
sponsorships coming in from legislators increased significantly in the time period from 1999 to
2001.[262]

344.    Martino took messages from these callers for Commissioner O'Brien. Messages
contemporaneously made by Martino demonstrate that politicians made specific requests for the
candidates they were sponsoring. For example, one note reflecting a call from Representative
William McManus states, "has PO he wants to take care of, 70,000 salary range – wants details
re: Don Moran – any suggestions for creating regional person."[263] In another message to
O'Brien, Martino wrote, "I spoke w/ Rep. Candaras this morning. She's asking for PO candidate
Michael Wells to be sent to the judge on the finalist list."[264]

345.    Martino also received calls from legislators following up on the candidates they
had sponsored. Notes from Martino show that a member of Senator Pacheco's staff called

---

[262]  Testimony of Michelle Cahill Martino, October 1, 2010 (Exhibit 97), at 23.

[263]  A copy of the phone messages taken by Cahill Martino, and marked as exhibits 9 through 21 during her
testimony, accompanies this Report as Exhibit 97. *See also* testimony of Michelle Cahill Martino, October 1,
2010 (Exhibit 97), at 29-30.

[264]  A copy of the phone messages taken by Martino, and marked as exhibits 9 through 21 during her testimony,
accompanies this Report as Exhibit 97. *See also* testimony of Michelle Cahill Martino, October 1, 2010
(Exhibit 97), at 53-54.

167

wanting to know why a certain candidate did not make the finalist list.[265] Martino's notes indicate that she kept the legislators posted on the status of their candidates. On a recommendation letter from Rep. Nyman written for Elzy Tubbs, Martino wrote, "10/6 spoke with Rob (aid) will be interviewed."[266]

346.    Sometime in 2004, Martino was informed by Commissioner O'Brien or John Cremens that she no longer had responsibility for taking calls regarding sponsorships. Maria Walsh took over receiving such calls for Probation Department candidates. While Martino testified she still occasionally received these calls, she forwarded those calls to Maria Walsh.[267]

347.    When Walsh took over responsibility for handling sponsorships, she testified that she received phone calls from individuals sponsoring candidates directly, but more often the calls went to Commissioner O'Brien. O'Brien provided her the names of individuals he was given.[268] Walsh testified that during the hiring process, a substantial volume of calls were received. Phone messages from February 17, 2005 taken by Ms. Walsh for O'Brien show that in a single day, Commissioner O'Brien received calls from six different senators and representatives, or their staffs, sponsoring seventeen candidates. Notably, Walsh testified that this volume was a small number of calls to receive in one day during the hiring season.[269]

---

[265]    A copy of the phone messages taken by Martino, and marked as exhibits 9 through 21 during her testimony, accompanies this Report as Exhibit 97. *See also* testimony of Michelle Cahill Martino, October 1, 2010 (Exhibit 97), at 62-64.

[266]    A copy of the phone messages taken by Martino, and marked as exhibits 9 through 21 during her testimony, accompanies this Report as Exhibit 97. *See also* testimony of Michelle Cahill Martino, October 1, 2010 (Exhibit 97), at 65-66.

[267]    Testimony of Michelle Cahill Martino, July 21, 2010 (Exhibit 97), at 89-90, 96-97.

[268]    Testimony of Maria Walsh, July 19, 2010 (Exhibit 139), at 15-16.

[269]    Testimony of Maria Walsh, July 19, 201 (Exhibit 139), at 166.

348. Walsh also testified that she often called the legislators to inform them whether or

not their candidate was qualified for the requested position.[270]

349. Martino and Walsh, both testified that the sponsoring individuals did not provide

any substantive information regarding the candidate.[271]

> Q. Did you ever have any substantive discussions with anyone
> who called for a recommendation about the substance of
> the recommendation they were making?
>
> A. Not that I can recall.
>
> Q. So it was purely, here's the name, here's the position; I've
> noted it; we're all set.
>
> A. Yes.

Testimony of Maria Walsh, July 19, 2010 (Exhibit 139), at 133-134.

350. Lucia Vanasse, O'Brien's administrative assistant, testified that she frequently

receives calls and takes messages from individuals, including legislators and their staff members,

calling the Commissioner to sponsor candidates for positions.[272] The Commissioner often

returned the call and asked Vanasse to provide Maria Walsh the names of the sponsored

candidates.[273]

351. Edward Ryan also testified that he received calls from legislators. Ryan kept

handwritten notes of the calls he received, which were produced to Independent Counsel. Ryan

testified that he received calls from high ranking members of the legislature including Senate

President Therese Murray, Senator Steven Panagiotakis, Senator Marc Pacheco, Senator Robert

Travaglini, Senator Steven Baddour, Senator Stephen Buoniconti, Senator Robert Creedon,

---

[270]  Testimony of Maria Walsh, July 19, 2010 (Exhibit 139), at 26-28.

[271]  Testimony of Michelle Cahill Martino, July 21, 2010 (Exhibit 97), at 38-39; Testimony of Maria Walsh, July 19, 2010 (Exhibit 139), at 133-134.

[272]  Testimony of Lucia Vanasse, July 20, 2010 (Exhibit 138), at 31.

Speaker Salvatore DiMasi, Speaker Robert DeLeo, and Representative Eugene O'Flaherty among others.[274]

352.    Ryan testified that he discussed the calls he had received with Commissioner O'Brien.[275] According to Ryan, the Commissioner also received calls directly from politicians and others.[276] O'Brien provided Ryan the names of the candidates and asked Ryan to confirm that they were minimally qualified for, and had actually applied for, the position(s) for which they had been sponsored.[277] Ryan produced original notes in O'Brien's handwriting with names of candidates who were sponsored and the individuals sponsoring them.[278]

353.    Ryan testified that he understood part of his function when appointed to the legislative liaison position by the Commissioner was to handle the influx of calls.[279] He testified that his role was to deal with members of the House and Senate, while Maria Walsh kept track of logistics.[280]

## B.    Sponsor Lists

354.    Throughout this process while the names of sponsored candidates were being collected, the names of some – but not all – of the candidates were logged, together with the names of the sponsors, on documents known within OCP as "Sponsor Lists." The Sponsor Lists

---

[273]    Testimony of Lucia Vanasse, July 20, 2010 (Exhibit 138), at 45.

[274]    Testimony of Edward Ryan, June 29, 2010 (Exhibit 131), at 73-77, 154.

[275]    Testimony of Edward Ryan, June 29, 2010 (Exhibit 131) , at 42.

[276]    Testimony of Edward Ryan, June 29, 2010 (Exhibit 131), at 42.

[277]    Testimony of Edward Ryan, June 29, 2010 (Exhibit 131), at 42.

[278]    Testimony of Edward Ryan, July 21, 2010 (Exhibit 131), at 218-236. A copy of these handwritten notes, marked during Ryan's testimony as exhibit 11, accompanies this Report as Exhibit 131.

[279]    Testimony of Edward Ryan, June 29, 2010 (Exhibit 131), at 52.

[280]    Testimony of Edward Ryan, June 29, 2010 (Exhibit 131), at 52-54.

are spreadsheets maintained initially by Michelle Cahill Martino, and later by Maria Walsh.[281] O'Brien directed Martino and Walsh to compile the Sponsor Lists.[282]

355.   Several of these Sponsor Lists were produced by Walsh and Ryan. Based on the date ranges indicated on the Lists, Independent Counsel was not provided with all of the lists. Exemplars of these spreadsheets accompany this Report as Exhibit 32.

356.   The Sponsor Lists created by Martino list the name of the candidate, the position the candidate is applying for, and – in a column often labeled "Sponsor" – the individual who had called or sent in a letter on the candidate's behalf.[283]

357.   Martino testified that every "recommendation" she received by telephone or by letter was recorded on the Sponsor List, regardless whether the sponsor was a legislator.[284] The spreadsheets, however, reveal that for fiscal years 1999-2001, all but 13 of the 119 sponsors is a state representative or senator.[285]  The Sponsor Lists, in other words, are not simply lists of recommendations, but constitute a record of support given to candidates by legislators with political influence over the Department.

358.   The Sponsor Lists Martino created also tracked the progress of candidates through the process. They include an "outcome" column which tracks whether the candidate received an interview, became a finalist and ultimately was given a position.[286]

---

[281]  Testimony of Michelle Cahill Martino, July 21, 2010 (Exhibit 97), at 126-27; Testimony of Maria Walsh, July 19, 2010, at 17.

[282]  Testimony of Michelle Cahill Martino, July 21, 2010 (Exhibit 97), at 49-50; Testimony of Maria Walsh, July 19, 2010 (Exhibit 139), at 18.

[283]  Sponsor Lists created by Michelle Cahill Martino, which can be found in Exhibit 32.

[284]  Testimony of Michelle Cahill Martino, July 21, 2010 (Exhibit 97), at 40-41.

[285]  Sponsor Lists created by Michelle Cahill Martino, which can be found in Exhibit 32..

[286]  Sponsor Lists created by Michelle Cahill Martino, which can be found in Exhibit 32.

359.    Maria Walsh began compiling the Sponsor Lists sometime in 2004. Walsh had

extensive political knowledge and connections prior to joining OCP. She was employed as a

paralegal at former Speaker Thomas Finneran's law firm and then served as office manager for

Finneran. Walsh also worked for the chief of staff and budget director for the House Ways and

Means Committee when Finneran was Chairman.[287]

360.    The Sponsor Lists Walsh created contained the name of the sponsor offering the

recommendation, the name of the sponsored candidate, and often the position the candidate was

applying for. Unlike Martino's spreadsheets, Walsh's spreadsheet did not track the outcome of

each sponsored candidate.[288] This may have been due to the fact that the Sponsor Lists grew

from 1 to 2 page documents in 1999 to dozens of pages long by 2005.

361.    Like Martino, Walsh testified that she entered all "recommendations" received for

a candidate on the Sponsor List.[289] The documents, however, reflect that the great majority of

candidates on Walsh's lists were sponsored by legislators.[290]

362.    The Sponsor Lists are extensive, with some sponsors supporting numerous

candidates for positions. Two of the legislative liaisons, Maria Walsh and Edward Ryan,

produced over 130 pages of Sponsor Lists for the 2004 – 2007 time period.

363.    During both Martino's and Walsh's tenures, it was not uncommon for legislators

to sponsor multiple candidates. Indeed, Speaker DiMasi had his own spreadsheet of sponsored

---

[287]    Testimony of Maria Walsh, July 19, 2010 (Exhibit 139), at 52.

[288]    Sponsor Lists created and produced by Maria Walsh, which can be found in Exhibit 32.

[289]    Testimony of Maria Walsh, July 19, 2010 (Exhibit 139), at 17-18.

[290]    Sponsor Lists created and produced by Maria Walsh, which can be found in Exhibit 32.

172

candidates. A spreadsheet entitled, "DiMasi, Speaker Sal" and dated January, 2007 lists sixteen different candidates he sponsored for various positions within the Probation Department.[291]

364.    In some instances, where a sponsor was supporting multiple candidates, the Sponsor Lists reflect what appear to be a ranking of preference by the sponsors. In several places the sponsor's name is listed together with several candidates, whose names are ranked, e.g., one through four.[292] It appears, in other words, that legislators were ranking their preferred candidates even within the group of candidates they were recommending.

365.    During hiring periods, Commissioner O'Brien and Edward Ryan obtained copies of the Sponsor Lists. Ryan testified that he used the list to track the progress of the sponsored candidates, trying to ensure that they progressed through the rounds of interviews. Ryan also received copies of the lists of final candidates:

> Q.    ...I mean, were you – was it understood that one of the things you were supposed to do was keep an eye out for highly-recommended candidates from, say, leadership and be sure they were getting from list to list up to the final list?
>
> A.    Yes.

Testimony of Edward Ryan, June 29, 2010 (Exhibit 131), at 95.

## C.    The Decision of which Candidates to Prefer

366.    There was some testimony that all persons "recommended" by legislators were put on the Sponsor Lists. The evidence suggests that is not the case, however. Senator Montigny produced letters of recommendation he had written on behalf of constituents, though many of these individuals' names were not found on Sponsor Lists.

---

[291]    A copy of this Sponsor List can be found in Exhibit 32; *see also* Testimony of Edward Ryan, July 15, 2010 (Exhibit 131), at 239-240.

[292]    January 27, 2005 Sponsor List, which can be found in Exhibit 32.

173

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

367.    There was some testimony that an actual letter of recommendation from a

legislator was effectively worthless. The letters are typically form letters written on behalf of

almost anyone who asks a legislator for one.[293] If a legislator actually cared about a candidate

and wanted to see him or her get a position, the legislator (or a member of the staff) called the

Commissioner's Office.[294]

368.    Moreover, there is some evidence that not all of the individuals on the Sponsor

Lists were provided to the interview panels as favored candidates, and that O'Brien exercised

discretion in deciding when and on behalf of whom to manipulate the system.

369.    First Deputy Commissioner Tavares testified that based on the volume of calls

received by the Commissioner, not every name could be passed along to the interview panels.[295]

370.    Former First Deputy Commissioner Cremens likewise testified that it was his

impression that individuals recommended by more powerful legislators had a better chance of

getting hired than those recommended by less powerful legislators:

> Q.    Did you ever talk to Commissioner O'Brien [about]
>        whether there were politicians whose recommendations
>        counted for more than other politicians?
>
> A.    Well, I didn't talk to him about it, no, because I thought it
>        was fairly obvious.
>
> Q.    Is it obvious that if you're in the leadership of the House,
>        leadership of the Senate, you're going to count for more?
>
> A.    That would be my feeling.

---

[293]    Testimony of Robert DeLeo, November 1, 2010 (Exhibit 105), at 26-28; Testimony of Mark Montigny, October 26, 2010 (Exhibit 119), at 61-72; Testimony of Marc Pacheco, October 20, 2010 (Exhibit 125), at 19-23. Relevant excerpts of the testimony of Speaker DeLeo accompany this Report as Exhibit 105. Relevant excerpts of the testimony of Senator Montigny accompany this Report as Exhibit 119.Relevant excerpts of the testimony of Senator Marc Pacheco accompany this Report as Exhibit 125.

[294]    Testimony of William Burke, July 22, 2010 (Exhibit 96), at 125-26.

[295]    Testimony of Elizabeth Tavares, July 13, 2010 (Exhibit 137), at 111-12.

174

Testimony of John Cremens, August 6, 2010 (Exhibit 102), at 38.

371.    Edward Ryan testified that the legislators with the greatest influence were those

with leadership positions or seats on the Ways and Means and Judiciary Committees:

> Q.    Was there an understanding within the Probation Office
>        that certain politicians were to have more clout in the hiring
>        process than others?
>
> A.     Yes.
>
> Q.    And what was the hierarchy in terms of preferences given
>        to candidates sponsored by politicians?
>
> A.     I think the leadership would have more say, and I also -- I
>        would say, yeah, I would say the leadership would be able
>        to carry more weight with the Commissioner.
>
> Q.    During the period in which you were involved in these
>        preferential lists, what was the leadership to which you're
>        referring?
>
> A.     The Senate president, Senate Ways and Means.
>
> * * *
>
> Q.    On the House side, what was the leadership to which you
>        refer?
>
> A.     The House side was, when I came in, Speaker DiMasi.
>        House Ways and Means was the now Speaker DeLeo. The
>        chair of the judiciary was, is Gene O'Flaherty

Testimony of Edward Ryan, July 15, 2010 (Exhibit 131), at 153-54.

372.    Former Regional Supervisor Nicholas DeAngelis also testified that, in his

experience, the higher ranking the legislator, the more pull they had in getting their candidates

probation jobs.

> Q.    Going back to our discussion about having to know
>        someone political in order to get hired or advance in the
>        Probation Department, connected with that, were there any
>        specific politicians who were identified that were better to
>        be connected to than others?

175

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

> A.  Yeah, the higher up in politics you were. So I would
>     assume it would be Petrolati or DiMasi or someone of that
>     caliber that people were more interested in contributing to.
>
> Q.  So it is your understanding that the people who were higher
>     up in the legislature had more pull getting jobs in
>     Probation?
>
> A.  That's right.

Testimony of Nicholas DeAngelis, August 24, 2010 (Exhibit 104), at 117-118.

373.    Deputy Commissioner Burke, likewise, testified that the support of

Representative Petrolati was useful to those seeking promotion within the western Massachusetts

counties, in part because the Department's relationship with Representative Petrolati was

important to getting Probation's budget maintained at high levels:

> Q.  Isn't it well known that if you want to get a promotion
>     within the Probation Department it's a good idea to support
>     Representative Petrolati?
>
> A.  Do I know that? Are you asking me do I know that?
>
> Q.  Yes.
>
> A.  Probably help, could help, yeah. Any rep, any Senator, I
>     mean, they're the ones that give us the money.
>
>                              * * *
>
> Q.  I'm not suggesting there are no exceptions, but broadly
>     speaking, you need Representative Petrolati's support if
>     you want to get promoted in Probation, correct?
>
> A.  In Hampshire County, Hampden County?
>
> Q.  Yes.
>
> A.  It would help, yes.

Testimony of William Burke, July 22, 2010 (Exhibit 96), at 67, 71.

374.    The Sponsor Lists reflect the greater influence of legislators in leadership or on

important committees. The list of the ten-most frequent sponsors (found at Appendix 7) consists

176

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

entirely of influential state legislators: former Speaker of the House Salvatore DiMasi; Senate President Robert Travaglini; Senators Steven Panagiotakis, Stephen Brewer, John Hart, and Marc Pacheco (all on Senate Ways and Means); Senator Mark Montigny, previously chairman of Senate Ways and Means; Senator Thomas McGee and former Senator Robert Creedon, on the Senate Judiciary Committee; and Representative Stephen Tobin of Quincy (where Commissioner O'Brien resides), who previously was on the House Judiciary and Ways and Means Committees.[296] Speaker of the House DeLeo falls just outside the top 10.

375.    On the sponsor lists Ryan produced, he highlighted and/or circled the names of the preferred candidates on the Sponsor List. Those candidates were supported by high ranking legislators such as Senate President Therese Murray, former Speaker Thomas Finneran, then Speaker Sal DiMasi and Chair of the Judiciary Committee, Senator Creedon.[297]

### D.    Reasons For Accommodating Legislators

376.    Substantial evidence indicates that the Probation Department sought to accommodate legislators' requests on hiring and promotion with the expectation and understanding that the legislature would provide generous funding to the Department.

377.    Evidence that this relationship began early in O'Brien's tenure includes a series of recorded voicemails left by Janet Mucci at the home of Edward Dalton in October 2000. In the voicemails, Mucci can be heard relating to Dalton that Commissioner O'Brien needs certain candidates to make it through the interview process because the legislature had acted favorably on Probation's budget, and Probation needed to return the favor:

---

[296]    Representative Thomas Petrolati is not among the ten legislators most frequently listed on the Sponsor Lists, but former Deputy Commissioner Burke testified that he sometimes would receive calls with the names of favored candidates for positions in western Massachusetts from Petrolati directly, and would act on them without always going through the Commissioner.

[297]    Testimony of Edward Ryan, June 29, 2010 (Exhibit 131), at 73-77, 154.

177

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

I know you are not doing interviews today but in Dedham there are people that have to be finalists … Jack [O'Brien] had given me, one, two, three, four, like 7 names to be interviewed

\* \* \*

I've got some names for finalists in the Dedham District Court … can you just make sure they're in there somewhere … so now that I just beefed you up a little bit, you gotta do this… there's one, two, three, four, five, there's 6 people to be finalists in Falmouth… *he had a meeting at the State House yesterday and he has no choice*.

\* \* \*

Falmouth's going to be tough because there is about, I think there's 5 or 6 finalists and that out of eight is crazy. But Jack had had a meeting over at the State House yesterday… and again that triggered a lot of this. *You know [whispering] when he got everything he wanted this year in the budget moneywise, so they feel like they did that for him …and obviously he needs to do this for them.*

A copy of the transcript of these voicemail recordings accompany this Report as Exhibit 31.

      378.    Mucci confirmed that her information came directly from O'Brien:

        Q.    So you're saying to Mr. Dalton here that because Mr. O'Brien got what he wanted in the budget that he therefore has to be sure these candidates make the final list, correct?

        A.    Yeah. That's definitely what I'm saying.

        Q.    And you're not saying that because you made it up, are you?

        A.    No. Because I would have no reason to – I wouldn't know anything about anything going on at the State House if he didn't tell me it. I can't imagine why he would share that with me.

        Q.    Does it follow that you got this information directly from Mr. O'Brien?

        A.    It had to be, yeah. Because I don't know who else he would even go with.

Testimony of Janet Mucci, October 5, 2010 (Exhibit 121), at 180.

178

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

379.    Ellen Slaney testified that Commissioner O'Brien explained the connection

between hiring and the Department's budget to her:

> Q.    What was said next in this conversation, as best you can
>       recall?
>
> A.    Well, you know, I also indicated to him that I understood
>       that this was just my perception and that he had other
>       things to consider. He said he did, that the budget was
>       important and that these appointments were important to
>       his being able to accomplish the budget that he needed in
>       order to do our business.

Testimony of Ellen Slaney, August 5, 2010 (Exhibit 135), at 19.

380.    Years later, when Slaney was discussing the Lucy Ligotti hiring with Deputy

Commissioner Tavares and urging that another, more qualified candidate be selected, Tavares

cautioned her that "sometimes the political thing needs to be done first," which Slaney

understood to be a reference to keeping the legislature mollified for budget purposes.[298]

381.    Deputy Commissioner Burke portrayed himself as extremely close to powerful

legislators, particularly Representative Petrolati. Burke volunteered the link between funding

and accommodating legislators:

> Q.    Isn't it a fact that Speaker Petrolati is a particularly
>       important figure to those who would like to get promoted
>       within the Probation Department because he is a powerful
>       political figure and he's known to have influence in hiring?
>
> A.    He's a good figure because he supports Probation. I mean,
>       if Jack O'Brien was there right now, we would not have
>       layoffs. He would have got the money, and there would be
>       no layoffs. You would have had furloughs, but you would
>       have had no layoffs. I swear, he would have got that
>       money somehow.

---

[298]    Testimony of Ellen Slaney, August 5, 2010 (Exhibit 135), at 88-89.

179

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

> Q.   And what you mean by that is that Jack O'Brien had a sufficiently strong relationship with Representative Petrolati and others –
>
> A.   All others, yeah.
>
> Q.   – that he would have seen to it that there was an appropriation sufficient so that there wouldn't be layoffs?
>
> A.   Correct.
>
> Q.   In your mind, there's a direct link between the relationship that the Commissioner's office has with legislative leaders and appropriations sufficient to support hiring and growth within Probation, is that correct?
>
> A.   Correct.

Testimony of William Burke, July 22, 2010 (Exhibit 96), at 67-68.

382.   Burke reiterated this view later in his testimony in unequivocal terms:

> Q.   You understood, didn't you, that while it wasn't written down, the legislature was funding Probation generously because Probation was responding to legislative requests for hiring, among other things, isn't that right?
>
> A.   I'd say yeah.
>
> Q.   So you understood that one of the reasons Probation under the auspices of Jack O'Brien could get the funding it needed was that Jack O'Brien was being responsive to the hiring requests of legislative leaders?
>
> A.   And judges.
>
> Q.   But certainly legislative leaders, correct?
>
> A.   Yes.
>
> * * *
>
> Q.   The way in which it worked was one hand, you know, washed the other?
>
> A.   Washes the other. Yeah, I know. I know what you're talking about.

LIBA/21225629

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

> Q.    And the way it worked particularly with Probation was
>         Mr. O'Brien would get his funding, and the legislature
>         would get some jobs, isn't that right?
>
> A.    Yeah, I would say so, yeah.

Testimony of William Burke, July 22, 2010 (Exhibit 96), at 79, 82-83.

383.    Other witnesses stated that this belief – that hiring and promotions were a way of ensuring generous appropriations for Probation – was widely held throughout the Department. For example, Regional Supervisor Rios told us that she heard "through the rumor mill" at work that if Probation did not accommodate the legislature with respect to hiring and promotions, the Department's budget would be at risk and other legislation important to the department might not be passed.[299]

384.    Whether probation's budget was increased in return for favorable employment action for sponsored candidates remains uncertain but probable.  Despite convincing evidence, during the period 2005-2009, Probation's budget increased more rapidly than the state budget as a whole, but not at a measurably greater rate than the Trial Court as a whole. *See supra* ¶¶ 54-55.  On the other hand, the legislature increased Probation's appropriation by an aggregate $25 million more than the Trial Court requested in that period. *See supra* ¶ 56.  That fact, and testimony concerning O'Brien's motivation in rigging the hiring process in favor of legislatively connected candidates, strongly suggests at least an implicit arrangement between O'Brien and legislative leadership.

## E.    Success of Sponsored Candidates

385.    Not every sponsored candidate was successful in obtaining employment or promotion.  As seen in some of the testimony from the regional supervisors, the Commissioner

---

[299]    Testimony of Nilda Rios, August 4, 2010 (Exhibit 130), at 105-106.

181

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

frequently submitted multiple names to the local panels for a single position. In such instances, some sponsored candidates were disappointed, although, because candidates often applied for multiple positions, it was possible they could obtain a position in a different court.

386.    Nonetheless, the anecdotal evidence suggests that positions typically went to sponsored candidates, rather than a candidate whose name was not given to the interviewers.

387.    Moreover, statistically the top sponsors were successful in obtaining employment and promotions for their candidates, particularly given the hundreds or even thousands of applicants for positions within the Department.

388.    For example, Speaker of the House Salvatore DiMasi is shown by the Sponsor Lists as having sponsored a total of 36 candidates for hiring and promotion. Of these, 24, or 66.7%, were successful in being hired or promoted within a year of being sponsored.

389.    Senator Travaglini appears as the sponsor for 28 candidates on the Sponsor Lists. Of these, 16 candidates were hired or received promotions, for a success rate of 57.1%.

390.    Speaker DeLeo appears as the sponsor for 12 candidates. Of these, 7 – 58.3% – were successful in being hired or promoted.

391.    The following table reflects the success rate for the top 10 sponsors, plus Speaker DeLeo and Representative Petrolati, in having sponsored candidates hired or promoted within one year of the sponsorship. Overall, the candidates sponsored by these legislators had a 36.4% success rate in hiring and promotion in a defined period, a rate that is far in excess of that for non-sponsored candidates:

182

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

**TABLE 1**

| Sponsor | No. of Candidates Sponsored | No. of Sponsored Candidates Who Were Hired or Promoted Subsequent to Their Being Sponsored | Success rate |
|---|---|---|---|
| Montigny | 54 | 12 | 0.222 |
| Brewer | 44 | 11 | 0.250 |
| DiMasi | 36 | 24 | 0.667 |
| Travaglini | 28 | 16 | 0.571 |
| Pacheco | 24 | 6 | 0.250 |
| Creedon | 22 | 6 | 0.273 |
| Hart | 21 | 9 | 0.429 |
| McGee | 21 | 11 | 0.524 |
| Tobin | 20 | 2 | 0.100 |
| Panagiotakis | 20 | 5 | 0.250 |
| Petrolati | 17 | 7 | 0.412 |
| DeLeo | 12 | 7 | 0.583 |
| **Total** | 319 | 116 | 0.364 |

## F.   Assurances Given to Politicians Concerning Candidates

392.   The promotion of Joseph Dooley to first assistant chief probation officer in the

Bristol Superior Court in 2005, is one of the more troubling examples of patronage and

demonstrates the extent to which O'Brien was willing to corrupt the system even if the Probation

Department might be harmed.

393.   Ellen Slaney testified (and her contemporaneous notes reflect) that prior to the

local round of interviews for the first assistant chief probation officer position, Joseph Dooley (at

the time a probation officer in charge) told her that he had discussed the position with Senator

Marc Pacheco, a friend of his.[300]   According to Dooley, Pacheco had, in turn, discussed the

position with Commissioner O'Brien.  O'Brien reportedly assured Pacheco that either Dooley

---

[300]   Testimony of Ellen Slaney, August 5, 2010 (Exhibit 135), at 115.

183

would be selected for the first assistant chief probation officer position, or the position would

remain vacant:

> A.    Well, Joe Dooley had indicated to me that he got a call
> from Senator Pacheco, who told him that he had had a
> conversation with the Commissioner and that if Joe was not
> the final candidate there would be no appointment.
>
> Q.    So Joe Dooley told you that he had heard from Senator
> Pacheco that Senator Pacheco had a conversation with the
> Commissioner, and the Commissioner in some way assured
> Senator Pacheco that unless Joe Dooley was made the First
> Assistant then the court would just go without a First
> Assistant?
>
> A.    Right.

Testimony of Ellen Slaney, August 5, 2010 (Exhibit 135), at 115. Slaney had the sense that

Dooley told her this because he was nervous about his chances of receiving the promotion.[301]

394.    Dooley claimed not to remember describing this conversation with Senator

Pacheco to Slaney. He did confirm, however, that his conversation with Pacheco took place:

> Q.    In 2005, when you were applying for the first assistant
> chief position, did Senator Pacheco relay to you that the
> commissioner had told him that if you didn't get the
> position then the commissioner would just freeze the
> position and wouldn't fill it?
>
> A.    I believe he did.
>
> Q.    As best you can recall, what exactly did Senator Pacheco
> tell you?
>
> A.    He supported me for the first assistant chief's job and that
> if I did not receive the position, the commissioner would
> freeze the position.

Testimony of Joseph Dooley, September 17, 2010 (Exhibit 106), at 37-38.

---

[301]    Testimony of Ellen Slaney, August 5, 2010 (Exhibit 135), at 115.

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

395.    According to Dooley, he was "surprised" by what Senator Pacheco told him.[302]

Beyond his surprise, Dooley appeared to have greeted Pacheco's message as "business as usual"

in Probation:

> Q.    Do you think it was appropriate for the Commissioner to
> say, I'm going to freeze this position if one particular
> candidate's not the one selected?
>
> A.    Do I think it was appropriate?
>
> Q.    Right.
>
> A.    I don't know.  I don't know.
>
> Q.    Would you have wanted the position to actually be frozen if
> you weren't the one selected?
>
> A.    I don't know.  That's in 2005.  I don't remember what my
> emotions were then.  I remember being happy in the job that
> I had. I don't recall.  I don't remember.  I don't mean to be
> vague but –

Testimony of Joseph Dooley, September 17, 2010 (Exhibit 106), at 40-41.

396.    Dooley was appointed as first assistant chief probation officer.[303]  Accordingly,

there was no occasion for O'Brien to leave the position vacant.

397.    Senator Pacheco testified that O'Brien never made the statement attributed to him,

nor did he ever repeat that statement to Dooley.  It is Independent Counsel's conclusion that the

testimony of Dooley and Slaney regarding what Pacheco said is truthful.

398.    Slaney was at first unclear whether Dooley's name was provided to the local

interview panel as a favored candidate.  She testified that she was not provided Dooley's name in

advance of the interviews.[304]  However, her contemporaneous notes reflected, and she

---

[302]   Testimony of Joseph Dooley, September 17, 2010 (Exhibit 106), at 38.

[303]   Testimony of Ellen Slaney, August 5, 2010 (Exhibit 135), at 197.

[304]   Testimony of Ellen Slaney, August 5, 2010 (Exhibit 135), at 123.

LIBA/21225629