# EXHIBIT A

subsequently testified, that in advance of the interviews Tavares did inform her that "the
Commissioner was interested in seeing Joe Dooley for First Assistant …." Slaney then shared
this information with the chief probation officer sitting on the interview panel.[305]

399.    The provision of Dooley's name to the local interview panel may not have
mattered. Slaney testified that she ranked Dooley second among the applicants appearing before
the local panel, and would have done so even if she had not known he was a preferred candidate
because she had a favorable opinion of his work as a probation officer in charge.[306] The judge
on the panel ranked him fifth. Thus, it is likely that Dooley would have made it through the local
panel interview in any event.

400.    At the final interview stage, the selection of Dooley was preordained as part of the
O'Brien promotion process. Regional Supervisor Edward Rideout, who sat on the final panel
interviewing for the first assistant chief probation officer position, testified that while he favored
a different candidate whom he believed to be more qualified than Dooley, Deputy Commissioner
Wall told him that "it was not time" for that candidate to be promoted.[307]

## G.    Hiring of Robert Ryan as a Chief Probation Officer

401.    The *Boston Globe* Spotlight story reported that Robert Ryan received his position
as chief probation officer in Eastern Hampshire District Court because his wife worked as an
aide to Representative Petrolati. Independent Counsel concludes that the evidence does not
support a conclusion that Petrolati was a determinative factor in Ryan's hiring.

402.    The *Globe* reported that Acting Chief Probation officer, David Roy, "lost his job"
as acting chief in 2005 "in favor of the husband of Petrolati's legislative aide, Colleen Ryan."

---

[305] Testimony of Ellen Slaney, August 5, 2010 (Exhibit 135), at 132.

[306] Testimony of Ellen Slaney, August 5, 2010 (Exhibit 135), at 116-17.

[307] Testimony of Edward Rideout, August 27, 2010 (Exhibit 129), at 67, 79-82.

186

The article reported that Ryan had recently retired from a career in the federal probation service and wanted to work for the state. According to the *Globe*, Roy declined to apply for the Assistant Chief Probation Officer position and went back to being a line probation officer.

403.     Ryan worked in the Federal Probation Service for twenty-five years and reached the mandatory retirement age in that agency of fifty-seven at the end of 2004.[308] Ryan stated that because he knew he was going to be forced to retire from the Federal system and he wanted to keep working, he asked Deputy Commissioner William Burke to let him know if there were job openings in the Probation Department in western Massachusetts. Ryan knew Burke, having worked as a probation officer in the Holyoke District Court prior to joining the Federal Probation Service.[309]

404.     Ryan testified that he first saw the posting for the chief's position on a website and that Burke may have pointed it out to him.[310] He submitted his application and was interviewed by Burke and Francine Ryan, whom Ryan also knew from his days in Holyoke District Court.[311] Ryan testified that he may have known in advance that Burke and Francine Ryan were going to interview him and that at some point Burke told him that he thought Ryan had a good chance of getting the job based on his qualifications.[312]

---

[308]    Testimony of Robert Ryan, October 22, 2010 (Exhibit 133), at 9-12. Relevant excerpts of the testimony of Chief Probation Officer Ryan accompany this Report as Exhibit 133.

[309]    Testimony of Robert Ryan, October 22, 2010 (Exhibit 133), at 24-25.

[310]    Testimony of Robert Ryan, October 22, 2010 (Exhibit 133), at 26.

[311]    Testimony of Robert Ryan, October 22, 2010 (Exhibit 133), at 20-21.

[312]    Testimony of Robert Ryan, October 22, 2010 (Exhibit 133), at 29-31.

187

405.    Ryan confirmed that his wife has worked for Representative Petrolati for the past

seven years and that he knows Petrolati "very well."[313]  Ryan told us that he listed Petrolati as

one of his references on his application for the chief probation officer position:

> One of the things I wanted to expand on or make some clarification
> on was in reference to Tom Petrolati as a reference. It is true that I
> put him down because I felt that he knew me from a different
> perspective than the judges but I'm not naive enough to think that
> having a -- I don't know what his position was exactly at that time
> -- but having a state representative supporting a position for a state
> job would not be beneficial to me so I'm not saying that I viewed
> him as somebody who would be the guy next-door to me where
> there would be no recognition of who he is and what his position
> is. So I wanted to clarify that.

Testimony of Robert Ryan, October 22, 2010 (Exhibit 133), at 39.

406.    While Ryan did not have a clear recollection of discussing his application with

Petrolati, he testified that he "would expect" that he "had some communication with him...or did

notify him that I was applying and that he was a reference."[314]  Ryan also stated that he was

aware through Petrolati that Petrolati had a relationship with Commissioner O'Brien.[315]

407.    Ryan testified that he did not ask Petrolati or anyone in Petrolati's office to

contact Probation on his behalf and to his knowledge, his wife did not speak with Petrolati

regarding his application.[316]  Ryan further testified that he does not know whether Petrolati

contacted anyone within Probation on his behalf, but he "would not be surprised if he did

something relative to [his] application."[317]

---

[313]   Testimony of Robert Ryan, October 22, 2010 (Exhibit 133), at 33, 35.

[314]   Testimony of Robert Ryan, October 22, 2010 (Exhibit 133), at 40.

[315]   Testimony of Robert Ryan, October 22, 2010 (Exhibit 133), at 42.

[316]   Testimony of Robert Ryan, October 22, 2010 (Exhibit 133), at 36, 38.

[317]   Testimony of Robert Ryan, October 22, 2010 (Exhibit 133), at 39-40, 51-52.

188

408.    The Sponsor Lists identify "Robert Ryan" as a sponsored candidate, but show Representative John Rogers as his sponsor, not Representative Petrolati. It should be noted that Deputy Commissioner William Burke testified that he would often act directly on recommendations from politicians in the western part of Massachusetts. Burke, however, testified that to his knowledge the Commissioner's Office did not receive a recommendation for Ryan from Petrolati.[318]

409.    Francine Ryan testified that she did receive Robert Ryan's name as a candidate to advance to the next round of interviewing from Deputy Commissioner Elizabeth Tavares.[319] Francine Ryan testified that she believed that Ryan was "absolutely" the most qualified candidate for the job.[320]

410.    The evidence is that Ryan was well connected to individuals with influence within the Probation Department, including Petrolati and Burke, and that his name was given to the local interview panel. Accordingly, it is likely that Ryan's connections did play a role in his hiring.

411.    Ryan, however, was extremely well qualified for the position. He began his career in the Holyoke District Court Probation Department. At the time he was a Vietnam veteran and entered the Probation Department through a federal program. He started out as a probation officer and then was appointed Assistant Chief Probation Officer. When Ryan left in 1980, he was Acting Chief in that Court. Ryan then spent the next twenty-five years of his career in the Federal Probation Service and ultimately held the position of Chief, U.S. Probation

---

[318]    Testimony of William Burke, October 22, 2010 (Exhibit 96), at 143-144.

[319]    Testimony of Francine Ryan, October 22, 2010 (Exhibit 132), at 121-124.

[320]    Testimony of Francine Ryan, October 22, 2010 (Exhibit 132), at 121-124.

189

Office for the District of Massachusetts.[321]  In that position he oversaw 80 employees and three courthouses.[322]  There is no reason to believe that Ryan would not have been offered his position without Petrolati and/or Burke's support.

## V.    ALLEGATIONS OF "PAY FOR PLAY"

412.    One of the principal allegations in the *Boston Globe* story is that many individuals hired into the Probation Department, or seeking promotion within the Probation Department, made suspiciously timed contributions to state legislators.  The implication is that these individuals effectively purchased the crucial support of legislators in order to be hired or promoted.

413.    Independent Counsel sought evidence supporting or refuting these "pay for play" allegations.  No witness interviewed provided any direct evidence that politicians were explicitly exchanging sponsorship for campaign contributions.  There is statistical evidence, however, demonstrating that a significant percentage of the candidates sponsored by certain high-ranking politicians have been contributors to those politicians, and stronger statistical evidence that sponsored candidates who contribute are more likely to be hired or promoted within the Department than sponsored candidates who do not contribute.

414.    Independent Counsel interviewed two individuals who were identified by the *Boston Globe* as potential participants in "pay for play" schemes.  As discussed herein, Independent Counsel concludes that in neither case did "pay for play" actually occur.

### A.    Statistical Evidence of Pay for Play

415.    While no witness testified that any formal pay for play scheme existed, there is statistical evidence suggesting the possibility of such an understanding.

---

[321]    Testimony of Robert Ryan, October 22, 2010 (Exhibit 133), at 9-10, 22.

190

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

416.    A list of the top 20 legislative recipients of contributions from Probation

Department employees appears as Appendix 8 to this Report.

417.    Independent Counsel did not elicit direct evidence that legislators offered to

sponsor candidates in exchange for campaign contributions, but there is considerable overlap

between individuals sponsored and contributors, as shown in the following table:

**TABLE 2**

| Sponsor | No. of Candidates Sponsored | No. of Sponsored Candidates Who Made Contributions | Percent Contributors |
|---------|-----------------------------|----------------------------------------------------|----------------------|
| Montigny | 54 | 23 | 0.426 |
| Brewer | 44 | 6 | 0.136 |
| DiMasi | 36 | 12 | 0.333 |
| Travaglini | 28 | 10 | 0.357 |
| Pacheco | 24 | 6 | 0.250 |
| Creedon | 22 | 3 | 0.136 |
| Hart | 21 | 9 | 0.429 |
| McGee | 21 | 6 | 0.286 |
| Tobin | 20 | 1 | 0.050 |
| Panagiotakis | 20 | 3 | 0.150 |
| Petrolati | 17 | 13 | 0.765 |
| DeLeo | 12 | 6 | 0.500 |
| TOTAL | 319 | 98 | 0.307 |

418.    Of the 54 candidates sponsored by Senator Montigny, for example, it appears that

at least 23, or 42.6% , were or are contributors to the Senator. Of the 21 candidates sponsored by

Senator Hart, 9, or 42.9%, were or are contributors. Of the 17 individuals for whom

Representative Petrolati was listed as a sponsor, 13, or 76.5%, were contributors. At the other

end of the spectrum, only 6 of the 44 candidates sponsored be Senator Brewer, only 3 of the 22

sponsored by Senator Creedon, only 1 of the 20 sponsored by Representative Tobin have been

contributors.

---

[322]    Testimony of Robert Ryan, October 22, 2010 (Exhibit 133), at 53-54, 66-70.

419.    In addition, six of the top ten legislators in terms of sponsoring candidates –

DiMasi, Travaglini, Montigny, Hart, Pacheco, and Brewer – along with Speaker DeLeo are

among the twenty most-frequent recipients of contributions from Probation Department

employees since 2000.   With the exception of the two Speakers, consistently almost half or more

of the Probation Department contributors to these legislators were sponsored by the legislators

for hiring or promotion within the Department.  This high percentage suggests that for many a

desire for sponsorship, or the past receipt of sponsorship, was the motivation behind the

contribution:

**TABLE 3**

| Sponsor | No. of Contributors | No. of Contributors Who Were Sponsored | Percentage Sponsored |
|---------|---------------------|----------------------------------------|----------------------|
| Montigny | 46 | 23 | .500 |
| DiMasi | 34 | 12 | .353 |
| Travaglini | 21 | 10 | .476 |
| Hart | 19 | 9 | .474 |
| DeLeo | 18 | 6 | .333 |
| Pacheco | 13 | 6 | .462 |
| Brewer | 9 | 6 | .667 |
| TOTAL | 160 | 72 | .450 |

420.    Perhaps more relevant than statistics of the percentage of sponsored candidates

who were contributors and the percentage of sponsored candidates who were not contributors,

however, is the greater success that contributors have had in being hired or promoted than non-

contributors.  Given the manner in which some legislators prioritized their sponsored candidates

for Commissioner O'Brien, the discrepancy in success rates between contributors and non-

contributors to these politicians is troubling.

421.    For example, of the 10 contributors to Senator Travaglini whom he sponsored, all

but one were successfully hired or promoted – a 90% success rate.  On the other hand, of the 18

LIBA/21225629

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

candidates sponsored by Senator Travaglini who never contributed, only 7 were hired or promoted within the Department – a still impressive rate of 38.9%, but less than half the success rate of contributors.

422.    Senator Montigny provides another compelling example. Of the 54 candidates sponsored by Senator Montigny, 12 were hired into or promoted within the Probation Department. Of these, 11 of them – 91.5% – have been contributors to Montigny. In other words, only one of the candidates sponsored by Montigny who was hired was not a contributor.

423.    In addition, only 12 of the contributors that Montigny sponsored were not hired or promoted. Sponsored candidates who have contributed to Montigny thus had a 47.8% success rate (11/23). The 31 sponsored candidates who have not been contributors to Montigny, on the other hand, had a success rate of only 3.2% (1/31).

424.    Significant discrepancies in favor of contributors appear as well for Senator Brewer, Senator Pacheco, Senator Creedon, Senator Hart, and Senator Panagiotakis. But no significant difference exists for contributors of former Speaker DiMasi, Senator McGee, or Representative Hart.

425.    As a group, the legislators successfully sponsored 62.2% of the contributors, but only 25% of the non-contributors. The sponsored contributors, in other words, were almost two and a half times more likely to be successful in being hired or promoted than the sponsored non-contributors. Setting aside former Speaker DiMasi who was successful in placing a large number of non-contributors, the respective percentages are 62.8% and 19.4% – the contributors are more than three times as likely to be successful.

426.    The following table sets forth this information for all of the legislators in the top 10 sponsors list:

193

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

### TABLE 4

| Sponsor | Sponsored Contributors | Successful Contributors | Sponsored Non-Contributors | Successful Non-Contributors | Success Rate Contributors | Success Rate Non-Contributors |
|---|---|---|---|---|---|---|
| Montigny | 23 | 11 | 31 | 1 | 0.478 | 0.032 |
| Brewer | 6 | 5 | 38 | 6 | 0.833 | 0.158 |
| DiMasi | 12 | 7 | 24 | 17 | 0.583 | 0.708 |
| Travaglini | 10 | 9 | 18 | 7 | 0.900 | 0.389 |
| Pacheco | 6 | 4 | 18 | 2 | 0.667 | 0.111 |
| Creedon | 3 | 3 | 19 | 3 | 1.000 | 0.158 |
| Hart | 9 | 6 | 12 | 3 | 0.667 | 0.250 |
| McGee | 6 | 3 | 15 | 8 | 0.500 | 0.533 |
| Tobin | 1 | 0 | 19 | 2 | 0.000 | 0.105 |
| Panagiotakis | 3 | 3 | 16 | 2 | 1.000 | 0.125 |
| Petrolati | 13 | 6 | 4 | 1 | 0.462 | 0.250 |
| DeLeo | 6 | 4 | 6 | 3 | 0.667 | 0.500 |
| **Total** | 98 | 61 | 220 | 55 | 0.622 | 0.250 |

427.    With respect to the successful contributors, contributions were not always

proximate to sponsorship. For some individuals contributions were far in advance, and for others

years later. However, in the great majority of cases, some or all of the contributions were made

in relatively close proximity to the sponsorship.

### B.    Anecdotal Evidence of Pay for Play

428.    With few exceptions – Joe Dooley and Robert Ryan, mentioned above, and some

further individuals discussed herein – Independent Counsel did not undertake to systematically

interview the sponsored candidates. That may be an avenue for future exploration by appropriate

agencies.

429.    Independent Counsel did receive compelling testimony from one Department

employee, Bernard Dow, tending to confirm the statistical evidence that legislators push harder

for their contributors than their non-contributors, and certainly confirming that Department

employees believe they will.

194

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

430.    According to Dow, between 1976 and 2005 he applied for a promotion approximately six times, including to the positions of assistant chief probation officer, chief probation officer, and regional supervisor. He was denied each time.[323]

431.    In late 2004, Dow learned that two positions were available within Worcester District Court – first assistant chief probation officer and assistant chief probation officer. Upon the posting of the jobs, Dow went to Chief Probation Officer William Mattei to let him know that he would be applying for the positions. Dow testified that he got the sense that Mattei was not going to support him for either position.

432.    Dow went home and talked with his wife and decided that he was tired of getting passed over.[324] He believed that even though he was more than qualified in terms of education and experience than other potential applicants for the promotions, having such qualifications would not have been enough. Dow stated "I knew that I was not going to get that job on my qualifications alone. I knew I was not going to get it. So I knew or believed that I needed some political help to get it."[325]

433.    Accordingly, Dow decided to obtain sponsorship from Speaker DiMasi, despite not being a constituent of the speaker:

> Q.    So you're having this conversation with your wife. What were your next steps when you determined that you needed some political backing?
>
> A.    I don't remember specifically.
>
> Q.    Yes.

---

[323]    Testimony of Bernard Dow, October 21, 2010 (Exhibit 108), at 63-64. Relevant excerpts of the testimony of Assistant Chief Probation Officer Dow accompany this Report as Exhibit 108.

[324]    Testimony of Bernard Dow, October 21, 2010 (Exhibit 108), at 61-63.

[325]    Testimony of Bernard Dow, October 21, 2010 (Exhibit 108), at 63.

LIBA/21225629

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

A.    But I knew I better go ahold [sic] of somebody and
      certainly one if you will, the politician that was the most
      powerful certainly in the state was Mr. DiMasi.

Q.    Due to his role as Speaker of the House?

A.    Absolutely.

                              * * *

Q.    So after doing it on your own over and over again for the
      chief probation officer jobs, ACPO jobs, regional
      administrator jobs, in 2004 and 2005, that's when you
      decide to go to DiMasi and ask for help?

A.    I woke up. I woke up. That's right.

Testimony of Bernard Dow, October 21, 2010 (Exhibit 108), at 64, 142.

434.    Dow called Speaker DiMasi's office and spoke with DiMasi's Chief of Staff,

Danny Toscano, prior to taking part in a first round interview for a first assistant chief probation

officer position and an assistant chief probation officer position.[326] Toscano, who Dow was

familiar with from Probation Department work, responded by telling Dow "we'll let you know"

and "we'll work on it."[327]

435.    Though Dow stated that neither DiMasi, Toscano, nor anyone else from DiMasi's

office ever solicited funds, he began contributing to DiMasi in the belief that this would assist in

securing DiMasi's assistance in his promotion.[328]  On September 26, 2004, Dow made a $500

donation to the Committee to Elect Sal DiMasi, his first donation to Speaker DiMasi ever. Just

five months later, on February 4, 2005, Dow again donated $500 to Speaker DiMasi – this while

Dow was in the middle of interviewing for the positions.[329]

---

[326]   Testimony of Bernard Dow, October 21, 2010 (Exhibit 108), at 64-65.

[327]   Testimony of Bernard Dow, October 21, 2010 (Exhibit 108), at 66.

[328]   Testimony of Bernard Dow, October 21, 2010 (Exhibit 108), at 54-55, 60, 74-77, 89-92, 104-105, 142.

[329]   Testimony of Bernard Dow, October 21, 2010 (Exhibit 108), at 54-55.

196

LIBA/21225629

436. After their initial call, Dow and Toscano spoke on several more occasions.[330]

Toscano eventually informed Dow that he was "not going to get the first assistant chief probation

officer's job because it's already spoken for, but you're going to get the assistant chief probation

officer's job."[331] Dow testified that Toscano gave him this news over the phone, the night

before his final round interview. The next morning Dow drove to Boston for his final round

interview but first stopped at the State House to meet with Toscano.

> Q. This was the same day that was going to be your second
> round interview for the assistant chief probation officer's
> job?
>
> A. That's right. I met him just before. I left the State House
> and walked over to One Ashburton Place which is right
> next door basically.
>
> Q. It was at this time that Mr. Toscano first told you that the
> assistant chief probation officer job was going to be yours?
>
> A. No. I think that he told me the night before I met him and I
> went back. I went there and he says, "did you listen to
> what I said to you last night?" I said, "well, I thought you
> were only kidding." I think that was my words. He says,
> "I'm not kidding." He says "congratulations." He
> congratulated me.
>
> Q. Mr. Toscano congratulated you on getting the assistant
> chief probation officer position prior to your going into
> your second round interview?
>
> A. Yes, sir, and the reason I remember it, but [sic] when I
> went in there, I had a whole different demeanor about me.
>
> Q. When you say you went there, you mean when you went
> into your second round interviews?

---

[330] Testimony of Bernard Dow, October 21, 2010 (Exhibit 108), at 66-67.

[331] Testimony of Bernard Dow, October 21, 2010 (Exhibit 108), at 69. Toscano did not inform Dow who was going to get the first assistant chief probation officer position. *Id.* Maureen Chamberlain, a probation officer with approximately eight years experience, was selected over numerous current assistant chief probation officers with decades of experience. *Id.* at 85-88. Chamberlain is the daughter of deceased Massachusetts Supreme Court Justice Frank O'Conner, the wife of a Trial Court employee who works in data processing, and the sister of Eileen O'Connor who works for the Judicial Institute. *Id.* at 85-86.

197

A.    Yes, sir, yeah.

Testimony of Bernard Dow, October 21, 2010 (Exhibit 108), at 72-73.

437.    Even after receiving his promotion, Dow continued to donate money to DiMasi or

one of his committees. All told, Dow contributed more than $1600 to DiMasi or one of his

committees from September 2004 through December 2005, which is more than half of the $3060

Dow contributed to all politicians in a nine year span.[332]

438.    Despite contributing to DiMasi with the explicit hope that this would help him

secure a promotion, Dow told us that he was "appalled" at the fact that he felt he needed to do

so:

> Q.    But you know that you got your job through assistance with
> Mr. Toscano and Mr. DiMasi, because they told you ahead
> of time?
>
> A.    Absolutely. Let me also put it this way, if I may.
>
> Q.    Uh-huh.
>
> A.    I don't like contributing, okay, large sums of money to
> anybody other than to my family, my children. Okay? My
> grandchildren. I don't like doing that. $500.00 to me on
> two occasions and a total of over $3000.00 of this after
> taxes that is, not -- Remember, I can't claim these. Okay?
> I don't like doing that. I don't mind 25 here and something
> you get a breakfast or something, you know, take off to,
> what would a breakfast cost me, five bucks? So really I
> only contributed $20.00, but $500.00 and $500.00 again
> and the Committee for a Democratic House which was
> sponsored by, I think that was a Sal DiMasi, he set that up,
> I believe. Okay? I don't like doing that.
>
>                         \* \* \*
>
> [I] don't find fault with Bernie Dow, that he gave a
> thousand dollars or whatever he gave to Sal DiMasi.
> Bernie Dow was more than qualified for that job. Okay?
> Service-wise, educational-wise, all right? And everybody

---

[332]    Testimony of Bernard Dow, October 21, 2010 (Exhibit 108), at 90-91.

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

> thought that it was appalling if anybody knew that I would
> have had to give money, that money would have possibly
> played a part in me getting a job. I think it is appalling. I
> think that sucks. Okay? Here I go. I'm going off on a
> tangent again.

Q.    No, I understand.

A.    All right? I've got better things to do with $500.00, a
      thousand, $3000.00. Okay?

Testimony of Bernard Dow, October 21, 2010 (Exhibit 108), at 89-90, 104-105.

## C.    Allegations of Pay for Play in the *Globe* Spotlight Story

439.    Although there appears to be statistical support for the notion of "pay for play"

involving certain legislators and some anecdotal evidence, Independent Counsel concludes that

the specific examples of potential "pay for play" that were mentioned in the *Boston Globe* story

are not substantiated.

### 1.    The Promotion of Mark Prisco to Chief Probation Officer

440.    The *Boston Globe* Spotlight story singled out the promotion of Mark Prisco, the

then acting chief probation officer of the West Roxbury branch of the Boston Municipal Court,

to chief probation office as an example of a politically-connected candidate receiving preferential

treatment over a purportedly more qualified candidate.

441.    The *Globe* story noted that Prisco has donated more than $10,000 to politicians in

the Commonwealth, including more than $2,000 to Treasurer Cahill, suggesting that these

donations were responsible for his being promoted.

442.    Publically available records show that Prisco has in fact donated substantial

sums – more than $10,000 – to a wide range of politicians (state legislators, as well as District

Attorney candidates and a city councilor) over the past decade.

199

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

443.    Independent Counsel reviewed with Prisco each of the politicians to whom he has donated.  Prisco represented that he knows most of these politicians because they are relatives, friends or acquaintances from his undergraduate school, "friends of friends," or individuals that he met through the course of his employment in the Department with whom he was impressed.[333] The only person not falling into that category was Representative Robert DeLeo, to whom Prisco made one donation.[334]

444.    Prisco testified that he never asked any of these politicians to make a call to the Commissioner's office nor to write a letter on his behalf.  He further testified that he was not aware of any of these politicians in fact making such a call or sending such a letter.[335]

445.    Records obtained demonstrate that in fact some politicians did make calls on behalf of Prisco, though it is possible they did so without his knowledge.

446.    In particular, when Prisco was applying to become chief probation officer in 2006, calls were made on his behalf by Rep. John Rogers (whom he knows from Norfolk) and Rep. Angelo Scaccia, who is his cousin.  These calls were logged on the Sponsor List maintained by the Commissioner's office.

447.    There is no evidence, however, that these calls on Prisco's behalf had any impact on his candidacy for the chief probation officer position.  Most importantly, there is no evidence his name was given to interviewers as a preferred candidate.  Former First Deputy Commissioner Cremens recalled being provided the name of James Rush, Prisco's predecessor, as a preferred candidate for the West Roxbury position during final round interviews, but did not recall

---

[333]   Testimony of Mark Prisco, September 24, 2010 (Exhibit 127), at 36-41.  Relevant excerpts of the testimony of Chief Probation Officer Prisco accompany this Report as Exhibit 127.

[334]   Testimony of Mark Prisco, September 24, 2010 (Exhibit 127), at 41.

[335]   Testimony of Mark Prisco, September 24, 2010 (Exhibit 127), at 48, 53.

receiving Prisco's name as a preferred candidate.[336] Likewise, Regional Supervisor McHale testified that he did not receive Prisco's name as a preferred candidate at the local round of interviews.[337]

448. While the *Globe* Spotlight story focused on the credentials of the other applicant for the position, Prisco also had significant credentials. He was, at the time of his candidacy for chief probation officer, the acting chief probation officer, and had previously been first assistant chief probation officer and assistant chief probation officer for that court. He is a graduate of Boston College and has a masters degree. He provided numerous letters of commendation and recommendation from community leaders obtained throughout his tenure in Probation attesting to his hard work and dedication to the Department and its goals.

449. On balance, based on the testimony by Cremens and McHale that Prisco was not identified to them as a favored candidate, Independent Counsel does not believe the calls placed on Prisco's behalf played any meaningful role in his promotion. Based on the available evidence, it is unclear that his contributions to politicians were motivated by the promotion process, or were the catalyst for calls made on his behalf by the two legislators.

### 2. The Hiring of Arthur Sousa as a Probation Officer

450. The *Boston Globe* Spotlight story also highlighted Arthur Sousa, a probation officer in Somerville District Court, as an example of its "pay to play allegations." Independent Counsel concludes that the evidence does not support a conclusion that Sousa, in effect, purchased a recommendation from DeLeo.

451. The *Globe* story reported that Sousa began donating to Representative DeLeo in April 2006, despite the fact that he did not live in DeLeo's district. According to the *Globe*,

---

[336] Testimony of John Cremens, August 6, 2010 (Exhibit 102), at 54-56.

since that time he has donated $1,700 to DeLeo and received a promotion from associate probation officer to probation officer and his pay has increased by almost $15,000 a year to $55,348. The article reported that Sousa claimed to be a long-time supporter of DeLeo but had not made any donations in the four years prior to 2006.

452.    Publically-available records show that Sousa has donated $1,750 to DeLeo after first giving to his campaign in April 2006. Sousa has not donated to any other politician in that time.

453.    Sousa testified that he first gave to DeLeo in 2006 when he attended a fundraiser with his cousin.[338] Sousa stated that his cousin lives in DeLeo's district (Revere), was doing work for DeLeo's campaign, and asked Sousa and his wife to attend.[339] He testified that each of the donations he made were to attend fundraisers (although in two instances they did not end up attending the events).[340]

454.    Sousa testified that he had applied for a probation officer position in Brighton District Court in 2006. At that time, he called Representative DeLeo's office to request a recommendation.[341] Although Sousa was vague about why he sought a recommendation from DeLeo, merely stating he thought it could be "helpful," he testified that he spoke with a secretary in his office and informed her that he was seeking a reference or a recommendation.[342]

---

[337] Testimony of Mark McHale, July 30, 2010 (Exhibit 117), at 104.

[338] Testimony of Arthur Sousa, October 7, 2010 (Exhibit 136), at 33-34. Relevant excerpts of the testimony of Probation Officer Sousa accompany this Report as Exhibit 136.

[339] Testimony of Arthur Sousa, October 7, 2010 (Exhibit 136), at 34-35.

[340] Testimony of Arthur Sousa, October 7, 2010 (Exhibit 136), at 65-66.

[341] Testimony of Arthur Sousa, October 7, 2010 (Exhibit 136), at 37-38.

[342] Testimony of Arthur Sousa, October 7, 2010 (Exhibit 136), at 37-38.

455. Sousa stated he did not receive any response to his call to DeLeo and has no knowledge whether any recommendation was given on his behalf.[343]

456. Leonard Mirasolo, who is Director of Constituent Service for DeLeo, recalled Sousa. Mirasolo met Sousa at one of the fundraisers Sousa described and subsequently received a call from Sousa asking for a letter of recommendation. Mirasolo told us that Sousa stood out as a candidate because of his many years of service and ability to speak Spanish and Portuguese.[344] Mirasolo did not provide the requested letter, but did make one call to Commissioner O'Brien to offer a recommendation for Sousa on DeLeo's behalf.[345] Mirasolo did not tell Sousa that he called the Commissioner to offer a recommendation for him.[346]

457. Mirasolo stated that although he met Sousa at a DeLeo fundraiser, he did not have any further knowledge of Sousa's contributions to DeLeo and any contributions that Sousa made were not a factor in making a recommendation on his behalf.[347]

458. The Sponsor Lists we obtained indicate that DeLeo or someone from his office (as well as Senator Travaglini or someone from his office) did make a call on Sousa's behalf. A list from January 2007 bears a check mark next to Sousa's name. Sousa was appointed as a probation officer on July 26, 2007.

459. Sousa did not obtain the Brighton District Court probation officer position for which he states he sought a recommendation. He did, however, obtain the Somerville probation officer position around that same time.

---

[343] Testimony of Arthur Sousa, October 7, 2010 (Exhibit 136), at 40-41.

[344] Informal interview of Leonard Mirasolo.

[345] Informal interview of Leonard Mirasolo.

[346] Informal interview of Leonard Mirasolo.

[347] Informal interview of Leonard Mirasolo.

203

460.    Regional Supervisor Brian Murphy stated in an informal telephone interview with Independent Counsel that he recalled receiving two names with respect to the Somerville District Court position. Sousa was not one of them.[348]

461.    Sousa appears to have been well qualified for the probation officer position. He served as an associate probation officer since 2001; has experience working in the court system; has done post-graduate work in government, including work at the Harvard Extension School; has a paralegal certificate; and is fluent in both Spanish and Portuguese.[349] Sousa provided his resume and letters of recommendation. [350]

462.    Based on the lack of evidence that Sousa was identified to the interview panel as a sponsored candidate and his credentials, we do not believe that Sousa's donations to DeLeo played a meaningful role in his promotion to probation officer.

## VI.    RETALIATION AGAINST REGIONAL SUPERVISORS

463.    While some regional supervisors testified that they did not question the Commissioner's orders to engage in fraudulent hiring and promotion, others expressed misgivings and still others refused to advance at least some sponsored candidates who were manifestly unqualified. On occasion, the decision not to advance a sponsored candidate was accepted by O'Brien and his Deputies. But at least two regional supervisors were disciplined for their failure to do so, and others believed that if they failed to implement O'Brien's scheme, they too would be subject to retaliation.

---

[348]    Telephone conversation with Brian Murphy, October 20, 2010.

[349]    Testimony of Arthur Sousa, October 7, 2010 (Exhibit 136), at 8, 11; telephone conversation with Brian Murphy, October 20, 2010.

[350]    A copy of Sousa's resume and letters of recommendation, marked as exhibits 3 and 4 during his testimony, accompany this Report as Exhibit 136.

204

## A.   Ellen Slaney

464.   As discussed above (*see supra* ¶¶ 193-194), when asked to get Doug MacLean

onto the list of candidates for a final interview Ellen Slaney refused to cooperate.

465.   Slaney testified that after the list of finalists had been sent to OCP, she met with

Commissioner O'Brien in his office, and he angrily questioned her as to why MacLean had not

made the list:

> Q.   As best you can recall, what conversation did you have
> with the Commissioner concerning this round of hiring?
>
> A.   He was – seemed physically upset with me.  When I went
> in, I got called into office, and he wanted to know why I
> hadn't put Doug Maclean's name on the final list.
>
> Q.   And what did you say in response?
>
> A.   That I didn't think he was an appropriate candidate because
> he was a convicted felon and that I thought my position
> was one to make sure the best candidates got the job, and I
> didn't think he was the best candidate or an appropriate
> candidate.
>
> Q.   What was said next in this conversation, as best you can
> recall?
>
> A.   Well, you know, I also indicated to him that I understood
> that this was just my perception and that he had other
> things to consider.  He said he did, that the budget was
> important and that these appointments were important to
> his being able to accomplish the budget that he needed in
> order to do our business.  And I told him that I thought that
> having the names ahead of time was unethical, and I felt
> that it was cheating and that I couldn't do that.  And he
> eventually told me that he understood and that he would not
> insist that I continue to be on the hiring panels if I did not
> want to do it, and I said I did not.

Testimony of Ellen Slaney, August 5, 2010 (Exhibit 135), at 18-19.

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

466.    Commissioner O'Brien appears to have confirmed these events in a conversation

with former First Deputy Commissioner John Cremens.  Although his memory was vague

concerning the decade-old incident, according to Cremens:

> A.    … I do remember Ellen Slaney, though, asking to get off
> the interview committees.
>
> * * *
>
> Q.    Do you have a memory of why she wanted to get off the
> interview panels?
>
> A.    She talked with [O'Brien] about it.  I was not there.  But I
> know, afterwards, he told me she wanted to get off the
> panels.
>
> Q.    Did he say why she told him she wanted to get off the
> panels?
>
> A.    I believe it was that she wasn't comfortable doing the
> interviews.
>
> Q.    And it was that she wasn't comfortable doing the
> interviews because she was getting names from the
> Commissioner?
>
> A.    That may have been it.  You're asking me to remember a
> conversation a long time ago.
>
> Q.    Do you know one way or the other whether that was the
> reason she wanted to get off?
>
> A.    I believe that was it.  The best of my memory, that was it.
>
> * * *
>
> Q.    … Did Commissioner O'Brien ever express to you any
> anger at Ellen Slaney over her failure to get a preferred
> candidate onto the list of finalists.
>
> A.    I vaguely remember hearing that, but I'm not sure I heard it
> from Commissioner O'Brien.  I know I did hear it at that
> time that that had something to do with it, and then she
> came in and asked to moved.  I'm not sure of the sequence
> of events, whether she walked in and asked to be removed
> and then it became apparent what had happened or he was

206

> upset about not getting somebody on and then she asked to
> give it up. I'm not sure of that sequence.

Testimony of John Cremens, August 6, 2010 (Exhibit 102), at 49-51.

467. When Slaney was later reassigned to perform interviews in December 2004, she

testified that she had decided, based on her earlier experience, to go along with the rigged

process:

> Q. Why in 1999 or 2000 did you not go along with the
> Commissioner's request to get Doug Maclean onto the list
> of finalists, but so far in the interviews we've seen
> occurring in 2005 you have put candidates favored by the
> Commissioner's office ahead of people that you thought
> were more qualified?

> A. I guess I had convinced myself that my vote, so to speak, as
> a member of the committee belonged to the Commissioner
> and that I was there just to represent his interest. That's
> how I tried to swallow it.

Testimony of Ellen Slaney, August 5, 2010 (Exhibit 135), at 77-78.

468. Nonetheless, she was again the subject of retaliation following the "botched"

promotion of Lucy Ligotti to assistant chief probation officer in 2005.

469. Slaney testified (and her notes reflect) that about two weeks after the Ligotti

incident Liz Tavares called to inform her that she was being pulled from interviewing for a

position in the Bristol Superior Court, and that Deputy Commissioner Burke was going to take

her place. Tavares explained to Slaney "It was because of Fall River, and they wanted to be sure

that it was done right."[351]

470. Subsequently Slaney, along with Edward Dalton, was called into a room at OCP

by Deputy Commissioners Wall and Walsh. They were informed that they were being removed

---

[351] Testimony of Ellen Slaney, August 5, 2010 (Exhibit 135), at 101-102.

207

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

from hiring, and instead were being reassigned to perform audits at Probation offices throughout the Commonwealth.[352]

471.    Tavares stated that she recalled Slaney being removed from hiring in 2005, and confirmed that it was connected to the Lucy Ligotti incident. Tavares, however, provided what she deemed to be a justification for removing Slaney from hiring. According to Tavares, the removal of Ellen Slaney from hiring was justified because the panel had "used the wrong form":

> Q.    Just to make the record clear, was there an incident in which Ellen Slaney, although the Regional Supervisor for a particular county, was not a member of the local interview panel?
>
> A.    Right, right. And I think there was an incident where she may have used a wrong form or what not, and it resulted in a conversation with the Commissioner, but I'm not privy to what happened. She was either asked – she either asked to be taken off or the Commissioner didn't want to use her as a result of an incident.
>
> * * *
>
> Q.    So there's some form with directions on how to come up with the number of people to go on to the next round?
>
> A.    Exactly.
>
> Q.    And your memory is that, as best you can recall, she may have used the wrong set of instructions?
>
> A.    Exactly.
>
> * * *
>
> Q.    Do you think Ellen using the wrong form, the wrong set of – the wrong methodology for selecting a slate of candidates justified taking her off of interviewing going forward?
>
> A.    At the time, I suppose I did, yeah.

---

[352]   Testimony of Ellen Slaney, August 5, 2010 (Exhibit 135), at 155-56; Testimony of Edward Dalton, August 17, 2010 (Exhibit 103), at 107-108.

208

Testimony of Elizabeth Tavares, July 13, 2010 (Exhibit 137), at 23-25.

472.     The explanation provided by Tavares is meritless and a pretext for O'Brien's action. As discussed above, the instructions provide that only eight candidates per position may be forwarded for a final interview, not every candidate who appears on two lists. *See supra*, ¶¶ 93-94, 205. Witnesses consistently expressed that same understanding.[353] Section 4.302(E) of the *Policies and Procedures Manual* is unambiguous that only eight names can come to the Commissioner. And in Chief Justice Mulligan's letter refusing the Ligotti appointment, he already rejected Tavares' reading of the instructions repeatedly citing § 4.302(E) of the *Policies and Procedures Manual*.[354]

473.     In summary, Tavares confirmed that Slaney was removed from hiring and reassigned to audits over the Ligotti incident, and offered a false justification that had already been rejected by AOTC. There was, in fact, no valid basis for the disciplining of Ellen Slaney, a fact which had to have been apparent to Tavares.

## B.     Edward Dalton

474.     As noted above, in 2005, Edward Dalton was also removed from interviewing and reassigned to audit duty. Dalton provided extensive testimony concerning the meeting in which that occurred, and testified that he believed he was being sanctioned for failure to advance the Commissioner's preferred candidates, Elzy Tubbs, to the final round interview:

> Q.     Did you believe that either as a result of the Tubbs incident or any other perception that you were not cooperating sufficiently with the commissioner's wishes, that you were sanctioned?

---

[353] Testimony of Edward Dalton, August 17, 2010 (Exhibit 103), at 30; Testimony of William Burke, July 22, 2010 (Exhibit 96), at 99-100.

[354] March 29, 2005 letter (Exhibit 42) responding to Letter from Commissioner O'Brien to Chief Justice Mulligan dated March 28, 2005. A copy of the March 28, 2005 letter accompanies this Report of Exhibit 71.

209

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

A.     I do believe that, yes.

Q.     Will you tell us how you were sanctioned and why you
       believe that's the case?

A.     I indicated on April 4th of '05 Deputy Commissioner Fran
       Wall indicated, I believe it was during a senior staff
       meeting, which were held once a month, that he wanted to
       speak to Ellen Slaney, myself, and I believe Brian
       Murphy's name was mentioned, although when we met
       Brian was not there, that he wanted to talk to us after the
       meeting and wanted to meet with us I believe it was 2:00
       o'clock on that afternoon.

       At that meeting Ellen Slaney and I went into it; it was being
       conducted by Fran Wall and Pat Walsh was also a deputy
       commissioner who I guess had some supervision over us.
       And we were provided with a list of benchmark audits
       listed 1 through 13 of different courts that were behind in
       this audit process which each of the regional supervisors
       was responsible for based on which counties you had. We
       had to do these audits. And they were pretty intense.

       We were given the list and told that these audits were
       behind and that we needed to schedule them and do the
       reports, the audit reports, and that each of our initials was
       down there who would actually write the report but we
       would be responsible for doing the audits and every other
       one would be done by either me or Ellen Slaney and that
       we were to make arrangements with the courts to go there,
       do the audits and do the reports, and we would not be doing
       interviews.

Testimony of Edward Dalton, August 17, 2010 (Exhibit 103), at 107-108.

       475.    Dalton produced the list of audits that he and Slaney were assigned by Deputy

Commissioner Wall.[355] The courts in question were located throughout the Commonwealth, far

away from Dalton and Slaney's homes in southeastern Massachusetts. The schedule appears to

be put together to cause maximum inconvenience for the two regional supervisors.

---

[355]  A copy of the list of audits, marked as Exhibit 13 during the testimony of Edward Dalton, accompanies this
       Report as Exhibit 103.

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

476. Dalton explained that to have been pulled off of hiring within their own regions

was a deliberate "embarrassment" that was understood by everyone in the region.[356]

## C. Other Interviewers

477. Slaney and Dalton were the only two interviewers with respect to whom we

received direct evidence of retaliation. However, many other interviewers testified that they

feared retaliation if they did not comply in moving preferred candidates through the hiring

process, with multiple interviewers referencing Ellen Slaney's and Edward Dalton's experiences

as a reason to believe that the risk of retaliation was substantial.

478. Edward McDermott, for example, testified that he was afraid that he would face

employment repercussions if he did not score the preferred candidates high enough during final

round interviews. He volunteered Slaney's experience as a reason to believe that the risk of

retaliation was measureable:

> Q. Can you tell me why you felt you had to comply with
> selecting, if you will, the commissioner's choice as
> opposed to your saying this is a rigged process, I'm not
> going to participate in that?
>
> A. Quite frankly, because I was afraid for my job. And if I
> can interject, I had also heard that regional supervisor Ellen
> Slaney had failed to comply with a request and that she was
> brought into the office, berated and threatened, and that
> was not lost on me. And I was three or four years into the
> probation service at 52 years of age or whatever and I felt
> that if I didn't comply with a directive by my supervisor,
> that I might be in harm's way.
>
> Q. So in effect you felt compelled to go along with this
> scheme because you felt there would be sanctions if you
> didn't score the commissioner's choice more highly than he
> deserved?
>
> A. I'm not very proud of it, but yes.

---

[356] Testimony of Edward Dalton, August 17, 2010 (Exhibit 103), at 119.

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

Testimony of Edward McDermott, August 25, 2010 (Exhibit 116), at 37-38; *see also id.* at 57-58 (same).

479.    Regional Supervisor Dianne Fasano broke down while testifying about her

concern with retaliation, a concern based in part on Slaney's experience:

> Q.    Why did ... you go along with it?
>
> A.    Well, I think probably because I was concerned that if I didn't I'd be called into the commissioner's office. You know, when I got the call again I felt like, Well, you know, okay. Let's see how they do [this] type of thing. I think if it was somebody -- I'm sorry.
>
> Q.    Why don't we take a quick break?
>
>       [Witness crying.]
>
> A.    I think if I thought it was somebody that I thought would be, you know, not able to do the job or awful, I think I would say something but I can't say for sure because I would have been afraid. But I really don't remember passing on anybody that I thought wasn't appropriate.
>
> Q.    At the time that you passed along these names, I take it from your testimony that you were already aware of Miss Slaney and perhaps others being called in or otherwise retaliated against?
>
> A.    Yes.

Testimony of Dianne Fasano, September 3, 2010 (Exhibit 109), at 60-61.

480.    Regional Supervisor Nilda Rios testified that she feared retaliation if preferred

candidates did not make it to the next round of interviews, based on Ellen Slaney's experience:

> Q.    Did you believe that there would be repercussions if you didn't do what you were told to do?
>
> A.    That was my assumption.
>
> Q.    Are you aware of any instances where someone who was doing interviewing didn't put a candidate who was on the preferred list through to the next round, and there was any sort of punishment or repercussion as a result of that?

212

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

A.      Well, I know of someone who complained –

Q.      Who was that?

A.      - and I thought that they got punished.

Q.      Who was this?

A.      Ellen Slaney.

* * *

Q.      You said it was your belief that you thought she was
        punished as a result of that complaint. What do you mean
        by that?

A.      She and another Regional Supervisor were just like super
        loaded with work all of a sudden.

Q.      Who was the other Regional Supervisor?

A.      Eddie Dalton.

* * *

Q.      So it's your impression that if you were to complain about
        how this hiring process was working, you would be on the
        hit list or on the outs with the Commission's office?

A.      Yes.

Testimony of Nilda Rios, August 4, 2010 (Exhibit 130), at 88-89, 93.

481.    Regional Supervisor O'Neil also voiced concern with repercussions, and noted

the reassignment of Dalton and Slaney to audits as "repercussions there that I didn't necessarily

want to engage in."[357]

482.    Additionally, Bristol Superior Court Chief Probation Officer Eugene Monteiro

testified that he put a preferred candidate's name on the list of final candidates for fear of

retaliation against his local office:

---

[357]   Testimony of Richard O'Neil, August 3, 2010 (Exhibit 124), at 102-105.

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

Q.    Can you describe for me what your feelings were at this time?

A.    My feelings were that Joe Dooley was the preferred candidate from the Commissioner's Office. My feelings were also that while I could have eliminated him at that stage and not sent his name up, I had concerns about any -- the after effects of all of that on myself and my office.

* * *

Q.    You said that you ended up putting his name on the list because you were afraid of any effects to either yourself or your department?

A.    Not myself, to my office.

Q.    To your office. What repercussions were you afraid of?

A.    Well, I don't have anything specific that comes to mind, but I didn't think that we would be looked at in a good light by the commissioner's office for any future hirings, personnel issues, or other needs.

Testimony of Eugene Monteiro, October 6, 2010 (Exhibit 118), at 54-55, 55-56.[358]

483.    Later on, in an apparent reference what happened to Dalton following the Elzy Tubbs incident, Monteiro stated that he believed "the process would have been repeated. The process of interviews might have been repeated, and that I would not have been part of that repeated process, and that my office could be affected negatively in terms of future job fillings."[359]

484.    More generally, Deputy Commissioner Bocko explained that while he was unaware of retaliation in the Department related to hiring, he expected retaliation against disloyal employees and had witnessed O'Brien retaliate against employees for other reasons:

---

[358]    Relevant excerpts of the testimony of Chief Probation Officer Monteiro accompany this Report as Exhibit 118.

[359]    Testimony of Eugene Monteiro, October 6, 2010 (Exhibit 118), at 86.

214

Q.     Did you have a concern that there would be some sort of
       retaliation, any adverse effect on your employment? Did
       you have those concerns?

A.     Based on experience in other situations besides hiring and
       promotion, I think like in many situations organizations
       employees who are considered disloyal would be shunned,
       snubbed, and perhaps given assignments that they weren't
       seeking.

Q.     Had you seen examples of that during Commissioner
       O'Brien's reign as commissioner?

A.     Yes. But I'm not remembering any regarding hiring or
       promotions.

Q.     What other context have you seen, you know, that sort of
       treatment?

A.     I've been asked to supervise a number of employees who
       had displeased the central office so they were sent to either
       my research department or to the training department
       because they had worn out their welcome at their regular
       assignment.

Testimony of Stephen Bocko, September 13, 2010 (Exhibit 94), at 73-74.

## VII.     CONCEALMENT OF FRAUDULENT HIRING DURING GRIEVANCE AND ARBITRATION PROCEEDINGS

485.     Certain Probation Department personnel – probation officers, probation officers in

charge, assistant chief probation officers, and first assistant chief probation officers – are entitled

to grievance and arbitration rights pursuant to collective bargaining agreements between the Trial

Court and the probation officers' union.

486.     As part of the investigation, Independent Counsel investigated representations

made by interviewers regarding promotional decisions during grievance and arbitration

proceedings. Resource and time constraints prevented examining every file pertaining to

grievance and arbitration proceedings on promotion decisions, but these files require the

conclusion that senior Probation Department employees likely testified falsely during arbitration

LIBA/21225629

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

proceedings, stating that names had not been pre-selected and that ranking and scoring decisions were based solely on the merits.

487.   In particular, during arbitration proceedings, the members of the final interview panel (usually Wall and Walsh) ordinarily were called to testify. The arbitrators' decisions from these proceedings typically recount that ranking of the candidates was based on the interviewers' consideration of the candidates' answers to interview questions and the candidate's application materials.

488.   Independent Counsel examined 38 arbitration files, and in none did a final interview panel member, in describing the basis for his or her scoring of a candidate, ever disclose that scoring of a candidate was based on receipt of that candidate's name from Commissioner O'Brien or one of his deputies. Instead, the panel members provided elaborate explanations as to why the candidates' answers justified the scores or rankings that they were given.

489.   In addition, in at least two arbitration cases, Deputy Commissioners Wall and Walsh explicitly denied receiving any names, as noted in the arbitrators' decisions:

> They asked each candidate the same four questions, each of which was worth 5 points, and independently scored the responses using a scoring key prepared by the OCP. *According to both Wall and Walsh, no one from OCP expressed a preference for any of the candidates.*
>
> * * *
>
> Both deputies testified that they had reviewed the materials the applicants had submitted prior to the interviews. *They also said that no one had spoken to them one way or the other about any candidate* ....[360]

---

[360]   A copy of the Harder arbitration decision accompanies this Report as Exhibit 9. A copy of the Adamson arbitration decision accompanies this Report as Exhibit 8.

216

490. Witnesses consistently testified that preferred names were handed down for most hires, and for promotional positions for which probation officer union members applied. Independent Counsel concludes that it is statistically improbable that in the three dozen cases for which we have records, none involved names communicated to interviewers. On at least some occasions, there is the potential that final interview panel members perjured themselves, falsely describing their decisions as being based on the answers provided by the candidates, when in reality the decisions were based on the instructions provided by the Commissioner.

491. Independent Counsel questioned the lawyers within Probation and AOTC who were involved in the grievance and arbitration process to determine why the rigging of interview scoring was not disclosed during arbitration. The evidence suggests that those responsible for evaluating the grievances and representing Probation/AOTC at grievances were content to put grievants to their proof. Because a lack of information concerning rigging benefited the Department, which invariably prevailed on grievance and at arbitration, no disclosure of promotion practices was made.

492. Former Deputy Commissioner and Legal Counsel Anthony Sicuso testified that his decision to grant or deny a grievance was based primarily on testimony from the grievant along with the written record, including the scoring and ranking sheets and the applicants' answers to the interview questions as noted by the interviewers. Sicuso testified that he did hear allegations from grievants occasionally that politically-connected candidates received artificially inflated-scores. While he testified that there was no way for him to know if a candidate's scores or answers had been inflated, he admitted that he never asked Deputy Commissioners if that occurred.[361]

---

[361] Testimony of Anthony Sicuso, September 30, 2010 (Exhibit 134), at 54-57, 84-87.

217

Q.     In the course of step three of a grievance, did any of the
       interviewers to whom you spoke ever say they inflated the
       scores of an applicant?

A.     No.

A.     Did you ever ask any of the interviewers during step three
       of the grievance process whether they had artificially
       inflated the scores of an applicant?

A.     No. There was no reason to believe that they had. They
       were –

Testimony of Anthony Sicuso, September 30, 2010 (Exhibit 134), at 86-87.

493.    In fact, Sicuso did have reason to question the interviewers' scoring the

candidates. Specifically, Sicuso stated that he heard such allegations in a grievance brought by

an employee named Karen Jackson. Jackson alleged that an individual who received a

promotion to assistant chief probation officer, Amy Parente (who is related to Representative

Marie Parente), had received inflated scores from the local interview panel. Sicuso said he asked

Jackson to substantiate her claims, and she was not able to do so.[362] Sicuso stated that based on

Jackson's lack of direct evidence, Sicuso let the matter drop. He never asked the interviewers

whether they had in fact inflated Parente's scores.[363]

494.    Sicuso's decision not to investigate the Jackson matter appears intentional and

strongly suggests a studied ignorance of a tainted process. As reflected in the record of the

arbitration concerning this incident, Chief Probation Officer Steve Alpers stated that Deputy

Commissioner Burke called him before the interview and "expressed an interest in Ms. Parente

being in the group that would be given a second interview," and Burke admitted telling Alpers

---

[362] Testimony of Anthony Sicuso, September 30, 2010 (Exhibit 134), at 87-90.

[363] Testimony of Anthony Sicuso, September 30, 2010 (Exhibit 134), at 86-88.

218

"that there were two outstanding candidates in Ms. Jackson and Ms. Parente and that he hoped that they made the cut."[364]

495.    The union raised Burke's admission as a ground in the arbitration, arguing that

Burke had placed an "indelible stain" upon the process. The arbitrator agreed:

> There is no doubt but that the interjection by Mr. Burke was
> uncalled for and could have potentially invalidated the entire
> promotion process. This is an instance of an individual outside the
> established promotion process attempting to interject his opinion
> into the process.

496.    Nonetheless, the arbitrator rejected the grievance, noting, *inter alia*, that "[t]he

comment was made before the first set of interviews. It was made to only one of the

interviewers." The arbitrator did not discover, but Regional Supervisor Francine Ryan, who also

sat on the interview panel with CPO Stephen Alpers, testified to Independent Counsel that

someone from the Commissioner's Office (likely Deputy Commissioner Elizabeth Tavares)

instructed her that Parente and Jackson were to make it through to the next round of

interviewing. Ryan believes she then passed these names on to Alpers.[365]

497.    Christine Hegarty, Human Resources Coordinator for AOTC who handled

grievance proceedings, similarly testified that she did not really investigate the allegations made

by grievants. Hegarty stated repeatedly that her role in the grievance proceedings was "limited"

to determining whether the provisions of the union contract had been violated.[366] Hegarty

described the grievance process as "union driven" and stated that she relied on the union to make

its case.[367] She did not view it as her role to investigate beyond what was presented to her.[368]

---

[364] A copy of the decision in the Karen Jackson arbitration accompanies this Report as Exhibit 7.

[365] Testimony of Francine Ryan, August 9, 2010 (Exhibit 132), at 103-105.

[366] Testimony of Christine Hegarty, October 20, 2010 (Exhibit 111), at 31, 42, 56-57. Relevant excerpts of the testimony of Human Resources Coordinator Hegarty accompany this Report as Exhibit 111.

[367] Testimony of Christine Hegarty, October 20, 2010 (Exhibit 111), at 31, 39-42, 118-120.

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

Hegarty testified that in a few instances she was aware of allegations that candidates who had political connections were given preferential treatment in hiring within the Probation Department.[369] Hegarty was dismissive of these allegations and did not press the issue:[370]

> Q.  Did you ever follow up or question the individuals from OCP about these alleged connections that the other more successful candidates had?
>
> A.  No. No.
>
> Q.  Is there a reason why you didn't do that?
>
> A.  Because they could -- they were there to hear it. They could have addressed it, and sometimes they did. Sometimes they just said, well, you know, you're throwing that out there, and, you know, you have nothing to prove that.

Testimony of Christine Hegarty, October 20 (Exhibit 111), 2010, at 53-54.

498.  In most instances, Hegarty failed to consider information from the first round panel.[371]

> Q.  Is there a reason then why you wouldn't go and, for instance, say I want to see the first round interviewing panel to have a better understanding of how the overall process worked?
>
> A.  Most -- again, it's union driven, and if they're not asking me to -- I'm not doing an investigation. All is I'm doing is doing a -- I'm not relitigating the whole interview process. I'm really -- my role is to review what was done to make sure that it's in compliance with the contract. So if OCP can demonstrate to me that they have legitimate business-related reasons for what they did, that's where my role is.

Testimony of Christine Hegarty, October 20, 2010 (Exhibit 111), at 42.

---

[368]  Testimony of Christine Hegarty, October 20, 2010 (Exhibit 111), at 41-42, 119-120.

[369]  Testimony of Christine Hegarty, October 20, 2010 (Exhibit 111), at 51-52.

[370]  Testimony of Christine Hegarty, October 20, 2010 (Exhibit 111), at 41-42, 88-89, 137-38.

[371]  Testimony of Christine Hegarty, October 20, 2010 (Exhibit 111), at 40-41.

LIBA/21225629

499.   Hegarty heard the grievance that resulted in the arbitration brought by Karen

Jackson. Hegarty's notes reflect that Jackson raised the allegation that Parente's name was given

to the local round of interviewers as a preferred candidate. Her notes further appear to indicate

that Burke told "TS" (Tony Sicuso) that he "saw 2 candidates on a list that would be the best –

AP (Amy Parente) + KJ (Karen Jackson)."[372]  Hegarty testified that Burke probably was not

present at the grievance proceeding and her notes indicate that neither Burke nor Alpers

attended.[373]  During her testimony (without her notes) Hegarty testified that she did not recall

whether she investigated further Jackson's allegation that there were "other factors" involved in

the interview process, but it was not her role as the grievance hearing officer to undertake such

an investigation.[374]

500.   Hegarty testified that she looked to the Commissioner's Office to prove that it had

legitimate reasons for its promotional decisions. Hegarty did not question the documentation

provided by the Commissioner's Office, but assumed that it was true and accurate.[375]  Like

Sicuso, her siloed view of her role allowed her to ignore that the hiring process was rigged

against a grievant who was equally or better qualified than the selected candidate.[376]

501.   John ("Jack") Alicandro, who served as the President of the probation officers'

union (NAGE) from 2002-08, testified that it was nearly impossible for grievants to succeed in

grievance and arbitration proceedings because the Probation Department's hiring and promotion

practices looked good on paper.

---

[372]   A copy of these notes accompanies this Report as Exhibit 34.

[373]   Testimony of Christine Hegarty, October 20, 2010 (Exhibit 111), at 144.

[374]   Testimony of Christine Hegarty, October 20, 2010 (Exhibit 111), at 136 -37.

[375]   Testimony of Christine Hegarty, October 20, 2010 (Exhibit 111), at 30-31, 52-53, 55-57, 117-118.

[376]   Testimony of Christine Hegarty, October 20, 2010 (Exhibit 111), at 56-57.

221

**PRIVILEGED AND CONFIDENTIAL**
**BY ORDER OF THE SUPREME JUDICIAL COURT**

502. By way of example, Alicandro testified that the Commissioner's Office often justified a particular hiring based on the "fact" that the selected individual scored the highest in the final round interviews and there was paperwork to corroborate the scores.[377] Of course, because the scoring was often rigged in favor of sponsored candidates, this "fact" was essentially meaningless:

> Again, you know the mantra out of the commissioner's office is the person who scores number one always gets the job. But, you know, it's like speaking of horse races, you hobble nine of the horses, the tenth horse who isn't hobbled is always going to win. At least the perception is that its fixed before you go in.

Testimony of John Alicandro, October 1, 2010 (Exhibit 93), at 91.

503. Alicandro told us that grievants had informed him that the answers indicated on the scoring sheets were not the answers they had, in fact, given during the interviews.[378] Alicandro testified that he believes the reliability of the scoring sheets is further undermined by the fact that all final round interview notes and scores were, as a matter of practice, made in pencil, leaving room for scores to be changed.[379] During our review of selected final round scoring sheets, it appears in some instances that scores have been falsified. It is possible to see a score that was either erased or written over.[380]

504. Because those deciding the grievances and arbitrations did not look beyond the paperwork they were presented with, they never acknowledged even obvious unfairness. Both Alicandro and Hegarty testified that that not a single grievance relating to the promotion of an

---

[377] Testimony of John Alicandro, October 1, 2010 (Exhibit 93), at 89-92. Relevant excerpts of the testimony of former NAGE Union President Alicandro accompany this Report as Exhibit 93.

[378] Testimony of John Alicandro, October 1, 2010 (Exhibit 93), at 90-91.

[379] Testimony of John Alicandro, October 1, 2010 (Exhibit 93), at 89-90, 104-106.

[380] A copy of the February 17, 2005 interview scoring sheets, marked as exhibit 3 during the testimony of Patricia Horne, accompany this report as Exhibit 112.

222

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

employee within the Probation Department had ever been allowed.[381]  At best, grievances were

settled during the later stages of the proceedings, though even this was a rare occurrence.[382]

## VIII.  EFFORTS BY AOTC TO CONTROL THE HIRING PROCESS

505.    Throughout Commissioner O'Brien's tenure, efforts were made by AOTC, in

particular Chief Justice Dortch-Okara and Chief Justice Mulligan, to exercise increasing

oversight of hiring and promotion by O'Brien.

### A.    Chief Justice for Administration and Management Dortch-Okara

506.    As early as 2000, AOTC knew that there were significant and fundamental

problems with the Probation Department's hiring practices.

507.    Chief Justice Dortch-Okara was aware that Commissioner O'Brien was providing

names of "recommended" candidates to the local interview panels and improperly influencing

the hiring process.  She testified that she concluded by 2000 that in many cases, hiring within

the Probation Department was "fixed."[383]

> Q.    … the totality of what you were looking at was that the
> commissioner's representative was utilizing some device,
> whether waiting to see what other people scored and then
> compensating for that, or some other method, but the net
> effect was that the commissioner's choice was being graded
> in such a way as to negate the recommendations of the
> other panel members?
>
> A.    Yes.
>
> Q.    Accordingly, by late 2000 or early 2001, it was known
> within AOTC that the commissioner's scoring was being
> essentially falsified; isn't that right?

---

[381] Testimony of John Alicandro, October 1, 2010 (Exhibit 93), at 60-61, 100-102; Testimony of Christine Hegarty, October 20, 2010 (Exhibit 111), at 25-26, 28-29, 32, 50-51.

[382] Testimony of John Alicandro, October 1, 2010 (Exhibit 93), at 100-101; Testimony of Christine Hegarty, October 20, 2010 (Exhibit 111), at 25-27, 49-50.

[383] Testimony of Barbara Dortch-Okara, October 13, 2010 (Exhibit 107), at 11, *see also id.* at 29.  Relevant excerpts of the testimony of Chief Justice Dortch-Okara accompany this Report as Exhibit 107.

223

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

A.     I don't want to say -- the commissioner scoring. You mean his -- the personnel he placed on these committees?

Q.     Yes.

A.     That their scoring in many cases did not reflect the merits of these candidates and rather reflected other issues or other influences.

Q.     When you say "other issues or influences," what you mean is that to the extent there was recommendations to Commissioner O'Brien from legislators or others and to the extent that he favored certain candidates, his delegate to these interview panels was scoring in such a way as to promote those candidates?

A.     Yes.

Testimony of Barbara Dortch-Okara, October 13, 2020, at 18-19.

508.    Chief Justice Dortch-Okara testified that she was aware that AOTC's regional coordinators felt that their "voice carried no weight in the process because the two probation members of [the interview] committee would vote together and would achieve the result they desired without any input from the court."[384]

509.    Jill Ziter, Regional Coordinator for the District Court Department, testified that she and other regional coordinators brought to the attention of Chief Justice of the District Court Zoll and his staff that they were being asked to pass certain candidates on to the next round interview regardless how the candidate actually performed during the interview process. Ziter testified that she complained to her superiors about the incident in Wareham at which Deputy Commissioner Wall provided names of recommended candidates and then, unhappy with Ziter's scoring of that candidate, falsely scored the candidate to ensure he made the next round of interviews. [385]

---

[384] Testimony of Barbara Dortch-Okara, October 13, 2010 (Exhibit 107), at 10-11.

[385] Testimony of Jill Ziter, September 23, 2010 (Exhibit 140), at 32-34.

224

LIBA/21225629

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

510.    In an attempt by the District Court to curb the influence of the Commissioner's

Office on the hiring process, the regional coordinators were replaced by judges on the local

interview panels.  Ziter testified that the hope was that the Commissioner's representatives would

be less inclined to try involving a judge in fraudulently advancing a particular candidate.[386]

511.    Furthermore, Chief Justice Dortch-Okara met with the Chief Justice of the District

Court Zoll and the Commissioner to attempt to reform the recommendation process.  In letters to

the Commissioner and Chief Justice Zoll dated January 10, 2001, Chief Justice Dortch-Okara set

forth a process pursuant to which letters of recommendation received by one interview panel

member were to be distributed to all panel members.  Any oral recommendation was to be

reduced to writing and distributed.  Chief Justice Dortch-Okara's letter also stated that there was

to be no discussion of any recommendation, though panel members could consider them as they

saw fit.

> First, Chief Justice Zoll and you will formulate a written policy
> concerning the type and content of preliminary discussions that the
> committee engages in before interviews commence.  This policy
> will require that letters of recommendation received by individual
> committee members be distributed to other members and remain
> with the applicant's file following the interviews.  Oral
> recommendations must be put in writing and distributed to
> committee members.
>
> Second, there must be no discussion of the content of the
> recommendations by the committee.  Of course, the
> recommendations may be considered by committee members in
> their evaluation of the candidates.  However, it is intended that the
> individual committee members make their independent judgment
> concerning the weight to be given to the recommendations.[387]

---

[386]  Testimony of Jill Ziter, September 23, 2010 (Exhibit 140), at 52-54.

[387]  The letters from Chief Justice Dortch-Okara to Chief Justice Zoll and Commissioner O'Brien accompany this
Report as Exhibit 59.

225

512.    A policy was then drafted to implement such changes and incorporate a

requirement that panelists "score each candidate independently and without favoritism."[388] Ziter

prepared a memorandum commenting on the draft policy that contained other suggestions to

ensure that interviews are conducted fairly. Ziter recommended that all interviewers be required

to score the candidates simultaneously to avoid what had occurred in Wareham. Ziter also

suggested that the composition of the interview panel be changed to include another

representative from the District Court:

> The panel now consists of one representative for Chief Justice
> Zoll, one representative for the Commissioner and the CPO. In
> instances where political pressure is applied, that seems to translate
> into two votes for the political choice and one against. Adding a
> fourth panel member who does not report to the Commissioner
> may help even out the process...

A copy of Ziter's January 30, 2001 memorandum accompanies this report as Exhibit 61.

513.    Chief Justice Dortch-Okara acknowledged that the *Policies and Procedures*

*Manual* requires that all appointments be made on the merits, and she believed these changes

would bring practices in line with that requirement.[389] She also testified, however, that she felt

"boxed in" by the amendment to M.G.L. c. 276, § 83 which gave additional appointment

authority to the Commissioner. She believed the change was a "symbolic" statement by the

legislature that she and the judges should be more "hands off" in Probation Department hiring.[390]

514.    It appears that because of a hiring freeze, the proposed changes to the hiring

practices were never implemented. Chief Justice Dortch-Okara's term expired before hiring

---

[388]    The draft policy accompanies this Report as Exhibit 60; Testimony of Jill Ziter, September 23, 2010, at 69-70.

[389]    Testimony of Barbara Dortch-Okara, October 13, 2010 (Exhibit 107), at 24-26.

[390]    Testimony of Barbara Dortch-Okara, October 13, 2010 (Exhibit 107), at 70-72, 87-88.

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

began again, and she was not forced to address these issues. She had only limited involvement in hiring after M.G.L. c. 276, § 83 was enacted.[391]

## B.    Chief Justice for Administration and Management Mulligan

515.    Chief Justice Mulligan was appointed to the Chief Justice for Administration and Management position effective October 1, 2003, during the hiring freeze that began in 2001. It appears that the issues Chief Justice Dortch-Okara raised with respect to hiring were not communicated during the change in leadership, possibly because hiring was not active at that time.

516.    When hiring resumed in late 2004, Chief Justice Mulligan began efforts to gain greater control and oversight. Correspondence between Chief Justice Mulligan and O'Brien indicates that in October 2004, the two met to discuss revisions to Administrative Order # 4. At that point, Mulligan agreed not to issue a revised Administrative Order #4 because O'Brien agreed to an "interim approach" which allocated decisionmaking with respect to chief probation officer hiring more equally among the judges and OCP. Mulligan and O'Brien agreed to maintain the two OCP representatives, but also allow for two representatives designated by the Chief Justice of the relevant trial court. This was intended to eliminate disproportionate weight being given to the preferences of OCP.[392]

517.    O'Brien, however, continued to push for increased autonomy in hiring. In correspondence between Mulligan and O'Brien a month later, O'Brien sought to eliminate section 4.302(E) of the *Policies and Procedures Manual*. Failing that, O'Brien sought to simply remove the Chief Justice from the interview committee. Mulligan declined to grant O'Brien's

---

[391]    Testimony of Barbara Dortch-Okara, October 13, 2010 (Exhibit 107), at 15-16.

[392]    Letter from Chief Justice Mulligan to Commissioner O'Brien dated October 25, 2004. A copy of this letter accompanies this Report as Exhibit 35.

227

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

request but agreed to modify the last sentence of section 4.302(E) to take into account the

statutory change that vested appointment authority in the Commissioner subject to approval by

the Chief Justice for Administration and Management. As modified, section 4.302(E) now read:

> In the case of a Probation Officer, Probation Officer in Charge,
> Assistant Chief Probation Officer, or First Assistant Chief
> Probation Officer vacancy, an interview committee consisting of
> the Commissioner of Probation (Chair) or his/her designee, the
> Chief Probation Officer of the Division, and a representative of the
> Chief Justice of the Department shall interview applicants
> consistent with the guidelines set forth in this section. Each
> candidate selected for an interview shall be evaluated and
> determined to be recommended or not recommended. A list not to
> exceed 8 names of candidates for each open position shall be
> forwarded to the *Commissioner of Probation for appointment
> subject to the approval for the Chief Justice of Administration and
> Management.*[393]

518.    Had Mulligan agreed to O'Brien's request, significantly more authority would

have been given to OCP in hiring, as there would have been no judicial oversight of the first

round of interviews.

519.    During the active hiring in 2004, Chief Justice Mulligan was able to exercise

some control over which positions were filled and when. Mulligan strictly enforced the staffing

formula used to determine the number of probation officers and supervisory positions needed in

a particular court and refused to authorize job postings if not supported by the formula.

Correspondence between O'Brien and Chief Justice Mulligan includes numerous examples of

Mulligan refusing to allow O'Brien to post positions.[394]

520.    As time went on, Chief Justice Mulligan seemingly relented in his attempts to

limit the power of OCP. In March 2005, Mulligan informed O'Brien that judges were no longer

---

[393]  November 22, 2004 letter (Exhibit 36).

228

going to be participating in interview panels for probation officers (interviewing every candidate)

because of the large number of interviews slated to take place. O'Brien had scheduled 3,800

interviews for 52 positions. Mulligan stated:

> I do not believe that participating in the mind-numbing process of
> interviewing hundreds of candidates for a single position
> constitutes a meaningful method of selection. Further, it would be
> far too disruptive to court business to remove judges from the
> bench for an inordinate amount of time that it would take to
> conduct these interviews.[395]

521.    Mulligan proposed the current model, under which a screening panel winnows the

number of candidates to eight per position, with only eight going before the local panel on which

a judge sits.[396]

522.    Notably, although Mulligan proposed this process, his letter of March 22, 2005

indicated his belief that O'Brien had intentionally driven him to reduce the role of judges in the

hiring process. As Mulligan put it:

> Some months ago, when you and I discussed judicial involvement
> in the hiring of probation officers, you made it clear that you did
> not want to have judges involved in the process and that you
> considered it an imposition on your authority…I can only conclude
> that you have decided on 3,800 interviews so that you could fulfill
> your own prophecy that judges would not want to be involved. I
> consider such action to be contrary to the good order of the trial
> court.[397]

523.    In several instances, Mulligan asked for additional information regarding various

hires or promotions and withheld his approval of those appointments. For example, in March

---

[394]    Letter from Chief Justice Mulligan to Commissioner O'Brien dated November 30, 2004; Letter from Chief
Justice Mulligan to Commissioner O'Brien dated December 28, 2004. A copy of this correspondence
accompanies this Report as Exhibits 37 and 38.

[395]    March 10, 2005 letter (Exhibit 39).

[396]    March 10, 2005 letter (Exhibit 39).

[397]    Letter from Chief Justice Mulligan to Commissioner O'Brien dated March 22, 2005. A copy of this letter
accompanies this Report as Exhibit 40.

229

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

2005, Mulligan received the complaint from Judge Gilbert Nadeau concerning the Lucy Ligotti

hiring. Mulligan forwarded Judge Nadeau's letter to Commissioner O'Brien and asked for an

immediate response.[398] Mulligan's follow up letter to O'Brien indicates that the process,

whereby nine candidates were forwarded to O'Brien as finalists, violated the limit on the number

of finalists to eight. Mulligan therefore rejected Ligotti's appointment and directed O'Brien to

select a candidate from the original list of eight.[399]

524.   In April 2006, Mulligan once again appears to have questioned several

appointments requested by O'Brien. In response, O'Brien challenged the Chief Justice and

wrote to Mulligan:

> Although I am gravely concerned that the approval process has far
> exceeded its scope, as defined by both policy and law, I have
> enclosed the requested information. I am confident the above
> referenced appointees are more than qualified and each have been
> appointed pursuant to existing policies and procedures.[400]

525.   Mulligan responded by stating that "despite his reservations" he was approving

the appointments of certain probation officer candidates, but refusing to approve the appointment

of some associate probation officer candidates who did not meet the education and/or experience

requirements. Mulligan also reiterated his authority to review the Probation Department

appointments,

> I take exception with your expressed view that the approval
> process has far exceeded its proper scope. I intend to review fully
> the qualifications of all candidates, both now and in the future, to

---

[398] Letter from Chief Justice Mulligan to Commissioner O'Brien dated March 25, 2005. A copy of this letter accompanies this Report as Exhibit 41.

[399] March 29, 2005 letter (Exhibit 42).

[400] Letter from Commissioner O'Brien to Chief Justice Mulligan dated April 3, 2006. A copy of this letter accompanies this Report as Exhibit 45.

230

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

ensure that the hiring policies and requirements of the manual are met.[401]

526.    Mulligan kept to his word and continued to review the qualifications of candidates and the process overall.  In September 2006, Mulligan withheld approval of a candidate because of discrepancies in the candidate's ranking by the local panel and the final interview panel.  The local panel ranked her seventh, sixth and tenth respectively, whereas the final interview panel ranked her first.[402]

527.    It also appears that Mulligan "sat on" appointments that he did not agree with. There are several letters from O'Brien to Mulligan asking him to approve appointments requested months earlier.[403]  This exacerbated the ongoing power struggle between Mulligan and O'Brien.  In a letter of October 2006, O'Brien informed Mulligan that he had contemplated petitioning the Supreme Judicial Court to seek clarification of the scope of Mulligan's powers, because he believed that Mulligan's approval process has "undermine[d his] statutory authority of appointment."[404]

528.    Mulligan was undeterred by O'Brien's implied threat.  Later that same month Chief Justice Mulligan called in Deputy Commissioner Patricia Walsh and questioned her about, inter alia, rigging of the Probation Department's hiring process.  A memorandum from Walsh reporting on the content of that meeting indicates that Mulligan asked her whether final round

---

[401]  Letter from Chief Justice Mulligan to Commissioner O'Brien dated April 6, 2006.  A copy of this letter accompanies this Report as Exhibit 46.

[402]  September 26, 2006 letter (Exhibit 47).

[403]  Letter from Commissioner O'Brien to Chief Justice Mulligan dated October 2, 2006 regarding appointment of Carmen M. Collins; Letter from Commissioner O'Brien to Chief Justice Mulligan dated May 23, 2007.  A copy of this correspondence accompanies this Report as Exhibits 48 and 54.

[404]  Letter from Commissioner O'Brien to Chief Justice Mulligan dated October 2, 2006 regarding approval of John F. Chisholm.  A copy of this letter accompanies this Report as Exhibit 49.

231

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

candidates were given questions in advance and whether Walsh was ever directed to score

candidates in a particular way.[405]  As Walsh recounted,

> At this point in the meeting Frank Carney asked me a question.  I
> cannot recall this question because immediately upon my answer,
> the Chief Justice asked me very directly if anyone told me how to
> score this candidate.  I answered the Chief Justice and stated that
> no one told me how to score this candidate.  Chief Justice Mulligan
> repeated the same question again and I responded again that I was
> not told by anyone how to score this candidate.  At this point,
> Chief Justice terminated the meeting and thanked me for coming to
> his office.[406]

529.    Based on that conversation, Mulligan pressed the issue again and informed

O'Brien by letter that he wanted to revise the hiring policies and procedures.  Mulligan did not

raise the issue of rigged hiring directly, but instead directed Commissioner O'Brien to reconsider

the overall structure of the hiring process:

> I would like you to restructure the existing practice and produce a
> procedure which will result in the selection of the most qualified
> candidate by either abolishing the central [final] interview panel or
> by establishing a meaningful integration of the work of the local
> panel with that of the central panel.[407]

530.    In response, O'Brien proposed to make the ranking and comment sheets from the

local panel available to the final interview panel.  Mulligan, however, maintained his position

that it was not sufficient, given past disparities in the rankings, and sought to require the

following procedure:

> Where there is a substantial discrepancy between the rankings of
> the two panels, the central panel should communicate with the
> members of the local panel (e.g. via a conference call) to discuss
> the divergence of views.  If the difference of opinion persists, the
> central panel should prepare a written explanation of the reasons

---

[405]    A copy of Walsh's October 2, 2006 memorandum accompanies this Report as Exhibit 50.

[406]    Walsh's October 2, 2006 memorandum (Exhibit 50).

[407]    October 17, 2006 letter (Exhibit 51).

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

> underlying the divergent views, along with the rationale for
> selecting the final candidate.[408]

Such a procedure, by decreasing the autonomy of the final interview panel, would have provided

the judges a potentially greater voice in selecting candidates and decreased the ability of

Commissioner O'Brien to rig the system in favor of sponsored candidates.[409]

531. In response, O'Brien misleadingly described to Mulligan the reason for

disconnects between the scoring of the local and final interview panels, suggesting that these

were based on different questions asked by the different panels, directing attention away from his

frequent rigging of the final result:

> Second, when there is what you term to be a "disconnect" between
> the assessments of the local panel and those of the central panel, it
> is primarily attributable to the fact that each panel is asking
> different questions and evaluating different attributes. The local
> panel, in a relatively brief and general interview, asks questions to
> evaluate the general quality and relevance of a candidate's
> experience, education, training and general knowledge related to
> the position to identify the best qualified candidates to advance to
> the final interview. The central panel, in a more challenging and
> detailed final interview, asks questions to evaluate specialized and
> particular knowledge, skill and experience related to the position;
> and to evaluate how a candidate would put those attributes to use
> in the position for which the candidate has applied.[410]

532. Mulligan's correspondence to Commissioner O'Brien through 2008 continued to

question discrepancies in the rankings determined by the local and final interview panels.[411] In

---

[408] Letter from Chief Justice Mulligan to Commissioner O'Brien dated January 23, 2007. A copy of this letter accompanies this Report as Exhibit 52.

[409] Interestingly, by letter of January 25, 2007, O'Brien appears to have agreed to Mulligan's proposed revisions to the procedure for handling scoring discrepancies between the local and final panels. Letter from Commissioner O'Brien at Chief Justice Mulligan dated January 25, 2007. A copy of this letter accompanies this Report as Exhibit 53. None of the witnesses who testified regarding the hiring and interview process, however, indicated that such a procedure was ever implemented.

[410] January 25, 2007 letter (Exhibit 53).

[411] Letter from Chief Justice Mulligan to Commissioner O'Brien dated March 6, 2008; Letter from Commissioner O'Brien to Chief Justice Mulligan dated March 11, 2008; Letter from Chief Justice Mulligan to Commissioner

response to Chief Justice Mulligan's inquiries, O'Brien continued to misleadingly discuss the

reasons why discrepancies may exist between the local and final panels, and between the judges

and the probation department employees serving on the local panel:

> Discrepancies between the rating of the justices and probation
> managers at the screening stage of the hiring process are to be
> expected. Probation managers and justices perform two separate
> functions in the Trial Court and it follows that they will assign
> different weight to the various qualities of candidates.
> Nevertheless, this is a healthy dichotomy and is useful in the
> process of winnowing down the number of candidates that are
> forwarded to the final round. Here, 7 of the 13 candidates for the
> position were eliminated. Accordingly, the first round of
> interviews served its purpose of narrowing the number of
> candidates eligible for selection in the final round.
>
> Furthermore, I am sure you understand that I do not know what
> factors or information the local panel relied upon in rating the
> candidates. I was not present at the interviews and there is always
> an element of subjectivity on the part of interviewers that can not
> easily be measured...[412]

533.    Although the written record reflects considerable effort by Chief Justice Mulligan

to address the integrity of O'Brien's hiring and promotion, these efforts appear to have been

mostly indirect and around the edges of the problem. Chief Justice Mulligan did not typically

question whether candidates were the most qualified, and he generally relented once provided

some explanation by the Commissioner. Chief Justice Mulligan took this approach in part

because he had a very narrow view of his authority to reject the Commissioner's proposed

candidate:

> I considered my authority overseeing probation's hiring is as
> follows: One, that probation hired pursuant to the policies which
> were in the personnel policies and procedures manual, that is, they
> conducted a process that was consistent with the policies; two, that

---

O'Brien dated March 14, 2008. A copy of this correspondence accompanies this Report as Exhibits 56, 57 and
58.

[412]    March 11, 2008 letter (Exhibit 57).

234

Case 1:11-cv-11850-NMG Document 66-5 Filed 11/07/12 Page 51 of 51

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

> they had -- my review that they had adequate funds to actually
> engage in the hiring, which I suppose is the very first step, one;
> and, three, that their hiring complied with the affirmative action
> policies in the trial court.

> There are, as you say, statutes. And there was outside sections in
> the budgets for the last several years reinforcing the exclusive
> appointment power in the commissioner of probation relative to
> hiring within the probation service.

Testimony of Robert Mulligan, October 4, 2010 (Exhibit 122), at 4-5.

534.    The statutes and budget sections Chief Justice Mulligan referenced are the

amended version of M.G.L. 276, § 83, and budgetary enactments since 2000, which have

purported to give the Commissioner exclusive hiring authority. Based on these provisions, Chief

Justice Mulligan believed his authority to reject an appointment was limited to situations in

which the Commissioner failed to follow Trial Court's hiring policies and procedures.

535.    Chief Justice Mulligan may have been reluctant to openly challenge O'Brien

despite the fact that the *Policies and Procedures Manual* requires hiring the "most qualified

individuals" based solely on the merits (with limited exceptions for affirmative action and under

collective bargaining agreements). If lesser candidates were being selected based on

considerations other than merit, the Chief Justice could reject their appointment. During his

testimony Chief Justice Mulligan agreed that, based on language in the *Policies and Procedures

Manual*, he has authority to ensure that hiring is merit-based:

> Q.    The statutory language or the regulatory language of the
>        policies and procedures manual indicates in the first two
>        paragraphs of Section 4.000 that hiring shall be of, quote,
>        "the most qualified individuals." And it goes on in the
>        second paragraph of 4.0 to say that such hiring shall be,
>        quote, "based on their qualifications."

>        Didn't that give you the authority to reject, in the event that
>        you determined that hiring with respect to the most
>        qualified individual did not occur?

235

LIBA/21225629