# EXHIBIT A

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

A.      I suppose it -- on the face of it, it may -- I guess it did give
        me the -- but to -- yeah. I'll answer -- leave the answer the
        way it is.

Q.      Apart from whether you would have known the intricacies
        of particular recommendations and how you could be
        expected to fully understand either the qualifications of the
        proposed appointment or whether an individual was most
        qualified, am I missing something? Or does the regulation
        appear to give you the power to reject, according to the
        statute, if standards are not met, including the most
        qualified applicant?

A.      No. I think you're correct. I believe you're correct.

Q.      If you look at page 6 of 17, Section 4.304 on nepotism
        under Subsection A, it says, quote, "It is the policy of the
        trial court that all appointments be made solely on the basis
        of merit," end quote. Then it goes on to talk about
        nepotism as such.

        Doesn't that reinforce the notion that whatever appointment
        authority the commissioner had, it was subject to the hiring
        being solely on the basis of merit?

A.      It does.

Testimony of Robert Mulligan, October 4, 2010 (Exhibit 122), at 21-22.

        536.    Even if the Chief Justice had taken a more expansive view of his oversight

authority, it is not likely that the Chief Justice had the resources to review every appointment that

came before him. As Mulligan explained during his testimony, the Probation Department is only

one of the many parts of the Trial Court over which AOTC must exercise oversight:

        Probation was one aspect of the [CJAM]'s work, and we had seven
        trial court departments. I was very actively involved during a lot
        of this time with problems with buildings, including a building in
        East Cambridge that took a lot of my time, Sullivan Courthouse.
        We were putting new procedures in place relative to metrics as a
        result of the Monan report.

        So there were a lot of things going on in my mind at the time, other
        than just probation. And maybe in some ways, because of the
        distastefulness of dealing with Commissioner O'Brien, it was

236

> perhaps an avoidance situation relative to meeting with him. And I
> think I alluded to that previously.
>
> But as I say, my memory isn't clear on all of this because there
> were -- I was being occupied in many different spheres. And I
> would say for the first three years that I was in that position as a
> [CJAM], I was over occupied -- if I could put it that way -- to the
> point of really responding to so many things. It was really an
> overload situation for me.

Testimony of Robert Mulligan, October 4, 2010 (Exhibit 122), at 53-54.

537.    In addition to Chief Justice Mulligan's attempts to ensure that the most qualified

candidate was hired, Mulligan also sought, as far back as 2005, to control O'Brien's contacts

with the legislative branch. In an incident in April 2005, Mulligan questioned O'Brien's position

on the transferability of funds within the Trial Court and demanded to know whether O'Brien

had communicated a Departmental position to any legislator or legislative staff member.[413]

O'Brien responded that he had not had such communications.[414]

538.    Mulligan's efforts increased significantly in 2008 when he ordered O'Brien and

his staff not to have any contact with the legislature. In a January 24, 2008 letter, Mulligan

stated: [415]

> As I informed you, I want you or anyone acting on your behalf to
> coordinate with Elizabeth Cerda all future contacts with any and
> every member of the Legislature, House and Senate.

539.    Mulligan followed up this directive by ordering O'Brien to keep logs of his

contact with legislators. Lucia Vanasse testified that she was instructed to keep logs of all

---

[413] Letter from Chief Justice Mulligan to Commissioner O'Brien dated April 7, 2005. A copy of this letter accompanies this Report as Exhibit 43.

[414] Letter from Commissioner O'Brien to Chief Justice Mulligan dated April 8, 2005. A copy of this letter accompanies this Report as Exhibit 44.

[415] Letter from Chief Justice Mulligan to Commissioner O'Brien dated January 24, 2008. A copy of this letter accompanies this Report as Exhibit 55.

237

communications that came in from any member of the legislature as was the Commissioner.[416]
Vanasse produced copies of these logs which show the name of the legislator who called. In the
"Regarding" column, nearly every entry indicates "recommendation."[417] Vanasse further
testified that when the hiring process stopped, she and the Commissioner were no longer
required to keep these logs.

540. In summary, Chief Justice Mulligan exercised a responsible level of control over
hiring and recognized flaws in the system, but neither he, nor Chief Justice Dortch-Okara, were
successful in preventing the fraudulent hiring that occurred. There remains the question whether
either Chief Justice might have gone further by activating the Advisory Committee authorized in
M.G.L. c. 211B. The Chief Justice is the statutory chair and is empowered to "establish and
promulgate standards for the appointment [and] promotion … of all personnel within the trial
court …." More particularized standards may be an avenue to address abusive hiring practices in
the future. Nonetheless, the Chief Justice faced a hostile Commissioner determined to
institutionalize a corrupt and fraudulent process which the Chief Justice could not have been
expected to correct given legislative directives empowering O'Brien to appoint. Both Chief
Justice Dortch-Okara and Chief Justice Mulligan acted with integrity to counterbalance O'Brien.

## IX. THE FAILURE OF LEGAL COUNSEL TO THE DEPARTMENT TO MONITOR AND ENSURE THE DEPARTMENT'S LEGAL COMPLIANCE

541. During the years of senior management participation in the fraudulent hiring and
promotion process, Legal Counsel for the Department remained mum. The absence of any
cautionary advice is troubling, and suggests either that Legal Counsel was unaware of massive

---

[416] Testimony of Lucia Vanasse, July 20, 2010 (Exhibit 138), at 61, 80.

[417] A copy of the telephone logs, marked as exhibit 3 during the testimony of Lucia Vanasse on July 20, 2010, accompanies this Report as Exhibit 138.

238

LIBA/21225629

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

fraud within the Department involving dozens of employees, or that Legal Counsel was aware of

the fraud but acquiesced in it.

542.    Rule 1.13(b) of the Massachusetts Rules of Professional Conduct address the

responsibilities of legal counsel in an organization who has knowledge of wrongdoing by others

in the organization:

> If a lawyer for an organization knows that an officer, employee, or
> other person associated with the organization is engaged in action,
> intends to act or refuses to act in a matter related to the
> representation that is a violation of a legal obligation to the
> organization, or a violation of law that reasonably might be
> imputed to the organization, and that is likely to result in
> substantial injury to the organization, then the lawyer shall proceed
> as is reasonably necessary in the best interest of the organization.
> Unless the lawyer reasonably believes that it is not necessary in the
> best interest of the organization to do so, the lawyer shall refer the
> matter to higher authority in the organization, including, if
> warranted by the circumstances, to the highest authority that can
> act on behalf of the organization as determined by applicable law.

543.    "[T]he highest authority that can act on behalf of the organization" in this instance

is likely the Administrative Office of the Trial Court and/or the Supreme Judicial Court, which

exercises oversight over the Department and had the authority, for instance, to suspend

Commissioner O'Brien and to initiate this investigation. *See* Massachusetts Rules of

Professional Conduct, Comment 9  ("For example, if the action or failure to act involves the head

of a bureau, either the department of which the bureau is a part or the relevant branch of

government may be the client for the purposes of this Rule.").

544.    As described herein, there is reason to believe that both Legal Counsel to the

Department in the relevant time period – former Deputy Commissioner Anthony Sicuso and

Deputy Commissioner Christopher Bulger – were aware of the fraud and ignored it, or had

reason to be aware and turned a blind eye.  Furthermore, testimony by Bulger underscores that

239

his loyalty lies first with Commissioner O'Brien, not the Department. His "briefings" to O'Brien

during the suspension are in direct conflict with the Department's interest and reflect the high

probability that Bulger knew the extent of the fraud for years but maintained "plausible

deniability."

## A.      Former Deputy Commissioner Anthony Sicuso

545.    Former Deputy Commissioner and Legal Counsel Sicuso, who represented the

Department from 1993 until his retirement in 2008, disclaimed any knowledge of the rigged

hiring during his testimony. Indeed, he disclaimed knowing even that politicians were calling

the office to sponsor candidates, an assertion that Independent Counsel does not credit:

> Q:      [W]hen you were in the Office of the Commissioner of
> Probation under Jack O'Brien, were you aware that the
> Commissioner's office was receiving telephone calls from
> politicians to put a word in for applicants for hiring or
> promotion in the department?

> A:      No. I have no direct knowledge of anything like that.
> You'd hear a rumor perhaps or read something in the
> papers. I never saw or heard or was present at or had
> anybody tell me that they were there when a call came in or
> something like that. ….

Testimony of Anthony Sicuso, September 30, 2010 (Exhibit 134), at 78.

546.    Despite carefully chosen words, Independent Counsel finds Sicuso's testimony to

have been untruthful. Based on other testimony and the volume of calls received by OCP from

politicians, it was common knowledge that politicians sponsored applicants. Sicuso could not

have been ignorant of that basic reality.

547.    Sicuso testified that he lacked any direct knowledge that names of sponsored

candidates were being given to the interview panels:

> Q:      During the years you were legal counsel under
> Commissioner O'Brien, did you even observe
> Commissioner O'Brien or someone working for

240

> Commissioner O'Brien, such as a deputy commissioner,
> pass names to an interview panel of candidates that they
> wanted the interview panel to make sure got to the next
> round?
>
> A.    No, I never observed that,

Testimony of Anthony Sicuso, September 30, 2010 (Exhibit 134), at 79-80.

548.    However, Sicuso had ample reason to believe that hiring was being rigged. The

evidence in the Karen Jackson grievance and arbitration established that Deputy Commissioner

Burke had directly interfered at the local panel level. More troubling, Sicuso testified that he

once had a conversation with Ellen Slaney in which she appeared to be upset. Sicuso had the

sense that Commissioner O'Brien wanted her to falsely score a candidate and, because she did

not follow that direction, she was taken off of hiring.[418] Sicuso testified that this conversation did

not cause him to scrutinize the hiring practices within Probation:

> Q.    Did that give you any concerns as legal counsel for the
> department that scoring was in some way being fixed or
> influenced by the commissioner?
>
> A.    Scoring in general? No, not necessarily. Because I was still
> looking at documents which in grievances were not -- there
> was not a case factually in terms of the qualifications. If an
> issue came up as a result of a grievance because of that, I
> would be looking at the actual qualifications of the person,
> of the people involved. And I never saw issues that were
> not really defendable.

Testimony of Anthony Sicuso, September 30, 2010 (Exhibit 134), at 83-84.

549.    Sicuso appears to have consistently engineered "plausible deniability" in order to

protect himself at the expense of unknowing Probation applicants. So long as the Department

was "winning" grievances and prevailing at arbitration – as long as there was a defensible

argument that a selected candidate was "qualified" – Sicuso placed his head firmly in the sand.

---

[418] Testimony of Anthony Sicuso, September 30, 2010 (Exhibit 134), at 81-84.

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

As legal counsel for a public agency, however, and particularly in light of the Jackson grievance and his conversation with Slaney, Sicuso acted unprofessionally. His conduct betrayed his obligations as chief Legal Counsel to the Department. His apparent dishonesty during his testimony simply perpetuated that unprofessional conduct.

## B. Deputy Commissioner Christopher Bulger

550.    Christopher Bulger has served as a lawyer in Probation since 1998, becoming Legal Counsel in the Department in 2008.[419]

551.    As such, Bulger knew the requirements of the *Policies and Procedure Manual* with respect to hiring:

> Q:    Did you understand the policy to require the Commissioner to make appointments solely on the basis of merit?
>
> A:    Yes. I had an understanding that appointments should be based upon merit.
>
> * * *
>
> Q:    …Did you understand at all relevant times that Commissioner O'Brien's obligation was to make appointments "solely on the basis of merit"?
>
> A:    Yes. Yes. That was my understanding.

Testimony of Christopher Bulger, October 13, 2010 (Exhibit 95), at 103-104.

552.    Despite this awareness, Bulger knew or "assumed" that hiring and promotions were routinely motivated by factors other than merit:

> Q:    You know, do you not, that it was a routine practice in the office to communicate names of preferred candidates … to interview panelists at the regional level prior to those interviews …?

---

[419]    In 2008, Bulger was appointed Deputy Commissioner by O'Brien. He assumed the duties as Legal Counsel to the Probation Department.

> A:   I understand that to be the case now that it was routine
> practice. Prior to the [*Boston Globe*] article, I assumed it
> occurred anyway. I assumed it happened anyway ….

Testimony of Christopher Bulger, October 13, 2010 (Exhibit 95), at 44.

553.   Having earlier testified that he assumed that the hiring and promotion process was

fraudulent, Bulger retraced his verbal steps, claiming to be agnostic even now:

> Q:   No, Mr. Bulger. You knew it was happening didn't you?
> You couldn't possibly work there for 12 years and not
> know how the hiring was being done as legal counsel,
> could you?
>
> A:   But I didn't have knowledge of any *particular* case or ….
> (emphasis added)

* * *

> Q:   You're a graduate of Williams College and a law school.
> You deal with grievances. You know the allegations of the
> *Globe*. You've had two or three [conversations per week]
> with Mr. O'Brien since [O'Brien was suspended]… And
> you're telling me you still think all the hiring in the
> Probation Department was on the merits? …
>
> A:   I … at this time I do not know what to believe. I am telling
> you I don't know what to believe.

Testimony of Christopher Bulger, October 13, 2010 (Exhibit 95) at 49, 57-58.

554.   During the course of the investigation, Bulger confirmed directly with O'Brien

that names were provided to interview panels. He repeatedly stated that O'Brien expressly told

him so:

> Q:   You talk to Commissioner O'Brien two or three times a
> week now since his suspension and almost daily prior to
> this suspension, is that correct?
>
> A:   Yes. Yes.

* * *

243

**PRIVILEGED AND CONFIDENTIAL**
**BY ORDER OF THE SUPREME JUDICIAL COURT**

> Q:    Mr. O'Brien has told you in fact he did pass names along to
>       the regional interview panelists, correct?
>
> A:    Yeah. He would, yeah. Yeah.
>
>                * * *
>
> A:    …He's told me that he passes the - - - passed the names
>       along. He did ….
>
>                * * *
>
> Q:    …Have you had conversations [with O'Brien] specifically
>       about hiring practices and the fact that Commissioner
>       O'Brien gave names to the deputy commissioners or others
>       in the office to communicate to regional administrators
>       prior to interviews?
>
> A:    Yes. He – – since his departure, he mentioned that he had
>       given names … mentioned that was done, yeah."

Testimony of Christopher Bulger, October 13, 2010 (Exhibit 95), at 51, 62, 68, 42.

    555.    Bulger's apparent indifference to or willful blindness regarding fraudulent hiring

prior to this investigation also extended to his testimony regarding the Sponsor Lists. Bulger

reluctantly acknowledged telling O'Brien that the spreadsheets had surfaced in the investigation:

> Q:    Are you saying you don't know today whether or not
>       you've ever had a conversation with Commissioner
>       O'Brien regarding the fact that there's a list of political
>       recommendations for candidates?
>
> A:    … I think I *may* have been the person to mention it in the
>       conversation [with O'Brien]. *I don't know* that he had - -
>       he offered anything with respect to it. *I can't remember* if
>       it was because of my interaction with Maria or this article
>       but I believe *I mentioned the existence* of this database
>       [containing a Sponsor List] (emphasis added).
>
>                * * *
>
> Q:    You know you talked to Commissioner O'Brien and you
>       identified the fact that you knew of a list is that correct?
>
> A:    Yes. Yes.

Testimony of Christopher Bulger, October 13, 2010 (Exhibit 95), at 83-84.

556.    Bulger testified that he first saw the spreadsheet on the computer screen of Maria

Walsh, a legislative liaison in the Department, who told him "there were names she recorded

regarding recommendations." Bulger advised her to turn it over to Independent Counsel but

despite that testimony, Bulger claimed not to have even looked at the list:

> Q:    As legal counsel, did you go get the document and look at
>        it?
>
> A:    No.
>
>                     * * *
>
> Q:    I understood you to tell me that prior to the point at which
>        Maria Walsh came to testify before Independent Counsel
>        you saw at her desk on a computer screen a list and she
>        asked you about producing that list and you advised her to
>        produce the list; is that correct?
>
> A:    Yes.
>
>                     * * *
>
> A:    . . . I don't even know if I leaned to look at her computer or
>        not but she said, you know, I have a list of people. She
>        pointed to the screen. I can't recall exactly but she said,
>        you know, I have a list of people. I don't even know what
>        she said but she indicated there were names she recorded
>        regarding recommendations. And I just said, Take it. Take
>        it with you [to Independent Counsel].
>
> Q:    Before you told your employee who was coming to testify
>        before Independent Counsel to disclose a particular
>        document about which she was asking you, did you look at
>        the document to see what it was?
>
> A:    ... I don't think it was my role to review documents that
>        someone was going to bring down to this investigation.
>
>                     * * *

245

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

Q:    Did you put your hand over your eyes so you couldn't see what she was showing you on the screen before you told her to disclose it?

A:    Her screen is - - I was walking by the door and her screen was sideways and she described - - she said, I have lists of names on this thing.  What do I do?

Q:    Mr. Bulger, please.  You're legal counsel to the Probation Department.  There is an investigation going on which you have said you treat as a criminal investigation.  Your employee comes to you and says, here's a list of recommenders for particular candidates.  Do I take this to Independent Counsel?

      And you said yes without looking at the list?

A:    Yes.  Yes.

                              * * *

Q:    You didn't even have an understanding what the list was. Is that what you're telling me now?

A:    My understanding is it was a list of people who called in.

Q:    How did you get that understanding?

A:    From what she said.  "I have a list of names from people who called in."

Q:    So despite her telling you something that you say you never knew before that and showing you on the screen that it was a list of names of people recommending candidates, you're now telling me you didn't look at it?

A:    Yes.

Q:    And despite not looking at it, you later had a conversation with Commissioner O'Brien about what it was.  Is that what you're saying?

A:    I - - again, what I - - the feeling I had - -

                              * * *

Q:    You had a conversation with Mr. O'Brien about the fact that you had seen a list and what it was, isn't that correct?

                              246

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

A:    I don't know that I told him I saw a list because - -

Q:    Well, how did you tell him what it was then?

A:    ... I understood that Maria had kept a list of names of
      people that called in. I didn't ask for a printout. I didn't
      study the screen. I was walking by the office.

                              * * *

Q:    And so you're now saying you didn't look at it?

A:    Right.

Testimony of Christopher Bulger, October 13, 2010 (Exhibit 95), at 78, 82, 85-89.

557.    Independent Counsel views the testimony of Bulger as having been both evasive

and untruthful. He had been a lawyer in the Commissioner's office for twelve years and was

partially responsible for grievance proceedings which challenged specific promotions. Bulger is

also a confidant of O'Brien, frequently authoring O'Brien's most sensitive correspondence.

558.    It is clear that Bulger's foremost loyalty even today lies with Commissioner

O'Brien, not the Probation Department. When O'Brien was initially told of his suspension,

Bulger sought to participate in the suspension meeting, apparently as counsel for O'Brien. More

tellingly, Bulger conceded during his testimony that he has been informing Commissioner

O'Brien "two or three times a week" of developments in this investigation:

Q.    What's the purpose of your discussions with Commissioner
      O'Brien –

A.    Just –

Q.    – since his suspension?

A.    The purpose now is to just go over the events that are
      taking place in our office.

Q.    What events are you talking about?

A.    The investigation.

                              247

> Q.     Are you saying that you keep Commissioner O'Brien
>        posted on what you know about the investigation?
>
> A.     If I hear of something, I will tell him, yeah.

Testimony of Christopher Bulger, October 13, 2010 (Exhibit 95), at 38-39.

559.    Bulger told Independent Counsel that he wanted to keep O'Brien informed

precisely because he viewed O'Brien as "the target of this investigation."[420]

560.    Bulger also revealed during his testimony that he is effectively of one mind with

Commissioner O'Brien that manipulating hiring and promotion is acceptable at some level

because, to paraphrase, "everyone does it":

> Q.     Have you talked with the commissioner at all with respect
>        to hiring practices?
>
> A.     Um, I did.  I –
>
> Q.     What did he say and what did you say?
>
> A.     Um, my understanding is that, you know, I think he would
>        say, yeah, there were phone calls made to him from all
>        walks.  And our view is that – I mean, I guess I share his
>        view that it happens in a lot of agencies.  So I guess it was,
>        you know – that's what we would discuss.  That this is
>        something that happens everywhere to some degree.

Testimony of Christopher Bulger, October 13, 2010 (Exhibit 95), at 39-40.

561.    To the extent Bulger's credibility may be relevant to the Court, Independent

Counsel observed Bulger to be dishonest in responding to questions under oath. He made

repeated attempts to deflect the questioning. Many of his answers were blatantly false in the

view of Independent Counsel, particularly as regards his knowledge of fraudulent hiring,

O'Brien's direct role in such hiring and promotion, and his claim that he advised the production

to Independent Counsel of a Sponsor List database though he never looked at it nor completely

---

[420]  Testimony of Christopher Bulger, October 13, 2010 (Exhibit 95), at 64.

understood what it was. Despite his claimed lack of understanding, he advised a Probation employee to disclose the list to Independent Counsel and subsequently discussed the list (which he says did not really see) with O'Brien.

562.    Bulger's role as counsel to the Department has been irrevocably compromised by his misplaced loyalty, not only to Commissioner O'Brien but to business-as-usual in Probation. Bulger remains an advocate for the "return" of Commissioner O'Brien whom he praised as a "great Commissioner" and "a man of integrity."[421]

## X.    PROBLEMS ARISING FROM THE FRAUDULENT HIRING AND PROMOTION PROCESS

563.    While legal precedent supports the characterization of the fraudulent hiring and promotion process as a criminal fraud, the illegality of the scheme is only one reason why this corruption of the process should never have occurred and must be prevented in the future. As set forth in this section of the Report, the scheme had and will continue to have a number of severely detrimental effects on individuals and on the Department itself.

### A.    Unfairness to More Qualified Candidates

564.    One obvious consequence of a system in which preferred candidates are purposefully moved through initial rounds of interviews, is that potentially more qualified candidates are denied the opportunity to compete in subsequent rounds of interviews, including the final round. Accordingly, by definition, they were deprived of positions to which they may have been entitled.

565.    First Deputy Commissioner Tavares, for example, agreed that the intent of providing names of preferred candidates to the interview panels was to have the preferred candidates hired instead of candidates who outperformed the Commissioner's choices:

249

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

Q.     So it was your understanding that what these Regional
       Supervisors were supposed to take away from getting a call
       from you with a list of names was that, you know, if this
       person ordinarily may have only been the 30th best person
       out of say the 50 in my example, as long as they were
       responsive, you should still try and put them in the top
       eight to get to the next round?

A.     I think if the Regional Supervisor had a sense that the
       person was responsive to the questions and could convey to
       the committee that they understood the role of a Probation
       Officer based on these questions, then if they were
       recommended, then see if you can move them up to the
       final round.

Q.     This is just to clarify that. So long as somebody was in
       some sense qualified, even if they really weren't one of the
       best eight people who interviewed that day, if they got a
       recommendation, then you should list their name among
       the top eight?

A.     If they were responsive and two committee members
       agreed, yes.

Testimony of Elizabeth Tavares, July 13, 2010 (Exhibit 137), at 101-102.

566.   Regional Supervisor Nilda Rios also acknowledged that more qualified candidates

during the screening round of interviews for probation officer positions were knocked off the list

of candidates eligible for a second round of interviews:

        Q.     If you had an individual who was supposed to make it into
               the top ten, they're 15th, they needed four points to get into
               the top ten –

        A.     Mm hmm.

        Q.     – how would you determine who came out of the top ten if
               that person needed a slot there?

        A.     The lowest one.

Testimony of Nilda Rios, August 4, 2010 (Exhibit 130), at 96-97.

---

[421]   Testimony of Christopher Bulger, October 13, 2010 (Exhibit 95), at 142.

250

567.   Regional Supervisor O'Neil told us that he found it "appalling" that less qualified

candidates were getting final interview slots and jobs over more qualified candidates, and he

eventually asked to be taken off of interviews:

> Q.   What specifically were you uncomfortable about?
>
> A.   I just had problems with the whole integrity of the process
> and that -- I would say "uncomfortable" probably is not
> strong enough. I found it really appalling, quite frankly,
> that people, because of their connections, were getting jobs
> or certainly making it to a finals where candidates that I
> thought were better qualified were not. Because I knew
> that these were the courts that I head and supervise, for one.
> One, I was fundamentally opposed to just the concept that
> you're going to get jobs because of who you know, and that
> was kind of, I don't know, for some of my colleagues, like
> what's the big deal? I mean, I didn't come in the system
> through that way. I certainly wasn't naive to think that
> that's not how some people got their jobs because of
> connections. And some people have turned out very well.
> As I said to you in our last interview, I personally
> experienced this with the Chief's position in Suffolk and
> the person that ultimately got the job. So I'm not naive to
> think that this doesn't happen. But the more it happened
> and the frequency in which it happened, I just – I found it
> difficult to participate in the process. On the other hand, if
> I was told to do it, I would have done it.

Testimony of Richard O'Neil, August 3, 2010 (Exhibit 124), at 99-100.

568.   Dianne Fasano likewise agreed with the statement that she had placed candidates

on the list of finalists "who were less qualified than other meritorious candidates who would

have made it along had it not been for these phone calls" from OCP.[422]

569.   In the Lucy Ligotti episode, for example, Ellen Slaney testified that she only

ranked Ligotti in the top eight because she had been identified as a preferred candidate, and

pointed out for us the names of additional candidates that she would have ranked above Ligotti

---

[422]   Testimony of Dianne Fasano, September 3, 2010 (Exhibit 109), at 102.

but for the rigged process. At least one of those individuals was denied the opportunity to

proceed to the final round interview due to the rigged process:

> Q.     Looking at your list of ranked candidates, were there
>        candidates on that list that you would have ranked higher
>        than Lucille Ligotti is not for the fact that you had received
>        her name from the Commissioner's office prior to the
>        interviews?
>
> A.     I would say yes.
>
> Q.     Who would you have ranked higher?
>
> A.     Maybe Sean Houghton.
>
> Q.     So is it your recollection today that you only put Lucille
>        Ligotti number eight because you had been asked to get her
>        in the top eight by the Commissioner's office and,
>        otherwise, she would have dropped off the top eight and
>        Sean Houghton might have appeared on it?
>
> A.     Yes. I think there might have been others, too, maybe
>        Mike Borden, Harry Terrien. These are people whose work
>        I was familiar with, some of them from other courts.

Testimony of Ellen Slaney, August 5, 2010 (Exhibit 135), at 52-53.

570.    Slaney testified that in the same time period she also put a favored candidate, Jean

Roche, ahead of Sean Houghton in a second round of interviews, this for Bristol Juvenile

court.[423]

571.    Deputy Commissioner Lucci agreed that there were probably instances in which

he passed someone through to the next round of interviews who probably did not deserve it,

which necessarily means that someone who deserved the interview spot was denied it.[424]

---

[423]   Testimony of Ellen Slaney, August 5, 2010 (Exhibit 135), at 77.

[424]   Testimony of Paul Lucci, August 23, 2010 (Exhibit 114), at 81-82.

252

LIBA/21225629

572.    Inflating the scores of preferred candidates in the final round interviews inevitably

resulted in more qualified candidates being denied the opportunity to be hired into Probation or

promoted within Probation.

573.    Deputy Commissioner Burke agreed that the net effect of the system of

identifying preferred candidates was that, in some cases, less qualified individuals were hired or

promoted over more qualified candidates:

> Q.    Well, you know that some people who are less qualified
>         than other candidates got jobs because the Commissioner
>         wanted them to get jobs, isn't that correct?
>
> A.    I'd say yeah, yes.
>
> Q.    And you were part of that process sometimes, isn't that
>         correct?
>
> A.    Well, as part of it, I interviewed the people, moved people
>         on, yeah.

Testimony of William Burke, July 22, 2010 (Exhibit 96), at 75.

574.    Regional Supervisor O'Neil provided similar testimony, stating "I want to say in

2005, '6, people with external influences started to get positions that I thought were not as

qualified or inferior candidates."[425]

## B.    Unfairness to Politically-Connected Candidates

575.    While the rigged hiring process is unfair to more qualified candidates, it is also

worth noting that the process is in some sense unfair to candidates with political backing as well.

576.    Hiring and promotion decisions will always be to some extent subjective.  In

some cases Independent Counsel heard from witnesses, even those opposed to the rigged hiring

and promotion process, that certain favored candidates were the best candidates for their

---

[425]    Testimony of Richard O'Neil, August 3, 2010 (Exhibit 124), at 77.

positions. In many other cases it may be a "close call" between politically and non-politically connected candidates.

577.    Ellen Slaney, who was generally critical of the rigged hiring and promotion process and suffered retaliation for her failure to always comply with it, nonetheless testified that on one occasion (involving hiring for Dedham District Court) her receipt of names did not alter the composition of the final list, as the preferred candidates were among the most qualified anyway.[426] On another occasion, Slaney felt that four of the five candidates singled out prior to the interviews as preferred candidates deserved to make the list of finalists on their own merits.[427] With respect to Joseph Dooley, she thought he was the second-best candidate, and another person whose name she received for a position in the Bristol Superior Court – Mary Santos for an assistant chief probation officer position – she considered the most qualified.[428]

578.    As seen in the *Globe* Spotlight story, the rigged hiring process has cast a shadow over all politically-connected candidates within the Department, even in those instances (for example, Mark Prisco and Arthur Sousa) where the facts suggest that no preferential treatment resulted.

579.    The many accomplishments, in some cases life work, of many individuals with political connections have been called into question, in at least some cases undeservedly. This is part of the collateral damage wrought by the Commissioner's rigging of the Department's hiring and promotion process.

---

[426]    Testimony of Ellen Slaney, August 5, 2010 (Exhibit 135), at 41-42.

[427]    Testimony of Ellen Slaney, August 5, 2010 (Exhibit 135), at 43-44.

[428]    Testimony of Ellen Slaney, August 5, 2010 (Exhibit 135), at 116, 133.

254

## C.     Hiring of Problematic Candidates

580.     Many sponsored candidates were demonstrably unqualified for employment or
have been disciplined, fired or forced to resign because of poor work performance and other
improper behavior.

### 1.     Douglas MacLean

581.     Douglas MacLean was a sponsored candidate whose name was given to several
interview panels until he was ultimately hired as a probation officer.  MacLean is a glaring
example of a candidate who was a "Commissioner's Choice," but ultimately failed as a probation
officer.

582.     MacLean is the son of former Senator William "Biff" MacLean.  MacLean had a
lengthy criminal record at the time he began applying for probation positions in 2000.
MacLean's criminal history stretches back to 1983, beginning with charges such as shoplifting
and possession of a hypodermic needle, followed by a charge of possession of heroin in 1986.  In
1993, MacLean was found guilty possession of cocaine and conspiracy to violate the controlled
substances act (which is a felony).  In 1994, MacLean was convicted of three counts of violations
of the Abuse Prevention Act and one count of Assault and Battery, was placed on probation,
violated probation and was sentenced to 6 months of committed time.  These convictions should
have appeared in a criminal background check when MacLean applied for Probation Department
positions.

583.     After a jury trial in 1994, MacLean was found guilty of possession with intent to
distribute heroin, possession of clonazepam, possession of heroin, two counts of conspiracy to
violate the controlled substances act, and two counts of possession of a hypodermic needle.
MacLean was sentenced to, in total, an 18 month split sentence with nine months committed and

255

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

the remainder suspended. MacLean's record, however shows that a new trial was held on all of

these offenses in 1996 and in 2000 all of the charges were dismissed. It is unclear whether

MacLean ever served the time he was sentenced to.

584.    MacLean's record demonstrates that he should have been disqualified from any

position in the Trial Court. The *Policy and Procedures Manual* states that a person who has

been convicted of a felony may not be appointed to a position within the Trial Court. *See Policy*

*and Procedures Manual*, Section 4.000.

585.    Independent Counsel was unable to obtain MacLean's applications from the 2000

period when he interviewed with Slaney and Dalton. In his 2004 job application for a temporary

probation officer position, MacLean indicated that he had been convicted of a crime.[429] It was

widely known that MacLean had a criminal record and a drug problem.[430]

586.    Despite this fact, in 2000 MacLean's name was given on separate occasions to

Regional Supervisors Ellen Slaney and Brian Murphy as a "Commissioner's Choice" candidate.

Slaney refused to advance MacLean to the next round because of his criminal record and was

reprimanded by the Commissioner for her actions. Murphy, on the other hand, thought MacLean

interviewed well and did put him on the list of candidates for a final round interview. MacLean

did not receive a Probation Department position at that time.

587.    James Casey, Chief Probation Officer for the Bristol County Probate and Family

Court, testified that Frank Campbell gave him MacLean's name as a candidate the Commissioner

was interested in during an interview in 2003 or 2004. Casey was upset at the time because he

---

[429]    A copy of the application accompanies this Report as Exhibit 62.

[430]    Testimony of Mark Montigny, October 26, 2010 (Exhibit 119), at 108-109; Testimony of Christopher Bulger,
October 13, 2010 (Exhibit 95), at 117-19.

LIBA/21225629

knew MacLean had a "serious drug problem."[431]  Casey testified that sometime prior to that

interview, MacLean showed up to an event at the New Bedford Probate Court.

> Without any permission, Mr. MacLean came over to our court and
> after the ceremony, sat in the courtroom, listened to it and when
> Commissioner O'Brien went to go downstairs for lunch, we had a
> luncheon in the basement. Mr. MacLean pursued him aggressively
> and I was privy to the whole conversation, and at that time he was
> basically saying to him, you know, I can do this job. You know,
> I've rehabbed myself. What I know -- He wanted to go into
> criminal court.

* * *

> He followed the Commissioner downstairs to lunch, was persistent
> and finally Liz Tavares said to me, "Jim, can you get him off the
> Commissioner?" And I said, "look, Doug, you're making a fool of
> yourself now. Please back off now. You've made your point," and
> when there was some separation, he was all polite. Commissioner
> looked at Doug and said, "you'll never be a probation officer as
> long as I'm the Commissioner of Probation, Doug," and we went
> in and he left. Now, I heard that myself.

Testimony of James Casey, October 5, 2010, at 46-49.

588.    After this exchange, in October 2004, MacLean was appointed by O'Brien to a

temporary probation officer position, a position that was not posted and for which no interviews

were held. Casey testified that he was simply informed one day by Janet Mucci that MacLean

was going to be assigned to his office as a temporary probation officer.[432]  Casey told us that he

was "livid" and "physically upset" about the situation. He knew of MacLean's criminal history

and drug problem and did not want him in his court.[433]  Furthermore, at the time, MacLean was

engaged to Casey's administrative assistant and Casey felt this could cause problems.

Regardless, MacLean was given the position.

---

[431]   Testimony of James Casey, October 5, 2010 (Exhibit 100), at 45-46. Relevant excerpts of the testimony of
Chief Probation Officer Casey accompany this Report as Exhibit 100.

[432]   Testimony of James Casey, October 5, 2010 (Exhibit 100), at 50-51.

257

589.    One year later, a permanent probation officer position was posted for the Bristol

County Probate and Family Court. Rick O'Neil testified that he was given MacLean's name as a

favored candidate during the interview process.[434] O'Neil testified, and Casey confirmed, that

O'Neil gave MacLean's name to both the chief probation officer and the judge prior to

interviewing.[435] Casey testified that he was informed by O'Neil that MacLean was required to

make it into the top ten listing of candidates that went to the Commissioner because he was

already serving as a probation officer in an acting capacity.[436] MacLean was ranked in the

middle of the pack by the regional interview panel. Casey testified that MacLean performed well

at the interview.[437]

590.    Casey testified that he spoke to Commissioner O'Brien after MacLean was

appointed, and O'Brien admitted that MacLean was only appointed due to "tremendous pressure

from the legislature":

> Q.    What was your understanding as to why Mr. MacLean was
>        hired?
>
> A.    Tremendous amount of, my understanding, basically I was
>        never privy to anything or any discussions or any
>        knowledge of anything, but my understanding is it was
>        political pressure.
>
>                                * * *
>
> Q.    …Who did you talk to?
>
> A.    One person.
>
> Q.    Who was that?

---

[433]    Testimony of James Casey, October 5, 2010 (Exhibit 100), at 46-52.

[434]    Testimony of Richard O'Neil, August 3, 2010 (Exhibit 124), at 130-31.

[435]    Testimony of Richard O'Neil, August 3, 2010 (Exhibit 124), at 133;Testimony of James Casey, October 5, 2010 (Exhibit 100), at 62-63.

[436]    Testimony of James Casey, October 5, 2010 (Exhibit 100), at 55-56.

[437]    Testimony of James Casey, October 5, 2010 (Exhibit 100), at 59-60.

A.     Commissioner O'Brien.

Q.     Recall for me, if you can, when you spoke with him and the substance of that conversation.

A.     It was sometime after the dust had settled. I can't give you an exact date. It probably happened when we had these annual conferences in November and I had a chance to talk to him alone personally, and I just brought it up and I, you know, I was there. I said "why, what happened?" He just said, quote, "I had tremendous pressure from the Legislature."

Q.     Commissioner O'Brien personally told you in response to you asking him why Mr. MacLean was hired that it was a result of political pressure from the legislature?

A.     I'm again paraphrasing it. He never used any names. I just said -- He knew I was upset and he knew that I had a good rapport with him and a good relationship with him and it always worked well with him and I just, you know, what the hell? I was there. I heard it. Probably never would have asked the question or questioned him in his superior position unless I had a basis for it. The basis was that I had heard him. So I asked him and he, he said "tremendous pressure from the legislature."

Testimony of James Casey, October 5, 2010 (Exhibit 100), at 86-88.

591.   The records sent to Chief Justice Mulligan for the appointment of MacLean in

2004 and 2005 indicated that a criminal record check was completed and MacLean's

appointment was in compliance with the Trial Court's *Personnel Policies and Procedures*

*Manual*.[438] This appears to be untrue.

592.   According to O'Neil, it was clear from the outset that MacLean was not cut out to

be a probation officer. O'Neil described MacLean as follows:

...he had a criminal record. He served time in jail. And his background and skill set, let's say, I didn't think they were a particularly good match for the Probate Court. He had very limited writing abilities, very limited negotiating or very limited

---

[438]   An excerpt of the relevant record accompanies this Report as Exhibit 63.

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

experience doing any kind of negotiations. So I didn't think he
was very good match for the job, in addition to his history.

Testimony of Richard O'Neil, August 3, 2010 (Exhibit 124), at 132.

593.    MacLean's Probation career was marked by disciplinary actions. On two separate

occasions MacLean was disciplined for inappropriate conduct. In March 2006, he was

reprimanded for improper behavior towards a woman whom MacLean had worked with during a

mediation. According to the reprimand letter, MacLean conducted a mediation conference

between a woman and her ex-husband. MacLean is reported to have contacted the woman the

following day at her work to have a personal conversation with her. The woman "took

exception" to MacLean's call and informed her fiancé. Her fiancé was angry and went to the

Fall River courthouse to see MacLean. There was a heated exchange between the two men. The

fiancé reported to Casey that MacLean did not deny contacting the woman but stated he didn't

realize she was engaged to be married. MacLean admitted to contacting the woman to Chief

Probation Officer Casey.[439]

594.    MacLean was reprimanded for violating the woman's privacy in obtaining her

contact information through his position as a probation officer and subsequently using it for

personal purposes. In Chief Probation Officer Casey's reprimand letter he stated that the fiancé

expressed concern that the incident was going to be "swept under the rug" because MacLean's

father was a former state senator. Casey did, however, issue the formal letter of reprimand and

characterized MacLean's actions as "impulsive, immature and degrading to your co-workers and

the traditions of the department."

595.    MacLean was again reprimanded in October 2007. Casey testified that around

this time, MacLean's performance rapidly deteriorated. MacLean started calling in sick

frequently, and he "disappeared" from the courthouse.[440] According to the October 2007 letter

of reprimand, Assistant Chief Probation Officer Carl Cruz reported that on October 4, 2007

MacLean requested to leave work for personal reasons but stated he would return. MacLean

never returned to work that day, although he contended he left word with support staff that he

was not coming back. The staff had no recollection of any communication from MacLean.

Chief Probation Officer Casey concluded that MacLean's statements were "untrue and therefore

unacceptable."

596.    The reprimand addressed another incident occurring on October 9, 2007, in which

MacLean failed to show up for work and did not notify anyone that he was not coming in. When

finally reached, MacLean claimed he was "ill and overslept." Chief Probation Officer Casey

described MacLean's conduct as "[t]otally unacceptable, unprofessional, and inconsiderate of

[his] co-workers who have been crippled by our loss of work power."[441]

597.    Casey had become frustrated with MacLean and his actions. In concluding the

reprimand letter, Casey wrote, "I am baffled and angry at these [latest] violations of the work

code we hold to in this department. Your behavior is intolerable, your attitude is blatantly

ambivalent, and I am unable to reconcile these factors in considering what tact I will take after

discussion with the Office of these Commissioner of Probation. Please consider these matters

open and yourself subject to further disciplinary action."

598.    Following these incidents, in December 2007 and January 2008, the assistant

chief probation officer of MacLean's court, Carl Cruz, informed Casey that he had significant

concerns about MacLean due to incidents in which MacLean had not been fit for court duty. On

---

[439]   A copy of the March 7, 2006 Reprimand Letter accompanies this Report as Exhibit 64.

[440]   Testimony of James Casey, October 5, 2010 (Exhibit 100), at 91-94.

[441]   A copy of the October 9, 2007 Reprimand Letter accompanies this Report as Exhibit 65.

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

December 31, 2007, another probation officer, Sheila Lopes, found MacLean asleep at his desk after he had not performed a requested assignment in a timely manner. When she called to wake him, he did not respond and awoke after she approached him and shook him. Lopes informed Cruz of the situation. He arrived to find MacLean sitting at his desk, unshaven, with no tie and shoes untied. He sent MacLean home but had Lopes drive him because he did not feel he was a fit to drive, a concern the judge covering the court, Judge Nesi, shared. On January 2, 2008 MacLean did not show up for work and called in later that morning to report he was ill.[442]

599.    On January 13, 2008, MacLean checked into the Hazeldon Foundation in Minnesota for the treatment of chemical dependency, and on February 29, 2009, he resigned from the Department.[443] Just prior to his resignation, MacLean was arrested for possession of a class B substance; the charge was dismissed.

### 2.    Patrick Lawton

600.    Patrick Lawton was also a favored candidate of the Commissioner who did not succeed as a probation officer. Lawton's family has significant political and community connections in Plymouth County. Lawton's father was a judge and other family members held various other political positions.[444] Lawton indicated on his application that he was related to "Judge Mark E. Lawton, Suffolk Juvenile Court → Father; Judge James R. Lawton (Retired), First Justice, Plymouth County Probate and Family Court." Lawton received a letter of recommendation from Representative David L. Flynn.[445]

---

[442] Memorandum from Carl Cruz to James Casey dated January 9, 2008, a copy of which accompanies this Report as Exhibit 66; Testimony of James Casey, October 5, 2010 (Exhibit 100), at 98-99.

[443] Letter from Chief Justice Mulligan to Douglas MacLean, dated February 8, 2008; Letter from Douglas MacLean to James Casey dated February 28, 2008. Copies of these letters accompany this Report as Exhibits 67 and 68, respectively.

[444] Testimony of Michael LaFrance, September 29, 2010 (Exhibit 113), at 46-47.

[445] A copy of the letter from Representative Flynn accompanies this Report as Exhibit 73.

LIBA/21225629

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

601.    Lawton interviewed for a position in the Plymouth Probate and Family Court in 2008. Regional Supervisor Campbell testified that he was given Lawton's name as a favored candidate by Deputy Commissioner Wall. Chief Probation Officer Michael LaFrance testified that Campbell gave him Lawton's name during the interview process as a candidate that the Commissioner's office was "interested in."[446]

602.    Prior to applying for a position in the Probation Department, Lawton had been an Assistant District Attorney in Norfolk County. According to LaFrance, Lawton was fired from that position for using his work computer to send politically related emails in violation of Trial Court policy, an incident that LaFrance said was widely known in the community.[447] LaFrance testified that neither he nor the judge on the local interview panel wanted Lawton to be placed in their Court after he had been asked to leave the District Attorney's office.[448] Lawton also had a rumored history of drug abuse.[449]

603.    LaFrance stated that after the list of finalists had been compiled based on the rankings of Campbell, LaFrance and Judge Sabatis, Lawton was ranked ninth and thus did not make the list of finalists (Campbell had ranked him third, while LaFrance ranked him tenth and Sabatis ranked him eleventh). LaFrance testified that at this point, Campbell stepped out of the room and made a phone call, he believes to Deputy Commissioner Wall.[450]

---

[446]    Testimony of Francis Campbell, August 19, 2010 (Exhibit 98), at 116-17; Testimony of Michael LaFrance, September 29, 2010 (Exhibit 113), at 48.

[447]    Testimony of Michael LaFrance, September 29, 2010 (Exhibit 113), at 49-50.

[448]    Testimony of Michael LaFrance, September 29, 2010 (Exhibit 113), at 121-22.

[449]    Testimony of Michael LaFrance, September 29, 2010 (Exhibit 113), at 51.

[450]    Testimony of Michael LaFrance, September 29, 2010 (Exhibit 113), at 51-55.

263

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

604.    According to LaFrance, Wall called LaFrance directly.  Wall informed LaFrance that the Commissioner's office was interested in Lawton, and, although LaFrance explained his concerns to Wall, told LaFrance that OCP's position was unchanged.[451]

605.    LaFrance testified that after his conversation with Wall, there may have been a further conversation between Wall and Campbell before Campbell returned to the interview room.  After returning, Campbell suggested expanding the list to a larger number of candidates because there were multiple positions available and more than eight candidates could be advanced to the next round.[452]  While LaFrance still did not agree with the decision and opposed Lawton as a finalist, he and the judge acquiesced and added Lawton and one other individual to the list.[453]

606.    Campbell offered a different version of events.  He acknowledged that he was given Lawton's name in advance of the interview process, but that he only contacted First Deputy Commissioner Tavares to ask how many positions were open and hence the number of finalists who could be named.[454]  Regardless, Campbell confirmed that Lawton was a favored candidate, and the scoring sheets confirm that LaFrance and the judge scored Lawton far lower than did Campbell.

607.    Lawton went on to the final round interview and, at that round, was ranked first by the final interview panel consisting of Fran Wall and Edward McDermott.  Consequently he obtained a probation officer position, to which he was appointed on May 30, 2008 and began work on June 2, 2008.

---

[451]   Testimony of Michael LaFrance, September 29, 2010 (Exhibit 113), at 54-56.

[452]   Testimony of Michael LaFrance, September 29, 2010 (Exhibit 113), at 45-46, 56-58.

[453]   Testimony of Michael LaFrance, September 29, 2010 (Exhibit 113), at 56-58.

[454]   Testimony of Francis Campbell, August 19, 2010 (Exhibit 98), at 143.

264

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

608. Lawton did not hold the position for long. He was placed on paid leave in May

2010 after being arrested for conspiracy to violate the drug laws and possession of class B, C and

E controlled substances. Lawton remains on paid leave.[455]

### 3. James Rush

609. James Rush was a sponsored candidate who created significant issues in the court

to which he was assigned. Ultimately, Rush's behavior resulted in two female employees filing

a sexual and racial discrimination lawsuit.

610. James Rush is the father of state Representative Michael Rush. The *Boston Globe*

reported that James Rush was appointed by O'Brien as a "favor" to then-Speaker Finneran "who

said he sought the promotion for James J. Rush as a 'capstone' to the man's 41 year probation

career." The *Globe* went on to allege:

> The top judge in West Roxbury warned O'Brien that Rush was not
> up to the task, and his two-year career tenure turned out to be a
> fiasco. Rush clashed with five female employees who alleged that
> he threw tantrums, tossed papers at them, and slammed the door in
> one woman's face. He abruptly retied in September 2006, leaving
> behind a sex and race discrimination lawsuit filed by two of the
> women, but taking home a boost in pension thanks to his late-
> career appointment.

611. The *Globe*'s allegations were generally confirmed by the evidence. Tavares

testified that the Commissioner's office received a sponsorship for James Rush from his son,

Representative Michael Rush.[456] The Sponsor Lists maintained by Maria Walsh also reflect that

Finneran and Representative Eugene Flaherty recommended James Rush.

612. Rush interviewed for the chief probation officer position in December 2004.

Regional Supervisor McHale and Deputy Commissioner Wall were on the local interview panel.

---

[455] The Letter from Antoinette Rodney to Patrick Lawton, May 14, 2010 accompanies this Report as Exhibit 74.

[456] Testimony of Elizabeth Tavares, July 13, 2010 (Exhibit 137), at 117.

McHale testified that he was not given Rush's name as a recommended candidate in advance of the interviewing, but was aware that Rush's son is a Representative.[457]  Francis Wall invoked his Fifth Amendment and Article 12 rights so we were unable to question him concerning Rush's hiring.

613.    McHale and Wall's scoring of Rush is consistent with Rush being a "Commissioner's Choice" candidate.  McHale and Wall scored Rush significantly higher than the two judges who sat on the interview panel and who had worked with Rush in the past. Indeed, Rush received the highest scores of any candidate from McHale and Wall (a 90 and a 95, respectively), while the judges both scored him below the 80 points necessary for him to advance to the next round of interviewing.  McHale offered no explanation for the discrepancy in the scoring.[458]

614.    McHale testified that First Justice Kathleen Coffey expressed to him that Rush was not the best candidate for the job.[459]  First Justice Coffey was concerned about Rush's ability to be chief, his work ethic, his lack of innovation and his lack of a strong belief in community supervision. She conveyed these concerns to Commissioner O'Brien. [460]

615.    Regardless of Coffey's concerns, Rush was advanced to the final round where he was interviewed by O'Brien, Tavares and First Deputy Commissioner Cremens.  Each interviewer awarded Rush 18 out of 20 points, making him the highest ranked candidate.  Chief Justice Mulligan approved Rush's appointment as Chief Probation Officer in West Roxbury District, effective December 20, 2004.

---

[457]    Testimony of Mark McHale, July 30, 2010 (Exhibit 117), at 85.

[458]    Testimony of Mark McHale, July 30, 2010 (Exhibit 117), at 96-101.

[459]    Testimony of Mark McHale, July 30, 2010 (Exhibit 117), at 87-88.

[460]    The relevant excepts of First Justice Coffey's testimony from the Rush civil action accompany this report as Exhibit 76. Testimony of First Justice Kathleen Coffey from Rush civil action, November 10, 2009, at 38-40.

266

616.    In her testimony in the civil matter brought against Rush, First Justice Coffey testified that after Rush received his appointment "that's when problems began, real troubles began." First Justice Coffey began receiving complaints about Rush and his behavior towards the women he supervised. [461]

617.    Five women, including two assistant chief probation officers, in the West Roxbury District Court Probation Department filed a complaint against James Rush with AOTC's Office of Affirmative Action. An Investigation Report was issued by that office on July 13, 2006.[462] The Investigation Report states that the women alleged that Rush was demeaning, hostile, sexist, racist, mistrusting and that he created a hostile work environment. Rush is alleged to have treated the women in the office differently than the men in terms of tasks assigned, flexible work hours and permitted attendance at community programs outside of the probation office. Rush is further alleged to have thrown papers at the female probation employees he supervised, to have yelled at them, and in one instance, to have closed a door in one woman's face. Rush denied these allegations.

618.    According to the Investigation Report, the women further alleged that when they complained about Rush's behavior to Regional Supervisor McHale and First Assistant Chief Probation Officer Prisco, they felt they were being disciplined.[463]

619.    The Recommendations contained in the Investigative Report suggested Rush "examine his management style" and recommended that the female assistant chief probation officers who brought the complaint receive "fair and equal treatment." Rush received no sanctions or other discipline for his actions.

---

[461]    Testimony of First Justice Kathleen Coffey from Rush civil action, November 10, 2009 (Exhibit 76), at 27-28.

[462]    A copy of the July 13, 2006 Investigation Report accompanies this report as Exhibit 75.

[463]    July 13, 2006 Investigation Report (Exhibit 75).

267

620.    First Justice Coffey testified that after the women in the West Roxbury probation office filed their complaint against Rush, he became more argumentative and uncooperative.[464]

621.    Ultimately, on August 13, 2007, Assistant Chief Probation Officer Helen Brown and Probation Officer Crystal Young filed a civil lawsuit against Commissioner O'Brien and Rush, restating their allegations made to the Office of Affirmative Action. First Justice Coffey testified that during the pendency of the lawsuit, the influence of Rush's son, Representative Michael Rush, was felt throughout the courthouse.[465]  The case remains pending in Suffolk Superior Court.[466]  Rush, however, retired from his position as Chief Probation Officer in September 2006.

## D.    Detrimental Effects on Morale

622.    Fraudulent hiring practices have had a serious effect on morale within the Department. The evidence demonstrates that the morale of repeatedly unsuccessful applicants for promotion was dampened by awareness that the system is rigged. The morale of persons participating on interview panels also suffered.

623.    Former First Deputy Commissioner John Cremens volunteered his believe that the rigging of hiring decisions to favor certain applicants has a detrimental effect on morale:

> Q.    Do you think it would be inappropriate for you to let the Commissioner's indication of a particular candidate he favored influence your ranking or scoring of candidates?
>
> A.    I don't think that would be the best approach in handling hiring?
>
> Q.    Why not?

---

[464]    Testimony of First Justice Kathleen Coffey from Rush civil action, November 10, 2009 (Exhibit 76), at 33-34.

[465]    Testimony of First Justice Kathleen Coffey from Rush civil action, November 10, 2009 (Exhibit 76), at 58-59.

[466]    *See Brown, et al. v. O'Brien, et al.*, Civ. A. No. 07-3552, Suffolk Superior Court.

LIBA/21225629

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

A.    Because I think that would send a message that wouldn't be
      very good to the field.

Q.    What kind of message would it send?

A.    You know, things aren't on the up and up?

Q.    And by not on the up and up, you mean it could affect the
      morale of the Probation Department?

A.    Right.

Q.    If they thought that hiring and [promotion] decisions were
      fixed in some way?

A.    Correct.

* * *

Q.    Did you ever hear from any of the RAs that they were
      scoring people differently based on the fact that
      Commissioner O'Brien asked them to get them on the list
      of finalists?

A.    No, I haven't heard that, no.

Q.    If they were doing that, would you find that inappropriate?

A.    Yes, I would think so.

Q.    For the same reasons we were discussing before?

A.    Discussed earlier, yeah.

* * *

Q.    In your mind, was it appropriate for Commissioner O'Brien
      to pass down to the interview panels the names of
      individuals he wanted to see make the list of finalists?

A.    I'd have to say no, probably, certainly not a fair system.

Testimony of John Cremens, August 6, 2010 (Exhibit 102), at 42-43, 46-47, 49.

269

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

624.    Regional Supervisor Edward Rideout testified that he has seen an increased level

of "frustration" among career Probation Department employees who found their advancement

within the organization blocked by politically-connected candidates:

> Q.    What then is the basis for your belief that there is somehow
> an increased frustration among the rank and file in the
> department?
>
> A.    You can hear it.  You can hear it.  I've trained over
> thousands of probation officers in the last four, five years,
> people who have tried to work their best, with 25, 30 years
> in the system, 20 years with the system, and see somebody
> come in with five years or three years or no years and get
> an assistant chief's job or a first assistant or maybe a
> chief's job or something like that.

Testimony of Edward Rideout, August 27, 2010 (Exhibit 129), at 39.

625.    Former Regional Supervisor Nicholas DeAngelis also testified that the rigged

system of hiring and promotion had a detrimental effect on morale within the Probation

Department.

> Q.    Up until the time you retired, do you think it was the case
> that there was a general understanding within the Probation
> Department that in order to get a job you had to be
> politically connected?
>
> A.    I would say that was becoming a fact.
>
> Q.    Did that have any effect on morale or anything like that?
>
> A.    Yes.
>
> Q.    In what way?
>
> A.    People were upset.
>
> Q.    Did people communicate that to you?
>
> A.    Not directly to me, but in a way that I would get the idea.
>
> Q.    Well, what do you mean?  Can you be more specific?

270

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

> A.  I would be at a function and someone would say they were
>     talking to somebody and they said, you know, "The system
>     is becoming a farce. It's not what you know, it's who you
>     know."
>
> Q.  And do you believe that the interview process that you
>     described where names were given in advance contributed
>     to that?
>
> A.  I would say that had a lot to do with it.

Testimony of Nicholas DeAngelis, August 24, 2010 (Exhibit 104), at 65-66.

626.    Regional Supervisor Slaney testified that many chief probation officers had

expressed concerns about the system to her, highlighting in particular the unfairness to long-

serving Department personnel who never got a fair chance at advancement:

> Their concern was that people who did a good job for them locally
> in their court were not going to have an opportunity to be
> promoted, and they wanted to recognize those people and were
> concerned that these names meant that they would not have that
> opportunity, that they were going to be -- that there would be a
> preselected person sometimes from the outside, sometimes from
> within that they did not agree would be the best candidate, and
> they would end up with them, if that makes sense.

Testimony of Ellen Slaney, August 5, 2010 (Exhibit 135), at 95.

627.    Chief Probation Officer Prisco testified that he had heard "grumblings" among

employees in Probation that political backing is necessary to obtain promotions, although he

testified that he also heard such "grumblings" when working in other branches of state

government.[467]

628.    The former president of the probation officers' union, John Alicandro, testified

that morale in the Department was extremely low and that individuals did not bother applying for

---

[467]  Testimony of Mark Prisco, September 24, 2010, at 45-47.

promotions because they believed the position was already set aside for someone with political

connections:

> Q. So in your experience such instances suggested that those
> individuals scoring higher and obtaining the position were
> somehow preselected or favored by the commissioner's
> office?
>
> A. Correct. That's the general feeling throughout the service.
>
> Q. What is the basis of that feeling and your statements?
>
> A. A lot of people, in speaking with them, a lot of members
> would not even bother applying for positions, for
> promotional positions because they felt that that position
> already had a name on it. It was commonly discussed that
> in order to get either a job at the onset or a promotion that
> three calls had to made to the commissioner from usually
> political type people, either legislators, either reps or
> senators. Although when judges' offspring would apply,
> frequently they would say we don't even have a chance
> because judge so and so's kid is applying. But it was
> primarily the political aspect of it.
>
>                 * * *
>
> Q. You are stating that over the years there was a belief among
> the rank and file of the service that unless calls were made
> on your behalf you were unlikely to get a job and, thus,
> there were members of your union who, recognizing that
> situation, began themselves calling legislators so calls
> would start getting made on their behalf so they could
> perhaps get jobs?
>
> A. Correct.

Testimony of John Alicandro, October 1, 2010 (Exhibit 93), at 25-26, 27; *see also id.* at 77-78,
147.

    629.    Even beyond the effect on morale of lower-level employees who were applying

for promotions within the system, the hiring system has had a severely negative impact on the

morale of more senior employees called upon to implement it. Numerous witnesses expressed

their disagreement with what they commonly viewed as an inappropriate and unfair system, and

stated that they only complied with it out of fear of retaliation or because, in their mind, they had

no right to question it. Several witnesses were reduced to tears recalling their involvement with

rigging hiring decisions. No system that puts such pressure on its professionals, most of whom

have dedicated the majority of their professional careers to the Department, should be tolerated.

630.    The view among interviewers that the system was inappropriate was widespread.

As one example, regional supervisor McHale, explained:

> Q.    … you viewed putting someone through to the next round
> who didn't actually make the top eight on their own merits
> as inappropriate, right?
>
> A.    I'd want the best, you know, candidate to leave and go to
> the next level, you know. I've been in the field for 32
> years. I know when somebody comes in and do an
> interview with them, in looking at their resume and getting
> out of them for a 15-minute, 20-minute interview, that I
> think that this person is going to help the Probation
> Department and bring us to another level and help us out in
> the field, you know, this and that. And that's the way I
> looked at it, sir.
>
> Q.    And it would be inappropriate to pass over someone who
> would make the top eight, based on their merits and the
> interviews, it would be inappropriate to pass them over in
> favor of somebody else just because that person's name
> was passed to you before the interview with no explanation
> of why it was being given to you, right?
>
> A.    Yes.

Testimony of Mark McHale, July 30, 2010 (Exhibit 117), at 83-84.

631.    Deputy Commissioner Bocko likewise agreed that the rigging of hiring and

promotions bothered him because be thinks "the job should be offered on a level playing

273

field."[468] Regional Supervisor Fasano stated that the rigging of interviews made her "uncomfortable." [469]

632.     Several witnesses were clearly ashamed of their role in the rigged hiring process. Regional Supervisor Dalton was emotional during his interview recalling the incident in which he was asked to blackball two candidates in favor of the preferred candidates.

633.     McDermott testified that he repeatedly expressed his uneasiness with this process to the deputy commissioners – in particular First Deputy Commissioner Tavares, and Deputy Commissioners Wall and Walsh – and was told by each some variation of "don't worry about it."[470] But he was clearly worried that the process was inappropriate and unfair. He testified that he only went along with it based on fear of retaliation. Eventually, he testified, he stopped complaining because he feared "there was going to be retribution or consequences."[471] Nonetheless, he agreed that he was "ashamed of the fact that, having been pushed into this, [he] in fact scored these candidates disproportionately to what they deserved."[472]

### E.     Politicization of the Department

634.     In addition to detrimental effects on morale, the belief that political connections were beneficial or even necessary to promotion within the Department can also lead to internal pressure being placed on Probation Department personnel to donate to politicians, particularly more powerful politicians within the legislature.

635.     There is considerable evidence of such pressure. For example, as set forth above in the section on "pay for play," testimony was obtained from one assistant chief probation

---

[468]     Testimony of Stephen Bocko, September 13, 2010 (Exhibit 94), at 64.

[469]     Testimony of Dianne Fasano, September 3, 2010 (Exhibit 109), at 54.

[470]     Testimony of Edward McDermott, August 25, 2010 (Exhibit 116), at 39-41, 50-51.

[471]     Testimony of Edward McDermott, August 25, 2010 (Exhibit 116), at 41-42.

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

officer, Bernard Dow, in which he describes how, after repeated unsuccessful attempts to obtain

a promotion, he donated $1,000 to Speaker DiMasi in the hope (eventually realized) that this

would net him DiMasi's sponsorship.

636.     Others testified more generally about this sense within Probation. For example,

Regional Supervisor Rios testified:

> Q.     [H]ave you heard since then any discussions or rumors that
> in order to get promoted or to get an initial job you should
> be donating to political candidates?
>
> A.     I hear that a lot from Probation Officers who feel – they
> feel or they think that that's the only way to get promoted
> and, you know, they tell me because they I'm not going to
> be running back, dropping a dime on them or whatever.
> But, you know, they feel that they have to; that's what it
> takes.
>
> Q.     How common do you think that believe is?
>
> A.     I think it's pretty widespread.

Testimony of Nilda Rios, August 4, 2010 (Exhibit 130), at 118-119.

### F.     Potential Civil Liability

637.     Yet another problem with the rigged hiring system is the liability it has created for

the Probation Department, particularly with respect to candidates who were denied hiring or

promotion.

638.     Independent Counsel has not conducted an exhaustive review of all such sources

of liability. Even former Deputy Commissioner and Legal Counsel Anthony Sicuso suggested

possible action by the Massachusetts Commission Against Discrimination as one source of

liability, depending upon whether persons in protected classes were disadvantaged by the fraud:

---

[472]   Testimony of Edward McDermott, August 25, 2010 (Exhibit 116), at 57.

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

Q.    Would you have seen any legal implications of that kind of practice occurring?

A.    What do you mean?

Q.    So there is -- you have a contract with the union governing hiring and promotions in some sense. You have the administrative office's practices and procedures manual. If you had been made aware of that practice at the time, were there any concerns that you would have about potential legal liability for the department?

A.    Of course.

Q.    I guess what I'm trying to get at what are the potential avenues of liability for the department if such practices were occurring?

A.    Depending on the situation there are possible criminal issues, possible MCAD issues depending on who was involved.

Testimony of Anthony Sicuso, September 30, 2010 (Exhibit 134), at 91-92.

639.    Such liability could be realistic. Ellen Slaney testified that following the Ligotti

hiring, the candidate who had been ranked first by each of the local interview panel members,

Donnell Gomes, sought her advice concerning the possibility of filing a grievance. Slaney

demurred and suggested Gomes speak to her union representatives.[473] If Gomes had proof of the

rigged hiring process, her decision whether to grieve and the outcome of any grievance likely

would have been far different. As it is, Gomes may still have some cause of action against the

Department.

640.    Furthermore, it is possible that the probation officers' union may explore some

action on behalf of its members who were passed over for promotion.

---

[473]    Testimony of Ellen Slaney, August 5, 2010 (Exhibit 135), at 97-98.

LIBA/21225629

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

## FUNDRAISING WITHIN THE DEPARTMENT

### I. MASSACHUSETTS LAW PROHIBITS FUNDRAISING BY STATE EMPLOYEES OR ON STATE PROPERTY

641.    Massachusetts law places (among others) two restrictions on state employees raising funds for candidates for political office. First, the law prohibits state employees from ever raising funds for candidates for political office, except under limited circumstances:

> Section 13. No person employed for compensation, other than an elected officer, by the commonwealth or any county, city or town shall directly or indirectly solicit or receive any gift, payment, contribution, assessment, subscription or promise of money or other thing of value for the political campaign purposes of any candidate for public office or of any political committee, or for any political purpose whatever, but this section shall not prevent such persons from being members of political organizations or committees. The soliciting or receiving of any gift, payment, contribution, assessment, subscription or promise of money or other thing of value by a non-elected political committee organized to promote the candidacy for public office of a person so employed for compensation by the commonwealth or any county, city or town, shall not be deemed to be a direct or indirect solicitation or receipt of such contribution by such person; provided, however, that no such gift, payment, contribution, assessment, subscription or promise of money or other thing of value may be solicited or received on behalf of such a person from any person or combination of persons if such person so employed knows or has reason to know that the person or combination of persons has an interest in any particular matter in which the person so employed participates or has participated in the course of such employment or which is the subject of his official responsibility.
>
> Any appointed officer or employee convicted of violating any provision of this section may be removed by the appointing authority without a hearing.
>
> Violation of any provision of this section shall be punished by imprisonment for not more than one year or by a fine of not more than one thousand dollars.

M.G.L. c. 55, § 13 (Exhibit 10).

277

642.    Second, the law prohibits fundraising by any individual, not limited to state

employees, within public buildings:

> Section 14. No person shall in any building or part thereof
> occupied for state, county or municipal purposes demand, solicit or
> receive any payment or gift of money or other thing of value for
> the purposes set forth in section thirteen.
>
> Any appointed officer or employee convicted of violating any
> provision of this section may be removed by the appointing
> authority without a hearing.
>
> Violation of any provision of this section shall be punished by
> imprisonment for not more than one year or by a fine of not more
> than one thousand dollars.

M.G.L. c. 55, § 14 (Exhibit 11).

643.    These prohibitions "protect public employees from being coerced into providing

political contributions or services in their employment. In addition, they protect individuals

doing business with the public sector from being coerced into contributing to any political fund

or rendering any political service and generally seek to separate governmental activity from

political campaign activities." MASSACHUSETTS CONTINUING LEGAL EDUCATION, INC.,

MASSACHUSETTS ELECTION ADMINISTRATION, CAMPAIGN FINANCE AND LOBBYING LAW part 2 §

17.1. If managers within state agencies can solicit employees for campaign contributions, it

creates the appearance, if not the reality, of conditioning employment or career advancement on

political activity. Such a condition violates the First Amendment and "pressures employees to

pledge political allegiance to a party with which they prefer not to associate, to work for the

election of political candidates they do not support, and to contribute money to be used to further

policies with which they do not agree." *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 69

(1990).

278

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

## II. COMMISSIONER O'BRIEN AND OTHERS VIOLATED MASSACHUSETTS CAMPAIGN FINANCE LAWS REPEATEDLY

644. Numerous witnesses testified that these important campaign finance limitations

were routinely flouted by persons at the highest levels with Probation, including by

Commissioner O'Brien himself.

645. Several witnesses testified that ranking officials within the Probation Department

solicited attendance at fundraisers for politicians – in particular, Representative Thomas Petrolati

and State Treasurer Timothy Cahill – in the cafeteria at One Ashburton Place.

646. Former First Deputy Commissioner Cremens remembered Commissioner O'Brien

soliciting attendance for a Petrolati fundraiser in the One Ashburton Place cafeteria, and Deputy

Commissioner Wall collecting money from Department personnel for their tickets:

> Q. Do you recall anyone in the Probation Department soliciting contributions for political candidates in the office?
>
> A. I know that at lunch one day somebody said that there was going to be a party for Tommy Petrolati, and I know there was another for Cahill that somebody said there was going to be a party.
>
> * * *
>
> Q. There's a cafeteria at One Ashburton Place, and you recall someone saying during lunch at the cafeteria in the building, oh, there's going to be a party for this candidate tonight.
>
> A. Right.
>
> * * *
>
> Q. Do you recall who was the person who mentioned the Tommy Petrolati event?
>
> A. It may have been the Commissioner once. I think it was somebody else the other time. I'm not sure whether they went two or three times.

279

\* \* \*

Q.     So you remember – do you have a firm memory of
Commissioner O'Brien doing that?

A.     I remember Commissioner O'Brien saying on one
occasion, there's going to be a party, at someone's table,
for Tommy Petrolati. I said, oh, no I'll go, no problem.

\* \* \*

Q.     Was the goal to get a bunch of Probation Officers together
to all go as a group or –

A.     Well, I know that in my situation I gave my money to
Frannie Wall who was going to get the tickets for us ….

Q.     Who is this for, Petrolati?

A.     Petrolati.

Testimony of John Cremens, August 6, 2010 (Exhibit 102), at 86-89.

647.    Regional Supervisor Edward Rideout tied the timing of at least one Petrolati

fundraiser for which the attendance of Probation Department employees was solicited to the

passage of legislation favorable to the Department:

> Q.     You've mentioned that you have some connections with the
> legislature. Have you made political donations?
>
> A.     I made one to I think it was Tom Petrolati back whenever
> we started ELMO. He was the guy that was running with
> the bill for us, and there was a group of us went out to
> Ludlow and I gave a check at that time. I don't think I've
> given many more checks to any more people, to be honest
> with you.
>
> Q.     What were the circumstances -- I think you just said a
> bunch of you went out there. Was there some kind of
> internal organization or suggestion, hey, look, this guy has
> really stood up for us, we should go?
>
> A.     Yeah, I think it was the inference we should go out for him
> at this time because we're going to get this money to start
> up this new electronic monitoring GPS program. Let me
> say this: At the time they were doing this program, I

280

> thought it was very important for this commonwealth to
> have that because we were in a bad overcrowding crisis and
> this was some way to get us some extra beds at a very low
> price. I still believe in the program. I think we should look
> at it. But we were just about to come on board with it, so
> we went up to Ludlow for one of those times up there.

* * *

> Q. And I take your statement to mean that Representative
> Petrolati was very influential in either helping initiate --
>
> A. Secure the money.
>
> Q. -- or fund the program?
>
> A. Secure the funding for the program, that's correct.

Testimony of Edward Rideout, August 27, 2010 (Exhibit 129), at 140-41, 142.

648. According to Rideout, this precise pitch – we should donate to Petrolati because

he is supporting our budget – was made to him by Deputy Commissioner Wall at One Ashburton

Place:

> Q. Going back to the political fund-raiser for Mr. Petrolati,
> who was kind of the person who marshaled folks together
> or said, hey, we should –
>
> A. The only one I recall -- and I only went to maybe one; I
> can't even recall if I went to another one; I just stopped
> going -- would have been Frannie Wall at the time, "We're
> going out to see Representative Petrolati. Why don't we all
> get together and go out and support him? Because he's
> helping us try to get the funding for the jobs, for the
> program."
>
> Q. And in what context were these statements made? In other
> words, where, when, how?
>
> A. I don't know. If we talked around the office, you know,
> "Next week, don't forget Petrolati's having his party, I
> think we should go out and support him. Why don't you
> help us out? It'll be $100. Why don't you help us do it?"
> Or 75. I think it was 75 at the time. And we'd meet and try

281

> to go out as a group and spend a couple hours and then
> come back home.
>
> Q.     And this was just while you were at the offices at One
>        Ashburton?
>
> A.     Yeah. What I recall when they hit me up, say I was in one
>        day in Ashburton Place, he might say that to me, "Don't
>        forget next Wednesday, we're going."

Testimony of Edward Rideout, August 27, 2010 (Exhibit 129), at 144-45.

649.     Regional Supervisor Jeffrey Akers similarly recalled being asked, in the cafeteria

at One Ashburton Place after a staff meeting, to attend a Petrolati fundraiser. Akers testified that

he was approached by Wall and informed that members of the Department were going to be

attending the fundraiser and was asked if he would attend. Akers contributed $100 or $150 and

attended the Petrolati event in Ludlow[474] along with Wall, O'Brien and Burke. Akers testified

that he attended the fundraiser, at least in part, because a lot of the management from the

department was attending and he thought it was a good idea to go along with them.[475]

650.     Deputy Commissioner Lucci was also asked to go to three different fundraising

events for Petrolati, all of which took place out in the Western part of Massachusetts even though

Lucci lives in North Reading, MA in Middlesex county. On each occasion, Wall asked Lucci if

he wanted to go and collected the money for the event:

> Q.     What were the circumstances under which you decided to
>        donate to Thomas Petrolati, Representative Petrolati?
>
> A.     I think I donated, I don't know exactly, but I think I
>        donated three or four times. The guys in work were going
>        to a fund-raiser, they thought it'd be a good idea, and I gave
>        a check to Fran Wall, and I drove up every time with John
>        Cremens and we went to the fund-raiser.

---

[474]  Akers does not reside in Petrolati's district in Western Massachusetts. Akers lives on the north shore in Salem.
Testimony of Jeffrey Akers, August 25, 2010 (Exhibit 92), at 118.

[475]  Testimony of Jeffrey Akers, August 25, 2010 (Exhibit 92), at 117-127.

282

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

\* \* \*

A.    There's only the three I went to.  I'm pretty sure three.
      And we went, we were asked to go, it'd be a nice time, and
      we drove out there and went.  It was usually in the spring
      and I went with John Cremens.

Q.    Anybody else from the Department?  You mentioned Fran
      Wall particularly.

A.    Fran Wall.  We gave the check to Fran Wall and he'd give
      you a ticket or -- He was the person that, I don't know if
      you want to say organized it, but he's the one we would
      give the check to.  I think I actually mailed a check because
      I think once you get on the list, they send it to your house.
      And I know in the last couple of years I haven't gone.

Q.    So, as best you can recall, these are occasions where Fran
      Wall said, "Hey, there's going to be a Petrolati fund-raiser,
      it'd be a good idea to go, could be fun"?

A.    Yes, could be fun.  John and I went.

\* \* \*

Q.    Were there typically a lot of Probation Department
      employees there?

A.    I'd say a fair amount, yeah.

Q.    When Fran Wall was organizing the event, did he ever
      mention that Petrolati was a friend of the Department?

A.    No.  No, but his wife worked in ELMO.

Testimony of Paul Lucci, August 23, 2010 (Exhibit 114), at 96-98.

651.    Regional Supervisor Dianne Fasano testified that she too was approached for a

Petrolati fundraiser and provided money for a ticket, although she was not sure if she gave it to

Wall or Lucci, who was "coordinating" the attendance of probation employees.[476]

---

[476]    Testimony of Dianne Fasano, September 3, 2010 (Exhibit 109), at 70-71.

LIBA/21225629

652.    Regional Supervisor Francine Ryan testified that she attended the Petrolati

fundraiser with members of the Probation Department.  Prior to the event, others within

Probation asked her if she was "going to the party."[477]

653.    Lucci described a similar effort being made within the Department for a Cahill

fundraiser, which again was organized by Wall:

> Q.    On the occasion that you donated to Tim Cahill, what were
>        the circumstances?
>
> A.    Another time that a fund-raiser was going to be held, go
>        there, eat and....
>
> Q.    On this occasion was someone within the Department again
>        organizing people going?
>
> A.    Yeah, yeah.  We gave a check.
>
> Q.    Who was organizing that?
>
> A.    I'm pretty sure it was Fran Wall.  I'm not a hundred percent
>        sure.
>
> Q.    But you think it was Fran again?
>
> A.    Yeah, I think so.  He would organize golf outings; we'd go
>        once a year.  He would organize a golf outing and things of
>        that nature.

Testimony of Paul Lucci, August 23, 2010 (Exhibit 114), at 99-100.

654.    Cremens remembered attendance at a Cahill fundraiser being solicited in the One

Ashburton Place cafeteria:

> Q.    And then do you recall somebody else doing that for Tim
>        Cahill?
>
> A.    I think so.  I'm not sure who is for Cahill, to be very
>        honest.  That's a vague one.
>
> Q.    Do you think it was Ed Ryan, do you remember?

---

[477]    Testimony of Francine Ryan, August 9, 2010 (Exhibit 132), at 138-39.

A.     It may have been Ryan; it may have been the
       Commissioner. I don't know who else it would be. But
       one of the two, probably, but I just don't remember who
       brought it up.

Testimony of John Cremens, August 6, 2010 (Exhibit 102), at 88.

655.     Frank Campbell also remembered a discussion about attending a fundraiser for

Cahill while at the lunch table following a senior staff meeting. Even though Campbell stated to

those at the lunch table that he is not "politically oriented or motivated," and was unable to

attend the event, he still purchased a ticket:

Q.     What you're describing, someone bringing this up at the
       lunch table, was it a situation where someone said, "Hey,
       I'm going to this Tim Cahill fund-raiser, anybody else want
       to go?" Was it that sort of thing?

A.     Well, I don't know if it actually happened that way. But
       when I say the lunch table, there was a group of us from the
       office on a given day, if there was a senior staff meeting for
       instance. ... [U]sually there'd be a big group of us and
       there are some that are there every day that sit at the lunch
       table in the state cafeteria every day. It's like the meeting
       spot where you talk shop or talk BC -- I didn't go to BC --
       a lot of BC football. The commissioner went to BC, but I
       don't really follow it, BC football.

       And I just kind of have a flash memory of somebody
       mentioning that there was a bunch of guys going to a fund-
       raiser for Tim Cahill. And it wasn't a big deal to me, quite
       honestly. I made it clear to a couple of people after the fact
       that I probably -- And I can't recall. I don't know if I sent
       the check to him directly or if I had asked to get a ticket. I
       think they had tickets for that fund-raiser, if my memory
       serves.

       I didn't go. It was in Quincy somewhere. But without a
       doubt you won't see any pictures of me there. I wasn't
       there. I wasn't there. I can say that with certainty.
       Because my life and my home was insanity at the time with
       my little guy.

Testimony of Francis Campbell, August 10, 2010 (Exhibit 98), at 197-99.