# EXHIBIT A

656.    O'Neil described being asked to go to political fundraisers, though he stated that

he never attended:

> Q.    Have you ever attended or been asked to attend political
>        fundraisers for any candidate?
>
> A.     I've been asked to attend; I've never attended.
>
> Q.    Are there particular candidates who stand out whose
>        fundraiser Probation Department employees used to go to?
>
> A.     Nothing that stands out. To be honest with you, I really
>        don't like politics. I try to stay away from it completely.
>        So I don't really engage in those kinds of discussions. If
>        people were saying they were going to a fundraiser or
>        something, I wouldn't even be interested in pursuing a
>        conversation in that area.
>
> Q.    Who are these people, even though you had little interest,
>        that mentioned various fundraisers? And I mean Probation
>        employees.
>
> A.     I think some people in Dedham, maybe a Chief like --
>        Chief of Dedham District Court. The name escapes me.
>        I've heard talks at Chiefs meetings about going to different
>        fundraisers. I mean, nobody really comes to mind as
>        saying, I am going to so and so's fundraising party tonight;
>        you want to come? I mean, nobody would even engage me
>        in a discussion like that that knows me.

Testimony of Richard O'Neil, August 3, 2010 (Exhibit 124), at 177-78.

657.    Office of Community Corrections Regional Program Manager John Quinn

testified that he was approached by Wall and asked to attend the Cahill fundraiser. Quinn said he

did not want to attend the event, but still gave a donation check for $100 to Wall.[478]

658.    Independent Counsel was not able to ask Commissioner O'Brien if he raised

funds for Petrolati and/or Cahill because he refused to cooperate with the investigation. He did

specifically deny to the *Boston Globe* that he played any role in raising funds for Cahill. Deputy

---

[478]   Testimony of John Quinn, November 1, 2010 (Exhibit 128), at 100-103.

Commissioner Wall flatly refused to cooperate with this investigation, declining to answer any questions, including whether he collected money from Probation Department employees for attendance at political fundraisers. Edward Ryan, under oath, denied soliciting funds for Cahill, although he admitted that he did "talk up" Cahill fundraisers.[479]

659. Based on the testimony by numerous witnesses (many of whom are old friends of O'Brien) that O'Brien, Wall, and/or Ryan were soliciting funds for Petrolati and Cahill, Independent Counsel concludes that, at a minimum, O'Brien and Wall did so.

660. In addition to fundraising for Petrolati and Cahill, one chief probation officer testified that Senator Marc Pacheco, a friend of his, asked him on more than one occasion to solicit contributions from among his fellow Probation Department employees, and he did so:

> Q. Senator Pacheco asks you to help him sell tickets --
>
> A. In the past he's asked me if I could take tickets to sell to friends.
>
> Q. Has he ever specifically asked you to see if anyone else in the Probation Department would be interested in attending?
>
> A. Yes.

Testimony of Joseph Dooley, September 17, 2010 (Exhibit 106), at 49-50.

661. Senator Pacheco denied ever asking Dooley to raise funds among Probation Department employees.[480] Independent counsel concludes that the testimony of the chief probation officer, who had no motive to incriminate himself, is more credible than that of Senator Pacheco on this issue.

662. The evidence reveals a culture in the Probation Department, beginning at the top with Commissioner O'Brien and Deputy Commissioner Wall, of ignoring the important

---

[479] Testimony of Edward Ryan, July 15, 2010 (Exhibit 131), at 256, 261-62.

287

restrictions placed on fundraising by public employees and in public spaces. It is especially troubling that the hierarchy of the Department solicited employees for contributions to politicians widely thought within the Department to be influential in hiring and promotion decisions, such as Representative Petrolati. The evidence collected unambiguously points to repeated violations of the law by O'Brien, Wall, and others, violations still within the limitations period of six years applicable to such offenses.

---

[480]   Testimony of Marc Pacheco, October 20, 2010 (Exhibit 125), at 92-96.

288

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

## OTHER INCIDENTS

## I. THE HIRING OF O'BRIEN'S WIFE AND DAUGHTER BY THE DEPARTMENT OF THE TREASURY.

663. The *Boston Globe* reported that in July 2005, "45 probation employees – mostly senior managers – donated $5,900 to state treasurer Cahill" and Cahill "hired [O'Brien's] wife," Laurie O'Brien, "to work in the State Lottery." The paper reported that O'Brien's daughter, Kelly O'Brien, is also employed by the Massachusetts Department of the Treasury.

664. A review of the Treasury's records confirms that Laurie O'Brien has been employed by the Massachusetts Lottery, which is a division of the Treasury, since September 21, 2005. Kelly O'Brien has been employed by the Abandoned Property Division of the Treasury since December 21, 2005.

665. Based on the evidence, Independent Counsel concludes that Commissioner O'Brien did in fact cause contributions to be solicited from Probation Department employees to Treasurer Cahill in an effort to assist his wife in obtaining a desirable position within that agency. A Probation Department employee, Edward Ryan, with childhood connections to Cahill further lobbied Treasury on Laurie O'Brien's behalf. The evidence strongly suggests, although current and former Treasury officials deny it, that these efforts by Commissioner O'Brien had the desired effect, assisting Laurie O'Brien in obtaining a position in customer service at Treasury, rather than a far less desirable position she had been offered as a night-shift computer operator.

666. Similar direct evidence has not been obtained with respect to Kelly O'Brien. However, given the timing of her employment, it is reasonable to infer that O'Brien's earlier efforts also played a role in her hiring by the same agency.

LIBA/21225629

### A.     Laurie O'Brien

667.     Independent Counsel obtained documents concerning Laurie O'Brien's hiring by the Treasury. These documents mostly consist of emails among Michael Coughlin, Director of Human Resources for the Lottery; Scott Campbell, then Director of Operations for the Treasury (and friend of Edward Ryan); and Neil Morrison, then Chief-of-Staff for Cahill. All three were regularly involved in the hiring of employees within the Treasury.

668.     There was no record of Laurie O'Brien submitting a job application, and witnesses could not recall when they first received her resume. A July 1, 2005 email from, refers to Campbell and/or Morrison having "recently" forwarded Laurie O'Brien along as a candidate for a position in the Lottery. [481] Accordingly, sometime before that July 1, 2005 date, either Campbell or Morrison received Laurie O'Brien's resume and sent it along to Coughlin.

669.     The evidence pointed to Campbell as the person who initially referred Laurie O'Brien for employment. Morrison testified that he did not receive Laurie O'Brien's resume. , A spreadsheet maintained by Assistant Director of Human Resources for the Treasury, Eileen Glovsky, to track job applicants indicates that Laurie O'Brien was referred by "Scott." Under the circumstances, that is undoubtedly a reference to Scott Campbell. Campbell testified that he does not recall referring O'Brien, but conceded it was possible. [482]

670.     Coughlin testified that he interviewed Laurie O'Brien for her position at the Lottery in June 2005. [483] His undated notes, which he testified were from that interview, are

---

[481]  A copy of the July 1, 2005 email accompanies this Report as Exhibit 80.

[482]  Testimony of Neil Morrison, September 30, 2010 (Exhibit 120), at 84-85; Testimony of Eileen Glovsky, October 18, 2010 (Exhibit 110), at 66-67; Testimony of Scott Campbell, August 31, 2010 (Exhibit 99), at 29-30, 38-39. Relevant excerpts from the testimony of Mr. Morrison, Ms. Glovsky, and Mr. Campbell accompany this Report as Exhibits 120, 110, and 99, respectively. A copy of the spreadsheet maintained by Glovsky accompanies this report as Exhibit 84.

[483]  Testimony of Michael Coughlin, September 2, 2010 (Exhibit 101), at 39-40. Relevant excerpts of the testimony of Mr. Coughlin accompany this Report as Exhibit 101.

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

generally positive, though sparse. They state "good interview – good candidate for customer service – no to field work to start – promotions??"[484]

671.    In the July 1, 2005 email, Coughlin indicated to Campbell and Morrison that he offered Laurie O'Brien a position as the "night shift computer operator" in the Lottery. Coughlin, Campbell and Morrison all testified that the night shift computer operator position was an undesirable one that was difficult to fill because of the overnight hours.[485]

672.    Subsequently, there was a concerted effort within the Probation Department to help Laurie O'Brien obtain a more desirable position within the Lottery.

673.    In particular, on July 6, 2005, shortly after Laurie O'Brien was offered the undesirable position of night shift computer operator, at least 34 employees of the Probation Department attended a Cahill fundraiser and donated at least $100 each to Cahill's campaign.[486] These employees included high level Probation Department employees Jeff Akers, William Burke, Frank Campbell, Edward McDermott, Edward Ryan, Francine Ryan, Nicholas DeAngelis and Maria Walsh. The vast majority of these employees have no other history of donating to Cahill's campaign, either prior to or after the July 6 fundraiser. Laurie O'Brien also donated $200 to Cahill's campaign on that day, sufficient to purchase tickets to the fundraiser for herself and the Commissioner.

674.    Several of those contributing testified that there was an organized effort by senior Department management to have Probation Department employees attend the Cahill fundraiser.

---

[484]    A copy of Coughlin's notes accompanies this Report as Exhibit 78.

[485]    Testimony of Neil Morrison, September 30, 2010 (Exhibit 120), at 56, 83-84, 88-89; Testimony of Scott Campbell, August 31, 2010 (Exhibit 99), at 29-30, 32;Testimony of Michael Coughlin (Exhibit 101), September 2, 2010, at 28, 32, 45-46.

[486]    Information concerning these donations is available from the Massachusetts Office of Campaign Finance website.

LIBA/21225629

675. As quoted above, John Cremens testified that he was informed of the fundraiser

for Cahill in the lunchroom at One Ashburton Place by either Commissioner O'Brien or Edward

Ryan. *See supra*, ¶ 654.

676. Paul Lucci testified that he was told about the Cahill fundraiser by Fran Wall. *See*

*supra*, ¶ 653. Regional Supervisor Nicholas DeAngelis also testified that he was encouraged to

attend the Cahill fundraiser by Wall:

> Q.   Do you recall kind of was one person any more than
>       another spearheading this effort or was it just kind of a
>       group dynamic of we're going to go to the fund-raiser?
>
> A.    I got the call from Fran Wall and I did ask if the people
>       who I was driving to the audit with were going and when
>       he said yes, I said I guess I'll go.

Testimony of Nicholas DeAngelis, August 24, 2010 (Exhibit 104), at 114-15.

677. Francine Ryan testified that a group of Probation Department employees from

Western Massachusetts drove down together to attend the Cahill fundraiser.[487] Frank Campbell

also recalled being solicited for the Cahill fundraiser. *See supra*, ¶ 655.

678. Cahill received $4000 in contributions from Probation Department employees

who bought tickets to this fundraiser.

679. Around this same time and during the time when Laurie O'Brien was seeking

employment from the Lottery, Edward Ryan, who encouraged Department employees to attend

the Cahill fundraiser, was making calls on her behalf to Cahill's office.

680. Ryan, a family friend of Cahill, testified that, at the request of Commissioner

O'Brien, he contacted Scott Campbell to recommend Laurie O'Brien.[488] Ryan also testified that

the Commissioner asked to him to inquire as to how Laurie O'Brien was progressing through the

---

[487] Testimony of Francine Ryan, August 9, 2010 (Exhibit 132), at 154-56.

hiring process and he did so.[489] Commissioner O'Brien was aware that Cahill had been Ryan's wrestling coach and the two were friendly.[490]

681.   Campbell did not refute Ryan's testimony concerning his recommendation of Laurie O'Brien for a position in the Lottery; he claimed that he could not recall whether he had any conversations with Ryan concerning Laurie O'Brien's hiring within the Treasury.[491] Indeed, Campbell testified that he remembered next to nothing concerning Laurie O'Brien's hiring.[492] Campbell did testify, however, that if he had spoken to anyone about Laurie O'Brien's hiring, it would have been Edward Ryan.[493]

682.   Neil Morrison corroborated Ryan's version of events. He testified that he was aware of Campbell's friendship with Ryan and assumed that Campbell was communicating with Ryan regarding Laurie O'Brien.[494] Morrison told us that he had the impression that Campbell was approached by someone who asked him (Campbell) "to give her a hand."[495] Morrison testified that he recalled both Campbell and Coughlin pushing for Laurie O'Brien to be hired, indeed, that Campbell was a "advocate" for her.[496] According to Morrison, Campbell and Coughlin rarely agreed on hiring decisions, and he found it odd that they agreed in this instance and inquired more about Laurie O'Brien.[497] Morrison testified that he learned "almost

---

[488] Testimony of Edward Ryan, July 15, 2010 (Exhibit 131), at 244-46, 248.

[489] Testimony of Edward Ryan, July 15, 2010 (Exhibit 131), at 249-52.

[490] Testimony of Edward Ryan, July 15, 2010 (Exhibit 131), at 252.

[491] Testimony of Scott Campbell, August 31, 2010 (Exhibit 99), at 18, 30, 43-46.

[492] Testimony of Scott Campbell, August 31, 2010 (Exhibit 99), at 17-18, 26, 29-35, 39-45.

[493] Testimony of Scott Campbell, August 31, 2010 (Exhibit 99), at 43-44.

[494] Testimony of Neil Morrison, September 30, 2010 (Exhibit 120), at 73-78, 101-102, 125.

[495] Testimony of Neil Morrison, September 30, 2010 (Exhibit 120), at 55.

[496] Testimony of Neil Morrison, September 30, 2010 (Exhibit 120), at 57-58, 60-62, 70-72, 128-129.

[497] Testimony of Neil Morrison, September 30, 2010 (Exhibit 120), at 53-55.

293

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

immediately" that Laurie O'Brien was O'Brien's wife, that Coughlin had been friendly with Laurie O'Brien for years, and that Coughlin thought "highly" of her.[498]

683.    Morrison testified that he raised this issue with Treasurer Cahill. Cahill was initially reluctant to consider Laurie O'Brien for a position, but Coughlin and Campbell persisted in their support for her and eventually convinced Cahill that there was a vacant position and that Laurie O'Brien was well qualified to fill it.[499]

684.    Just days after the fundraiser, on July 13, 2005, Coughlin, Campbell and Morrison once again discussed hiring Laurie O'Brien.  This time, instead of a position as a night shift computer operator, she was going to be offered a position in Customer Service, prompting Campbell to enthusiastically reply "Fantastic on Laurie O'Brien."[500]  Campbell, Coughlin and Morrison all testified that a position in Customer Service was more desirable and easier to fill than a night shift computer operator.[501]  Coughlin testified that he had hundreds of candidates to choose from for this position.[502]

685.    Morrison stated that he was not aware of the timing of the fundraiser, but that Campbell probably was aware of fundraising activities during this time period.[503]  He agrees that the timing of the second position offered to Laurie O'Brien and the fundraiser was poor, and that it gives the appearance that something inappropriate was happening, although he believes Laurie O'Brien was hired on the merits.[504]  Morrison testified that if he had known Laurie O'Brien had

---

[498]    Testimony of Neil Morrison, September 30, 2010 (Exhibit 120), at 52, 57-58, 60-61.

[499]    Testimony of Neil Morrison, September 30, 2010 (Exhibit 120), at 65-70, 106-108, 110-11.

[500]    A copy of this email accompanies this Report as Exhibit 81.

[501]    Testimony of Neil Morrison, September 30, 2010 (Exhibit 120), at 91-93; Testimony of Scott Campbell, August 31, 2010 (Exhibit 99), at 32;Testimony of Michael Coughlin (Exhibit 101), September 2, 2010, at 31-32.

[502]    Testimony of Michael Coughlin, September 2, 2010 (Exhibit 101), at 66-67, 79-80.

[503]    Testimony of Neil Morrison, September 30, 2010 (Exhibit 120), at 96-101.

[504]    Testimony of Neil Morrison, September 30, 2010 (Exhibit 120), at 95-96, 99-101.

LIBA/21225629

donated to Cahill's campaign while she was interviewing he would not allowed the donation to be accepted or would have had it returned.[505]

686.    Even beyond the donations to Cahill, the hiring of Laurie O'Brien was irregular. Morrison testified that such a job offer should not have been made by the Lottery itself, because hiring was supposed to be centralized within the Treasury. He also that typically an offer letter is not sent to a candidate who has not first met with the Treasurer, and O'Brien had not done so when she received her offer.[506] Morrison was clearly frustrated during his testimony that Laurie O'Brien's hiring did not follow Treasury's practices and procedures. He testified this was an ongoing problem with hiring for Lottery positions.

687.    There are no further communications or documents concerning Laurie O'Brien's hiring and promotion until 2007. In an email dated June 14, 2007, Campbell wrote "I spoke with my contact regarding Laurie O'Brien and the thought of exploring any opportunities in Marketing were most exciting to her. Please let me know what your thoughts are."[507] Coughlin testified that he did not know who this "contact" was, but that he thought it was "a little out of the norm" for a third party to be discussing Laurie's employment within the Lottery with Campbell.[508] Campbell claimed not to remember to whom he was referring as his "contact."[509] Morrison testified that the contact Campbell referred to in his email is probably Edward Ryan,[510] and this seems most likely.

---

[505]    Testimony of Neil Morrison, September 30, 2010 (Exhibit 120), at 128-129.

[506]    Testimony of Neil Morrison, September 30, 2010 (Exhibit 120), at 49-50, 110-111, 115-19.

[507]    A copy of this email accompanies this Report as Exhibit 82.

[508]    Testimony of Michael Coughlin, September 2, 2010 (Exhibit 101), at 55-57, 58-59.

[509]    Testimony of Scott Campbell, August 31, 2010 (Exhibit 99), at 42-43.

[510]    Testimony of Neil Morrison, September 30, 2010 (Exhibit 120), at 124-26.

688.    Despite all of this activity around Laurie O'Brien, Coughlin testified he did not

receive any direction or pressure from anyone to hire or promote her.  Morrison, however, did

get the impression that she received extra attention.[511]  Campbell, as in his responses to most

questions, claimed to be unable to remember the circumstances surrounding her hiring.[512]

689.    While there is no direct evidence that Ryan's calls to Campbell or the large

number of well-timed campaign contributions from Probation Department employees helped

Laurie O'Brien, the circumstantial evidence leaves no doubt that Laurie O'Brien's hiring was a

result of these outside influences.  Because this investigation is not focused on wrongdoing

outside the judicial branch, Independent Counsel did not fully investigate this issue.  The Court,

however, may wish to forward the information presented in this Report to relevant executive

branch officials for their review.

690.    More importantly for present purposes, Independent Counsel concludes that

Commissioner O'Brien, either directly or through his subordinates Wall and Ryan, solicited

contributions to Cahill from his employees in the Probation Department in an effort to assist his

wife in obtaining a desirable position within Treasury.  O'Brien also asked his subordinate,

Ryan, to intervene at Treasury on his behalf.  The solicitation of contributions was in violation of

the law and, moreover, an abuse of O'Brien's position of authority within the Department for

personal gain.

## B.    Kelly O'Brien

691.    We were unable to obtain significant testimony or documentary evidence

concerning the hiring of Kelly O'Brien.  Campbell testified that he does not recall anything with

---

[511]   Testimony of Neil Morrison, September 30, 2010 (Exhibit 120), at 121-22.

[512]   Testimony of Neil Morrison, September 30, 2010 (Exhibit 120), at 67-70; Testimony of Scott Campbell, August 31, 2010 (Exhibit 99), at 34-36, 39;Testimony of Michael Coughlin, September 2, 2010 (Exhibit 101), at 41.

respect to her hiring.[513] Glovsky testified that she has no knowledge of Kelly O'Brien's hiring, but was likely on vacation at the time.[514] Counsel for the Treasury, Grace Lee, informed us in a telephone call that an individual named Vicki Williams likely was involved in hiring Kelly O'Brien, but that Williams was terminated from her employment with the Treasury. We subpoenaed Williams at her last known address, but were informed she moved sometime in July 2010 and have been unable to locate her at this time.

692. The Treasury has no record of a posting for the position Kelly O'Brien received, nor is there any record of her having been interviewed prior to being hired.[515]

693. Documents produced by the Treasury provided some information with respect to Kelly O'Brien's hiring. In an email dated February 21, 2006, Glovsky and another employee of the Treasury note that she was a "surprise employee."[516] Interestingly, her application for employment is dated the same day as that email. (Glovsky testified this was not uncommon at the time). A compensation assessment, however, shows her date of hire as December 19, 2005. [517] Accordingly, it remains unclear how she was hired and under what circumstances, though this minimal information indicates that her hiring was not in the ordinary course.

694. Morrison testified that he was not involved in Kelly O'Brien's hiring (which he found to be unusual now and at the time). He learned from Campbell that she was seeking employment.[518] He told us that the dates on the documents related to her hiring do not make

[513] Testimony of Scott Campbell, August 31, 2010 (Exhibit 99), at 26, 45.

[514] Testimony of Eileen Glovsky, October 18, 2010 (Exhibit 110), at 49-50.

[515] Testimony of Eileen Glovsky, October 18, 2010 (Exhibit 110), at 46-47, 54-56, 66-67.

[516] A copy of this email accompanies this Report as Exhibit 83; Testimony of Eileen Glovsky, October 18, 2010 (Exhibit 110), at 33.

[517] Testimony of Eileen Glovsky, October 18, 2010 (Exhibit 110), at 38-39. A copy of Kelly O'Brien's employment application and compensation assessment accompany this report as Exhibit 79.

[518] Testimony of Neil Morrison, September 30, 2010 (Exhibit 120), at 129-35, 139-40.

sense given how hiring was supposed to work. While he does not know if there was anything improper in her hiring, he believes that ordinary hiring protocols were not followed.[519] He did not recall any push back on her hiring as had been the case when Laurie O'Brien initially applied for a Lottery position.[520]

695.    Edward Ryan testified that he believes he contacted Scott Campbell to recommend Kelly O'Brien for a position within the Lottery at the Commissioner's request.[521] Probation Department employees, only a few months prior, had made a large number of donations to Cahill's campaign. At this time, therefore, there is evidence to indicate that her hiring may also have been driven by efforts of Probation Department employees. More importantly, the same evidence suggests that Commissioner O'Brien solicited political contributions from his employees in order to assist his daughter's hiring. Such evidence, however, is less compelling than in the case of Laurie O'Brien.

## II.    THE DISCIPLINING OF ASHLEY LOSAPIO

696.    In providing examples of alleged instances where "politically connected employees with histories of alleged misconduct or sloppy work avoided serious career fallout," the *Boston Globe* discussed the situation of Associate Probation Officer Ashley Losapio, the daughter of First Justice Paul Losapio of the Uxbridge District Court.

697.    The *Globe* reported that "Worcester police fruitlessly complained to O'Brien in 2008 that associate probation officer Ashley Losapio, the stepdaughter of a judge, had compromised an investigation by leaking information to criminals." According to the *Globe*, Ms. Losapio admitted to having contact with known criminals and informing them of people she

---

[519]    Testimony of Neil Morrison, September 30, 2010 (Exhibit 120), at 136-41, 143-45.

[520]    Testimony of Neil Morrison, September 30, 2010 (Exhibit 120), at 129-31, 133-35.

[521]    Testimony of Edward Ryan, July 15, 2010 (Exhibit 131), at 247-48.

saw come into the court where she worked. Worcester Police Officers, the *Globe* reported, informed Commissioner O'Brien that Losapio "is not a suitable person to serve this community as a probation officer" and believe she continues to associate with known criminals. The *Globe*'s story concluded that while Losapio "has been transferred," "[s]he continues to work for probation, and her pay has increased by nearly $3,000 a year." The implication of the story is that Losapio should have been terminated from Probation, and was not only because of her connections.

698.    Losapio was appointed Associate Probation Officer and assigned to the Worcester Superior Court effective July 24, 2006 with a starting salary of $33,017.00. Employee information provided by AOTC shows Losapio's current salary is $37,518.75.

699.    We spoke to members of the Worcester Police Department concerning Losapio. On June 11, 2010, we met with Deputy Superintendent Edward J. McGinn, Lt. Thomas Gaffney and Sgt. Eric Boss. They confirmed the information reported in the *Globe* with respect to Losapio's association with known criminals. They also provided us with their file concerning Losapio which included a memorandum to the chief probation officer for the Worcester Superior Court, Thomas Turco, and letter to Commissioner O'Brien that detailed Losapio's activities. Copies of this letter and memorandum were also located in Commissioner O'Brien's files.[522]

700.    The letter detailed, and it was confirmed during the interview with Worcester Police, that Losapio has been a known associate of several drug and gun dealers who have been the subject of Worcester Police and DEA investigations.

---

[522] A copy of the memorandum from Lt. Thomas J. Gaffney to CPO Thomas Turco, dated April 4, 2008, accompanies this Report as Exhibit 85. A copy of the letter from Det. Captain Edward J. McGinn to Commissioner O'Brien, dated April 16, 2008, accompanies this Report as Exhibit 86.

Case 1:11-cv-11850-NMG Document 66-7 Filed 11/07/12 Page 16 of 23

701.    The memorandum and letter state that through wiretaps Worcester Police
intercepted discussions between these individuals recounting that they had received helpful
information from "Ashley L." According to the reports, during one conversation they discussed
contacting Ashley L. to get information on their case.[523] One of them stated during that
conversation that "[*he*] saw Shorty in court, and that she gave him a signal where he was going
to be alright." Worcester Police know "Shorty" to be the moniker of Ashley Losapio.[524]

702.    During our interview with the Worcester Police, they stated that they believe
Losapio notified her criminal associates when witnesses might be testifying before the grand jury
and, as a result, they appeared at the courthouse to intimidate witnesses.[525] They also stated that
Losapio used Probation Department databases to locate an individual owing money to a used car
dealer, whom they believe was subsequently accosted by Losapio's criminal associates.[526]

703.    On April 4, 2008, Worcester Police met with Chief Probation Officer Turco to
inform him of their investigation and desire to speak with Losapio. "It was explained [to Turco]
that the targets of this investigation are very violent and have access to numerous firearms and
large quantities of drugs. It was also explained that if the wrong information was given to the
targets of this investigation that it could result in someone being seriously hurt or murdered."[527]
The Worcester Police reported that Turco was helpful.[528] During their meeting Turco called

---

[523] A copy of the letter from Det. Captain Edward J. McGinn to Commissioner O'Brien, dated April 16, 2008, accompanies this Report as Exhibit 86.

[524] A copy of the letter from Det. Captain Edward J. McGinn to Commissioner O'Brien, dated April 16, 2008, accompanies this Report as Exhibit 86.

[525] Informal Interview of McGinn, Gaffney and Boss.

[526] Informal Interview of McGinn, Gaffney and Boss.

[527] A copy of the memorandum from Lt. Thomas J. Gaffney to CPO Thomas Turco, dated April 4, 2008, accompanies this Report as Exhibit 85.

[528] Informal interview of McGinn, Gaffney and Boss.

300

LIBA/21225629

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

Christopher Bulger, counsel for OCP, and asked that Losapio be suspended. Police described

Bulger as advising them that Losapio could not be suspended without a hearing.[529]

704.    Worcester Police reported that, later that same day, they interviewed Losapio.

During that interview, Losapio admitted to knowing and socializing with the known criminals.[530]

She admitted that she discussed with them who she had seen in court (but reasoned it was

"public" information anyway). She admitted to looking up information relating to the used car

purchaser.[531] Losapio also reportedly admitted to police that she looked up the criminal histories

of her associates on her work computer. The Worcester Police reported that Losapio admitted

that she knew what she was doing was wrong and that she was aware of the criminal activities of

the individuals with whom she associated, but reasoned that "it's all right if it's not around

[her]."[532]

705.    On April 9, 2010, Bulger sent a letter to Losapio concerning her interview with

Worcester Police. The letter informed Losapio, "[b]ased upon preliminary information you are

excluded from courtroom work and are instructed to perform limited office duties within the

probation office. In addition, your Court Activity Record Information (CARI) password will be

suspended, pending the outcome of this investigation."[533]

706.    On April 16, 2008, Deputy Commissioner Tavares sent a letter to Losapio

confirming her "voluntary transfer from the Worcester Division of the Superior Court to the

---

[529]   Informal interview of McGinn, Gaffney and Boss.

[530]   Informal interview of McGinn, Gaffney and Boss. A copy of the memorandum from Lt. Thomas J. Gaffney to CPO Thomas Turco, dated April 4, 2008, accompanies this Report as Exhibit 85. A copy of the letter from Det. Captain Edward J. McGinn to Commissioner O'Brien, dated April 16, 2008, accompanies this Report as Exhibit 86.

[531]   Informal interview with McGinn, Gaffney and Boss.

[532]   Informal interview with McGinn, Gaffney and Boss.

[533]   A copy of the April 9, 2010 letter from Bulger to Losapio accompanies this Report as Exhibit 87.

301

Westborough Division of the District Court Department effective April 16, 2008. You shall remain at the Westborough District Court pending the outcome of your investigatory review."[534]

707.    On April 25, 2008, Nicole Pangonis, Deputy Legal Counsel for OCP, informed Losapio via letter that she was placed on administrative leave with pay as of that date.[535] The letter also reminded Losapio that her investigatory review was scheduled for April 30, 2008.[536]

708.    On May 27, 2008, Bulger transmitted to Michael Manning of NAGE the "agreed upon discipline in the Ashley Losapio matter."[537] That letter attached the findings from Losapio's investigatory review, in which Losapio confirmed the information she told police.[538] The findings concluded that Losapio acknowledged her wrongdoing, was cooperative in both the OCP and police investigations, accepted responsibility for her actions, "appeared to be genuinely contrite," and "[c]onsistent with the objectives of the Trial Court's progressive discipline policy, Ms. Losapio … expressed a willingness to conform to the high standard of conduct expected of an Associate Probation Officer.[539] The findings also noted that Losapio had no other disciplinary action in her employment record.[540]

709.    Based on those findings, the following disciplinary actions were taken against Losapio: (1) two week suspension (one week without pay, one week deducted from accumulated vacation time)[541]; (2) permanent assignment to the Westborough Division of the District Court Department; and (3) her "CARI password, which is presently suspended, shall be reinstated upon

---

[534]  A copy of the April 16, 2008 letter from Tavares to Losapio accompanies this Report as Exhibit 88.

[535]  A copy of the April 25, 2008 letter from Pangonis to Losapio accompanies this Report as Exhibit 89.

[536]  April 25, 2008 letter from Pangonis (Exhibit 89).

[537]  A copy of the May 27, 2008 letter and disciplinary findings accompanies this Report as Exhibit 90.

[538]  May 27, 2008 letter and disciplinary findings (Exhibit 90).

[539]  May 27, 2008 letter and disciplinary findings (Exhibit 90).

[540]  May 27, 2008 letter and disciplinary findings (Exhibit 90).

302

the recommendation of the supervising chief probation officer. Thereafter, the chief probation officer shall have the discretion to restrict and/or monitor Ashley Losapio's use of the CARI system as deemed necessary."[542] Losapio accepted and agreed to both the findings and the discipline.[543]

710. Worcester police informed Independent Counsel that they have never heard back from the Commissioner's office regarding Losapio, but they believe that she is still socializing with the individuals involved in criminal activity. The provided us with Facebook screen shots showing photos of Losapio associating with those individuals.[544]

711. Legal Counsel for the Probation Department, Christopher Bulger, testified that he believed the punishment Losapio received was commensurate with her actions. Bulger told us that it is difficult to maintain a termination of a union employee such as Losapio. While in this instance she was suspended from work, per the Trial Court's progressive discipline policy, if she incurred another violation then there would be more solid grounds for termination.[545]

712. On the basis of the available evidence, Independent Counsel concludes that termination of Losapio was certainly justified. It is inconceivable that a responsible private sector company would continue the employment of an employee who knowingly used company computers to assist her criminal friends. It must therefore be even more unreasonable for an employee of a public safety and law enforcement agency to remain employed under such circumstances, particularly where there is no indication that she has terminated her affiliation with a known criminal element. Independent Counsel is also concerned by the failure of Legal

---

[541] Testimony of Christopher Bulger, October 13, 2010 (Exhibit 95), at 135-36.

[542] May 27, 2008 letter and disciplinary findings (Exhibit 90).

[543] May 27, 2008 letter and disciplinary findings (Exhibit 90).

[544] Informal interview with McGinn, Gaffney and Boss.

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

Counsel for Probation, Christopher Bulger, to have made subsequent inquiry of Losapio or her superiors regarding her compliance with the terms of her discipline. Nonetheless, Independent Counsel acknowledges that, as Bulger testified, union issues, and the discipline imposed in other situations, may have tied Probation's hands. These questions warrant further investigation which was beyond the resources and timeframe of this investigation..

---

[545] Testimony of Christopher Bulger, October 13, 2010 (Exhibit 95), at 131, 136.

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

## FOLLOW-UP AND OUTSTANDING ITEMS

While Independent Counsel undertook to complete a comprehensive investigation, due to time and resource constraints there are discrete areas that remain outstanding and that should be completed.

713.    On Tuesday, November 2, 2010, Manager of Intergovernmental Affairs Maria Walsh produced a folder labeled "1998" which contained additional Sponsor Lists, presumably from that year. We have not yet analyzed those lists and they are not considered as part of the Report.

714.    According to the testimony of various witnesses, there are several judges who contacted Chief Justice Mulligan to raise concerns about the hiring and promotion process for Probation Department employees. Those judges include Judge Elizabeth LaStaiti and Judge Catherine Sabaitis. We did not interview or seek testimony from those judges.

715.    Independent Counsel took testimony from Executive Director of the Office of the Community Corrections, Stephen Price, and his Deputy Director, Patricia Horne. Price stated that he received calls from legislators offering recommendations for candidates and Horne testified that for every interview on which she sat for an OCC position, she received names of recommended candidates. Both Price and Horne, however, testified that the names of recommended candidates were provided only to enable the interviewer to inform the candidate that someone had made a recommendation on their behalf. Price is a friend of Commissioner O'Brien's and has spoken to O'Brien several times per week since he was suspended.[546] Because for at least some purpose, names of recommended candidates were given to interview panels, and because Price and O'Brien have a close relationship, the claim by Price and Horne

---

[546] Testimony of Stephen Price, October 21, 2010 (Exhibit 126), 143-44.

LIBA/21225629

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

that hiring in OCC was not compromised is at least questionable and probably untrue. Other witnesses within OCC who may possess relevant information have not yet been interviewed.

716.    Independent Counsel requested images of the hard drives of the Probation Department computers issued to Deputy Commissioners Francis Wall and Elizabeth Tavares. We are awaiting receipt of those images and accordingly have not analyzed them or reviewed the documents and emails contained on them.

717.    Independent Counsel received images of the hard drives of Commissioner O'Brien, Manager of Intergovernmental Relations Maria Walsh and Deputy Commissioner Christopher Bulger. Independent Counsel reviewed the active Word, Word Perfect, Excel and pdf documents found on Walsh's and Bulger's computers. (O'Brien did not have any active files on his computer). We have not yet reviewed any other active files, such as websites, and have not yet reviewed any inactive or deleted files on any of these hard drives.

718.    Independent Counsel was informed late in the investigation that there is a server controlled by AOTC that contains Probation Department files. We have not searched that server for relevant documents.

719.    Regional Supervisor Mark McHale and Chief Probation Officer Mark Prisco, along with several other Probation Department employees, were deposed in the discrimination matter of *Brown, et al. v. O'Brien, et al.*, Civ. A. No. 07-3552, pending in Suffolk Superior Court. We have not yet reviewed those transcripts for their relevance to this investigation.

306

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

## CONCLUSION

This Report, while substantial, is incomplete. Many avenues of obvious inquiry could not be fully explored given time and resource constraints. For example, Independent Counsel was mindful that this investigation was focused on the Probation Department, not other state agencies and not on the Legislature. Legislative conduct was not fully explored except as immediately relevant to Probation hiring. Hiring and promotion practices in other state agencies and departments was beyond the scope of the investigation except as specifically relevant to Commissioner O'Brien. Accordingly, many questions remain unanswered as of this writing.

Independent Counsel is realistic that recommendations to state agencies as regards candidates for initial hire or promotion are not unique to Probation. Indeed, even as to Probation, such recommendations are neither inappropriate nor inconsistent with fairness and objectivity in and of themselves. This investigation, however, revealed a degree of abuse and systemic corruption in hiring and promotion that cannot be ignored, and which as implemented, became an obstacle to the very principles of hiring articulated in Trial Court policies. That extent of interference with merit hiring and promotion transformed a credible process into a patronage hiring machine. However well-oiled, that machine no longer serves the public interest.

Respectfully submitted,

_____

Paul F. Ware,
Independent Counsel

Dated: November 9, 2010

307