EXHIBIT D

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                          SUPERIOR COURT DEPARTMENT
                                      OF THE TRIAL COURT
                                      C.A. No.

                                      )
NATIONAL ASSOCIATION OF GOVERNMENT    )
EMPLOYEES, SEIU LOCAL 5000            )
         Plaintiff                    )
                                      )
v.                                    )       **10 - 4894**
                                      )
CHIEF JUSTICE FOR ADMINISTRATION      )
AND MANAGEMENT OF THE TRIAL COURT     )
         Defendant,                   )
                                      )

## APPLICATION TO VACATE ARBITRATION AWARD

To the Honorable Justices of the Superior Court sitting in the County of Suffolk,

respectfully represents your Plaintiff as follows:

### JURISDICTION

1. This Court has jurisdiction pursuant to Massachusetts General Laws chapter 150C,

   sections 11 through 15, and this Application is brought pursuant to section 11(a)(1) to

   vacate an arbitration award issued by Arbitrator Joan G. Dolan on August 17, 2006,

   in American Arbitration Association Case No. 11-300-00160-05. (A copy of the

   award is attached as Exhibit A).

2. M.G.L. 150C, section 11(b) states "an application under this section shall be made

   within thirty days after delivery of a copy of the award to the applicant, provided that,

   if such application is based upon a claim of corruption, fraud or other undue means it

   shall be made within thirty days after such grounds are known or should have been

   known."

1

3. This Application to Vacate Arbitration Award is based upon a claim of corruption and fraud. M.G.L. 150C, section 11(a)(1).

4. The Plaintiff learned about the fraud from the investigation and report of Independent Counsel Paul F. Ware, Esq, who was appointed by the Massachusetts Supreme Judicial Court to investigate promotion and hiring practices of the Massachusetts Probation Department of the Trial Court. The Supreme Judicial Court released the report on November 18, 2010 (hereinafter referred to as the "Ware Report"). The Ware Report details widespread fraud and corruption in the promotion and hiring practices of the probation department.

5. This Application has been filed within thirty (30) days of the Plaintiff's receipt of the Ware Report, or within thirty days after the grounds of fraud and corruption were made known. M.G.L. 150C, Section 11(b).

6. Venue is proper in this court pursuant to M.G.L. c. 150C, s. 15.

## PARTIES

7. The Plaintiff, National Association of Government Employees, SEIU Local 5000, (hereinafter referred to as "NAGE" or "the Union") is an employee organization as that term is defined in M.G.L. c. 150E, Section 1, with a principal place of business at 159 Burgin Parkway, Quincy, Norfolk County, Massachusetts 02169, and represents all full-time and regular part-time Probation Officers, Assistant Chief Probation Officers and Associate Probation Officers employed by the Office of the Commissioner of Probation, a subdivision of the Defendant Administrative Office of the Trial Court.

8.  The Defendant, Chief Justice for Administration and Management of the Trial Court
    (hereinafter referred to as "AOTC" or "the Employer") is an employer as that term is
    defined in M.G.L. c. 150E, Section 1, with a principal place of business at Two
    Center Plaza, Boston, Suffolk County, Massachusetts, 02108, and is the employer of
    judicial employees, including probation officers.

9.  At all relevant times, the Honorable Robert A. Mulligan has been the Chief Justice for
    Administration and Management of the AOTC.

## FACTS

10. Plaintiff and Defendant are parties to a collective bargaining agreement in effect at all
    times relevant to this matter. (A copy of the most recent collective bargaining
    agreement is attached as Exhibit B).

11. Article 20.01 of the collective bargaining agreement reads (in relevant part) as
    follows: "The Employer recognizes the principle of seniority for employees covered
    by this agreement so that when qualifications, such as training, skill, ability and other
    relevant qualities are considered equal by the employer, the employer shall give
    preference in cases of transfer, layoff, shift assignments, reassignments, promotion
    and overtime to employees with the longest service." (See Exhibit B).

12. In the winter 2005, the Employer posted a vacancy notice for the position of Assistant
    Chief Probation Officer for the Barnstable District Court.

13. Joseph Zavatsky, a probation officer at Barnstable District Court, applied for the
    Assistant Chief Probation Officer position. Both positions are covered by the
    collective bargaining agreement.

3

14. Pursuant to the Employer's promotional procedures, Zavatsky was scheduled to
    attend an initial interview for the Assistant Chief Probation Officer position before a
    panel consisting of a representative of the Employer's Office of the Commissioner of
    Probation by the name of Ed Dalton, the presiding First justice of the Barnstable
    District Court Joseph Reardon and the Chief Probation Officer of the Barnstable
    District Court David Parke.

15. Zavatsky attended the initial interview, as did ten other applicants.  One applicant,
    Hyannis Probation Officer in Charge Elzy Tubbs, did not appear as scheduled.

16. After the interviews concluded, the panel met to score the applicants.  Zavatsky
    scored sufficient points to proceed to the final interview stage.

17. After the scoring for the first interview had been completed, Tubbs appeared at the
    conference room the panel was using to score the applicants and explained that he had
    missed his scheduled interview through no fault of his own.  He requested that he be
    interviewed.

18. Second Deputy Commissioner of Probation Elizabeth Tavares was unable to
    determine the exact cause of Tubbs' failure to attend his scheduled interview, so she
    decided to cancel the results of all the interviews held that day and set up a second
    "initial" interview with a new panel.

19. The result of the second "initial" interview was that Zavatsky was not certified to the
    final interview process and Tubbs was so certified.  As a result of the final interview
    process, Tubbs was ultimately awarded the position of Assistant Chief Probation
    Officer at the Barnstable District Court.

4

20. Pursuant to Article V of the collective bargaining agreement (Exhibit B), NAGE filed
a grievance stating that the interview process and non-selection of Zavatsky for the
posted position was a violation of Article 20 of the collective bargaining agreement.

21. The grievance proceeded to arbitration pursuant to Article V of the collective
bargaining agreement before Arbitrator Joan G. Dolan.

22. Arbitrator Dolan issued an award denying the grievance. (Exhibit A).

23. By order dated May 24, 2010, the Massachusetts Supreme Judicial Court appointed
Attorney Paul F. Ware of Boston to investigate alleged wrongdoing within the
promotion and hiring practices of the Massachusetts Probation Department. The
Massachusetts Probation Department is a subdivision of the AOTC and is the
subdivision within which Zavatsky, Tubbs, Dalton and Tavares all work.

24. Tavares appeared before the Ware Commission and "...testified extensively that, for
the preliminary rounds of interviews, Commissioner O'Brien provided her with the
names of candidates whom he preselected to advance to subsequent rounds. Tavares
communicated the names of favored candidates to Probation Department employees
on the local interview panels, who understood that (unless the favored candidates
were blatantly unqualified) they were to make sure the favored candidates made the
list for the second round, taking the place of more qualified candidates..." (Excerpts
of Ware Report attached as Exhibit C, p. 4).

25. Dalton, who retired earlier this year, testified extensively before the Ware
Commission. The Report indicates that "...Dalton sat on a local panel interviewing
for an assistant chief probation officer position in Barnstable District Court. Prior to
the start of that interview, Dalton received a number of names from Tavares of

preferred candidates from the Commissioner's office, including a probation officer in charge named Elzy Tubbs...Tavares also gave him the names of two candidates who were *not* to make the list of finalists- Joseph Zavatsky and (deletion). Dalton's understanding was that they were blacklisted for previously filing grievances concerning another round of hiring in which they were unsuccessful." (Ware Report at pages 120-127, attached as Exhibit C).

26. The Ware Report, released by the SJC on November 18, 2010, concluded that after a partial review of the "..arbitration proceedings on promotion decisions...these files require the conclusion that senior Probation Department employees likely testified falsely during arbitration proceedings, stating that names had not been pre-selected and that ranking and scoring decisions were based solely on the merits...In particular, during arbitration hearings, the members of the final interview panel (usually Wall and Walsh) ordinarily were called to testify...Independent Counsel concludes that it is statistically improbable that in the three dozen cases for which we have records...on at least some of the occasions, there is the potential that final interview panel members perjured themselves, falsely describing their decisions as being based upon the answers provided by the candidates, when in reality, the decisions were based on the instructions provided by the (Office of the) Commissioner (of Probation)....". (Ware Report at findings 486, 487 and 490, attached as Exhibit C).

27. The Ware report concludes that the Trial Court committed fraudulent misconduct. It not only unfairly evaluated candidates' qualifications during the process, it also abused the process. The report indicates that Deputy Commissioners Wall and Walsh, the final round interviewers and decision makers, potentially perjured

themselves. The report concludes in part as follows: "...This investigation revealed a degree of abuse and systemic corruption in hiring and promotion that cannot be ignored, and which as implemented, became an obstacle to the very principles of hiring articulated in Trial Court policies. That extent of interference with merit hiring and promotion transformed a credible process into a patronage hiring machine. However well-oiled, that machine no longer serves the public interest." (Ware Report Conclusion at p. 307, attached as Exhibit C).

28. In regard to the Zavatsky arbitration, NAGE raised the issue of pre-selection of candidates at the hearing.

29. Arbitrator Dolan records that it is the position of the Employer that "...Mr. Tubbs was deemed to be the best qualified candidate after the promotion process had been concluded...". See Exhibit 1 at 13).

Count 1 – The Award was Procured by Fraud, Corruption or other Undue Means

30. The basis of Arbitrator Dolan's award was that the interview process was fair and unbiased, a conclusion that is in dispute based on the independent findings of the Ware Report, particularly the involvement of Dalton and Tavares in the selection process that was the subject of this arbitration. The award was procured by fraud based on the particular circumstances of the process involving Zavatsky, and the independent finding that the Employer representatives were involved in a promotion process that had "... been thoroughly compromised by a systemic rigging of the interview and selection process in favor of candidates who have political or other personal connections..." (Exhibit C, Ware Report at 3).

31. The arbitrator's award violated the collective bargaining agreement and M.G.L.

150C, section 11(a)(1).

WHEREFORE, the Plaintiff respectfully requests that this Court vacate Arbitrator

Dolan's award and order such other and further relief as it deems equitable and just.

December 16, 2010                    Respectfully submitted,
                                     National Association of Government Employees,
                                     SEIU Local 5000
                                     by its attorneys

                                     Michael F. Manning
                                     BBO #545255
                                     Rebecca Lee Mitchell
                                     BBO #651611
                                     159 Burgin Parkway
                                     Quincy, MA 02169
                                     (617) 376-0220

8

# AMERICAN ARBITRATION ASSOCIATION
# ARBITRATION DECISION AND AWARD

In the Matter of the Arbitration between:

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

|  |  |
|---|---|
| NATIONAL ASSOCIATION OF GOVERNMENT EMPLOYEES | ARBITRATION DECISION AND AWARD (Joan G. Dolan, Arbitrator) |
| AND | GRIEVANCE: Zavatsky Interview |
| MASSACHUSETTS TRIAL COURT | |
| AAA Case No. 11 300 00160 06 | AWARD DATE: August 17, 2006 |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## AWARD OF ARBITRATOR

The undersigned Arbitrator, having been designated in accordance with the extended 2000-2003 arbitration agreement entered into by the above-named Parties, and having duly considered the proofs and allegations of the Parties, awards as follows:

1.) The decision of the Trial Court to invalidate the first panel results in the selection process for ACPO in Barnstable District Court on February 2, 2005 did not violate the collective bargaining agreement.

2.) The grievance must be, and hereby is, denied.

Joan G. Dolan, Esq.
Arbitrator

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| **NATIONAL ASSOCIATION OF GOVERNMENT EMPLOYEES** | **ARBITRATION DECISION AND AWARD** (Joan G. Dolan, Arbitrator) |
| **AND** | **GRIEVANCE: Zavatsky Interview** |
| **MASSACHUSETTS TRIAL COURT** | |
| **AAA Case No. 11 300 00160 06** | **AWARD DATE: August 17, 2006** |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

This matter was presented to the undersigned arbitrator at a hearing held in Boston, Massachusetts on June 8, 2006. Michael Manning, Esq. appeared for the Union. With him was Probation Officer/Grievant Joseph Zavatsky. Jean Driscoll, Esq. represented the Trial Court. Also present for the Employer was Elizabeth Tavares, the Second Deputy Commissioner of Probation. Both parties filed post-hearing briefs.

## AGREED ISSUES

1.) Did the decision of the Trial Court to invalidate the first panel results in the selection process for ACPO in Barnstable District Court on February 2, 2005 violate the collective bargaining agreement?

2.) If yes, what shall be the remedy?

## CONTRACT LANGUAGE

The following provisions of the parties' extended 2000-2003 collective bargaining

agreement are involved in this case:

## ARTICLE V
### Grievance Procedure

Section 5.01  A grievance for purposes of this Agreement is a written dispute concerning the application or interpretation of the terms of this Agreement...

Section 5.04 Grievances shall be settled in the following manner:

Step 4     If the grievance has not been settled at Step 3, it may be submitted to arbitration... . The arbitrator shall have no power to add to, subtract from, or modify any provision of this Agreement or to issue any decision or award inconsistent with applicable law or which interferes in any way with normal operation of the Courts. The decision or award of the arbitrator shall be final and binding in accordance with Massachusetts General Laws Chapters 150C and 150E.

## ARTICLE XVI
### Management Rights

Section 16.01  The listing of specific rights of management in this Agreement is not intended to be, nor shall be, restrictive of, or a waiver of, the rights of management not listed and specifically surrendered herein, whether or not such rights have been exercised by the Employer in the past. Rights vested exclusively in the Employer include, but are not limited to, establishing standards of service and performance of its employees, including establishment of qualifications for ability to perform work; ... determining the competency of employees; determining ... the methods, means and personnel necessary to fulfill that mission, ... the determination of the ... appointment, promotion, assignment, direction and transfer of personnel; ... .

## ARTICLE XX
### Seniority

Section 20.01 The Employer recognizes the principle of seniority for employees covered by this Agreement so that when qualifications, such as

3.

training, skill, ability and other relevant qualities are considered equal by the Employer, the Employer shall give preference in cases of transfer, layoff, shift assignments, reassignments, promotion and overtime to employees with the longest service.

## FACTUAL BACKGROUND

### The Job and the Selection Process

In the winter of 2005, a large number of Assistant Chief Probation Officer (ACPO) and Probation Officer positions were posted, one of which was the Barnstable District Court ACPO position that is contested in this case. Second Deputy Commissioner of Probation Elizabeth Tavares testified that there were almost a thousand applications that had to be processed for these openings.

The first step in the selection process was that three or four Probation Department clerical employees looked through the applications to make sure that the candidates met the minimum qualifications listed in the job description. The next was that interviews were scheduled for those who had successfully passed the initial review. The clerical employees coordinated all of the scheduling, and called candidates to tell them their interview time. Given the number of applicants, there was no written notice given or logs kept of the telephone calls setting up the interviews.

The process called for an initial interview with a three-person panel consisting of a representative of the Probation Office and the First Justice and Chief Probation Officer in the court with the ACPO opening. Eight candidates were to be selected after the first interview

4.

to move on to a second panel interview stage. In order to be selected, an applicant had to receive two of the three possible votes.

## The Barnstable ACPO First Interviews

### Interviews Held and Selections Made

The panel consisted of First Justice Joseph Reardon, Chief Probation Officer David Parke, and Probation Department representative Ed Dalton. The panel met with applicants on February 2, 2005.

Twelve candidates were scheduled to be interviewed between 9:00 a.m. and 1:00 p.m. One of them was Grievant Joseph Zavatsky, a Court employee since 1985. Another was Hyannis Probation Officer in Charge Elzy Tubbs, a Court employee since 1993. According to the schedule given to the interviewers, Mr. Tubbs' interview time was 11:20-11:35.

The interviews were held, but Mr. Tubbs did not appear. Members of the interview panel tried to reach him at his job several times, but were unable to. Between 1:00 and 1:30, the three panelists deliberated and came up with the list of the eight individuals who had received at least two votes and hence would move on to the second interview stage. Mr. Zavatsky was among the eight.

[continued next page]

5.

The first interview process worked out like this:

| Candidate | Votes | Moved to Stage 2 |
|-----------|-------|------------------|
| Welchman | 3 | Yes |
| Chase | 3 | Yes |
| Casey | 3 | Yes |
| Smith | 3 | Yes |
| DeAngeles | 3 | Yes |
| McGromley | 3 | Yes |
| Zavatsky | 2 | Yes |
| Nunes | 2 | Yes |
| Weber | 1 | No |
| Norris | 1 | No |
| Houghton | 0 | No |

## Mr. Tubbs Arrives

The deliberation and selection process concluded around 1:30. At some point after 1:30 but before 2:00, Mr. Tubbs arrived at the court. He sought to be interviewed. Mr. Dalton of the Probation Office and Chief Probation Officer David Parke wanted to interview Mr. Tubbs at that point. Both men felt that Mr. Tubbs should not be deprived of an interview opportunity if he had been given the wrong interview time by the clerical employees who did the scheduling. Judge Reardon did not agree. The judge was unwilling to interview Mr.

6.

Tubbs because he believed that doing so would constitute a violation of the protocol for the interviews.

Mr. Dalton telephoned Ms. Tavares in Boston and explained the situation. Ms. Tavares spoke to Judge Reardon, who reported Mr. Tubbs' explanation that he had appeared when he did because he had been given the wrong interview time by the employees who had done the scheduling. Judge Reardon also mentioned a concern about a local bylaw regarding personnel interviews that he thought precluded him from doing the Tubbs interview.

Later on the afternoon of February 2, the judge sent Ms. Tavares an e-mail. He suggested that an approach might be to have the Probation Department secure the assent of the other 11 candidates to a late interview of Mr. Tubbs. Another alternative Judge Reardon raised was voiding the interview process because of a mistake in giving the wrong time to Mr. Tubbs. His bottom line was that he would not interview Mr. Tubbs without an order to do so from the Chief Justice for Administration and Management, his departmental Chief Justice, or the Commissioner of Probation.

There was much consternation and many conversations among the judges and top-level personnel of the Probation Department. Various possibilities for dealing with the situation were discussed, but each had undesirable elements in terms of being fair to all, or creating more problems than it solved. One of the possibilities considered was to have Regional Administrative Justice Rosemary Minehan take Judge Reardon's place and go to Barnstable the next day to interview Mr. Tubbs. The problem with this approach was that

Judge Minehan would not have been able to rank the other 11 candidates since she would not have interviewed them.

In addition to being involved with these discussions, Ms. Tavares was trying to find out what had happened with Mr. Tubbs. She did not ask him where he had been earlier in the day when the interview panel had tried to reach him. Ms. Tavares said that she was concerned about whether Probation personnel had given him the wrong interview time. When she talked to the clerical employees who had done the scheduling, they said that they thought he had been given the right time, but Ms. Tavares was unable to discover who had actually called Mr. Tubbs. Ms. Tavares never asked Mr. Tubbs who had called him to set up the appointment. Ultimately, she was unsuccessful in obtaining a clear picture of what had happened with the appointment time.

As to what was to be done about the interview process, it was ultimately decided that the fairest solution was to start over again with a completely new panel.

## The Second Interview Panel

On February 9, the second panel re-interviewed everyone who had been interviewed on February 2, and also Mr. Tubbs. This panel consisted of Judge Minehan, Deputy Commissioner of Probation Paul Lucci, and Chief Probation Officer John Chapman. The second panel asked the candidates the same questions the first panel had asked them.

The panel reached a consensus on the top eight applicants. Mr. Zavatsky was not among them, but Mr. Tubbs was. Two other employees who had been among the eight after

8.

the first interview were not after the second. The three who went from "yes" to "no" votes were all Barnstable District Court Probation Officers. Two who had not been "yes" votes after the first panel were after the second. They were Probation Officers from Norfolk and the BMC. The bottom line in terms of Barnstable District Court Probation Officer candidates for the promotion was that five of them had applied; the first panel voted to send all five on to the next stage; and the second panel selected only two of the five to move on to the next stage.

A comparison of the two processes shows:

| Candidate | Panel 1 | Panel 2 |
|-----------|---------|---------|
| Welchman | Yes | Yes |
| Chase | Yes | Yes |
| Casey | Yes | No |
| Smith | Yes | Yes |
| DeAngeles | Yes | Yes |
| McGromley | Yes | Yes |
| Zavatsky | Yes | No |
| Nunes | Yes | No |
| Weber | No | Yes |
| Norris | No | Yes |
| Houghton | No | No |
| Tubbs | ---- | Yes |

### The Position is Filled

The selection process proceeded through its various steps with the pool created by the

second panel. Ultimately, the job went to Mr. Tubbs.

### The Grievance

On March 21, 2005, Mr. Zavatsky filed a grievance under Article 20.01 that reads in

pertinent part:

> Concerning the recently posted position for Assistant Chief Probation Officer
> in Barnstable Dist. Court.
>
> It is my contention that an appointment was made concerning
> promotion, where seniority, education, and qualifications were ignored by the
> Trial Court, the aggrieved individual holds a Masters Degree and 20 years of
> experience in said court. The Aggrieved individual was initially interviewed
> and submitted for consideration to the Commissioner of Probation. The
> Aggrieved individual was subsequently removed from consideration after the
> initial committee was replaced for no just cause.
>
> The aggrieved appointment was approved by the Chief Administrative
> Justice. The newly appointed person began work on 3/21/05.

The remedy Mr. Zavatsky sought read:

> It is my contention that the contract was ignored in the above
> appointment. It is also my contention that the interview process was flawed,
> when the initial interview committee was removed for no just cause.
> Interviews should be reopened and consideration given to seniority as per the
> contract.

The Trial Court denied the grievance and this arbitration followed.

## UNION POSITION

For the following reasons, it should be found that the Trial Court has violated the collective bargaining agreement. The proper remedy is that the result of the second panel's interviews should be invalidated. The first panel's determination about who should pass on to the second stage should be reinstated, and the Employer should proceed to fill the position from the pool created after the first panel.

### 1.) The Employer's Flexibility Is Not Unlimited

It is true that Article 20.01 gives the Trial Court a great deal of flexibility in the promotions area. However, before the Employer exercises its right to determine employee qualifications under the Article, the process of how applicants are handled during the interviews is subject to question and scrutiny.

This whole situation smacks of how urban myths start. There were 12 applicants scheduled for the February 2nd interviews, 11 of whom showed up as scheduled. Only Mr. Tubbs showed up afterwards, claiming that he thought his interview was scheduled for 2:00 or 2:15. There is simply no proof that Mr. Tubbs was late through no fault of his own. There is hearsay evidence that he reported that he believed his interview was when he said it was. Despite efforts to find Mr. Tubbs at the time of his interview, he could not be located, despite the fact that he was supposed to be working that day. Although Mr. Tubbs has apparently never claimed that he was misinformed about the time, that seems to have become the accepted version as this grievance progressed. Hence, the urban myth.

The Employer seems to respond to the situation by suggesting that the initial screening was biased in favor of local Barnstable candidates. It implies that this was corrected by the second panel, which did not accept three Barnstable candidates who had been on the first panel's list. This is an indictment of the entire promotional protocol from the party that established it.

## 2.) This Situation Is Unfair

As a prior Trial Court promotion case between these parties said, an employee who does not feel well but chooses to show up for his interview cannot claim that his illness excused poor performance in the interview. In such a situation, the employee must request a postponement.[1]

The same rule should have applied to Mr. Tubbs. Unless he requested a postponement for which he had some cause, he should be stuck with the interview opportunity as scheduled. Mr. Zavatsky played by the rules the Employer established. The Trial Court then cavalierly disregarded its own protocol to accommodate an employee who did not play by the rules. Mr. Tubbs has offered no justification for special treatment other than believing he misdiaried the appointment.

## 3.) Another Course of Action

What happened here has been catastrophic to the Grievant, who was on track for

---

[1] The Donald Mumford Case, AAA # 11 390 023117 05 (Cooper, 2006).

consideration for promotion until the special treatment was given to Mr. Tubbs, who, of course, ended up getting the job. At hearing, the Employer asserted that the Union would have rushed to Mr. Tubbs' defense had the situation not been handled exactly the way the Employer did. That is not true. The Union would have asked Mr. Tubbs one additional question, and would have required his attendance at subsequent hearings to repeat his answer. The question is a very simple one: Why did he think his interview was at 2:00 or 2:15? Without a satisfactory answer to the question, the Union would not have filed a grievance on Mr. Tubbs's behalf. The key question is one which the Employer apparently never asked.

## TRIAL COURT POSITION

This was a no-win situation in which none of the alternatives could make everyone happy. However, the contract preserves for the Employer the managerial right to establish qualifications for jobs, determine the competency of employees, and promote employees. There was nothing contractually amiss in the Trial Court's decision to void the initial round of interviews and start over again. The grievance should be denied.

### 1.) A Reasonable Solution to a Difficult Situation

The Employer had several concerns about the procedural regularity of what, had happened. According to Judge Reardon, Mr. Tubbs told the panel that he was scheduled to be interviewed at 2:00 or 2:15. The judge was unwilling to interview Mr. Tubbs without a

13.

specific order to do so, and the candidate could have been legitimately concerned about any

interview the judge had been directed to conduct. Substituting another judge had its own set

of problems.

The decision to start again from the beginning and put everyone on the same footing

was a reasonable decision. The Union would have the arbitrator vacate the position Mr.

Tubbs holds, and re-do the second round interviews with only the candidates selected by the

first panel. Such an approach directly violates Mr. Tubbs' interests. No one involved in this

case has any information that suggests that Mr. Tubbs deliberately missed his 11:20 February

2 interview and made up a story about receiving the wrong time. It is much more likely that

the Trial Court personnel department staff mis-spoke the time to Mr. Tubbs, given the

extraordinary scheduling challenges of that time.

## 2.) No Contract Violation

Mr. Tubbs was deemed to be the best qualified candidate after the promotion process

had been concluded. Section 20.01 of the contract says that the Employer is not required to

apply seniority unless it has judged other qualifications equal. Mr. Tubbs' qualifications did

not come before the first panel, which refused to interview him. The Trial Court's obligation

is to have a fair selection process. That is what it did in this case. The Union has submitted

no proof that the new first panel resulted from an arbitrary or capricious decision.

The Grievant was not the unanimous choice of the first panel, and it cannot be known

whether or not Mr. Tubbs replaced him in the second panel's ranking. Mr. Zavatsky's

14.

understandable disappointment cannot be a substitute for evidence that the Trial Court breached its contractual obligations.

## OPINION

Both the facts and the contract compel the conclusion that the Trial Court must prevail in this case. That said, it must be observed that it is no surprise that the Union and Mr. Zavatsky are very distressed about what happened here. From their perspective, this was a perfect storm of suspicious circumstances:

- Mr. Tubbs misses his interview;
- Mr. Zavatsky and four other Barnstable Probation Officers have been interviewed and selected to move on to the next stage of the promotion process;
- Mr. Tubbs shows up after the process is over with an excuse that cannot be verified;
- After interviews by a new panel, Mr. Tubbs is selected to move on to the next stage, and Mr. Zavatsky and two other Barnstable Probation Officers who had been selected are no longer in the running;
- Mr. Tubbs gets the job.

The other perspective is, of course, that of the Employer. Its view is that it was trying to make the best of a bad situation and be as fair as it could be to all. That view will be discussed in the following sections.

## The Subtext Here

It is the question of whether or not there was favoritism towards Barnstable District

Court Probation Officers in the first panel process, and a desire to get broader representation from candidates outside Barnstable in the second panel process. This is a subject that was referred to during the arbitration hearing, but it is not a subject that can be dealt with here.

That is so because my jurisdiction is limited to considering the grievance that led to this arbitration case. That grievance and the remedy it sought is printed in full at page 9 above. It is clear that bias towards or against the class of Barnstable Probation Officers who applied for this promotion is not the issue that was grieved. The concern the Union expressed at the hearing and repeats in its brief is certainly understandable, but it simply cannot be resolved in this case.

## The Contract and the Facts

When the parties negotiated the collective bargaining agreement, they did not put anything in it about the process for filling supervisory positions such as the ACPO job at issue here. Nothing in the contract requires that an interview process be used. Nothing in any way mandates what method the Trial Court must employ to assess the qualifications of individuals seeking promotions.

The Employer argues that its decision to start the process over again with a level playing field was not an arbitrary and capricious decision. Quite the reverse, it says. It was the most desirable among a collection of undesirable alternatives aimed at making the process as fair as it could be to all concerned. This is a position with which the facts compel

16.

me to agree. What we have here is a process that was as fair and regular as it could have been under adverse circumstances.

The sticking point here is the fact that there was no external, objective proof of Mr. Tubbs's claim that whoever had called him had given him the wrong interview time. The Union argues that someone should have asked Mr. Tubbs why he thought his interview was at 2:00 or 2:15, but, from what Judge Reardon reported to Ms. Taveras, it seems clear that Mr. Tubbs explained when he arrived that he had been told that that was the time he was to be there.

While it is certainly true that Ms. Taveras might well have asked Mr. Tubbs who gave him that information, it seems very doubtful that the answer to that question would have helped. As Ms. Taveras testified, when she talked to the clerical employees involved in this scheduling, none of them acknowledged making the Tubbs call. Why that was so is not clear from the record. What is clear is that, given the absence of any written record of these calls, even if the identity of the caller had been ascertained, it seems highly unlikely that the employee would have had any reliable recollection of one conversation among what sounds like hundreds of calls. No weight can properly be given to the employees' statement that Mr. Tubbs had been given the correct time when even the name of the caller could not be learned.

What the Employer was facing here was a report from a 12-year employee with no motivation to show up hours late for an interview for a job he sought. To have given Mr.

17.

Tubbs the benefit of the doubt in the context of the pertinent facts cannot be found to have been unreasonable.

Given that that is so, it must be found that the management personnel involved in trying to respond to this difficult situation fully considered the possibilities and then chose the fairest alternative. Their choice did not violate any provision of the collective bargaining agreement. It is indeed unfortunate that Mr. Zavatsky lost his chance to move to the next phase of the process, but there is no contractual basis to order that the results of the first panel be reinstated and the process re-done from that point.

### AWARD

1.) The decision of the Trial Court to invalidate the first panel results in the selection process for ACPO in Barnstable District Court on February 2, 2005 did not violate the collective bargaining agreement.

2. The grievance must be, and hereby is, denied.

Joan G. Dolan, Esq.
Arbitrator