# EXHIBIT E



**SEIU**

**NAGE**

| National Association of Government Employees |

*AFFILIATED WITH THE SERVICE EMPLOYEES INTERNATIONAL UNION*

August 16, 2011

Michael J. Donovan, Esq.
Clerk
Suffolk County Superior Civil
Three Pemberton Square
12th Floor
Boston MA 02108

**RECEIVED**

AUG 1 8 2011

**HR DEPARTMENT/AOTC**

Re:   National Association of Government Employees, SEIU, Local 5000

Vs.   Chief Justice for Administration and Management of the Trial Court
      Suffolk Superior Court C.A. Nos. 2010-4884-F through 4894-F

Dear Mr. Donovan:

        In accordance with Superior Court Rule 9A, enclosed please find for filing the
following documents:

        1.  Document List
        2.  Affidavit of Compliance
        3.  Plaintiffs' Motion for Judgment on the Pleadings
        4.  Plaintiffs' Memorandum in Support of its Motion for Judgment on Pleadings
        5.  Defendant's Opposition to Plaintiffs' Motion for Judgment on the Pleadings
        6.  (Defendant's Proposed) Order

        Would you kindly schedule this matter for oral argument as soon as possible.

                                        Very truly yours,

                                        Michael F. Manning

MFM/ms
Cc:    J.S. Driscoll, Esq.
        Anne Marie Ofori-Acquaah, Esq.

COMMONWEALTH OF MASSACHUSETTS
THE TRIAL COURT

SUFFOLK, ss                        SUPERIOR COURT
DEPARTMENT OF THE TRIAL COURT
DOCKET # SUCV 2010-4884-F
Through 2010-4894-F

---

| | |
|---|---|
| NATIONAL ASSOCIATION OF | ) |
|     GOVERNMENT EMPLOYEES, | ) |
|     SEIU LOCAL 5000, | ) |
|         Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| CHIEF JUSTICE FOR | ) |
|     ADMINISTRATION AND | ) |
|     MANAGEMENT OF THE | ) |
|     TRIAL COURT, | ) |
|         Defendant | ) |

## DOCUMENT LIST

1.  Affidavit of Compliance.

2.  Plaintiffs' Motion for Judgment on the Pleadings

3.  Plaintiffs' Memorandum in Support of its Motion for Judgment on the Pleadings

4.  Defendant's Response  to Plaintiffs' Motion for Judgment on the Pleadings

5.  (Defendant's Proposed) Order

Michael F. Manning
National Association of Government
Employees
159 Burgin Parkway
Quincy, MA  02169
(617) 376-0220

Date: August 16, 2011

I hereby certify that a true copy of the above document was served upon Jean Strauten
Driscoll, Esq., and Anne Marie Ofori-Acquaah, Esq., attorneys of record for the
Defendant, by mailing a copy of the same by certified mail on August 16, 2011.

Michael F. Manning

COMMONWEALTH OF MASSACHUSETTS
THE TRIAL COURT

SUFFOLK, ss

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
Docket # SUCV 2010-4884-F
Through 2010-4894-F

NATIONAL ASSOCIATION OF )
    GOVERNMENT EMPLOYEES, )
    SEIU LOCAL 5000, )
                Plaintiff )
                 )
v. )
                 )
CHIEF JUSTICE FOR )
    ADMINISTRATION AND )
    MANAGEMENT OF THE )
    TRIAL COURT, )
             Defendant )

## AFFIDAVIT OF COMPLIANCE

I, Michael F. Manning, attorney for Plaintiff National Association of Government

Employees, SEIU LOCAL 5000, hereby state that with regard to the above-captioned

matter I have complied with the provisions of Superior Court Rule 9A, having served the

Plaintiff's Motion for Judgment on the Pleadings and the Memorandum in Support of its

Motion for Judgment on the Pleadings to opposing counsel by mailing by prepaid mail on

July 14, 2011.

Michael F. Manning
National Association of Government
Employees, SEIU Local 5000
159 Burgin Parkway
Quincy, MA  02169
(617) 376-0220

Date: August 16, 2011

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss

SUPERIOR COURT
DEPARTMENT OF THE TRIAL
COURT
Docket # SUCV 2010-4884-F
      through 2010-4894-F

|  |  |
|---|---|
| NATIONAL ASSOCIATION OF<br>   GOVERNMENT EMPLOYEES,<br>   SEIU LOCAL 5000,<br>               Plaintiff, | ) ) ) ) ) |
| v. | ) ) |
| CHIEF JUSTICE FOR ADMINISTRATION<br>   AND MANAGEMENT OF THE<br>   TRIAL COURT,<br>             Defendant | ) ) ) ) ) |

**PLAINTIFFS' MOTION FOR JUDGMENT ON THE PLEADINGS**

Now comes the Plaintiffs, the National Association of Government Employees/Service

Employees International Union Local 5000 and moves pursuant to Mass. R. Civ. P. 12(c) for

Judgment in its favor based upon the Pleadings.

The Plaintiffs support this Motion with the accompanying Memorandum.

Respectfully submitted,
National Association of Government Employees,
     Service Employees International Union
     Local 5000
By its attorney,

Michael F. Manning, Esq.
BBO #545255
National Association of Government
     Employees
159 Burgin Parkway
Quincy MA  02169-4213
(617) 376-0220

Dated: July 14, 2011

## CERTIFICATE OF SERVICE

I hereby certify that the above Plaintiffs' Motion for Judgment on the Pleadings and the

accompanying Plaintiff's Memorandum in Support of the Motion for Judgment on the Pleadings

were this day served on the Counsel of Record for the Defendant Jean Strauten Driscoll by

sending a copy via first class mail, postage prepaid, to Two Center Plaza, Boston MA 02108.

Michael Manning
7/14/11

2

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss

SUPERIOR COURT
DEPARTMENT OF THE TRIAL
COURT
Docket # SUCV 2010-4884-F
through 2010-4894-F

|  |  |
|---|---|
| NATIONAL ASSOCIATION OF<br>    GOVERNMENT EMPLOYEES,<br>    SEIU LOCAL 5000,<br>              Plaintiff, | )<br>)<br>)<br>)<br>) |
| v. | )<br>) |
| CHIEF JUSTICE FOR ADMINISTRATION<br>    AND MANAGEMENT OF THE<br>    TRIAL COURT,<br>              Defendant | )<br>)<br>)<br>)<br>) |

## MEMORANDUM IN SUPPORT OF
## PLAINTIFFS' MOTION FOR JUDGMENT ON THE PLEADINGS

### STATEMENT OF THE CASE

The Plaintiffs, the National Association of Government Employees/Service Employees
International Union Local 5000 (hereinafter referred to as "NAGE" or the "Union") has
represented professional employees of the Chief Justice for Administration and Management
(hereinafter, the "CJAM") since August of 2003 regarding terms and conditions of employment
pursuant to MGL c. 150 s. 1. Approximately 1100 of those employees of the CJAM work for the
Office of the Commissioner of Probation (hereinafter, the Commissioner"). In the course of that
representation, these parties have had reason to resort to binding arbitration pursuant to a

collective bargaining agreement. On multiple occasions since 2003, the Union has sought and received arbitration review of not fewer than eleven disputes concerning said Commissioner's decisions regarding transfers and promotions (hereinafter, "appointments"). All eleven of those arbitration decisions were adverse to the Union.

On or about May 24, 2010 the Commonwealth of Massachusetts Supreme Judicial Court appointed attorney Paul Ware as Independent Counsel and ordered him to conduct a thorough investigation of the conduct of the Commissioner concerning questions of, inter alia, corruption in the selection process for appointments. On November 9, 2010, Attorney Ware submitted his report to the Supreme Judicial Court, concluding that "…This investigation…revealed a degree of abuse and systemic corruption in hiring and promotion that cannot be ignored, and which, as implemented, became an obstacle to the very principles of hiring articulated in Trial Court policies.". Ware Report at p. 307. (Cited excerpts to the Ware Report are appended as Exhibit 1.)

The Report details pervasive corruption at the highest levels of the Commissioner's Office, including a finding that in all likelihood Commissioner witnesses testified falsely at arbitration hearings such as those described above. Ware Report at p. 33. The Union thereupon filed these eleven civil actions seeking to vacate these eleven arbitration awards. See MGL c. 150, sect. 11(a)(1), the statutory bar prohibiting "…awards procured by corruption, fraud or other undue means…".

Part of the supporting material for the Ware Report is Exhibit 32, still subject to an impoundment order at the SJC. Exhibit 32 is referred to in the Ware Report as the "Sponsor List", a repository for the requests made to the Commissioner for special treatment of applicants for hire, transfer and promotion. In March of 2011, the parties jointly requested 1) that these

2

eleven cases be consolidated and 2) that the SJC allow these parties to review Exhibit 32 in order
to determine which, if any, of the records in the Sponsor Lists could have impacted the
appointments that were the subject of these arbitration awards.

The Motion for Consolidation was approved by this Court. The motion for limited access
to Exhibit 32 was also allowed by the SJC. See Order dated June 21, 2011, attached as Exhibit
2. A copy of the portions made available to the parties is available to this Court as authorized by
the Order. The subsequent review of those portions of Exhibit 32 revealed that a majority of the
appointments that are now before this Court were in fact sponsored. It is the Union's position
that this fact, when coupled with the Ware Report finding that the Commissioner did not turn
over all of the Sponsor lists as part of the Investigation, and with the Ware Report finding that
not all of the Sponsor Lists that were obtained during the Investigation were in fact forwarded to
the SJC as part of Exhibit 32, and the Ware Report finding that not all of the requests for special
treatment were recorded on the Sponsor Lists, reveals a pattern of corruption that mandates that
all of the arbitration awards at issue be vacated.

## OVERVIEW OF THE UNION'S POSITION

The collective bargaining agreement between these parties allows for an employee who is
denied a promotion or transfer to file a grievance to contest the legitimacy of that determination.
Article 16 of said agreement allows any such action to be sustained if, in the opinion of the
employer, the successful applicant deserves such appointment based upon merit. This is also the
policy of the CJAM. The filing of a grievance begins an internal review process (the 'grievance
procedure') and eventually allows for review of that procedure by a neutral arbitrator.

Eleven times since 2003 the Union has invoked arbitration. The standard response of the
CJAM has been to parade senior management officials from the Commissioner's Office before

3

the arbitrator to recite, under oath, that the successful applicant was, in fact, the best qualified candidate for the appointment. Due to the efforts of the Ware Investigation, it is now obvious that this was not the case. From the parties' review of Exhibit 32, it is now established that the Commissioner recorded "Sponsors" for most of the successful applicants that were reviewed in arbitrations and are now before this Court.

Finally, the Ware Report and its supporting documentation has self-described limitations. Paragraph 354 states that not all of the people who called to "sponsor' candidates were recorded on the lists. At Paragraph 355 of the Report, there is a finding that the Sponsor List submitted to the SJC as Exhibit 32 contains "exemplars" of the Sponsor Lists maintained by the Commissioner. Paragraph 355 of the Report also indicates that there are other sponsor lists that were not provided during the Investigation. Finally, Paragraph 341 finds that at least one Deputy Commissioner did not always send records of Sponsor requests to the Commissioner, but was instead just given license by the Commissioner to make appointments based upon requests of Sponsors that were not recorded on any lists. Again, all of these citations to the Ware Report are enclosed as Exhibit 1. The Union contends (after the review of those portions of Exhibit 32 provided to NAGE) that there is clear and convincing evidence of fraud in the consolidated cases at bar. The tangled web of deception the Commissioner of Probation has weaved demonstrates that all of them were tainted by the process. None of the appointments appear now to have been decided on the merits of the candidates. All of the eleven decisions at issue should be vacated pursuant to M.G.L. c. 149 s.11(a) (1).

It is undisputed that each of the appointments at issue were supported, at hearing, by the testimony of senior officials of the Probation Department; that each of the arbitration awards at issue use for support testimony by senior management officials whose penchant for preselection

4

and perjury has been found by the Ware Report; and that the review by the parties of those portions of Exhibit 32 of the Ware Report that the SJC made available has revealed that a majority of the successful applicants were in fact the subject of sponsorship.

## ARGUMENT

The pervasive nature of corruption at the Office of the Commissioner of Probation is staggering. While review of Exhibit 32 has not revealed that every appointment at issue in the arbitrations below was the subject of a specific request from a "sponsor", the fact that the "system" for promotion was "rigged" has been confirmed. More than half of the contested selections were in fact the "beneficiaries" of sponsorship. The Ware Report describes such records as more than just a recitation of which person supported which applicant. Ware describes the Sponsor List as "...a recording of the support being given to candidates by individuals with political sway over the Department".. Ware Report at p. 10.

Overturning an award in Massachusetts on the theory of fraud and corruption is a rare occurrence. United States Code Title. 9 s. 10 describes the standard of review of arbitration awards under the Federal Arbitration Act. See Attachment 3. Section 10(a)(1) mandates the vacatur of awards with identical language used in the M.G.L. C. 150E, sect. 11(a)(1), "where the award was procured by corruption, fraud or undue means". See Bonar v. Dean Witter Reynolds, Inc., 835 N.E.2d 1378 (1985). On page 1383 of that decision, the court recites a three part test.

> First, the movant must establish the fraud by clear and convincing evidence. Second, the fraud must not have been discoverable upon the exercise of due diligence prior to or during the arbitration. Third, the person seeking to vacate the award must demonstrate that the fraud materially related to an issue in the arbitration. This last element does not require the movant to establish that the result of the proceedings would have been different had the fraud not occurred. *Citations omitted.*

5

Paragraph 382 of the Ware Report is clear that when it came to the appointment process and funding from the legislature, "one hand washes the other". The conclusion in Ware is unmistakable: the arbitration files reviewed for the Ware Report "require(d) the conclusion that senior Probation employees likely testified falsely during arbitration proceedings, stating that names had not been pre-selected and that ranking and scoring decisions were based solely on the merits". Ware at Paragraph 486. The full Ware Report is some 307 pages long, exclusive of appendices and exhibits. The vast majority of the findings of the Report concern the manipulation of the appointment process by the Commissioner and other senior members of his staff. Commissioner O'Brien and two of his top Deputies have resigned rather than face administrative charges of malfeasance while in office. The Ware Report represents clear and convincing evidence satisfying the first test under Bonar.

The recent decision of the SJC to allow one of the Counsel in this case to review the actual sponsor lists (Exhibit 32 to the Ware Report) confirms the level of evidence needed for this test. Without divulging material under impoundment at the SJC, it can be related that of the twelve (12) appointments that were the subject of the eleven (11) arbitrations under consideration in the consolidated docket before this Court, more than half are to be found among those Exhibit 32 records as having been sponsored. The limitations of Exhibit 32 are described above. Throughout the grievance/arbitration process, the Union's sole requested remedy was the standard one to be found in labor relations disputes concerning merit-based appointments; namely, the tainted appointments should be vacated and the selection process done fairly as required by the collective bargaining agreement. All of the applicants who stood for the appointment in the first instance including the selected applicant would be eligible for consideration in any new selection process.

6

Pages 215 through 218 of the Ware Report describes the testimony of the the Office of the Commissioner of Probation personnel who were charged with investigating grievances filed by the Union. The conspiracy of silence by those conducting the interviews from other senior members of the Commissioner's staff is described. At page 218, the following exchange between the Investigative Team and Deputy Commissioner and Legal Counsel Anthony Sicuso is related as follows:

> Q. In the course of step 3 of a grievance, did any of the Interviewers to whom you spoke ever say that they inflated the scores of an applicant?
>
> A. No
>
> Q. Did you ever ask any of the interviewers during step three of the grievance process whether they had artificially inflated the scores of an applicant?
>
> A. No. There was no reason to.

The Report goes on to state that "...Sicuso's decision not to investigate...appears intentional and strongly suggests a studied ignorance of a tainted process..." Id. If the Commissioner was actively withholding evidence of preselection from its own senior staff, the Union had no chance of discovering the fraud despite any exercise of due diligence prior to or at the arbitration hearing, satisfying the second part of the test. See Bonar, supra.

The final test is the requirement that the fraud be materially related to an issue in the arbitration. The Court's attention is drawn to the arbitration awards themselves. An arbitrator's responsibility is to determine the facts and apply those facts to the collective bargaining agreement. In the cases at bar there is finding after finding that the testimony of the Commissioner's witnesses, the interview panelists themselves, was credible.

7

John Cochran, ruling on Adamson (SUCV 2010-4884) at page 11 "…Here…(speaking of Wall and Walsh)…there is simply no evidence to suggest that their assessments were unfair or tainted in any way…".

Roberta Golick, ruling on Cavanaugh (SUCV 2010-4886) at page 8 "…the fact that the panelists at the final interview stage …does not betray any arbitrariness of capriciousness in the selection process…".

Joan Dolan, ruling on Harder (SUCV 2010-4888) at page 34 "…I find that the qualities probed for in the…final interviews were job related…the process itself was fair and regular…there is no evidence whatsoever here indicating that the process was in any way results-oriented…".

Mark Grossman, ruling on Jackson (SUCV 2010-4889) at pages 8-9 "…They (the interviewers) testified, at the arbitration hearing, detailing the answers of each candidate and why they concluded that Parente's answers were better that Jackson's…They provided a reasonable basis…they did not act arbitrarily…".

Tammy Brynie, ruling on Joyce (SUCV 2010-4890) at page 11 "…Wall and Walsh articulated reasonable and job-related reasons for favoring O'Neil's candidacy over the Grievant's…".

Mark Grossman, ruling on Santosuosso (SUCV 2010-4893) at page 7-8 "…The interviewers (Wall and Walsh) both testified about the differences in answers…there is no reason to conclude that either interviewer acted in bad faith, arbitrarily or discriminatorily…".

These cases are submitted pursuant to subsection 1 of MGL c. 150C, s.11(a)(1), alleging "…the award was procured by corruption, fraud or other undue means…". Should this court decline to vacate these eleven (11) arbitration decisions, then, pursuant to MGL c. 150C sect.

8

11(d), the court shall confirm them.  Confirming these awards given the conclusion of the Ware

Report that there was widespread corruption in the appointment process of the CJAM's Office of

the Commissioner of Probation would be a gross miscarriage of justice.  M.G.L. C. 150E

requires the Court to vacate each of the eleven (11) arbitration awards.

                              Respectfully submitted,
                              National Association of Government
                              Employees/Service Employees International Union
                              By its attorney,


                              Michael F. Manning, Esq.
                              BBO #545255
                              National Association of Government
                                Employees
                              159 Burgin Parkway
                              Quincy  MA   02169-4213
                              (617) 376-0220

Dated:  July 14, 2011

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

## CONCLUSION

This Report, while substantial, is incomplete. Many avenues of obvious inquiry could not be fully explored given time and resource constraints. For example, Independent Counsel was mindful that this investigation was focused on the Probation Department, not other state agencies and not on the Legislature. Legislative conduct was not fully explored except as immediately relevant to Probation hiring. Hiring and promotion practices in other state agencies and departments was beyond the scope of the investigation except as specifically relevant to Commissioner O'Brien. Accordingly, many questions remain unanswered as of this writing.

Independent Counsel is realistic that recommendations to state agencies as regards candidates for initial hire or promotion are not unique to Probation. Indeed, even as to Probation, such recommendations are neither inappropriate nor inconsistent with fairness and objectivity in and of themselves. This investigation, however, revealed a degree of abuse and systemic corruption in hiring and promotion that cannot be ignored, and which as implemented, became an obstacle to the very principles of hiring articulated in Trial Court policies. That extent of interference with merit hiring and promotion transformed a credible process into a patronage hiring machine. However well-oiled, that machine no longer serves the public interest.

Respectfully submitted,

_____

Paul F. Ware,
Independent Counsel

Dated: November 9, 2010

307



PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

However, Independent Counsel does conclude that Commissioner O'Brien, either directly or through his subordinates Wall and Ryan, solicited contributions to Cahill from his employees in the Probation Department for the purpose of assisting his wife in obtaining a desirable position within Treasury. This was an apparent violation of the law and an abuse of O'Brien's position of authority within the Probation Department for personal gain.

### 10.   Probation Management May Have Testified Falsely in Grievance Proceedings

On some occasions, candidates passed over for promotion, including those rejected in favor of preferred candidates, filed grievances concerning the promotion process, some of which resulted in arbitration. Independent Counsel believes that Deputy Commissioners Francis Wall and Patricia Walsh testifying in those arbitration proceedings may have perjured themselves concerning the fraudulent promotion system by claiming promotions were merit based.

In particular, during the arbitration proceedings the members of the final interview panel ordinarily were called to testify. The arbitrators' decisions from these proceedings typically recount that final interview panel members' ranking of the candidates was based on the interviewers' consideration of the candidates' answers to interview questions and the candidates' application materials.

Independent Counsel reviewed thirty-eight arbitration files, and in none of them did a final interview panel member (usually Wall and Walsh) ever disclose that the scoring of a candidate was based on receipt of that candidate's name from Commissioner O'Brien or one of his deputies. In fact, in at least two arbitration cases, Deputy Commissioners Wall and Walsh explicitly denied receiving any names, as noted in the arbitrators' decisions:

33

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

Speaker Salvatore DiMasi, Speaker Robert DeLeo, and Representative Eugene O'Flaherty among others.[274]

352. Ryan testified that he discussed the calls he had received with Commissioner O'Brien.[275] According to Ryan, the Commissioner also received calls directly from politicians and others.[276] O'Brien provided Ryan the names of the candidates and asked Ryan to confirm that they were minimally qualified for, and had actually applied for, the position(s) for which they had been sponsored.[277] Ryan produced original notes in O'Brien's handwriting with names of candidates who were sponsored and the individuals sponsoring them.[278]

353. Ryan testified that he understood part of his function when appointed to the legislative liaison position by the Commissioner was to handle the influx of calls.[279] He testified that his role was to deal with members of the House and Senate, while Maria Walsh kept track of logistics.[280]

B. **Sponsor Lists**

354. Throughout this process while the names of sponsored candidates were being collected, the names of some – but not all – of the candidates were logged, together with the names of the sponsors, on documents known within OCP as "Sponsor Lists." The Sponsor Lists

---

[273]   Testimony of Lucia Vanasse, July 20, 2010 (Exhibit 138), at 45.

[274]   Testimony of Edward Ryan, June 29, 2010 (Exhibit 131), at 73-77, 154.

[275]   Testimony of Edward Ryan, June 29, 2010 (Exhibit 131) , at 42.

[276]   Testimony of Edward Ryan, June 29, 2010 (Exhibit 131), at 42.

[277]   Testimony of Edward Ryan, June 29, 2010 (Exhibit 131), at 42.

[278]   Testimony of Edward Ryan, July 21, 2010 (Exhibit 131), at 218-236.  A copy of these handwritten notes, marked during Ryan's testimony as exhibit 11, accompanies this Report as Exhibit 131.

[279]   Testimony of Edward Ryan, June 29, 2010 (Exhibit 131), at 52.

[280]   Testimony of Edward Ryan, June 29, 2010 (Exhibit 131), at 52-54.

LIBA/21225629

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

are spreadsheets maintained initially by Michelle Cahill Martino, and later by Maria Walsh.[281] O'Brien directed Martino and Walsh to compile the Sponsor Lists.[282]

355.   Several of these Sponsor Lists were produced by Walsh and Ryan.  Based on the date ranges indicated on the Lists, Independent Counsel was not provided with all of the lists. Exemplars of these spreadsheets accompany this Report as Exhibit 32.

356.   The Sponsor Lists created by Martino list the name of the candidate, the position the candidate is applying for, and – in a column often labeled "Sponsor" – the individual who had called or sent in a letter on the candidate's behalf.[283]

357.   Martino testified that every "recommendation" she received by telephone or by letter was recorded on the Sponsor List, regardless whether the sponsor was a legislator.[284] The spreadsheets, however, reveal that for fiscal years 1999-2001, all but 13 of the 119 sponsors is a state representative or senator.[285]  The Sponsor Lists, in other words, are not simply lists of recommendations, but constitute a record of support given to candidates by legislators with political influence over the Department.

358.   The Sponsor Lists Martino created also tracked the progress of candidates through the process.  They include an "outcome" column which tracks whether the candidate received an interview, became a finalist and ultimately was given a position.[286]

---

[281]   Testimony of Michelle Cahill Martino, July 21, 2010 (Exhibit 97), at 126-27; Testimony of Maria Walsh, July 19, 2010, at 17.

[282]   Testimony of Michelle Cahill Martino, July 21, 2010 (Exhibit 97), at 49-50; Testimony of Maria Walsh, July 19, 2010 (Exhibit 139), at 18.

[283]   Sponsor Lists created by Michelle Cahill Martino, which can be found in Exhibit 32.

[284]   Testimony of Michelle Cahill Martino, July 21, 2010 (Exhibit 97), at 40-41.

[285]   Sponsor Lists created by Michelle Cahill Martino, which can be found in Exhibit 32..

[286]   Sponsor Lists created by Michelle Cahill Martino, which can be found in Exhibit 32.

LIBA/21225629

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

## A.     The Collection of Names from Politicians, Judges, and Others

339.    Candidates for hiring into or promotion within the Department were required to list references and could provide letters of recommendation with job applications. Outside of this formal process, however, there was an informal sponsorship process.

340.    Members of the legislature and others called or sent letters to OCP on behalf of a particular candidate. An overwhelming majority of those sponsoring candidates were state legislators. While there were some judges, probation officers, police officers and attorneys, most of the sponsors were state senators and representatives. As legislative liaison Maria Walsh testified:

> Q.     Would you say that legislators were the leading group of
> people offering recommendations for candidates?
>
> A.     Yes.

Testimony of Maria Walsh, July 19, 2010 (Exhibit 139), at 46.

341.    Names of "sponsored" candidates came into a select few within OCP. State representatives and senators (or members of their staffs), judges and other individuals employed by the Trial Court contacted O'Brien directly (and through his assistant Lucia Vanasse), as well as through legislative liaisons – Michelle Cahill Martino, Maria Walsh, and Edward Ryan.[260] Legislators from Western Massachusetts also contacted Deputy Commissioner Burke to offer their sponsorship, which Burke sometimes acted on directly and sometimes passed along to Boston.[261]

342.    Legislators providing "sponsorship" did so typically by telephone call, although OCP also received some letters of recommendation for particular candidates. Fewer than 100

---

[260]  Testimony of Michelle Cahill Martino, July 21, 2010 (Exhibit 97), at 35-36; Testimony of Maria Walsh, July 19, 2010 (Exhibit 139), at 46-48; Testimony of Edward Ryan (Exhibit 131), June 29, 2010, at 41-42.

[261]  Testimony of William Burke, July 22, 2010 (Exhibit 96), at 24, 28.

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

The Sponsor Lists, in other words, are not simply lists of recommenders. They are more narrowly a recording of the support being given to candidates by individuals with political sway over the Department.

Tellingly, the individuals tasked with overseeing the creation of the Sponsor Lists have been the Department's "legislative liaisons." These liaisons subsequently obtained the lists of candidates for final interviews to confirm that candidates sponsored principally by members of the legislature – members of the leadership and key committees such as Ways and Means and Judiciary – were advancing as instructed through preliminary rounds of interviews.

This systematic recording and processing of the names of hundreds of candidates sponsored by influential politicians was necessary because fraudulent interviews occurred on a grand scale. Some witnesses advised Independent Counsel that they received the names of preferred candidates for nearly all of the positions for which they interviewed. As a result, most entry level and promotional positions within the Department went to "Commissioner's Choice" candidates:

> Q. All right. I understood you to say that the people that get hired or got hired in Probation during the 2005 to 2007 time period were by and large most of the time people who had political recommendations behind them, correct?
>
> A. Yes, correct.
>
> Q. Candidates who had no political connection were unlikely to be hired if there were candidates with political connections, is that fair to say?
>
> A. Yeah, I would say that that was the way it is.

Testimony of Edward Ryan, June 29, 2010 (Exhibit 131), at 99-100.[9]

---

[9]    Relevant excerpts of the testimony of Edward Ryan accompany this Report as Exhibit 131.

10

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

Q.     And what you mean by that is that Jack O'Brien had a
       sufficiently strong relationship with Representative
       Petrolati and others –

A.     All others, yeah.

Q.     – that he would have seen to it that there was an
       appropriation sufficient so that there wouldn't be layoffs?

A.     Correct.

Q.     In your mind, there's a direct link between the relationship
       that the Commissioner's office has with legislative leaders
       and appropriations sufficient to support hiring and growth
       within Probation, is that correct?

A.     Correct.

Testimony of William Burke, July 22, 2010 (Exhibit 96), at 67-68.

382.   Burke reiterated this view later in his testimony in unequivocal terms:

Q.     You understood, didn't you, that while it wasn't written
       down, the legislature was funding Probation generously
       because Probation was responding to legislative requests
       for hiring, among other things, isn't that right?

A.     I'd say yeah.

Q.     So you understood that one of the reasons Probation under
       the auspices of Jack O'Brien could get the funding it
       needed was that Jack O'Brien was being responsive to the
       hiring requests of legislative leaders?

A.     And judges.

Q.     But certainly legislative leaders, correct?

A.     Yes.

                              * * *

Q.     The way in which it worked was one hand, you know,
       washed the other?

A.     Washes the other. Yeah, I know. I know what you're
       talking about.

LIBA/21225629

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

Q.     Did you have a concern that there would be some sort of
       retaliation, any adverse effect on your employment? Did
       you have those concerns?

A.     Based on experience in other situations besides hiring and
       promotion, I think like in many situations organizations
       employees who are considered disloyal would be shunned,
       snubbed, and perhaps given assignments that they weren't
       seeking.

Q.     Had you seen examples of that during Commissioner
       O'Brien's reign as commissioner?

A.     Yes. But I'm not remembering any regarding hiring or
       promotions.

Q.     What other context have you seen, you know, that sort of
       treatment?

A.     I've been asked to supervise a number of employees who
       had displeased the central office so they were sent to either
       my research department or to the training department
       because they had worn out their welcome at their regular
       assignment.

Testimony of Stephen Bocko, September 13, 2010 (Exhibit 94), at 73-74.

## VII.    CONCEALMENT OF FRAUDULENT HIRING DURING GRIEVANCE AND ARBITRATION PROCEEDINGS

485.    Certain Probation Department personnel – probation officers, probation officers in

charge, assistant chief probation officers, and first assistant chief probation officers – are entitled

to grievance and arbitration rights pursuant to collective bargaining agreements between the Trial

Court and the probation officers' union.

486.    As part of the investigation, Independent Counsel investigated representations

made by interviewers regarding promotional decisions during grievance and arbitration

proceedings. Resource and time constraints prevented examining every file pertaining to

grievance and arbitration proceedings on promotion decisions, but these files require the

conclusion that senior Probation Department employees likely testified falsely during arbitration

215

proceedings, stating that names had not been pre-selected and that ranking and scoring decisions

were based solely on the merits.

487.    In particular, during arbitration proceedings, the members of the final interview

panel (usually Wall and Walsh) ordinarily were called to testify. The arbitrators' decisions from

these proceedings typically recount that ranking of the candidates was based on the interviewers'

consideration of the candidates' answers to interview questions and the candidate's application

materials.

488.    Independent Counsel examined 38 arbitration files, and in none did a final

interview panel member, in describing the basis for his or her scoring of a candidate, ever

disclose that scoring of a candidate was based on receipt of that candidate's name from

Commissioner O'Brien or one of his deputies. Instead, the panel members provided elaborate

explanations as to why the candidates' answers justified the scores or rankings that they were

given.

489.    In addition, in at least two arbitration cases, Deputy Commissioners Wall and

Walsh explicitly denied receiving any names, as noted in the arbitrators' decisions:

> They asked each candidate the same four questions, each of which
> was worth 5 points, and independently scored the responses using
> a scoring key prepared by the OCP. *According to both Wall and
> Walsh, no one from OCP expressed a preference for any of the
> candidates.*

* * *

> Both deputies testified that they had reviewed the materials the
> applicants had submitted prior to the interviews. *They also said
> that no one had spoken to them one way or the other about any
> candidate* ....[360]

---

[360]    A copy of the Harder arbitration decision accompanies this Report as Exhibit 9. A copy of the Adamson
arbitration decision accompanies this Report as Exhibit 8.

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

490.    Witnesses consistently testified that preferred names were handed down for most hires, and for promotional positions for which probation officer union members applied. Independent Counsel concludes that it is statistically improbable that in the three dozen cases for which we have records, none involved names communicated to interviewers. On at least some occasions, there is the potential that final interview panel members perjured themselves, falsely describing their decisions as being based on the answers provided by the candidates, when in reality the decisions were based on the instructions provided by the Commissioner.

491.    Independent Counsel questioned the lawyers within Probation and AOTC who were involved in the grievance and arbitration process to determine why the rigging of interview scoring was not disclosed during arbitration. The evidence suggests that those responsible for evaluating the grievances and representing Probation/AOTC at grievances were content to put grievants to their proof. Because a lack of information concerning rigging benefited the Department, which invariably prevailed on grievance and at arbitration, no disclosure of promotion practices was made.

492.    Former Deputy Commissioner and Legal Counsel Anthony Sicuso testified that his decision to grant or deny a grievance was based primarily on testimony from the grievant along with the written record, including the scoring and ranking sheets and the applicants' answers to the interview questions as noted by the interviewers. Sicuso testified that he did hear allegations from grievants occasionally that politically-connected candidates received artificially inflated-scores. While he testified that there was no way for him to know if a candidate's scores or answers had been inflated, he admitted that he never asked Deputy Commissioners if that occurred.[361]

---

[361]    Testimony of Anthony Sicuso, September 30, 2010 (Exhibit 134), at 54-57, 84-87.

LIBA/21225629

PRIVILEGED AND CONFIDENTIAL
BY ORDER OF THE SUPREME JUDICIAL COURT

Q.   In the course of step three of a grievance, did any of the
     interviewers to whom you spoke ever say they inflated the
     scores of an applicant?

A.   No.

A.   Did you ever ask any of the interviewers during step three
     of the grievance process whether they had artificially
     inflated the scores of an applicant?

A.   No. There was no reason to believe that they had. They
     were –

Testimony of Anthony Sicuso, September 30, 2010 (Exhibit 134), at 86-87.

493.   In fact, Sicuso did have reason to question the interviewers' scoring the

candidates. Specifically, Sicuso stated that he heard such allegations in a grievance brought by

an employee named Karen Jackson. Jackson alleged that an individual who received a

promotion to assistant chief probation officer, Amy Parente (who is related to Representative

Marie Parente), had received inflated scores from the local interview panel. Sicuso said he asked

Jackson to substantiate her claims, and she was not able to do so.[362] Sicuso stated that based on

Jackson's lack of direct evidence, Sicuso let the matter drop. He never asked the interviewers

whether they had in fact inflated Parente's scores.[363]

494.   Sicuso's decision not to investigate the Jackson matter appears intentional and

strongly suggests a studied ignorance of a tainted process. As reflected in the record of the

arbitration concerning this incident, Chief Probation Officer Steve Alpers stated that Deputy

Commissioner Burke called him before the interview and "expressed an interest in Ms. Parente

being in the group that would be given a second interview," and Burke admitted telling Alpers

---

[362] Testimony of Anthony Sicuso, September 30, 2010 (Exhibit 134), at 87-90.

[363] Testimony of Anthony Sicuso, September 30, 2010 (Exhibit 134), at 86-88.

218

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS

SUPERIOR COURT
CIVIL ACTIONS NOS.
2010-4884 through
2010-4894-F

---

NATIONAL ASSOCIATION OF GOVERNMENT )
EMPLOYEES, SEIU LOCAL 5000, )
               Plaintiff )
            )
v. )
            )
CHIEF JUSTICE FOR ADMINISTRATION AND )
MANAGEMENT OF THE TRIAL COURT, )
              Defendant )

---

## DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS[1]

The Defendant Chief Justice for Administration and Management of the Trial Court

(Trial Court) responds to the Motion of the Plaintiff National Association of Government

Employees, SEIU Local 5000 (Union) as follows:

These consolidated cases are suits by the Union to vacate arbitration awards issued under

the collective bargaining agreement between the Union and the Trial Court, pursuant to

G.L.c.150C, Section 11. Specifically, the Union alleges that the awards were procured by fraud

and relies on the conclusions of Independent Counsel Paul Ware, who conducted an investigation

of the hiring practices of former Probation Commissioner John O'Brien and issued a lengthy and

---

[1]The Trial Court notes that the Union's memorandum in support of its motion for
judgment on the pleadings refers to materials outside of the pleadings and this motion should
therefore be treated as a motion for summary judgment under Rule 56.

1

detailed report. (The Ware Report).   The Trial Court wants it clearly understood that it does not

seek to defend any instance of misuse of the hiring or promotion processes of the Trial Court or

any false testimony at arbitration.  The Trial Court joined with the Union in these cases to seek

potentially relevant information about the hiring process from exhibits in the Ware Report.  That

information was to determine whether any of the successful candidates in the arbitration cases at

issue were on what is referred to as "sponsor lists," apparently created to track recommendations

for hiring or promotion from legislators and others.  The Union's assertion that a "majority" of

the successful candidates names are contained on the "sponsor lists" of Exhibit 32 of the Ware

Report is technically accurate, but that majority is seven out of the twelve successful candidates;

five of the successful candidates' names do not appear in Exhibit 32.[2]

The Trial Court takes no position on whether the general findings and conclusions of the

Ware Report, especially as applied to the five promoted individuals whose names did not appear

on the "sponsor lists," are sufficient to demonstrate fraud warranting the vacating of the

arbitration awards sustaining those promotions.  Because of the serious issues and continuing

investigations resulting from the Ware Report, the Trial Court does not believe it could provide

witness testimony concerning the truthfulness or untruthfulness of the evidence presented at any

of the eleven arbitration hearings.  However, none of the successful candidates for the

promotions at issue are parties to this proceeding, nor were they parties or witnesses in any of the

arbitration hearings.  Each of them presumably has an interest in retaining his or her promotion.

Therefore, the Trial Court urges that any decision by this Court vacating any or all of the

---

[2]There are twelve successful candidates for these promotions because two individuals
grieved one promotion and in two other cases two candidates were selected.

2

arbitration awards include an order remanding them to a single arbitrator mutually agreed upon

by the Trial Court and the Union and order that the parties notify the successful candidates of any

arbitration proceedings and provide them with an opportunity to appear and respond. A proposed

draft order is attached.

Respectfully submitted,
Chief Justice for Administration and
        Management of the Trial Court
By his attorneys,

Jean Strauten Driscoll, BBO #1355640
Anne-Marie Ofori-Acquaah, BBO #638768
Administrative Office of the Trial Court
2 Center Plaza, Room 540
Boston, MA 02108
Tel. No. (617)742-8575
jean.driscoll@jud.state.ma.us

August 11, 2011

3

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS

SUPERIOR COURT
CIVIL ACTIONS NOS.
2010-4884 through
2010-4894-F

NATIONAL ASSOCIATION OF GOVERNMENT )
EMPLOYEES, SEIU LOCAL 5000,            )
               Plaintiff    )
                             )
     v.                          )
                             )
CHIEF JUSTICE FOR ADMINISTRATION AND   )
MANAGEMENT OF THE TRIAL COURT,         )
              Defendant    )

## ORDER

       After hearing and consideration thereof, Plaintiff's Motion for Judgment on the Pleadings

is granted as to case numbers _____, and the arbitration awards that

are the subject of those cases are hereby vacated and remanded as follows:

       The Trial Court and the Union shall mutually select a single  arbitrator familiar with the

promotion process in the Trial Court through the auspices of the American Arbitration

Association within 30 days.  Said arbitrator shall hear the matters as a consolidated proceeding.

The Trial Court and the Union shall notify the successful candidates for the promotions at issue

of the time and place of the consolidated arbitration hearing and that they may be heard in such

manner and under such circumstances as the arbitrator permits.

                        By the Court,

                        _____

Date:

COMMONWEALTH OF MASSACHUSETTS
THE TRIAL COURT

SUFFOLK, ss

SUPERIOR COURT
DEPARTMENT OF THE TRIAL COURT
DOCKET # SUCV 2010-4884-F
Through 2010-4894-F

NATIONAL ASSOCIATION OF          )
    GOVERNMENT EMPLOYEES,     )
    SEIU LOCAL 5000,              )
              Plaintiff,   )
                              )
                              )
v.                               )
                              )
CHIEF JUSTICE FOR                )
    ADMINISTRATION AND           )
    MANAGEMENT OF THE            )
    TRIAL COURT,                 )
              Defendant    )

Certificate of Notice of Filing

       I hereby certify that a copy of the Rule 9A package for the above-captioned matter was served upon Jean Strauten Driscoll, Esq., and Anne Marie Ofori-Acquaah, Esq., attorneys of record for the Defendant, by mailing a copy of the same by first class mail, postage prepaid on August 16, 2011.

                                      Michael F. Manning