EXHIBIT F

**AMERICAN ARBITRATION ASSOCIATION, ADMINISTRATOR**
**Tammy Brynie, Esq., Arbitrator**

---

In the matter of the
arbitration between:

National Association of
Government Employees

- and -

Case No. 11 390 0353 12
Remand

Massachusetts Trial Court

---

### Decision and Award

**For the Employer**

Jean Strauten Driscoll, Esq.
Anne-Marie Ofori-Acquaah, Esq.

**For the Union**

Michael F. Manning, Esq.
Rebecca Lee Mitchell, Esq.

This case is the result of an order of the Superior

Court in National Association of Government Employees,

SEIU Local 5000 and Chief Justice for Administration

and Management of the Trial Court, Suffolk CA 2010-4884

through 4894.  The Superior Court case was a

consolidated proceeding involving petitions to vacate
eleven arbitration awards.  The Superior Court vacated
all of the awards and remanded them for further
arbitral review.  The issue as framed in the court
order, and adopted by the parties, is:

> Whether the Trial Court violated the rights of
> the grievant(s) under the collective bargaining
> agreement by appointing the successful candidate
> to the specific position at issue.

> Is so, what shall be the remedy?

### Overall Background

The parties are signatories to a collective
bargaining agreement that includes, at Article XX, a
Seniority provision.  Article 20.01 provides:

> The Employer recognizes the principle of
> seniority for employees covered by this Agreement
> so that when qualifications, such as training,
> skill, ability and other relevant qualities are
> considered equal by the Employer, the Employer
> shall give preference in cases of transfer,
> layoff, shift assignments, reassignments,
> promotion and overtime to employees with the
> longest service ...  Joint Exhibit #1.

Over the years, the Union has relied upon Article XX
to challenge employment actions taken by former
Probation Commissioner John J. O'Brien.  On at least
eleven occasions, contractual grievances challenging
employment actions were filed on behalf of an employee

2

who was more senior than a successful applicant,
processed to arbitration and an arbitrator's Award
issued.  Each Award considered an application process
consisting of at least two rounds of interviews
resulting in a certification that the person selected
was the best or most qualified candidate.  Typically,
an initial screening panel was held at the court level.
The initial panel usually consisted of the court's
Presiding Justice, its chief probation officer and a
regional representative from the probation service.
The initial interviews and evaluations were followed by
a final round of interviews conducted by probation
management personnel.  Generally, Deputy Probation
Commissioners Francis Wall and Patricia Walsh conducted
the final interviews for  probation officer and
assistant chief probation officer vacancies.
Arbitrators, citing the level of discretion
contractually reserved by the Trial Court, afforded
deference to the judgment of the Probation Department
managers who participated in the final round of
interviews, unless that judgment was shown to be
arbitrary or capricious. As a result, in eleven cases,
arbitrators relied upon the testimony of, and evidence
from, Probation Department managers and determined that

3

the challenged employment action did not constitute a violation of the collective bargaining agreement.

By the Spring of 2010, the Probation Department was the subject of intense scrutiny with respect to its hiring and promotional practices. The Supreme Judicial Court, on May 24, 2010, appointed an Independent Counsel, Paul F. Ware, Esq., to investigate, among other matters, alleged improprieties with respect to the hiring and promotion of employees within the Probation Department.  Ware's investigative process involved interviewing more than two dozen witnesses, taking testimony from 67 witnesses under oath, and reviewing more than 525,000 documents collected from the Probation Department and disparate witnesses.[1]  On November 9, 2010, Ware filed his report with the Supreme Judicial Court, Joint Exhibit #3.

The Independent Counsel found that there were fundamental patronage problems within the Probation Department.  In its general conclusions, the Ware Report indicated that "[t]he hiring and promotion process in the Probation Department is corrupt and has disproportionately favored politically-connected candidates." Joint Exhibit #3, p. 2.  The Independent

4

Counsel further determined that "[t]he fraud is systemic and not episodic." Joint Exhibit #3, p. 9. Specifically, the Ware Report stated:

> [T]he hiring and promotion process within the Probation Department during Commissioner O'Brien's tenure, and particularly since the Commissioner was granted statutory authority with respect to hiring and promotion in 2001, has not been intended to select "the most qualified individual" for each position "solely on the basis of merit." Instead, hiring and promotion have been thoroughly compromised by a systemic rigging of the interview and selection process in favor of candidates who have political or other personal connections. Joint Exhibit #3, p.2-3.

The Ware Report concluded that the Probation Department's Deputy Commissioners were complicit in Commissioner O'Brien's fraud. Joint Exhibit #3, p. 15. The Independent Counsel determined that "senior management for the Probation Department, including all of the Deputy Commissioners, were involved in implementing a system of fraudulent hiring and promotion in favor of politically-connected candidates pre-selected by the Commissioner." Joint Exhibit #3, p. 15. According to the Independent Counsel, "numerous witnesses testified that [Deputy Commissioners] Wall and Walsh regularly provided names of preferred candidates and received names of candidates whom they

---

[1] Ware Report, p. 1-2, Joint Exhibit #3.

ranked and scored." Joint Exhibit #3, p. 16. Edward
McDermott, who was employed at the Office of the
Commissioner of Probation, testified that the message
he was given by Wall and Walsh when he sat on panels
with them was unambiguous -- the favored candidates
were to be ranked at the top of the list. Joint Exhibit
#3, p. 7.

The Independent Counsel considered both the local
panels and final interview rounds. Local panels --
usually comprised of the court's First Justice, its
chief probation officer and a designee of the
Commissioner (often the relevant regional supervisor)--
screened and evaluated promotional candidates.
According to Ware, "Regional supervisors whom we
interviewed typically testified that they did not share
names of sponsored candidates with the judges on their
interview panels." Joint Exhibit #3, p. 98.   The
judges, and the chief probation officer of a court,
were often "personally familiar with each candidate's
strengths and weaknesses based on his or her
performance as a probation officer in that court."
Joint Exhibit #3, p. 79.  Local panel members ranked
candidates' responses to a series of standard questions
and the top candidates were forwarded to a final round

6

interview.  The rankings compiled by the local panel,

however, were not reviewed during the final interview.

The final interview panel then convened.  The final

interviews were usually conducted by Deputy

Commissioners Wall and Walsh, who rank ordered the

final round candidates based on their responses to

standard questions.  Then, Commissioner O'Brien

selected the top ranked candidate for promotion.  Joint

Exhibit #3, p. 80.  The Independent Counsel, however,

stated:

> The interview procedures used by Probation to
> hire and promote were, however, in large measure
> a facade and sham.  The evidence is unambiguous
> that for most open positions, interviewers at
> each stage of the hiring process were provided
> the names of one or more candidates favored by
> Commissioner O'Brien with the direction that the
> favored candidates be given preferential ranking
> and/or scoring.  Joint Exhibit #3, p. 90.

The Independent Counsel noted that, on some

occasions, candidates passed over for promotion had

filed grievances concerning the promotion process.

Then, during the related arbitration proceeding the

members of the final interview panel ordinarily were

called to testify, with the result that arbitrators

routinely recounted that the final interview panel

members' ranking of candidates was based on the

7

interviewers' consideration of the candidates' answers
to interview questions and the candidates' application
materials.  But, according to the Independent Counsel's
review, "Probation management may have testified
falsely in grievance proceedings."  Joint Exhibit #3,
p. 33.  Specifically, after reviewing numerous
arbitration files, the Independent Counsel noted that
"in none of them did a final interview member (usually
Wall and Walsh) ever disclose that the scoring of a
candidate was based on receipt of that candidates' name
from Commissioner O'Brien or one of his deputies."
Joint Exhibit #3, p.33.  Yet, the Independent Counsel
noted, "witnesses consistently testified that preferred
names were handed down for most of the promotional
positions for which probation officer union members
applied."  As a result, Ware concluded:  "It is
probable that on at least some occasions, the final
interview panel members falsely described the basis for
their decisions without any reference to the
Commissioner's expression of a preference for a
particular candidate, and/or falsely denied receiving
names from OCP."  Joint Exhibit #3, p. 34.

Although the Independent Counsel found "a degree of
abuse and systemic corruption in hiring and promotion

8

that cannot be ignored ..."[2], his report also included

important caveats.  As Ware noted, "some of those hired

or promoted as a result of the rigged process would and

should have been hired or promoted on their own

merits." Joint Exhibit #3, p. 34.  The Independent

Counsel further reported that "the testimony was that

in some cases the sponsored candidates were themselves

the most qualified, or arguably the most qualified

candidates."  He also observed: "While there was

testimony that more qualified candidates were routinely

passed over, it may be difficult to identify such cases

with confidence." Joint Exhibit #3, p. 45.

    The Ware Report included a recommendation that

policy changes concerning personnel actions be

considered. Joint Exhibit #3, pp. 45-47. The Supreme

Judicial Court appointed a Task Force to review the

Probation Department's hiring and promotion procedures.

The Task Force, on February 10, 2011, issued its

"Action Plan for Reform and Renewal of Probation

Department Hiring and Promotion Practices." Joint

Exhibit #6. The Chief Justice for Administration and

Management, in turn, formed a Personnel Policy

Committee to undertake a thorough review of the Trial

---

[2] Joint Exhibit #3, p. 307.

Court Personnel Policies and Procedures. Joint Exhibit #8.

In addition, the Independent Counsel recommended that appropriate federal and state law enforcement authorities be made aware of the findings of the Report. Joint Exhibit #3, p. 48. Ultimately, former Commissioner O'Brien and Deputy Commissioners Elizabeth Tavares and William Burke, III, were indicted in federal court. Joint Exhibit #5.

The Union filed petitions in Superior Court to vacate eleven arbitration awards on the basis that they were procured by fraud, as detailed in the Ware Report. The Superior Court, on February 14, 2012, vacated all of the awards and remanded them for further arbitral consideration, to determine whether the rights of the grievants under the collective bargaining agreement were violated. The Court required that the successful candidates in the challenged employment actions receive notice of the new proceedings, "so that they may be heard in such manner and under such circumstances as the arbitrator permits." Joint Exhibit #10, p. 2. The Court specified that any remedy could not be inconsistent with recent statutory changes in c. 93 of

the Actions of 2011. Joint Exhibit #10,p.2; Joint
Exhibit #7.

In the meantime, a grievance challenging a March
2008 Probation Department promotion was pending before
Arbitrator James Litton. Relying on aspects of the
Ware Report, Litton determined that the Trial Court had
acted in an arbitrary and capricious manner by
selecting the successful candidate. Chief Justice for
Administration and Management of the Trial Court of the
Commonwealth of Massachusetts and National Association
of Government Employees, AAA No. 1139-2006-09, (Litton,
2012), Joint Exhibit #4. Edward McDermott and Deputy
Commissioner Francis Wall conducted the final
interviews in the promotional challenge considered by
Litton. Litton cited McDermott's testimony to the
Independent Counsel, that "every time there was a
panel, Fran Wall made known to [him] that this
candidate was the commissioner's top choice...", as
conclusive evidence that the promotional panel "did not
make a final selection for ACPO at the Woburn District
Court on the basis of an honest comparison of the
qualifications of the competing applicants as Article
XX, Section 20.01 requires." Joint Exhibit #4, p. 16.
As remedy, Litton ordered "a new selection process for

11

the ACPO position at the Woburn District Court, with
access to the re-selection process limited to the five
candidates who initially applied for the posted
position -- to the extent to which they wish to
participate."   Joint Exhibit #4, p. 17.

A pre-hearing conference and three days of hearing
were held with respect to the eleven remanded matters
at issue here.   All successful applicants received
notice of the conference and hearing dates.   Joint
Exhibit #9. Many of the successful applicants retained
counsel for the proceeding.   Successful applicants had
the opportunity to participate at arbitration and
submit documentary and testimonial evidence.   The
arbitration transcript was made available for review at
the AAA and successful applicants had the opportunity
to file post-hearing submissions for my consideration.

At arbitration, the parties entered the following
stipulations:

1.   All successful applicants and grievants met
the qualifications for the positions at issue in
their respective cases.
2.   The final interview results indicated that
each of the successful applicants were the top
scorers.
3.   Former Commissioner of Probation John O'Brien
certified to the CJAM that all successful
applicants were the 'most qualified' or 'best
candidate'.

12

4.   The arbitrator is without authority to order
the promotion/appointment of any particular
employee.
5.   The arbitrator is to retain jurisdiction of
this matter for a period not to exceed 180 days,
unless that period is extended by mutual
agreement of the parties.

The Union subpoenaed two of the Deputy Commissioners

who conducted most of the final round interviews,

Francis Wall and Patricia Walsh.  Each, through

counsel, indicated that, if called to appear, he or she

would assert the constitutional right to not testify.

Joint Exhibits #11B, #11C. As a result, they were

excused from appearing.

At the conclusion of the arbitration, the parties

and a number of successful applicants filed post

hearing submissions.  I will detail the parties'

overall contentions, outline my overall analytical

framework and then separately consider each grievance

and challenged employment action.

### Overall Positions of the Parties

The Union contends that the Trial Court violated the

contractual rights of the grievants when it appointed

the successful candidates to the positions at issue.[3]
Arbitrators have traditionally invested in the Employer
the maximum latitude in determining the identity of the
'most qualified' applicant for any particular
appointment. Nonetheless, at arbitration, the Trial
Court has been required to describe its process in
evaluating applicants and explain how the
qualifications of the respective applicants
distinguished the successful applicant from the
grievants. The Trial Court is the only party who must
produce their evaluative process and demonstrate its
compliance with the contract.

   Here, however, the Trial Court presented nothing.
The interviewers of the final applicant pool declined
to come to the arbitration hearing and defend their
decisions. In the absence of any evidence that the
Employer considered the successful applicant to have
some edge in terms of the contractual criteria of
"training, skill, ability or other relevant qualities"
the contract mandates that seniority be utilized to

---

[3] The Union did not compare, or evaluate, the respective
qualifications or abilities of candidates in its post-hearing
submission. Instead, the Union presented an overall argument that,
in light of the findings and conclusions of the Ware Report, and in
the absence of any Trial Court justification for the selections
during the remand proceedings, all of the challenged employment
actions should be done again.

14

make these types of selections. The absence of
evidence that the Trial Court considered the successful
applicant to be more qualified, so that seniority would
not automatically reign, is arbitrary and capricious.
The hand of the arbitrator is forced. In the absence
of any type of support for its decision, the finding
that the decision was arbitrary can not be avoided.

In addition, the Ware Report concludes that there
was widespread abuse in the hiring and promotion
practices of the Probation Department. According to the
Ware Report, the Probation Department's senior
management team conceded that they knew or participated
in a corrupt appointment system in which candidates for
promotion were pre-selected. There is ample evidence
that Wall and Walsh, in conjunction with Commissioner
O'Brien, pre-selected candidates.

It is not significant that the Ware Report did not
independently evaluate and individually declare that
each of the employment actions challenged here were
tainted by a rigged interview and selections process.
Instead, the Ware Report involves countless details
concerning the pervasive corruption of the hiring and
promotion process. The arbitrator should rely on the
evidence of systemic and total corruption depicted in

15

the Ware Report, and the absence of any evidence in support of the Trial Court's personnel decisions at arbitration, to concluded that the grievants' contractual rights have been violated.

As remedy, the Union seeks to address the Trial Court's failure to have a fair promotional process. To that end, the fairest remedy is a "re-do." If, after a re-do, the Trial Court determines that the successful applicant should have received the position, then he/she will be appointed again. Any re-do should be limited to the participants in the original applicant pool, if she or he remain interested. Finally, in the event an applicant from the original pool is no longer an employee (i.e., the person quit, moved on to another position or retired), he or she should no longer be included in the original applicant pool when the position is re-posted.

\*       \*       \*       \*

The Trial Court recognizes that there are significant interests at stake here. The Employer does not condone and will not defend any improprieties in the hiring or promotion practices of the Probation

Department that resulted in the appointment of less qualified individuals on the basis of political favoritism.  But, the Union's claims paint with too broad a brush.  Neither party can provide evidence of the specific decision-making process in each of these cases.  Instead, the Union relies on inferences: inferences from the Ware Report; inferences from the absence of certain witnesses; and, in some cases, inferences from the existence of political contributions.

The issue of burden of proof permeates each of these cases.  The Superior Court directed that this arbitration determine whether the rights of the grievants under the collective bargaining agreement were violated by the selection of the successful candidates.  The Union argues that the failure of witnesses to testify about the promotion or transfer of successful candidates, coupled with the conclusions of the Ware Report that many of the appointments were influenced by former Commissioner O'Brien, necessarily leads to a conclusion that all of the cases must be decided in the Union's favor.  A conclusion that all of the selections must be done anew, however, is not immediately warranted.  Contrary to the Union's

17

position, the burdens of proof and the rights of the
grievants are not so easily framed.

For most of the cases presented here, the Ware
Report provides no direct information. Its use to
infer that each of the present cases "must" have been a
tainted appointment process is unwarranted. The two
Deputy Commissioners who conducted most of the final
round interviews, Patricia Walsh and Francis Wall, did
not appear at arbitration, having asserted their rights
to remain silent. Their absence from this hearing does
not support an inference that each of the appointment
decisions they made in the present cases was to promote
or appoint a less qualified candidate based on
political considerations and/or a directive from former
Commissioner O'Brien. Instead, the individual hearings
have produced other information about the selection
process that is relevant and material. The first round
interview scores of the Judges on the interview panel
are relevant and material to a determination of whether
the rights of a particular grievant may have been
violated. A grievant, for example, who is ranked lower
than other applicants who were deemed more qualified by
the Judge, who, in an in-house promotion case
presumably knows and has observed the job performance

18

of each of the applicants, cannot have been
disadvantaged even if one of the other applicants gets
selected upon some "recommendation" at the final stage
of the process because, arguably, the grievant wouldn't
have received the position anyway.

The Trial Court's overriding interest is in the
effective operation of the court system, including the
Probation Department, and the fair treatment of those
who work in the system. Careful consideration of each
of the appointment processes at issue here, consistent
with the Superior Court mandate, is crucial.  In order
to find that the decision to promote or appoint a
specific candidate was arbitrary or capricious, the
record must contain, by a preponderance of the
evidence, proof that the successful candidate was
advance for reasons other than merit.

Should the arbitrator conclude than one or more of
these selections should be re-done, the re-selection
process: should not be unduly constricted by time
limit; should be limited to the original applicant
pool; and, to the extent possible, should be restricted
to the most manageable number of persons to be
interviewed.  Employees who have left the Trial Court
by retirement or otherwise should not be eligible to

19

apply. Additional consideration must be given to situations where the successful applicants are no longer in their positions. Finally, any remedy must be consistent with new statutory changes and in keeping with the revised merit-based process that is in the process of being implemented.

## Opinion

It is well-settled that the language of Article 20.01 gives the Trial Court maximum flexibility and discretion in assessing the "training, skill, ability, and other relevant qualities" of candidates for positions covered by the parties' collective bargaining agreement. It is only when the Trial Court determines that those qualifications are equal that seniority becomes the tie-breaking criteria. See, e.g., National Association of Government Employees and Trial Court of the Commonwealth, AAA No. 11 390 1344 06, (Cochran, 2007); National Association of Government Employees and Trial Court of Massachusetts, AAA No. 11 390 743 07, (Brynie, 2008).

However, arbitrators have also recognized that the Trial Court's discretion is not absolute. The

selection process must be fair and the Trial Court must
not undertake its selection in a manner that is
arbitrary, capricious or discriminatory. See, e.g.,
National Association of Government Employees and Trial
Court of the Commonwealth, AAA No. 11 390 2331 06,
(Cochran, 2007);  National Association of Government
Employees and Trial Court of Massachusetts; AAA No. 390
1508 07 (Brynie, 2008).  The Trial Court is obligated
to "make a final selection [for promotion] on the basis
of an honest comparison of the qualifications of the
competing applicants as Article XX, Sec. 20.01
requires." Chief Justice for Administration and
Management of the Trial Court of the Commonwealth of
Massachusetts and National Association of Government
Employees, AAA No. 1139-2006-09, (Litton, 2012), p. 16.

     Traditionally, the managers from the Trial Court's
final interview panel have testified at arbitration and
have provided detailed grounds and rationale for their
selection of successful candidates.  In each of the
eleven remanded matters, arbitrators relied upon such
testimony and determined that the Trial Court's process
and judgment was neither arbitrary nor capricious.

     Here, Francis Wall and Patricia Walsh, the final
interview team in all but one of the challenged

                              21

selections[4], did not testify. As a result, no full
explanation of, or rationale for, the selection of the
successful applicants was presented on remand. As the
Union correctly notes, in the absence of evidence that
the Trial Court considered a successful applicant to
have some edge in terms of the contractual criteria of
"training, skill, ability or other relevant
qualifications" the contract indicates that seniority
will be a deciding factor.

Unlike the Union, however, I do not consider Wall
and Walsh's failure to testify to be, necessarily,
dispositive. As repeatedly recognized and acknowledged
during the remand proceedings, the present situation is
novel. Here, I have been instructed, in Judge
Connolly's order, to determine "whether the Trial Court
violated the rights of the grievant under the
collective bargaining agreement by appointing the
successful candidate to the specific position at
issue." National Association of Government Employees,
SEIU Local 5000 and Chief Justice for Administration
and Management of the Trial Court, Suffolk CA 2010-4884
through 4894, p. 2 (emphasis added).

---

[4] Patricia Horne joined Patricia Walsh in conducting interviews for
an Assistant Chief Probation Officer position at the Milford

As a result, I carefully review each individual case
to assess whether or not each grievant's contractual
rights have been violated. My review will include the
facts found by the arbitrators in the underlying
arbitration matters, excluding any findings based on
the testimony of, and discounting the overall
reliability of the scorings and rankings generated by,
Walsh and Wall. In each instance, I examine the Ware
Report for specific information relating to each
remanded matter and consider the inferences, if any, to
be drawn from the Ware Report in each case. I consider
the documentary information produced by the successful
applicants, especially for insights into how the
candidates were evaluated by personnel who both knew
and worked with them at the local level.[5] I also
carefully consider the testimony of the successful
applicants, who, like the grievants, have significant
interests at stake here. Ultimately, in each case, I
will evaluate the available, reliable evidence to
determine whether the preponderance of the evidence

---

District Court. Horne appeared at the remand proceeding, pursuant
to a subpoena.
[5] The Union argues that the initial interview scores and marks are
not relevant, as they were not considered by the final interview
panel. The Ware Report, however, indicates that the names of
sponsored candidates were not, typically, shared with the judges on
local panels. As a result, I consider local judges' perspectives
in my review.

23

indicates that a grievant's qualifications for a
position were honestly compared or assessed or whether,
instead, there is a sufficient basis to conclude that
the selection process was based on criteria other than
those established by the parties at Article 20.01.

Each case, including the evidence and arguments
advanced by a successful applicant, is separately
considered, below.


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*


Grievant:                      Theresa Adamson

Successful Applicant:          Richard Ferrino
Represented By:                Carmen A. Frattaroli, Esq.

Original AAA No:               11 390 01344 06
                               Joint Exhibit #2(1)


The Grievant, Theresa Adamson, with twenty seven
years of Trial Court service, applied for the position
of Assistant Chief Probation Officer (ACPO) at the East
Boston District Court in 2006. Richard Ferrino, who was
hired in 1998, applied for the ACPO position, too.
Ferrino had a BA from the University of Lowell and, at
the time of his application for promotion, was enrolled

in the same university's Master's program in criminal
justice . Ferrino Exhibit #4.[6]

A local panel consisting of First Justice Mahoney,
Chief Probation Officer David Arinella and Mark McHale
from the Office of the Commissioner of Probation (OCP)
convened.  Judge Mahoney said that the three candidates
were equally qualified, Ferrino Exhibit #8, while
McHale and Arinella ranked Ferrino first.  Ferrino
Exhibits #6 and #7.  Arinella's form, however, is dated
1/20/06, while the other two panelists' ranking sheets
are dated 1/19/06.  All three original applicants were
forwarded for a second interview with Deputy
Commissioners Wall and Walsh.

In the original arbitration, Arbitrator Cochran
considered Arinella's ranking form, noting both that it
was dated a day later than the other rankings and the
fact that the ranked names had not been written by
Arinella.  Cochran, however, acknowledged Arinella's
testimony, to the effect that the names, as ranked,
reflected his views and recorded his denial that anyone
from the OCP had told him how to rank the candidates.
Joint Exhibit #2(1), p. 4.

---

[6] The record does not contain details about Grievant Adamson's
educational background.

McHale provided testimony to the Independent Counsel. The Ware Report finds that, "[l]ike others, Regional Supervisor Mark McHale testified that he received the names of favored candidates from the Commissioner's Office, "having received such names from First Deputy Commissioner Tavares, Deputy Commissioners Francis Wall and Patricia Walsh, and Edward Ryan." Joint Exhibit #3, p. 131. When asked, "[W]ere there instances when you were given names of preferred candidates during the hiring process?", McHale replied; "The way it was, I was given names, and they said 'In consideration of how these people do during the interview process, could you give them some consideration.' " McHale affirmed that he understood that the named candidates were supposed to make it through to the next round. Joint Exhibit #3, p. 132.

Cochran determined that, prior to the final interviews, several of the Grievant and Ferrino's co-workers overheard Ferrino making comments that led them to believe that he was going to get the job. Cochran specifically cited two workers who recalled Ferrino talking, in advance of the final interviews, of the changes he would make when he became the ACPO. Joint Exhibit #2(1), p. 5.

26

Indeed, during the final interviews with Walsh and Wall, Ferrino received a 40 score, reflecting perfect marks. The Grievant received a mark of 26, with the third candidate receiving an even lower score. Ferrino Exhibit #14. After acting as ACPO in East Boston for about six years, Ferrino, in April of 2012, transferred to an ACPO position at Salem District Court. Ferrino Exhibit #15.

Ferrino argues that there is no specific evidence indicating that the Trial Court acted in an arbitrary and capricious manner with respect to his selection. General inferences from the Ware Report are insufficient to reach such a conclusion. Wall and Walsh, in the underlying arbitration, indicated that no one from OCP expressed a preference for any of the candidates. The Independent Counsel noted, in his report, that "it was possible that this sworn testimony was truthful, at least with respect to these specific cases." Joint Exhibit #3, p.34. In the absence of any evidence to suggest that Ferrino was not the better candidate for the position, the evidence does not meet the burden of showing that Grievant Adamson's rights were harmed under the collective bargaining agreement.

27

I disagree. The facts as found by Arbitrator
Cochran take on a special resonance in light of the
Ware Report. The Independent Counsel reported that
"numerous witnesses testified that Wall and Walsh
regularly provided names of preferred candidates and
received names of candidates whom they ranked and
scored." Joint Exhibit #3, p. 16. McHale, a member of
the local panel in Adamson's case, admitted to the
Independent Counsel that (although not specifically
identifying the present case) he had received the names
of favored candidates from the Commissioner's Office.
Arinella, another member of the local panel, dated his
ranking sheet a date after everyone else, and turned in
a list of names that was actually written by someone
else. Although Arinella testified, before Arbitrator
Cochran, that the rankings reflected his views and
denied receiving names of favored candidates from OCP,
I also note that the Independent Counsel concluded that
Commissioner O'Brien retaliated against employees who
refused to pass preferred candidates through the
preliminary rounds of interviews. Joint Exhibit #3,
p.13. After the initial round of interviews, several
Trial Court employees recalled hearing Ferrino make
comments about his upcoming changes as an ACPO, as if

the promotion were a foregone conclusion. Then, after
the initial round evaluators -- including the court's
First Justice -- had ranked the three candidates
equally, Ferrino received perfect final round interview
marks from Wall and Walsh, Ferrino Exhibit #14, while
the other two candidates lagged far behind.

    The available evidence does not support a
determination that the selection of the ACPO for the
East Boston District Court in 2006 was based on the
criteria established in Article 20.01. Specifically, I
am not persuaded that the 2006 East Boston ACPO
selection process was made on the basis of an honest
comparison of the qualifications of the competing
candidates. Instead, a variety contemporaneous
circumstances indicate that the process was tainted by
pre-selection, or favored candidate, considerations. As
a result, I conclude that Grievant Adamson's rights
pursuant to the collective bargaining agreement have
been violated.

    As remedy, the Trial Court shall conduct a new
selection process for the ACPO position at the East
Boston District Court originally posted on January 4,
2006. Access to the re-selection process shall be
limited to the three candidates who originally applied

29

for the posted position and who remain employed by the
Trial Court -- to the extent they wish to participate.[7]
The re-selection process shall be conducted by
personnel who are tainted neither by the general
promotion/hiring scandal at the Probation Department
nor by the particular facts of this underlying case.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Grievant:                          Lynn Affonso

Original AAA No:                   11 390 2362 05
                                   Joint Exhibit #2(2)

Grievant:                          William Cavanaugh

Original AAA No:                   11 390 2363 05
                                   Joint Exhibit #2(3)

Successful Applicant:              Joseph Abber
Represented By:                    Gabriel O. Dumont,
                                   Jr., Esq.


Joseph Abber's 2005 promotion to Assistant Chief
Probation Officer at the Plymouth County Juvenile Court
led to two grievances.[8]  At the time of his promotion,
Abber had been a probation officer for about nine

---

[7] Ferrino's recent transfer to the Salem District Court may affect
his participation in the re-selection process.
[8] Abber argues that, by pursuing both grievances, the Union has
conceded that Cavanaugh's rights (as the most senior grievant) were
not violated.  I disagree.  Instead, the Union processed grievances
filed by bargaining unit members who had each asserted that their

30

years.  Abber had a Bachelor's degree in
sociology/criminal science from Bridgewater State
College, and had previous experience working with
juveniles.  Specifically, he served as a mentor
supervisor at DARE family services, worked as a
counselor at Judge Baker Children's Center, and was a
youth counselor at the New England Home for Little
Wanders.  Abber Exhibit #2A.

At the time of the promotion, Grievant Lynn Affonso
had three months greater seniority than Abber.  Joint
Exhibit #2(2), p.1.  Before working for the Probation
Department, Grievant Affonso had been a DSS social
worker, an assistant program supervisor and program
supervisor at a juvenile residential program and had
served as an intern with the Probation Department.
Affonso graduated from Stonehill College, with a BA in
criminal justice.  Abber Exhibit #2B.  Grievant
Cavanaugh had been a Trial Court employee for about 17
years at the time of the challenged promotion.
Previously, he had worked as the Assistant Director
within the boys shelter care unit of the Old Colony Y.
In addition, he had experience as an English teacher, a
counselor, and a care coordinator and principal at a

contractual rights had been violated during the promotional

31

program serving truant adolescents referred by the
Boston Juvenile Court. Cavanaugh received his BA in
sociology from Roger Williams College. Abber Exhibit
#2C.

A local interview panel convened to evaluate and
rank the twenty seven candidates who had applied for
the ACPO vacancy. Abber Exhibit #3. The panel was
comprised of Judge Corbett, Joel West, the court's
Chief Probation Officer (CPO), and Francis Campbell, a
Regional Supervisor from the Office of the Commissioner
of Probation. Abber Exhibit #4. Judge Corbett ranked
Affonso #3, Cavanaugh #5 and Abber #8. CPO West and
Campbell ranked Affonso #7. West ranked Cavanaugh #6
and Abber #8, while Campbell ranked Abber #3, and
Cavanaugh #8. Abber Exhibit #3. The final interview
round was comprised of the top eight candidates, with
two ACPO positions to be filled.

At the remand arbitration, Nancy Roderick, a former
First Assistant Clerk-Magistrate for the Plymouth
County Juvenile Court testified. She testified that
she knew Abber, Cavanaugh and Affonso and was
"delighted" to learn of Abber's promotion, as she

_____

process.

32

thought it was "well deserved."  Transcript, Vol. I, p.
85.

Francis Campbell, a member of the local interview
panel, provided testimony to the Independent Counsel.
Campbell indicated that he did not generally
participate in the local rounds of interviews, but
recalled such participation in 2001 and 2008.  Campbell
testified that he never shared the names of recommended
candidates with the judges on interview panels.  Joint
Exhibit #3, p. 128.  He also indicated that, on most
occasions, he shared the names of preferred candidates
that he received from Wall with the chief probation
officer sitting with him on the interview panel.  Joint
Exhibit # 3, p. 127.

Although Campbell, in his testimony to the
Independent Counsel, did not refer to his participation
in the 2005 promotional process at issue here, I
extrapolate from his testimony and assume that, as with
other interview panels, if Campbell received a name of
preferred candidates in advance, he did not share that
name with the judge on the panel. But, if he had
received the name of a preferred candidate, it is
likely that the individual's identity would have been
shared with the chief probation officer.

Abber testified at the remand hearing. He indicated that, prior to his selection as ACPO in 2005, he had previously applied for other promotions. In about 2002-2003, he had applied for a promotion with the electronic monitoring program. Transcript, Vol. I, p. 94. In 2004, Abber applied for ACPO positions at the West Roxbury Municipal Court and for similar positions at the Suffolk Juvenile Court. Transcript, Vol. I, p. 96. At the remand arbitration, Abber conceded that he had asked his state senator for a recommendation for the electronic monitoring and West Roxbury ACPO positions, promotions that he did not receive. Transcript, Vol. I, pp. 98-100. Abber also verified the information contained within the records of the Office of Campaign and Political Finance to the effect that he made campaign contributions to his state senator, Marian Walsh, in September and November of 2004 and in February of 2005. Transcript, Vol. I, pp. 108-109.

Reviewing the remand record, a number of factors persuade me that the selection process was not solely based on the training, skills, abilities and experience of candidates. First, Campbell, the OCP representative on the local panel, testified that, although he had, in

34

some instances, received the names of preferred
candidates, he never passed the names of those
preferred candidates to the judge on a panel.  As a
result, I give extra weight to the evaluation and
rankings of Judge Corbett, who knew and worked with
Abber and the grievants.  Of the eight candidates who
went on to the final around, Abber received the lowest
ranking -- #8 -- by Judge Corbett.  Each grievant
received higher marks, with Affonso receiving a #3 rank
from Judge Corbett, while Cavanaugh was ranked # 6.[9]
Although Abber's candidacy and abilities were robustly
supported by former-First Assistant Clerk-Magistrate
Roderick, I decline to give her testimony more weight
than the contemporaneous evaluation and ranking of
Judge Corbett.

   At the conclusion of the local round of interviews,
Abber was at the bottom of Judge Corbett and CPO
Walsh's list of final candidates (having been ranked #8
by each), but he was near the top of Campbell's list,
with a #3 ranking.  Then, following the final round of

---

[9] The Trial Court argues that a judge's marks, as an individual
free from the taint of pre-selection, should be, in effect, a
dispositive indicator of a grievants' rights.  Here, for example,
neither Affonso nor Cavanaugh were in the judge's top two rankings.
As a result, according to the Trial Court, neither could be
contractually disadvantaged during the promotional process because,
arguably, neither would have been selected anyway.  Although I

interviews with Walsh and Wall, Abber was a top ranked
applicant and received one of the two vacant ACPO
positions.   Wall and Walsh's evaluations and rankings,
however, were unexplained at the remand arbitration.
As a result, the remand record contains no rationale or
basis for Abber's climb from the bottom of the group of
candidates advanced from the local panel to being
awarded a promotion position based on scores from Wall
and Walsh.

The remand record, however, contains evidence of
Abber's political contributions and his prior requests
for recommendations from his state senator, with
respect to promotional opportunities.   Abber testified
that he was friendly with the politician and had worked
on her campaign.   Transcript, Vol. I., pp. 108-111.
While Abber specifically denied seeking a
recommendation for the position at issue here, he
acknowledged previously seeking promotional
recommendations. His political contributions totaled
$505, with some donations made immediately before the
promotional process and decisions at issue here.

Abber, however, contends that the grievants'
contractual rights have not been violated here because,

regard the local judges' as an important piece of remand evidence,

based on their low final interview round rankings, they would not have been promoted, whether or not Abber was a selected candidate. This argument, however, is contingent upon the accuracy and reliability of Wall and Walsh's scores and rankings. At the remand arbitration, however, neither Wall nor Walsh provided evidence to support their awarded marks or rankings. On the other hand, the Ware Report contains information, including testimony received under oath, indicating that Wall and Walsh regularly provided names of preferred candidates and received names of candidates whom they ranked and scored. Joint Exhibit #3, p. 16. As the Independent Counsel indicated, without the cooperation of Wall and Walsh, it is "impossible to establish what the unbiased ranking for each position would have been." Joint Exhibit #3, p. 45. As a result, in the absence of an explanation for the rankings and scores here, I decline to rely on the unexplained final rankings to determine who, if not Abber, would have received the promotion.

In summary, the remand evidence indicates that the local judge ranked each of the grievants more highly than successful candidate Abber. The OCP

---

I decline to consider any judge's score as dispositive.

37

representative, who ranked Abber #3 out of 27
candidates, generally testified to the Independent
Counsel that he had received names of recommended
candidates.[10]  Then, without explanation, Wall and Walsh
ranked Abber more highly than either grievant.  The
remand record also reflects Abber's series of
political contributions.  Overall, I am persuaded that
the selection process was based on, or influenced by,
criteria other than those established by the parties at
Article 20.01.  I am not persuaded that the 2005
selection for ACPO at the Plymouth Juvenile was based
on an honest comparison of the qualifications of the
competing applicants.  As a result, I determine that
the grievants' contractual rights have been violated.

    As remedy, the Trial Court shall conduct a new
selection process for the ACPO position at the Plymouth
Juvenile Court originally posted in 2005.  Access to
the re-selection process shall be limited to the
candidates who originally applied for the posted
position and who remain employed by the Trial Court --
to the extent they wish to participate.  The re-
selection process shall be conducted by personnel who
are tainted neither by the general promotion/hiring

---

[10] Campbell, however, specifically recalled only his participation

38

scandal at the Probation Department nor by the

particular facts of this underlying case.


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*


Grievant:                          Thomas Gentile

Successful Applicant:         Orlando Zayas, Pro Se

Original AAA No.               11 390 02315 06
                                        Joint Exhibit 2(4)


In February 2006, the Trial Court issued an in-house

posting for an ACPO position in the Springfield

District Court.[11]  Eleven probation officers applied for

the position, including the Grievant, Thomas Gentile

and the successful applicant, Orlando Zayas.  When he

applied, Gentile was a Probation Officer II, with about

24 years of Trial Court experience, while Zayas, a

Probation Officer I, had been with the Trial Court for

about 12 years.  Each had a Master's in Criminal

Justice. Joint Exhibit #2(4), p. 3. Zayas indicated, on

his application, that he was "Bilingual, Spanish

Speaking." Joint Exhibit #2(4), p. 3; Zayas Exhibit #2.

---

in panels only in 2001 and 2008. Joint Exhibit #3, p. 126.
[11] This promotional process predates a second challenged ACPO
promotion in the Springfield District Court, involving Grievant
Rachel Joyce and Successful Applicant Terence O'Neil, by about
seven months.

39