EXHIBIT F

Grievant Gentile included information concerning his additional education, training and experience, including Spanish language and culture courses and a management training program. Joint Exhibit #2(4), p. 3.

A local interview panel convened, consisting of First Justice William Boyle, Chief Probation Officer John Morganstern and Regional Supervisor Nicholas DeAngelis. Each member of the panel rated Zayas as the top candidate. Zayas Exhibit #1. Gentile was ranked 10th out of 11 applicants by both DeAngelis and Judge Boyle, while he was ranked 6th by Morganstern. Zayas Exhibit #1, Joint Exhibit #2(4), p. 4. The names of all eleven candidates were forwarded to the second round of interviews, conducted by Walsh and Wall. Joint Exhibit #2(4), p. 4.

Regional Supervisor DeAngelis provided sworn testimony to the Independent Counsel. DeAngelis testified that he received names of favored candidates from individuals within the Commissioner's Office in advance of every probation officer and assistant chief probation officer interview panel he sat on while he was a regional supervisor. According to DeAngelis, he received the names of candidates who were to advance to the final interview from Wall, among others. Joint

Exhibit #3, p. 141. DeAngelis further testified that he regularly passed the names of the favored candidates on to the chief probation officer sitting on the panel and, if he knew the judge on the panel, he also passed the names along to the judge as well. Joint Exhibit #3, p. 143.

Zayas appeared and testified at the remand proceeding. Zayas emphasized that he worked regularly and directly with two members of the local interview panel, Judge Boyle and Chief Probation Officer Morganstern. He emphasized that his employment background, prior to working for the Trial Court, involved managing employees. Zayas resolutely indicated that he had the experience and ability for the ACPO position and that he had the best qualifications for the promotion. Transcript Vol. II, pp.34-38. Moreover, Zayas testified that he believed he received the position based "on my merits only." Transcript, Vol. II, p. 38.

Grievant Gentile testified at the remand arbitration, too. Gentile recalled that he was a candidate for Commissioner of Probation when O'Brien was hired. In addition, he had been a longtime Union Steward, filing grievances on his own behalf and on

41

behalf of others.   Gentile recalled his involvement
with respect to grievances challenging other ACPO
selections. Transcript Vol. II, pp. 44-47.[12]

Both Gentile and Zayas made political contributions,
with Zayas contributing $100 to Senator Petrolati, in
April of 2006. Union Exhibit #1.  Gentile contributed
to several politicians, including giving, in 2005 and
2007, a total of $175 to Petrolati. Trial Court Exhibit
#1.  DeAngelis' testimony to the Independent Counsel
indentified Petrolati as a high ranking, influential
politician for contribution purposes.  Joint Exhibit
#3, pp. 175-176.  Deputy Commissioner Burke testified
that the support of Petrolati was useful for
individuals seeking promotion within the western
Massachusetts counties. Joint Exhibit #3, p. 176.

At the remand arbitration, Zayas persuasively
articulated his position and belief -- that he was the
most qualified for the ACPO position; that he received
the promotion based on merit; and, that he had been
swept up in the tsunami effect of the Ware Report.

The Ware Report, however, contains information that
demonstrates that the Springfield District Court ACPO

---

[12] I note that the Independent Counsel received testimony
indicating that individuals were "blacklisted" for grieving
employment actions.  Joint Exhibit #3, p. 125.

selection process at issue here was tainted by pre-
selection considerations. DeAngelis' testimony to the
Independent Counsel decisively links the corruption
illustrated within the Independent Counsel report to
the promotion considered here on remand. Specifically,
DeAngelis testified that he received the names of
favored candidates in advance of every assistant chief
probation officer interview panel he sat on as a
regional supervisor. He also indicated that he
regularly passed the names of favored candidates to the
chief probation officer on a panel. As a result,
DeAngelis' testimony to the Independent counsel
establishes that the identity of the Commissioner's
preferred candidate for the early 2006 vacant ACPO
position at Springfield District Court was known, in
advance. In addition, DeAngelis indicated that Wall
was among the OCP personnel who would contact him with
names of favored candidates Here, Wall was a member of
the two person final interview panel. As a result, I
determine that the record provides sufficient evidence
upon which to conclude that the selection process for
the ACPO position at the Springfield District Court
was, at a minimum, influenced by criteria other than
those established by the parties at Article 20.01. In

43

other words, I am not confident that the ACPO selection

process was based on an honest assessment and

comparison of the qualifications of the competing

candidates. As a result, I determine that Grievant

Gentile's contractual rights have been violated.

   As remedy, the Trial Court shall conduct a new

selection process for the ACPO position at the

Springfield District Court originally posted in

February 2006. Access to the re-selection process

shall be limited to the candidates who originally

applied for the posted position and who remain employed

by the Trial Court -- to the extent they wish to

participate. The re-selection process shall be

conducted by personnel who are tainted neither by the

general promotion/hiring scandal at the Probation

Department nor by the particular facts of this

underlying case.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Grievant:                 Jason Harder

Successful Applicants:    Maureen Adams, Pro Se
                          Christopher Hoffman, Did
                          Not Appear

Original AAA No.:         11 390 2259 06
                          Joint Exhibit #2(5)

44

At issue here are two probation officer positions at
the Hampshire Superior Court involving, in essence, a
2005 lateral transfer for any existing probation
officer who applied from another court. Originally,
there were seventy applicants for the openings.
Hoffman began his Trial Court employment in 2001, as an
associate probation officer. He became a probation
officer, in a temporary capacity, in 2004, and the
position became permanent in 2005. Joint Exhibit #2(5),
pp. 5-6. Hoffman's prior employment included working
for the Department of Social Services, and he had
attained a Master's Degree in Criminal Justice. Joint
Exhibit #2(5), p. 6.  Adams' Trial Court employment
record indicates that she started as a probation
officer in 2001.  Following a two year lay-off, she
appears to have been temporarily assigned to the
Hampshire Superior Court.  Joint Exhibit #2(5), p. 5.
Prior to his 2000 employment with the Trial Court,
Grievant Harder had served in the military, worked for
the City of Northampton for two years as an assistant
to the Mayor and the Finance Director, and worked as a
corrections officer supervising state inmates.  He had
been a Hampshire County Deputy Sheriff for about 15

years at the time of the interviews here. He also held a Master's Degree in Criminal Science. Joint Exhibit #2(5), pp. 5-6; pp. 20-21.

Nineteen applicants made it through the initial screening process to the local interview process. From there, thirteen candidates advanced to the final interviews conducted by Walsh and Wall. Joint Exhibit #2(5), p. 4. The record contains no information concerning the identity of the local panel of interviewers, nor their assessment of candidates.

Thirteen candidates were interviewed by Walsh and Wall. Wall and Walsh recorded identical scores for each candidate at issue here -- with each awarding Hoffman perfect 20 marks, while Adams received a 19 score from each. Harder, on the other hand, received only 11 marks from each interviewer.

On remand, there was no substantiation for the marks received by any candidate. Objectively viewed, the award of identical marks for each of the candidates, during the final interview round, is remarkable. The uniformity of scoring, alone, seems to indicate a lack of independent evaluation and judgment of candidates.

In addition, the selection of Hoffman for the position at issue here appears to be referenced in the

46

relevant federal indictment.  The indictment states: "C.H. was sponsored for employment by the defendant Burke as a probation officer at Hampshire County Superior Court.  C.H. was not the most qualified candidate, but was hired in or about December 2005." Joint Exhibit #5, p. 14.  Hoffman did not appear at, or otherwise participate in, the remand proceeding.

The reliable record here is devoid any rationale concerning, or explanation for, the selection of the individuals for the vacant probation officer position instead of Grievant Harder.  I am not persuaded that the selection of the candidates for the probation officer position at the Hampshire Superior Court was based upon an honest assessment and comparison of their respective qualifications.  Rather, under the circumstances, including the unexplained uniformity of final round interview scores, I determine that the selection process was based on criteria other than those established by the parties at Article 20.01.

As remedy, the Trial Court shall conduct a new selection process for the probation officer position at the Hampshire Superior Court originally posted in 2005. Access to the re-selection process shall be limited to the candidates who originally applied for the posted

47

position and who remain employed by the Trial Court --
to the extent they wish to participate.[13]   The re-
selection process shall be conducted by personnel who
are tainted neither by the general promotion/hiring
scandal at the Probation Department nor by the
particular facts of this underlying case.

*********************************************************

Grievant:                       Karen Jackson

Successful Applicant:           Amy (Parente) Pighetti
Represented By:                 Steven D. Power, Esq.

Original AAA No:                11 390 0233 05
                                Joint Exhibit 2(6)

In 2005, fourteen applicants sought promotion to an
ACPO vacancy at the Milford District Court.   The
Grievant, Karen Jackson, and Amy Parente, now Pighetti,
were among the applicants.   At the local level, the
applicants were interviewed and ranked by Steve Alpers,
the Chief Probation Officer, Presiding Justice
Calagione and Francine Ryan, a representative from OCP.
Joint Exhibit #2(6).   Ryan testified, to the

---

[13] At the remand arbitration, Successful Applicant Adams indicated
that she had subsequently transferred from Hampshire Superior Court
and that she was not particularly  interested in returning to that
location.   The Trial Court noted its willingness to work with Adams
with respect to her permanent work location.

Independent Counsel, that Liz Travares gave her the names of candidates, in advance of local interviews, that should be advanced to the final interview. Joint Exhibit #3. pp. 139-140. In addition, Ryan indicated that she passed the names of the recommended candidates to the chief probation officers with whom she conducted interviews. Joint Exhibit #3, p. 141.

In the underlying arbitration matter, Arbitrator Grossman found that, prior to the interviews, William Burke, OCP Deputy Director for the Western Region, called Alpers and informed him that Ryan would be on the local interview panel. In addition, Alpers testified that Burke expressed an interest in Pighetti being in the group that would be given a second interview. Joint Exhibit #2(6). The Independent Counsel recorded that "Burke could think of only one chief probation officer, and no assistant chief probation officers, appointed in western Massachusetts who were not previously identified to him as preferred candidates by the Commissioner's office." Joint Exhibit #3, p. 146.

The Grievant and Pighetti were among the finalists for the ACPO positions. The final interviews were conducted by Walsh and Patricia Horne, who worked with

49

the Trial Court's Office of Community Corrections, as a
Deputy Director. Horne testified at the remanded
proceedings, pursuant to subpoena, and explained that
she served on interview panels at the behest of the
OCP, for a week or two at most. Transcript II, pp. 57-
58. Horne further testified that Walsh did not provide
her with the name of the successful applicant in
advance.   Transcript II, p. 60.

Horne served on the final interview panel with
Walsh.   Walsh and Horne's final scores with respect to
the successful applicant and the Grievant were
identical. Each awarded Pighetti 19 out of 20 points,
leading to a 38 point total. Jackson received identical
marks of 11, for a total of 22 points out of 40. Joint
Exhibit #2(6).

The selection process at issue here is an aspect of
the federal indictment issue with respect to the hiring
and promotion situation within the Trial Court.   The
indictment refers to A.P. (apparently in reference to
then-Amy Parente) who was "sponsored for a promotion to
an Assistant Court Officer at the Milford District
Court by a member of the House of Representatives and
the Defendant Burke.   A.P. was not the most qualified

candidate, but was promoted in or about March 2005."
Joint Exhibit #5, p. 14.

Successful Applicant Pighetti argues that the Union
has failed to show that her appointment was arbitrary,
capricious or without a reasonable basis. The Ware
Report records no testimony regarding the final
interview relating to her matter. As a result, this
case is substantially different from the circumstances
considered in the Litton Award. Indeed, Horne, a
member of the final panel, testified that she was never
supplied the name of any preferred candidate in advance
of the interview. Pighetti argues that there is no
evidence of pre-selection in her case.

I disagree. Arbitrator Grossman found that, prior to
the initial local interviews, Deputy Commissioner Burke
called Alpers and indentified his interest in having
Pighetti be in the final interview round. Alpers'
testimony in the underlying arbitration provides an
early indication that Pighetti was a favored, or
otherwise sponsored, candidate.

Horne's testimony, that she was never provided with
the name of the successful applicant, in advance, does
not, necessarily, indicate that the ACPO promotional
process at the Milford District Court involved an

honest comparison of the skills, abilities and

qualifications of the applicants.  Instead, Horne

testified that she served on interview panels, at the

behest of the OCP, for a week or two, at most.  Indeed,

Horne testified that she "believed[d] that they needed

someone of my pay grade to do interviews for them

because their personnel were on vacations and they

wanted to continue doing the interviews."  Transcript,

Vol. II, p. 57.  The record contains no indication that

Horne, an employee within the Office of Community

Corrections, was either familiar with, or well-versed

in, the duties and responsibilities of an ACPO within

the Probation Department.  As a temporary member of a

Probation Department's final interview panel, serving

while others were on vacation, it is unsurprising that

Horne's evaluation and scoring of Pighetti and the

Grievant coincided, exactly, with the marks awarded by

experienced OCP Deputy Commissioner Walsh. Exhibit

#2(6), p. 4. Moreover, Horne, during the remand

arbitration, did not provide any basis for, or

rationale concerning, the selection of candidate

Pighetti.

I am persuaded that the promotional process for the

ACPO position at the Milford District Court was tainted

by pre-selection considerations. Arbitrator Grossman found that then-Deputy Commissioner Burke expressly communicated, to interviewer Alpert, an interest in having Pighetti advance to the final interviews. Ryan, another member of the local interview panel here, also provided testimony to the Independent Counsel that she received names of candidates to be forwarded to final interviews in advance of in the initial interviews.

The balance of evidence does not reflect that the selection for ACPO at the Milford District Court was made on the basis of an honest comparison of the qualifications of the competing applicants. Instead, the record reflects that the process included criteria other than those established by the parties at Article 20.01. As a result, I determine that the contractual rights of Grievant Adamson have been violated.

As remedy, the Trial Court shall conduct a new selection process for the ACPO position at the Milford District Court originally posted in January 2005. Access to the re-selection process shall be limited to the candidates who originally applied for the posted position and who remain employed by the Trial Court -- to the extent they wish to participate. The re-selection process shall be conducted by personnel who

are tainted neither by the general promotion/hiring

scandal at the Probation Department nor by the

particular facts of this underlying case.


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*


Grievant:                     Rachel Joyce

Successful Applicant:         Terence O'Neil, Pro Se

Original AAA No.              11 390 1508 07
                              Joint Exhibit #2(7)


The Trial Court posted an ACPO position for the

Springfield District Court in September of 2006.  The

Grievant, Rachel Joyce, who began working for the Trial

Court in 1995, was one of nine applicants. Prior to her

Probation Department employment, Joyce had a range of

work experience, including serving as an employment

coordinator working with traumatic brain injury

survivors, as a child development specialist and a

senior childcare worker, with supervisory experience.

Joint Exhibit #2(7), pp. 2-3. Terence O'Neil, at the

time of the promotion process, had about four years of

Trial Court experience.  In addition, he had worked for

over 5 years as a Sessions Clerk to the Hampden County

District Attorney and had also served, for about a

54

year, as a Firearms Prosecution Coordinator and School
Safety Liaison with that District Attorney. Joint
Exhibit #2(7), p. 6; O'Neil Exhibit #3.

The local interview panel consisted of First Justice
William Boyle, Chief Probation Officer Morganstern and
Regional Supervisor Nicholas DeAngelis. The Grievant
was ranked second by Judge Boyle, second by Morganstern
and sixth by DeAngelis. O'Neil was Judge Boyle's
seventh choice, DeAngelis' second choice and
Morgenstern's first choice. Joint Exhibit #2(7), p. 4;
Union Exhibit #1.

DeAngelis' testified to the Independent Counsel that
he received names of favored candidates from
individuals within the Commissioner's Office in advance
of every probation officer and assistant chief
probation officer interview panel he sat on while he
was a regional supervisor. According to DeAngelis, he
received the names of candidates who were to advance to
the final interview from Wall, among others. Joint
Exhibit #3, p. 141. DeAngelis further testified that
he regularly passed the names of the favored candidates
on to the chief probation officer sitting on the panel
and, if he knew the judge on the panel, he also passed

the names along to the judge as well. Joint Exhibit #3, p. 143.

O'Neil appeared at the remand arbitration, provided testimony and, by way of argument, spoke in support of his position that the facts and circumstances specific to his appointment are unaltered from those found at the original arbitration. O'Neil, in addition, filed a post-hearing submission, arguing that despite the many revelations contained within the Ware Report, and the specific cases referred to in the federal indictment, his specific promotion has never been referenced in any fashion. As a result, O'Neil seeks to have the original Award affirmed.

Although the Ware Report does specifically address the ACPO promotion Springfield District Court in September of 2006, it contains information directly related to my remand inquiry. DeAngelis testified that he received the names of favored candidates in advance of every assistant chief probation officer interview panel he sat on as a regional supervisor. He also indicated that he regularly passed the names of favored candidates to the chief probation officer on a panel. DeAngelis' testimony establishes the identity of the

Commissioner's preferred candidate must have been known for the 2006 Springfield District Court ACPO position.

In light of DeAngelis' testimony to the Independent Counsel, the scoring by the local panel here is revealing. DeAngelis testified to the effect that, depending on his familiarity with a local judge, he may or may not pass on a favored candidates name to him or her. Here, Judge Boyle ranked Joyce as number 2, while O'Neil was his seventh choice. Both DeAngelis and Morganstern, however, favored O'Neil over Joyce.

DeAngelis' testimony to the independent counsel establishes that every panel he served on was tainted by pre-selection considerations. The rankings afforded at the local level are consistent with a determination that Morganstern and DeAngelis had foreknowledge of O'Neil's favored candidate status, while Judge Boyle, on the other hand, ranked him significantly lower than Grievant Joyce. Finally, DeAngelis indicated that Wall was among the OCP personnel who would contact him with names of favored candidates. Wall was a member of the final interview panel here. As a result, the record provides ample evidence upon which to conclude that the selection process for the ACPO position at the

Springfield District Court was based on criteria other
than those established by the parties at Article 20.01.

As remedy, the Trial Court shall conduct a new
selection process for the ACPO position at the
Springfield District Court originally posted in
September 2006. Access to the re-selection process
shall be limited to the candidates who originally
applied for the posted position and who remain employed
by the Trial Court -- to the extent they wish to
participate.  The re-selection process shall be
conducted by personnel who are tainted neither by the
general promotion/hiring scandal at the Probation
Department nor by the particular facts of this
underlying case.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| Grievant: | Donald Mumford |
| Successful Applicant: | Michelle Williams, Pro Se |
| Original AAA No. | 11 390 2317 05 |
| | Joint Exhibit #2(8) |

In early 2005, a notice was posted for the position
of Assistant Chief Probation Officer for the Roxbury
District Court.  The Grievant, Donald Mumford, who had

been a Trial Court employee for twenty seven years, applied for the position.  Immediately prior to the local round of interviews, the Grievant had shoulder surgery.  Although he was in terrible condition, the Grievant attended the local interview and was among the candidates who made it to the final round. Joint Exhibit #2(8), pp.2-3.

At the underlying arbitration, Mumford testified that he was in great pain during the final interview. However, the record contains no indication that, at the second round of interviews, the Grievant requested a postponement of the interview or otherwise advised the interviewers of his pain level.  Michelle Williams, a Trial Court employee with less seniority, was selected for the ACPO position.

The record here contains no information about the identity of the members of the local interview panel, or the candidates' respective scores and rankings from that panel.  Nor are Wall or Walsh's final interview scores available.

Williams appeared at the remand arbitration and testified.  She received her undergraduate degree from Boston College and received a Master's Degree in criminal justice from the University of Massachusetts

in 1999.  Williams was promoted to ACPO in Roxbury in
2005 and, in March of 2011, she was promoted to the
Chief Probation Officer at the Charlestown District
Court.[14] Transcript, Vol. I, pp-128-130. Williams
testified firmly, and without contradiction, that "she
never participated in any donor list, never
participated in any money schemes that the probation
department has been marred with lately. Transcript,
Vol. I, pp. 129-130.  The Ware Report contains no
reference to the 2005 Roxbury Assistant Chief Probation
Officer promotion process.

The critical question in the underlying arbitration
was whether Grievant Mumford's contractual rights were
violated by a final interview process that occurred
when the Trial Court knew or should have known that
Mumford was incapable of performing at his usual level
of training, skill and ability. Joint Exhibit #2(8), p.
4.  As a result, the arbitration record contains little
information about the local interview panel -- neither
the identity of the interviewers nor their respective
rankings of candidates are known.  There are also few

---

[14] Williams' promotion to Chief Probation Officer occurred after
the issuance of the Ware Report and following Commissioner
O'Brien's departure from Trial Court employment.

details about final interview round, including the candidates' scores.

Although I have determined that a second look at each promotion is warranted, with each examination informed by the Independent Counsel's findings and conclusions, there is just not much on the record on remand with respect to the 2005 Roxbury ACPO promotion process. That record, however, clearly reflects that, after serving as ACPO for about six years, Williams was promoted again, to a Chief Probation Officer position. Her later promotion occurred after the issuance of the Ware Report and after O'Brien's departure from the Probation Department. The inference I draw from Williams' later promotion is that, in the aftermath of the patronage scandal, her skills, abilities and qualifications were carefully considered, and re-evaluated, before she was named a Chief Probation Officer. In the absence of any specific information that the 2005 Roxbury ACPO promotion process was tainted by preselection considerations, and in light of Williams further advancement within the Probation Department in the wake of the patronage scandal, I am not persuaded that there is a sufficient basis, on the remand record, that the ACPO selection process at issue

was based on the criteria other than those established by the parties at Article 20.01. As a result, I do not find that Grievant Mumford's contractual rights have been violated.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Grievant:                    Jeffrey Rideout

Successful Applicants:        Justin Brennan
                             Genarro Moretti

Represented by:              Douglas I. Louison, Esq.
                             Stephen C. Pfaff, Esq.

Original AAA No.             11 390 2331 06
                             Joint Exhibit 2(9)

At issue here is the selection of two applicants for line probation officer positions at Cambridge District Court.  In December 2005, the Trial Court posted vacancies for the position of probation officer at eighteen different courts.  The Grievant, Jeffrey Rideout, having worked for the Trial Court since 1995 and served as an Associate Probation Officer at the Cambridge District Court since 1998, applied for a position at that court. Joint Exhibit #2(9), p. 2. Justin Brennan, another Associate Probation Officer, also applied, as did Genarro Moretti, an Assistant

Coordinator in the Electronic Monitoring Program.
Joint Exhibit #2(9), p.4. All three passed an initial
screening[15] and then participated in a local round of
interviews.

The local panel was comprised of First Justice
Roanne Sragow, Chief Probation Officer Angelo DiNardo
and Regional Supervisor Brian Murphy. After
interviewing fifteen candidates, Sragow and DiNardo
ranked Rideout first, while Murphy ranked him eleventh.
Sragow and Murphy ranked Moretti sixth and DiNardo
ranked him eleventh. Brennan was ranked fifth by
DiNardo, ninth by Sragow, and tenth by Murphy.
Brennan, Moretti and Rideout were all among the
candidates recommended for final interviews. Joint
Exhibit #2(9), p. 5.

The final interviews were conducted by Walsh and
Wall. Wall and Walsh gave the following, identical,
scores: Moretti - nineteen; Brennan-fifteen; and
Rideout - nine. Joint Exhibit #2(9), pp. 5-6.
Subsequently, Moretti and Brennan, the two candidates
with the highest point totals after the final
interviews, were appointed to two Probation Officer
positions at the Cambridge District Court.

---

[15] This initial screening was not performed with respect to ACPO

DiNardo spoke with Rideout after the appointments, indicating, in effect, that he knew that, in general, people get sponsored.  Joint Exhibit #2(9), p. 7. DiNardo, testifying at the underlying arbitration, indicated that he had no knowledge that Moretti or Brennan had personal sponsors. Joint Exhibit #2(9), p. 7.

During the underlying arbitration, Wall and Walsh were each questioned about the selection process. According to Arbitrator Cochran, "Both interviewers deny that anyone ever expressed a preference for any of the candidates to them."  Joint Exhibit #2(9), p. 5. In addition, Cochran stated:  "DiNardo, Wall and Walsh also each testified that no one put pressure on them during the interview process or attempted to influence their recommendations."  Joint Exhibit #2(9), p. 13.

At the remand arbitration, a record of Moretti's campaign contributions, from the Office of Campaign and Political Finance website, was entered.  The record indicates that in early 2005, Moretti made a $125 contribution to Salvatore DiMasi, Union Exhibit #1, a legislator identified in the Ware Report as one of the most frequent sponsors.  Joint Exhibit #3, Appendix 7.

---

promotions.

Murphy, the Regional Supervisor on the local interview panel, provided testimony to the Independent Counsel. Murphy testified that he received names of preferred candidates from the Commissioner's Office with respect to probation officer hiring. Joint Exhibit #3, p. 135. Murphy estimated that he received the names of favored applicants for about 75% of his probation officer interview panels, and that about 75% of the time the preferred candidates moved on to the final round of interviews. Joint Exhibit #3, pp. 136-137.

Moretti and Brennan argue that the evidence proves neither that the Trial Court's appointment decision was tainted by political influence nor that Rideout was the more qualified candidate. The successful applicants assert that the Ware Report is insufficient to establish that the challenged appointments were tainted, as neither is even mentioned in the Report. Moreover, Wall and Walsh testified in the underlying arbitration that, to them, no-one ever expressed a preference for any of the candidates. Nor is there any independent evidence here, according to Brennan and Moretti, that establishes that Rideout was, in fact, a better qualified candidate.

Significantly, however, two members of the local Cambridge District Court panel, where Grievant Rideout worked as an Associate Probation Officer, ranked him as the number one candidate. The Ware Report indicates that, typically, judges serving on the local interview panel were not privy to the identity of favored candidates. The Grievant was Judge Sragow's first choice. Likewise, Chief Probation Officer DiNardo ranked the Grievant first and, after the process, gave him words of consolation. Here, in contrast to the high scored given by individuals who knew the Grievant and worked with him at the Cambridge District Court, Murphy, the OCP Representative, ranked Rideout at #10 out of 15 applicants.

Rideout, who was highly rated by two out of three of the members of the local panel, saw a precipitous drop in his scoring and ranking by the final interview panel. Rideout plummeted to eighth place, out of fifteen candidates. Rideout received only eighteen points, having received identical scores of nine points from both Walsh and Wall.

In light of the information contained within the Ware Report, and light of Walsh and Wall's assertion of their right to remain silent with respect to the remand

proceeding and their declination to clarify matters, I
decline to credit their previous testimony.  Instead, I
focus on the disparity between local scores and
rankings of Grievant Rideout from individuals at the
local level and the scores and rankings of individuals
affiliated with the Office of the Commissioner of
Probation.  At the local level, Rideout was the
candidate of choice of the Presiding Justice and the
Chief Probation Officer.  The OCP Representative, who
conceded, to the Independent Counsel that, in a
majority of cases, he received the names of favored
candidates, scored the Grievant in a manner that was
out of line with his local colleagues.

Then, Wall and Walsh produced candidates scores and
rankings that were markedly different from the
evaluations of the local personnel who actually knew,
and worked with, Grievant Rideout.  The remand record
contains no reliable evidence to justify Brennan and
Moretti's final interview scores, or their ascendance
over Rideout in the final scores.  When viewed as a
whole, the available evidence demonstrates that the
2005 selection process for the probation officer
position at the Cambridge District Court was based on
criteria other than those established by the parties at

67

Article 20.01. I am not persuaded that the selection of probation officers at the Cambridge District Court was made on the basis of an honest comparison the skills and qualifications of the competing candidates. Instead, the record provides a sufficient basis upon which to conclude that the 2005 selection process for probation officers at the Cambridge District Court was based on criteria other than those established by the parties at Article 20.01.

As remedy, the Trial Court shall conduct a new selection process for probation officer positions at the Cambridge District Court as originally posted in 2005. Access to the re-selection process shall be limited to the candidates who originally applied for the posted position and who remain employed by the Trial Court -- to the extent they wish to participate. The re-selection process shall be conducted by personnel who are tainted neither by the general promotion/hiring scandal at the Probation Department nor by the particular facts of this underlying case.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Grievant:                          Robert Santosuosso

Successful Applicant:       Daniel Rourke
Represented By:               Paul F. Kelly, Esq.

Original AAA No.              11 390 0320 06
                                        Joint Exhibit #2(10)

   In January 2005, the Trial Court's state-wide

posting included the position of ACPO in the Concord

District Court.  Nineteen candidates applied, including

the Grievant Robert Santosuosso and the successful

applicant, Daniel Rourke. At the time, the Grievant had

about twenty years more seniority than Rourke.

Transcript Vol. II, p.108.[16]      The initial, local

interview panel consisted of First Justice Robert

McKenna, Jr., Edward Gaffey, Concord Chief Probation

Officer and Regional Supervisor Brian Murphy.  The

Grievant was ranked higher by each member of the local

panel than Rourke, receiving fourth place rankings from

Gaffey and Judge McKenna and being placed second by

Murphy.  Rourke, on the other hand, was ranked eighth

by both Murphy and Judge McKenna and seventh by Gaffey.

Joint Exhibit #2(10), p. 3; Union Exhibit # 1.

---

[16] Indeed, Santosuosso did not appear at the remand proceeding,
having retired from Trial Court employment.

69

Regional Supervisor Murphy provided testimony to the
Independent Counsel.  While Murphy testified that he
received names of preferred candidates from the
Commissioner's Officer for probation officer hiring, he
testified that he did not receive names with respect to
assistant chief probation officer positions. Joint
Exhibit #3, p.135.

Both Rourke and Grievant Santosuosso participated in
the final round of interviews with Walsh and Wall.
Rourke received the highest score, a perfect 40, while
the Grievant received 17 points, giving him a final
round rank of sixth out of the eight interviewed
candidates. Rourke Exhibit #3.

Rourke appeared at the remand proceeding and offered
sworn testimony.  Rourke testified that his sole
political campaign contributions involved giving $50 to
$75 dollars over the years, for a grand total of about
$600, to his cousin, Representative Tom Golden.
Transcript Vol. II, pp. 110, 113-114.   Rourke
indicated that he never spoke with Golden about the
ACPO position in question and that he "never went to
him for anything." Transcript, Vol. II., p. 110.
Rourke testified that he made "zero" campaign
contributions to Speaker DiMasi, Transcript Vol. II, p.

109, and that he neither made political contributions to Representative Nangle nor mentioned the Concord job to him. Transcript, Vol. II, p. 112.

Rourke contends that the Union bears the burden of proving that the specific process that resulted in his selection was arbitrary and capricious and that the rights of Grievant Santosuosso were thereby harmed. Here, according to Rourke, the Union failed to adduce sufficient evidence that the specific process resulting in his selection was arbitrary or capricious. The Ware report alone is insufficient to establish that result. There remains no evidence, apart from the general cloud over the process, that suggests that Rourke's selection was infected with a pre-selection by the Commissioner, much less political patronage.

I find no direct, specific evidence that there were pre-selection considerations at the local interview level in the 2005 ACPO promotion process at the Concord District Court. Regional Supervisor Murphy testified to the Independent Counsel that he did not receive favored names for ACPO positions. Although the local panel favored the candidacy of Santosuosso over Rourke's, neither were any local panelist's top choice. What is clear, however, is that the local panel rated

71

Rourke as either #8 or #7 out of the eight finalists selected to proceed to the final round of interviews.

Then Rourke, whose local interview performance had him ranked at or near the bottom of the ranked candidates proceeding to the next round, then emerged from the final interviews at the top of the list. Indeed, Rourke received identical, perfect marks from both Wall and Walsh.[17]

The discrepancies between Rourke's local and final interview rankings are problematic. Three individuals, with direct knowledge of the local conditions of the Concord District Court and an understanding of the skills, experience and abilities sought at that location, evaluated Rourke's candidacy. Then, two Deputy Commissioners of Probation reached a markedly different conclusion about Rourke's skills, experience and abilities.

Walsh and Wall exercised their rights to remain silent in connection with the remand arbitration. As a result, I am faced with Rourke's unexplained vault from at or near the bottom of the local interview panel's

---

[17]Wall and Walsh afforded the successful applicants identical, perfect marks in the Adamson/Ferrino and Gentile/Zayas matters, too.

eight person list, to the top of Wall and Walsh's list,
having achieved a perfect score.

There are factors here -- including the local to
final round rating discrepancy, Rourke's unexplained
emergence as the top candidate in the final round, and
his receipt of perfect scores from both Wall and Walsh
-- that are troubling.  On the other hand, I note that
Rourke testified, with clarity and without hesitation,
that he did not ask for political assistance with
respect to this promotion.  Nonetheless, Walsh and
Wall's scoring is unexplained and it differs, markedly,
from the local panel's perspective. On balance, it
appears that Rourke's marks from Wall and Walsh were
based on criteria other than those established by the
parties at Article 20.01. I consider the perfect marks,
in the absence of any reasonable or reliable
explanation, under the circumstances here, to be
arbitrary and capricious.  Grievant Santosuosso's
Article XX contractual rights include the ability to
participate in a promotional process that involved an
honest comparison of the qualifications of competing

73

applicants.[18]  I determine that his contractual rights
were violated here.

As remedy, the Trial Court shall conduct a new
selection process for the ACPO position at the Concord
District Court originally posted in 2005. Access to the
re-selection process shall be limited to the candidates
who originally applied for the posted position and who
remain employed by the Trial Court  -- to the extent
they wish to participate.  The re-selection process
shall be conducted by personnel who are tainted neither
by the general promotion/hiring scandal at the
Probation Department nor by the particular facts of
this underlying case.

---

[18]Rourke argues that Grievant Santosuosso's contractual rights have
not been violated because, due to his interview scores, it is clear
that Santosuosso would not have been selected for promotion,
irrespective of Rourke's selection. I disagree, for at least two
reasons.  First, inherent in Article 20.01 is the right to a fair
process, that honestly considers and compares competing candidates'
qualifications, skills and abilities.  Moreover, as the Independent
Counsel has recognized, without the full cooperation of all members
of each interview panel, "it would be impossible to establish what
the unbiased rankings for each position would have been." Joint
Exhibit #3, p. 45. As a result, I decline to rely on the rankings

74

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Grievant:                          Joseph Zavatsky

Successful Applicant:              Elzy Tubbs,
                                   Did Not Appear

Original AAA No.:                  11 300 0160 06
                                   Joint Exhibit #2(11)


A posting for an ACPO position in the Barnstable
District Court was included within a large number of
postings in the winter of 2005.  Twelve candidates for
the position were scheduled for local interviews on
February 2, 2005.  The local panel consisted of First
Justice Joseph Reardon, Chief Probation Officer David
Parke and OCP Representative Ed Dalton.

Dalton provided testimony to the Independent
Counsel, including details about the promotional
process at issue here.  According to Dalton, he
received a number of names of preferred candidates from
Tavares, including Tubbs'.  In addition, Dalton
testified that Zavatsky's name was not to be included
on the list of finalists, as he was blacklisted for
previously grieving employment actions. Joint Exhibit
#3, p. 125.

---

from the final interview here to determine who, if not Rourke,
would have received the promotion.

Yet, Tubbs missed his reserved interview time at the first round panel. The three local panelists deliberated and came up with a list of individuals who would advance to the next interview round. Zavatsky was on the list. Joint Exhibit #2(11), p. 4. Later that day, however, Tubbs appeared and sought to be interviewed. Joint Exhibit #2(11), p.5.

After much deliberation and communication between the local level and the Probation Commissioner's Office, a second panel re-interviewed all of the previously interviewed applicants, with the addition of Tubbs. A new ranking of top applicants occurred, with Tubbs now included, while Zavatsky was excluded. Tubbs was, ultimately, selected for the position. Joint Exhibit #2(11), p. 7.

Tubbs did not appear at the remand proceeding. It appears that Tubbs' 2005 promotion is referred to in the federal indictment, at paragraph 24. Joint Exhibit #5, p. 15.

Dalton's testimony to the Independent Counsel specifically referred to the Barnstable District Court ACPO promotion at issue here. Dalton testified that he received Tubbs names as a favored candidate from Travares. In addition, he was advised that Grievant

76

Zavatsky was not to be included among the finalists.
Joint Exhibit #3, 125. Indeed, after a re-run of the
initial first round interviews, Zavatsky was, in fact,
excluded from participating in the final interview
round.

The record contains conclusive evidence that the
selection of an ACPO for the Barnstable District Court
was not the result of a fair or honest comparison of
the qualifications of the competing candidates.
Instead, the overwhelming evidence establishes that the
selection was based on criteria other than those
established by the parties in Article 20.01. Grievant
Zavatsky's contract rights have been violated.

As remedy, the Trial Court shall conduct a new
selection process for the ACPO position at the
Barnstable District Court originally posted in 2005.
Access to the re-selection process shall be limited to
the candidates who originally applied for the posted
position and who remain employed by the Trial Court --
to the extent they wish to participate. The re-
selection process shall be conducted by personnel who
are tainted neither by the general promotion/hiring
scandal at the Probation Department nor by the
particular facts of this underlying case.

In conclusion, I determine that the rights of
Grievants Adamson, Affonso, Cavanaugh, Gentile, Harder,
Jackson, Joyce, Rideout, Santosuosso and Zavatsky have
been violated in connection with the challenged
employment actions. After examining the evidence in
each case, I am persuaded that each selection process
was influenced by, or based on, criteria other than
those established by the parties at Article 20.01. I
am not persuaded that the selections were based on an
honest comparison of the qualifications of the
candidates, as required by Article 20.01 of the
parties' collective bargaining agreement.

- + -

**AWARD**

The Trial Court violated the rights of Grievants
Adamson, Affonso, Cavanaugh, Gentile, Harder,
Jackson, Joyce, Rideout, Santosuosso and Zavatsky
under the collective bargaining agreement by
appointing the successful candidates in each of
the respective challenged employment actions.

As remedy, the Trial Court shall conduct new
selection processes for the following positions:

-- ACPO, Barnstable District Court, posted in
2005;
-- ACPO, Concord District Court, posted in 2005;
-- ACPO, Hampshire Superior Court, posted in
2005;
-- ACPO, Milford District Court, posted in 2005;

-- ACPO, Plymouth County Juvenile Court, posted in 2005;
--Probation Officer, Cambridge District Court, posted in 2005;
-- ACPO, East Boston District Court, posted in 2006;
-- ACPO, Springfield District Court, posted in March 2006;
-- ACPO, Springfield District Court, posted in September 2006.

Access to the re-selection process shall be limited to the candidates who originally applied for the posted position and who remain employed by the Trial Court -- to the extent they wish to participate.  The re-selection process shall be conducted by personnel who are tainted neither by the general promotion/hiring scandal at the Probation Department nor by the particular facts of each underlying case.

The arbitrator will retain jurisdiction of this matter for a period not to exceed 180 days, unless that period is extended by mutual agreement of the parties.

/s/ Tammy Brynie
Tammy Brynie
Arbitrator
September 17, 2012