```
                    United States District Court
                      District of Massachusetts
```

| | |
|---|---|
| JOSEPH ZAVATSKY,<br>    Plaintiff,<br><br>    v.<br><br>JOHN O'BRIEN,<br>ELIZABETH TAVARES, and<br>ROBERT MULLIGAN,<br>    Defendants. | Civil No.<br>11-11850-NMG |

**MEMORANDUM & ORDER**

**GORTON, J.**

This case emanates from a hiring scandal within the Commonwealth of Massachusetts Probation Department ("the Department"). Plaintiff alleges that defendants discriminated against him on the basis of his political non-affiliation when he was passed over for a promotion. Currently pending before the Court are defendants' motions to dismiss the Amended Complaint.

## I. Factual Background

The following facts are drawn from the Amended Complaint and accepted as true for purposes of resolving the pending motions to dismiss:

Joseph Zavatsky has been employed by the Department as a Probation Officer since 1985. By February 2005, the beginning of the time frame relevant to his Complaint, Mr. Zavatsky had been promoted to the position of Senior Probation Officer. At that

time, defendant John O'Brien served as Commissioner of the Department and oversaw the administration of probation services throughout the Commonwealth. Defendant Elizabeth Tavares served (at different times) as O'Brien's Second and First Deputy Commissioner.

Defendant Robert Mulligan was appointed Chief Justice for Administration and Management ("CJAM") of the Massachusetts Trial Court in 2003. His responsibilities included overseeing the administration of the Department, which is a division of the Massachusetts Trial Court. In that capacity, Chief Mulligan was charged with certifying that the Department complied with the standards for hiring personnel contained in the Personnel Policies and Procedures Manual ("the Policies Manual").

The crux of the plaintiff's grievance lies within events that took place in February, 2005, when he and 11 other candidates applied for a promotion to become the Assistant Chief Probation Officer in Zavatsky's district. Pursuant to the Policies Manual, hiring is merit-based and conducted in two steps. First, an interview committee consisting of a designee of the Commissioner's Office, the Chief Probation Officer of the local district, and the Chief Justice of the particular district court act as an initial screen and select up to eight candidates to advance to a second round of interviews. Final selections are then made from among candidates who advanced to the second round.

Initially, plaintiff was selected to become one of eight finalists to be interviewed for the Assistant Chief Probation Officer position. That decision had, however, been made without consideration of the candidacy of one Elzy Tubbs, a Probation-Officer-in-Charge of a corrections center in the Hyannis District. Mr. Tubbs had failed to appear for his interview before the committee. Purportedly as a result of pressure from defendants O'Brien and Tavares, and with Chief Mulligan's alleged acquiescence, the initial interview committee was dissolved and the process restarted with a second interview committee. The second committee did not advance plaintiff's candidacy to the second round of interviews. Tubbs, meanwhile, was among the eight candidates advanced and was ultimately hired for the position.

Plaintiff alleges that Tubbs succeeded where plaintiff failed because the process was rigged. Plaintiff avers that Commissioner O'Brien directed Tavares and others to circumvent the merits-based process outlined in the Policies Manual in order to advance candidates favored by state legislators (referred to as "sponsors") who could ensure that annual funding requests submitted by the Department and the Trial Court would be approved. O'Brien purportedly maintained a list of favored candidates in order to advance them through the allegedly rigged promotion process. Tubbs, plaintiff asserts, was one such

candidate, having been sponsored by an unnamed legislator with whom defendant O'Brien sought to curry favor.

Plaintiff further alleges that he was not on the list of sponsored candidates, as defendants well knew, because he chose not to affiliate himself with any such politicians or contribute to their campaigns.

Plaintiff discerned the details surrounding Elzy Tubbs' promotion through the release of the Ware Report on November 18, 2010. The Ware Report published the results of an inquiry initiated by the Supreme Judicial Court ("the SJC") in May 2010 to investigate the Department's hiring and promotion practices.

## II. Procedural History

Plaintiff initiated this action by filing a complaint in October, 2011 in which he alleged that defendants' actions, by purportedly passing over plaintiff in favor of an individual with political connections, violated plaintiff's federal and state constitutional rights protected by the Due Process Clause, the Equal Protection Clause and the Massachusetts Civil Rights Act. Extensive motion practice followed in which (1) defendant Chief Justice Mulligan and then-defendant Paul Lucci moved to dismiss the Complaint, (2) plaintiff moved to file an amended complaint, (3) defendants O'Brien and Tavares moved to stay the case pending the resolution of criminal investigations into their actions and

(4) the Commonwealth and the United States moved to intervene and to stay discovery.

In October, 2012 this Court allowed defendants' motions to dismiss in all respects and allowed plaintiff's motion to file an amended complaint with respect to his claims for political affiliation discrimination.  The Court also ruled that, regardless of its ultimate decision concerning the sufficiency of the amended pleadings, discovery would be stayed pending the resolution of pending criminal proceedings.

Plaintiff subsequently filed a two-count Amended Complaint alleging direct political affiliation discrimination by defendants O'Brien and Tavares (Count I) and supervisory discrimination by Chief Mulligan (Count II).  Defendants Tavares and Mulligan duly moved to dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim in November, 2012.  The Court subsequently permitted defendant O'Brien to join Tavares' motion.

### III. **Motions to Dismiss**

Plaintiff's Amended Complaint has not cured the central defect in his pleadings, namely, that his decision not to "affiliate" with unnamed legislators with whom defendant O'Brien sought to curry favor was "political" in nature.  As a result, plaintiff's remaining claims will be dismissed.

### A.   Standard of Review

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), a complaint must contain "sufficient factual matter" to state a claim for relief that is actionable as a matter of law and "plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A pleading that offers mere labels and conclusions or a formulaic recitation of the elements of a cause of action fails to state a claim. Id.

Post-Twombly and Iqbal, ruling on a motion to dismiss involves two inquiries.  First, the Court must assess whether the complaint contains sufficient factual allegations to state a claim for relief and to inform the defendant of the nature of that claim.  In so doing, the Court accepts as true all well-pled (i.e. non-conclusory, non-speculative) facts as true, and draws all reasonable inferences in the non-movant's favor. Schatz v. Republican State Leadership Comm., 669 F.3d 50, 56 (1st Cir. 2012).

Second, the Court must determine whether the claim is plausible.  Assessing plausibility is a

> context-specific task that requires the reviewing court to draw on its judicial experience and common sense [to determine whether the well-pled facts alleged in the complaint are sufficient to] permit the court to infer more than the mere possibility of misconduct.

Iqbal, 556 U.S. at 679.  Apart from well-pled facts, when

determining a claim's plausibility, the Court may also consider implications from documents attached to or fairly incorporated into the complaint, facts susceptible to judicial notice and concessions in plaintiff's responses to the motion to dismiss. Schatz, 669 F.3d at 56.

### B. Political Non-Affiliation Discrimination

The First Amendment prohibits state-sponsored acts of political discrimination or retaliation. Pagan v. Calderon, 448 F.3d 16, 33-34 (1st Cir. 2006). Under the First Amendment, non-policymaking public employees are protected from adverse employment decisions based on their political affiliation. Barry v. Moran, 661 F.3d 696, 703 (1st Cir. 2011). Such protection flows naturally from the principle that "debate on public issues should be uninhibited, robust, and wide-open." Padilla-Garcia v. Guillermo Rodriquez, 212 F.3d 69, 74 (1st Cir. 2000) (quoting Elrod v. Burns, 427 U.S. 347, 357 (1976)). Moreover, that protection extends to the decision not to associate with a political party or faction. Id. at 704 (citing Rutan v. Republican Party of Ill., 497 U.S. 62, 76 (1990)).

To make out a prima facie claim of political discrimination, a plaintiff must show that 1) the plaintiff and defendant have opposing political affiliations, 2) the defendant is aware of the plaintiff's affiliation, 3) an adverse employment action occurred, and 4) political affiliation was a substantial or

motivating factor for the adverse employment action. Welch v. Ciampa, 542 F.3d 927, 938-39 (1st Cir. 2008). Once the plaintiff establishes a prima facie claim, the burden shifts to the defendant to demonstrate, by a preponderance of the evidence, that it would have taken the same adverse employment action even in the absence of the protected conduct. Barry, 661 F.3d at 704.

Not all affiliations, however, trigger First Amendment protection. See id. at 704 ("[M]ere personal association without political overtones does not implicate First Amendment concerns."). Rather, the burden is on the plaintiff to show that the affiliation or refusal to affiliate is "political in nature or implicate[s] some other constitutional concern." Id.

"Political" in this context means pertaining to the conduct of government, public policy or policy controversies. Id. There is no "mechanical test" for determining whether an association is sufficiently political to trigger First Amendment protections. Id. at 705. Supporting a political candidate, as a member of a campaign or in an administration, provides the archetypal political affiliation. See id. at 704 (collecting cases). Similarly, remaining neutral during a contested election constitutes a protected form of non-affiliation. See Welch, 542 F.3d at 940-41 (termination, if based upon employee's decision not to participate in recall election, would violate First Amendment).

By contrast, an employment decision motivated by cronyism, rather than discrimination, is "lawful, though perhaps unsavory." Barry, 661 F.3d at 708 (citation omitted).  As the Second Circuit has opined, "back-scratching, log-rolling, horse-trading, institutional politics, envy, nepotism, [and] spite" are not illegal motivations for employment decisions. See id. at 708 (citing Stratton v. Dep't for the Aging for City of New York, 132 F.3d 869, 880 (2d Cir. 1997)).

### C.  Application

Plaintiff principally accuses Commissioner O'Brien of advancing applicants affiliated with "political leaders," i.e. state legislators in a position to influence the funding of the Trial Court and the Department.  Hence, Elzy Tubbs and other applicants who purportedly benefitted from the Department's rigged hiring process were "politically affiliated" because they were connected to and recommended by a legislator.

Notably absent from plaintiff's allegations is any discussion of political activity or "debate on public issues," the protection of which motivates the doctrine of political affiliation discrimination. See Padilla-Garcia, 212 F.3d at 74. Instead, Zavatsky avers that the decision of Department employees to affiliate with certain legislators, and his decision not to, had everything to do with their desire to obtain a promotion. The desire to "curry favor" with one's superiors, and,

necessarily, the desire not to do so, are not political activities protected by the First Amendment. See Rojas-Velazquez v. Figueroa-Sancha, 676 F.3d 206, 211 (1st Cir. 2012) (discrimination based upon "successful professional relationships" does not implicate the First Amendment).

Likewise, the purported desire of defendants to hire candidates sponsored by influential legislators has no constitutional ramifications.  Here, it is significant that defendants allegedly made no distinction among the political affiliations or the beliefs of the sponsors.  The only thing that mattered was the sponsor's proximity to the purse strings. Although, as Zavatsky claims, such an allegation "pertains to government" in the literal sense because it involves elected officials and the budget of a state agency, without more, the allegation does not implicate political expression or public debate.

To be sure, the funding of the Department could be a matter of public debate and concern, particularly if the Department were not receiving sufficient funds to perform essential functions. Cf. Foley v. Town of Randolph, 598 F.3d 1, 5-6 (1st Cir. 2010) (claim of fire department chief that declining funding impacted department's effectiveness could be First Amendment protected speech).  But, on their face, funding and budgets are issues germane to all organizations and do not necessarily assume a

political character.  Absent any well-pled allegations suggesting that defendants sought funding for a particular purpose or that there was any public debate surrounding the budget of the Department, the Court cannot plausibly infer that defendants passed over plaintiff on the basis of his political non-affiliation.  Instead, the compelling inference to be drawn is that defendants wanted to protect their turf and promoted candidates affiliated with sponsors from either party who could do so.  Rather than implicate any expression protected by the First Amendment, such actions constitute the sort of "back-scratching, log-rolling [and] horse-trading" that certainly qualify as unsavory but otherwise are deemed constitutionally permissible. See Barry, 661 F.3d at 708.

Plaintiff contends that the instant case is distinguishable from Barry because, unlike the individuals promoted in that case, Tubbs and others lacked personal relationships with the so-called sponsors but ingratiated themselves through campaign contributions and volunteer activities.  The allegations in the Amended Complaint in that respect are wholly conclusory; plaintiff simply avers that he was "apolitical" and that Tubbs was not.  It is just as likely that Tubbs' relationship with his sponsor resulted from a personal connection as from political activities.

Even if the Court credited those allegations, however, the

fact that Tubbs' relationship with his sponsor was political is insufficient to suggest more than the "mere possibility of misconduct." Iqbal, 556 U.S. at 679.  It is clear from plaintiff's other allegations, and from the Ware Report generally, that defendants did not care how candidates secured support from legislators or found their way on to the "Sponsor's List."  Under those circumstances, it is implausible to infer that campaigning, donating or otherwise engaging in First Amendment protected conduct of some kind was a requirement for the promotion. Cf. id. (distinguishing between public official who hires personal contacts and one who refuses to hire "those who failed to make campaign contributions, join her political party or attend political rallies").

Accordingly, when Zavatsky alleges that he deliberately chose to remain "apolitical" by choosing not to pursue a sponsor, and that defendants were aware of that fact, it is not plausible to infer that any resulting discrimination infringed rights protected by the First Amendment. Cf. Rojas-Velazquez, 676 F.3d at 211 (dismissing First Amendment claim where defendants' alleged motivation for adverse employment action was not based in plaintiff's party membership, support for party candidates or advocacy of party policies).  This conclusion is further sustained by the absence of circumstances supporting claims for political affiliation discrimination, such as a "charged

political atmosphere" or the particular relevance of a campaign, candidate or election. See id. at 704 (collecting cases).

### ORDER

In accordance with the foregoing,

1) the motion to dismiss filed by defendants Tavares and O'Brien (Docket No. 60) is **ALLOWED,**

2) the motion to dismiss filed by defendant Chief Justice Mulligan (Docket No. 64) is **ALLOWED,** and

3) the case is **DISMISSED.**

**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated September 11, 2013